# IN THE

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>DOUGLAS CHRISMAS,<br><br>Defendant-Appellant. | ) C.A. No. 25-324<br>) D.C. No. 2:21-cr-00127-MCS-1<br>) (Central Dist. Cal.)<br>)<br>) **GOVERNMENT'S**<br>) **OPPOSITION TO**<br>) **DEFENDANT'S MOTION FOR**<br>) **BAIL PENDING APPEAL**<br>) **UNDER CIRCUIT RULE 9-1.2**<br>)<br>) |

Plaintiff-Appellee United States of America, by and through its counsel of record, hereby opposes Defendant-Appellant Douglas Chrismas' Motion for Bail Pending Appeal.

This opposition is based on the attached memorandum, the exhibits attached hereto, the exhibits previously filed by defendant, the files and records in this case, and such further argument or evidence as may be presented to the Court.

///

///

Defendant is not in custody. He was ordered to self-surrender on or before March 3, 2025 at noon, but this Court granted defendant's motion for a temporary stay of the self-surrender date until the Court rules on the instant motion.

DATED: March 7, 2025

Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

/s/ *Valerie L. Makarewicz*

VALERIE L. MAKAREWICZ
Assistant United States Attorney
Major Frauds Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

For several decades, defendant Douglas Chrismas was the president and sole shareholder of an art gallery in Los Angeles that did business under the name "Ace Gallery." In February 2013, on behalf of Ace Gallery, defendant filed for Chapter 11 bankruptcy protection. Defendant continued to manage the debtor's day-to-day business as fiduciary for the bankruptcy estate until April 2016, when the bankruptcy judge appointed an independent trustee to oversee and manage the bankruptcy estate, as part of the plan confirmed by the bankruptcy court.

Just prior to the appointment of the independent trustee, defendant embezzled, spent, and transferred $264,595 from the bankruptcy estate via three separate transactions. Defendant used that money to benefit a wholly separate non-profit corporation, Ace Museum, of which he was the chief executive and financial officer. A jury convicted defendant of three counts of embezzlement from a bankruptcy estate, in violation of 18 U.S.C. § 153.

Defendant's motion for bail pending appeal should be denied

because, as the district court correctly concluded, defendant has not raised a substantial question on appeal. Primarily, the district court correctly instructed the jury because defendant misinterprets § 153 as requiring the government to prove that defendant transferred money belonging to the bankruptcy estate for his own use. Defendant knowingly embezzled funds belonging to the bankruptcy estate by transferring them without authorization of the bankruptcy court, even if those funds were not for his own use. Nor was there a constructive amendment, as the jury instructions narrowed, rather than broadened, the indictment. Furthermore, although the district court made no finding on the issue of flight, defendant—a citizen of Canada who violated his bond conditions—has not established by clear and convincing evidence that he is not a flight risk.

## II. BACKGROUND

### A. Offense Conduct

For several decades, defendant served as the president and chief executive officer of Art and Architecture Books of the 21st Century, d.b.a. Ace Gallery ("Ace Gallery"), a gallery that sold art in Los Angeles.

In his role, defendant had control over Ace Gallery's operations, including its financial operations.

In 2006, defendant incorporated Ace Museum as a California nonprofit. Defendant, as Ace Museum's director, entered into a lease to rent its location, a 59,000 sq. foot building at 400 S. La Brea Avenue in Los Angeles. The lease contained a provision that allowed Ace Museum the right to purchase the location if certain conditions were met.

In February 2013, Ace Gallery filed for Chapter 11 bankruptcy in the Central District of California, with defendant serving as the trustee of the debtor-in-possession. (PSR ¶ 10.)[1] When Ace Gallery filed a voluntary petition for bankruptcy, a bankruptcy estate was created, which included all the property owned by Ace Gallery as well as its claims on or rights to other property, no matter where the property was or who possessed it when the bankruptcy case began. (PSR ¶ 11.)

---

[1] "CR" refers to the Clerk's Record in the district court. "Mot." refers to the instant Motion for Bail Pending Appeal. "GEX" refers to the exhibits filed concurrently with this opposition. "PSR" refers to defendant's Presentence Report, which is being filed under seal concurrently with this opposition.

Shortly after the bankruptcy filing, defendant began embezzling millions of dollars from Ace Gallery, stealing the proceeds of Ace Gallery's art sales. (GEX 44-166.) For example, defendant redirected the proceeds from selling about 158 pieces of art away from Ace Gallery. (GEX 46-47.) Some of the money defendant stole from the bankruptcy estate was used to pay rent for Ace Museum. For example, after the bankruptcy was filed in 2013, defendant sold a piece of Ace Gallery art called Flor De Incino for $172,000; he then used $150,000 of the proceeds to pay for Ace Museum's rent. (GEX 46-47, 87.)

Some of the stolen money was used for other purposes too, including defendant's personal expenses. For instance, in June 2015, defendant used $1,414 from Ace Gallery's bankruptcy estate to pay the property taxes on a piece of land in Topanga Canyon on which he held title. (GEX 10-14.)

While defendant embezzled $14,243,884 from art sales, he "repaid" some of the stolen monies to Ace Gallery. For example, as described above, Ace Museum used $150,000 of the proceeds from the Flor De Incino sale for its own rent. But the museum then sent $15,000 back to Ace Gallery, giving the appearance that it had assets of its own,

4

even though those assets really belonged to Ace Gallery in the first place. After accounting for these "repayments," the net amount of embezzled money was $12,809,192. (GEX 47, 147-48 n.8.)

With all this embezzlement, Ace Gallery failed to make headway in clearing its debts. (GEX 47.) Therefore, its creditors eventually asked the bankruptcy judge to appoint an independent trustee to manage the business, and the court did so, naming Sam Leslie to fill that role in early 2016. (*Id.*)

However, shortly before Leslie took over, defendant embezzled a final $264,595 from the estate. Defendant sold four pieces of art from the inventory of Ace Gallery—pieces that were property of the estate under the Bankruptcy Code. Like many of the prior acts of embezzlement, these transactions were part of defendant's effort to use Ace Gallery money to pay the rent for Ace Museum. First, defendant wrote a $50,000 check directly to Ace Museum drawn against the bankruptcy estate's debtor-in-possession account (Count 1; GEX 3.) Second, defendant directed one purchaser of the art he sold from the estate to send $100,000 to Ace Museum, although those funds belonged to the bankruptcy estate (Count 2; GEX 3.) Third, defendant directed a

second purchaser of art to send $114,595.32 to the landlord of 400 S. La Brea, when again, that money was actually owed to (and owned by) the bankruptcy estate (Count 3; GEX 3.) The same day the check in Count 1 and the $100,000 from Count 2 were deposited into Ace Museum's account, defendant wired $150,000 to the landlord of Ace Museum. That amount, coupled with the direct wire of $114,595.32 to the landlord of Ace Museum, satisfied Ace Museum's April 2016 rent. (PSR ¶¶ 12-14.)

## B. Indictment and Jury Instructions

The indictment charged defendant with three counts of violating 18 U.S.C. § 153, embezzlement from a bankruptcy estate. That statute applies, in relevant part, to a trustee who:

> knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property . . . belonging to the estate of a debtor . . . .

The indictment charged all four verbs (appropriates to the person's own use, embezzles, spends, or transfers) in the conjunctive. (GEX 1-3.)

At trial, however, the government chose not to proceed on an "appropriated to the person's own use" theory; rather, the government narrowed the indictment and proceeded only on a theory that defendant

6

embezzled, spent, or transferred property belonging to the bankruptcy

estate. Accordingly, the district court gave the following charge with

respect to the elements:

> It's a Federal crime for the trustee or custodian of a bankruptcy estate to knowingly and fraudulently embezzle any property belonging to the bankruptcy estate.
>
> The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
> (1) On or about the date charged, a bankruptcy case docketed as <u>In Re: Art and Architecture Books of the 21st Century, d.b.a. Ace Gallery</u>, Case Number 2:13-bk-14135-RK was pending in the United States Bankruptcy Court for Central District of California, and Art and Architecture Books of the 21st Century, d.b.a. Ace Gallery was the Debtor;
>
> (2) the property or interest described in the indictment was part of the bankruptcy estate of the Debtor;
>
> (3) the defendant had access to the property as a trustee or custodian of the bankruptcy estate; and
>
> (4) the defendant knowingly and fraudulently embezzled, spent, or transferred property belonging to the bankruptcy estate.
>
> A "Debtor" is a person or corporation that's the subject of a Federal bankruptcy case.
>
> When a debtor files a voluntary petition for bankruptcy, the bankruptcy estate is created. Among other things, it includes all the property owned by the Debtor and the Debtor's claims on or rights to other property, no matter where the property is or who possessed it when the bankruptcy case began.

> The Bankruptcy Court for the Central District of California has the authority and power to appoint a custodian or trustee to administer the bankruptcy estate of a Debtor. The custodian or trustee is responsible for the control of all the property belonging to the bankruptcy estate.
>
> The heart of the charge in the indictment is the knowing and fraudulent embezzlement or appropriation of property belonging to the Debtor's estate.
>
> "Fraudulent" means to knowingly deceive or mislead someone, usually for personal gain.
>
> To "embezzle" means to wrongfully take someone's property and spend it, or transfer it.
>
> If you find the Defendant committed embezzlement, intent to repay or return property is not a defense.

(GEX 22-23.)

Defendant objected to element 4 of the instruction on the ground that the statutory language "to the person's own use" applies to all the terms in the series, not only to "appropriate," and argued that element 4 of the instruction should read, "the defendant knowingly and fraudulently embezzled, spent, transferred, or appropriated *to the Defendant's own use* property belonging to the bankruptcy estate." (GEX 7-8 (defendant's proposed addition in italics).) Defendant also argued that his additional language was required because embezzlement means to appropriate or convert to one's own use

another's money or property, of which the wrongdoer acquired possession lawfully. (CR 160.) Defendant sought to present a defense that he was not guilty because the charged transactions took place for the eventual benefit of Ace Gallery rather than for his own use.

The district court rejected defendant's "tortured" reading of the statute and ruled that the "to a defendant's own use" language applied only to appropriation, a theory the government did not pursue. (GEX 15-21.) The court thus precluded defendant from arguing that he evaded liability under the statute on the basis that he did not transfer, spend or embezzle funds from the bankruptcy estate for, or to, his own use. "This defense is not legally available to him." (GEX 21.)

## C. Sentencing and Motion for Bail Pending Appeal

The Presentence Report calculated an advisory Guidelines range of 121-151 months, based on offense level 32 and criminal history category I. (PSR, p. 3.) The district court agreed with the PSR's Guidelines calculation. (GEX 204-210.) The district court varied substantially downward, imposed a sentence of 24 months' imprisonment, and ordered defendant to pay restitution to the trustee in the amount of $12,809,192. (CR 242; GEX 204-210.)

The court ordered defendant to self-surrender on February 17, 2025, and later extended the date to March 3, 2025, the date of the hearing on defendant's motion for bail pending appeal. (CR 242, 250.) On March 3, the district court denied defendant's bail motion, finding that he had failed to present a substantial question. (CR 265; GEX 221.) The court did not rule on whether defendant was a flight risk. (*Id.*) The district court indicated that a separate and more detailed order would follow.

The district court ordered defendant to report to the U.S. Marshals at noon, which led to defendant's emergency motion for a stay of the district court's order pending this Court's determination of his bail motion. (*Id.*) This Court granted the stay.

## III. ARGUMENT

### A. Standard for Bail Pending Appeal

A defendant is ineligible for bail pending appeal unless (1) he proves "by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community if released"; and (2) his appeal raises "a substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence

that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1).

Defendant's motion for bail pending appeal does not satisfy any of these requirements. As explained below, he has failed to establish a substantial question regarding his convictions or sentence and he remains a flight risk.

## B. Defendant Has Failed to Establish a Substantial Question

A "substantial question" refers to a legal issue that is "fairly debatable" or "fairly doubtful," and is of more substance than would be necessary to a finding that it is not frivolous. *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985). "Fairly debatable" questions are those that are novel or not readily answerable, or that pose issues "debatable among jurists of reason." *Id.* at 1281-82 (quotation marks omitted). While this standard does not require that reversal be more likely than not, *id.* at 1280-81, neither is it so toothless that it eviscerates Congress' intent to "tighten[] the standards for bail pending appeal," *id.* at 1283.

### 1. The jury instructions were correct and did not deny defendant a legally available defense

Defendant reprises his argument that section 153 requires the government to prove that a defendant took property of the bankruptcy estate *for his own use or benefit*.

A plain, grammatical, and logical reading of the statute makes clear that the phrase "to the person's own use" follows only the verb "appropriates" and modifies only that verb. It does not modify any of the other verbs (embezzles, spends, transfers). Thus, it is not an element of the offense except with respect to a theory of appropriation. Because the government did not proceed on an appropriation theory, the government was not required to prove that defendant acted for his own use or benefit.

This reading is also consistent with the pertinent canons of statutory construction. The "rule of the last antecedent" provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *accord Lopez v. Gonzales*, 549 U.S. 47, 56 (2006) ("the last thing" statutory interpretation should do is "divorce a noun

12

from the modifier next to it without some extraordinary reason"). Applying this canon to section 153(a), the statute lists a series of four verbs: to [1] appropriate, [2] embezzle, [3] spend, or [4] transfer. 18 U.S.C. § 153(a). The phrase "to the person's own use" immediately follows "appropriate." It does not follow any of the other verbs. It therefore does not modify any of the other verbs. *Lockhart*, 577 U.S. at 351.

The scant available caselaw also supports the district court's interpretation. In *United States v. Love*, 17 F. App'x 796 (10th Cir. 2001),[2] a company called FACC was in bankruptcy. The "principals of FACC, and specifically [the defendant] Love, transferred money to accounts of FACC's alter ego, Impact, in order to conceal FACC's property from its creditors." *Id.* at 800. In affirming Love's § 153(a) convictions, the Tenth Circuit observed, "[W]e do not read . . . § 153 to require appropriation of funds to one's own use; the plain language of the statute prohibits knowing and fraudulent embezzlement, spending,

---

[2] The Tenth Circuit permits citation to its pre-2007 unpublished decisions. *See* 10th Cir. R. 32.1(A).

transference, etc., whether or not such activity is occasioned toward the offender's own use." *Id.*

Furthermore, the district court's interpretation is consistent with authority from this Court holding that an intent to repay embezzled funds is not a defense to embezzlement because the crime is complete when the embezzlement occurs. *United States v. Ross*, 206 F.3d 896, 899 (9th Cir. 2000) (collecting cases). That was essentially defendant's proposed defense here. His defense was that by paying Ace Museum's rent with funds from the bankruptcy estate of Ace Gallery, defendant preserved the possibility that he could at some future point find $30 million to purchase the property that housed Ace Museum, and then sell Ace Museum at an enormous profit and utilize the profit to pay off the debts of Ace Gallery.

Finally, the government's and district court's interpretation that defendant embezzled funds by transferring them without authorization from the bankruptcy court comports with the common law definition of embezzlement. *See In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010) ("It is knowledge that the use is devoid of authorization, scienter for short,

that makes the conversion fraudulent and thus embezzlement.")
(internal citation omitted).

Accordingly, the district court's interpretation of section 153 and
the jury instructions it gave were correct and did not deny defendant a
legally available defense.

### 2. There was no constructive amendment of the indictment

"Constructive amendment and variance are based on the 'rule that
after an indictment has been returned its charges may not be broadened
through amendment except by the grand jury itself.'" *United States v.
Wilbur*, 674 F.3d 1160, 1177 (9th Cir. 2012) (quoting *Stirone v. United
States*, 361 U.S. 212, 215-16 (1960)). A constructive amendment of an
indictment "occurs when the charging terms of the indictment are
altered, either literally or in effect, by the prosecutor or a court after the
grand jury has last passed upon them." *Id.* at 1177-78 (cleaned up). "A
variance occurs when the charging terms of the indictment are left
unaltered, but the evidence offered at trial proves facts materially
different from those alleged in the indictment." *Id.* at 1178 (cleaned
up).

The government did not constructively amend the indictment when, at trial, it proved defendant knowingly and fraudulently embezzled, spent, or transferred property belonging to the bankruptcy estate and chose not to proceed on a theory that defendant appropriated money belonging to the estate for his own use. "[C]onstructive amendment only applies to the broadening, rather than the narrowing, of indictments." *United States v. Wilbur*, 674 F.3d 1160, 1178 (9th Cir. 2012). As *Wilbur* explained:

> In *United States v. Miller*, the Supreme Court rejected a claim of constructive amendment where the complaint was "not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary." 471 U.S. 130, 140 (1985). In that case, Miller was indicted for various fraudulent acts in connection with a burglary at his place of business. *Id.* at 131. Proof at trial concerned only one of the many alleged fraudulent acts. *Id.* at 132. The Court specifically rejected the argument that "it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it." *Id.* at 144.

*Wilbur*, 674 F.3d at 1178.

Here, by eliminating one of the four charged means of violating the statute, the government did not expand or broaden the indictment and did not proceed to convict defendant on any theory or facts for

16

which defendant was not charged. Defendant was charged with knowingly and fraudulently embezzling, transferring or spending property of the bankruptcy estate, and that is what the government proved at trial. By eliminating the "appropriated for one's own use" means, the government and district court narrowed the indictment, not broadened it. Under *Miller* and *Wilbur*, there was no constructive amendment.

### 3. *No substantial question exists regarding the government's witness.*

Government witness David Richardson was counsel to the committee of unsecured creditors in the bankruptcy. As the district court noted in its opinion denying defendant's post-trial motions, aside from some explanation about what a bankruptcy estate is and explaining what debtors, creditors, and debtors-in-possession are, the district court excluded the kind of expert testimony of which defendant now complains. (GEX 178-179.) Richardson's percipient testimony described what he had observed about defendant and Ace Gallery in the course of his investigation and reading documents with which he was familiar. Other than basic bankruptcy terminology, Richardson gave no opinion, expert or lay. Defendant frequently raised objections, many of

17

which the court sustained, or the court required the government to rephrase its question or move on in its line of questioning. (*Id.*)

Defendant's reliance on *United States v. Holmes*, –F.4th–, 2025 WL 583307 (9th Cir. 2025), is misplaced. *Holmes* reaffirmed that "whether evidence is more properly offered by an expert or a lay witness depends on the basis of the opinion, not its subject matter." *Id.* at *6 (cleaned up). "If the basis of a witness's opinion is 'technical or specialized knowledge,' then that opinion falls within Rule 702. But if the basis of the opinion is 'just familiarity with the subjects,' then it is proper lay opinion under Rule 701." *Id.* (cleaned up). As defendant notes, *Holmes* explained that "[t]he fact that a witness personally observes a matter does not take the witness's opinion about that matter outside the scope of Rule 702 if that opinion is the product of '*specialized* knowledge.'" *Id.* at *7 (citation omitted). At the same time, however, "an opinion is not automatically deemed 'expert' within the meaning of Rule 702 merely because it is offered by a lay witness drawing on their own unique experiences or personal knowledge." *Id.*

*Holmes* held that testimony of a laboratory director who conducted a comprehensive statistical analysis of data collected from various

sources and interpreted the results "was clearly based on highly specialized knowledge," and thus was expert testimony. *Id.* at \*8. Likewise, testimony of other laboratory directors about the results of testing of the defendant's medical device stemmed from specialized scientific training and experience in clinical labs; it went beyond the common knowledge of an average layperson and thus amounted to expert testimony. *Id.* at 9-10.

Here, in contrast, Richardson did not provide expert testimony by explaining to the jury terms like "debtor-in-possession," "estate," and "ordinary course of business." *See Gadson*, 763 F.3d at 1212 (finding no error "when an agent who is providing lay testimony also interprets a few drug terms in the context of discussing personal observations"). And Richardson's testimony as to the steps he took, as part of his job, in reviewing documents to conclude that defendant diverted money from the estate (GEX 24, 29-32) was not based on highly specialized knowledge and did not concern a subject that the average juror was incapable of understanding.

Even if any isolated statement veered into expert testimony, it was harmless. In *Holmes*, this Court found that the error in admitting

19

expert opinions through the government's lay witnesses was harmless because the witnesses would have qualified as experts to deliver the disputed testimony. 2025 WL 583307 at *8 (citing *United States v. Holguin*, 51 F.4th 841, 855-56 (9th Cir. 2022)). The same is true of Richardson here. *See id.* ("experience alone" can be a reliable basis for expert testimony).

Further, the court was attuned to defendant's objections as to Richardson's testimony and utilized its position as gatekeeper for any potential "expert" testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The court showed sensitivity to defendant's concerns, even sustaining objections to questions where no expert testimony was solicited. (*See*, *e.g.,* GEX 25-26 (regarding consignments).) At other times, the court reasonably required the government to reformulate its question. (GEX 27-28.)

For these reasons, defendant has failed to meet his burden of demonstrating that Richardson's testimony raises a substantial question likely to result in reversal or an order for a new trial.

### 4. The loss calculation does not present a substantial question

In the bankruptcy case, the bankruptcy court issued a report and recommendation that granted the trustee's claims against defendant for conversion and breach of fiduciary duty. The bankruptcy court determined that based on the trustee's forensic accounting report, defendant was liable to the estate for $14,243,884. (GEX 60, 147-48 n.8, 160-66 (*Leslie v. Ace Gallery New York Corporation, et al.*, Bankruptcy Case No. 2:13-bk-14135-RK; Adversary No. 2:15-ap-01679-RK).) The bankruptcy court found that the amount of debtor's funds diverted was $12,809,192. In addition, the bankruptcy court adjusted this net amount of diverted funds upwards by $1,434,692 because Ace Museum "repaid" this amount to the debtor, which was credited against the outstanding loan by the debtor to Ace Museum. *Id.* The bankruptcy court found that Ace Museum should not be credited with a repayment of its loan for this amount because these funds were debtor's sales proceeds, that is, Ace Museum was using debtor's money to repay its loan to the debtor. *Id.*

The bankruptcy court referred the matter to the district court. That court adopted the report and recommendation and entered a final

21

judgment in the amount of $14,243,884 against defendant. *Leslie v. Ace Gallery New York Corporation, et al.*, Case No. 2:22-CV-01265-PA, Dkt. 1, 2, 7-9.

In defendant's criminal case, the government calculated the loss as $12,809,192 by allowing for the $14,243,884 net loss (as found in the civil case) to be reduced by the $1,434,692 that defendant "returned" to the debtor. *See* USSG § 2B1.1, comment. (n.3(D)) ("Loss shall be reduced by . . . [t]he money returned . . . to the victim before the offense was detected."). Defendant argued that the loss should be zero, reiterating his trial theory that the money diverted from the estate was for the "use and benefit" of debtor because paying the Museum's rent preserved the purchase option and could ultimately benefit the gallery. The Probation Office agreed with the government. (PSR ¶¶ 18, 99; CR 237.)

The district court also agreed with the government and PSR and found, including relevant conduct, that the loss was $12,809,192. (GEX 204-210.) Thus, contrary to defendant's contention, the court *did* credit defendant with the money he "returned" to the estate.

Defendant contends the uncharged loss should not have been included because the indictment did not charge a scheme (Mot. 21), but the Guidelines do not require that a scheme or conspiracy be charged. The Guidelines provide that with respect to offenses such as this one where § 3D1.2(d) would require grouping of multiple counts, relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan." USSG § 1B1.3(a)(2).

Finally, even if some further repayments should have been credited against loss—and there was no basis to do so—defendant cannot show a substantial question likely to result in a reduced sentence to a term of imprisonment less than the expected duration of the appeal process. At sentencing, the bankruptcy judge, who had referred the case for criminal prosecution to the government, submitted a victim impact statement regarding the need to maintain integrity within the court system and the intangible harm defendant's actions had upon the bankruptcy court and creditors. (GEX 37-40.) In explaining the below-Guidelines sentence, the district court commented that it had to balance the crime defendant committed and the concerns of the creditors against mitigating factors including defendant's age and

the fact that defendant did not use the embezzled money to live a luxury lifestyle. (GEX 207-210.) Considering all the factors, the court varied downward significantly and imposed a sentence of 24 months. Based on the court's reasons, there is no basis to believe that it would impose a different or shorter sentence even if the Guideline range was somewhat lower.

## C. Defendant Is A Flight Risk

Defendant must be detained pending appeal unless he can show "by clear and convincing evidence that [he] is not likely to flee" if released. 18 U.S.C. § 3143(b)(1)(A). Although the district court made no finding on this issue, defendant has not made the necessary showing.

First and foremost, defendant is a Canadian citizen who will be deported to that country after service of his sentence. Although defendant is a lawful permanent resident of the United States (PSR p. 2), an alien who is convicted of an "aggravated felony" is subject to deportation. 8 U.S.C. § 1227(a)(2)(A)(iii). A fraud offense for which the loss exceeds $10,000 qualifies as an aggravated felony, 8 U.S.C. §1101(a)(43)(M), and here, the loss attributed to the counts of conviction alone is well over the $10,000 threshold, as defendant admitted at

24

sentencing. (GEX 187-188.) Accordingly, defendant will be stripped of his green card and deported to Canada upon the completion of his sentence. Thus, even if defendant desperately wanted to remain in the United States after he serves his sentence, it would make no difference: he simply cannot. His choice is to remain in the United States and face two years in prison followed by deportation to Canada, or to "self-deport" to Canada or any other country he prefers, thereby saving himself prison time and deportation proceedings. It would be irrational for defendant to stay in the United States to face justice.

Furthermore, defendant has a history of failing to comply with court orders. Contrary to defendant's assertion that he has had no incidents while being on release, in May 2024, defendant's bail was revoked. (CR 124.) He was incarcerated for five days, after which the district court allowed him to be released with increased conditions regarding his financial disclosures and transfers. (CR 139-141.)

Additionally, defendant is no longer operating the gallery and earning the $30,000 monthly gross salary he reported in the PSR (PSR ¶¶ 65, 75); rather, he qualifies for appointed counsel. Defendant also reported having over $18 million in liabilities. (PSR ¶ 75.) By fleeing

the United States, defendant escapes all of that debt and can begin again in the commercial art world. Despite his protests otherwise, fleeing the United States is a genuine option for defendant.

Accordingly, defendant has failed to meet his burden of demonstrating by clear and convincing evidence that he is not a flight risk. His bail motion should be denied on this ground as well.

## IV. CONCLUSION

Defendant's motion for bail pending appeal should be denied.

DATED: March 7, 2025                    Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

/s/ *Valerie L. Makarewicz*

VALERIE L. MAKAREWICZ
Assistant United States Attorney
Major Frauds Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the 5,600-word length limit permitted by Ninth Circuit Rules 27-1(1)(d) and 32-3(2) because the brief contains 4,957 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.     This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: March 7, 2025          */s/ Valerie L. Makarewicz*

                                                  VALERIE L. MAKAREWICZ
                                                  Attorney for Plaintiff-Appellee
                                                  UNITED STATES OF AMERICA

# GOVERNMENT'S EXHIBITS

# GOVERNMENT'S EXHIBITS

**DESCRIPTION**                                                   **PAGE**

1.  INDICTMENT,
    filed March 15, 2021,
    Docket No. 1.................................................................... 1

2.  JOINT PROPOSED JURY INSTRUCTIONS,
    filed September 18, 2023,
    Docket No. 45................................................................... 4

3.  DEFENDANT'S OPPOSITION TO GOVERNMENT'S
    INTERPRETATION OF JURY INSTRUCTIONS 31,
    filed May 6, 2024,
    Docket No. 117................................................................. 7

4.  GOVERNMENT'S MOTION IN LIMINE TO ADMIT 404(b)
    EVIDENCE AND FOR JUDICIAL INQUIRY,
    filed May 16, 2024,
    Docket No. 144................................................................. 9

5.  ORDER ON DEFENDANT'S MOTION TO COMPEL
    DISCOVERY (ECF NO. 97), DEFENDANT'S MOTIONS IN
    LIMINE (ECF NOS. 85, 86), AND THE GOVERNMENT'S
    MOTIONS IN LIMINE (ECF NOS. 89, 91),
    filed May 22, 2024,
    Docket No. 153............................................................... 15

6.  JURY INSTRUCTIONS,
    filed May 31, 2024,
    Docket No. 172............................................................... 22

7.  EXCERPTS OF REPORTER'S TRANSCRIPT OF
    PROCEEDINGS,
    Trial Day 1, Afternoon Session,
    May 28, 2024,
    Docket No. 181............................................................... 24

8.  GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE
    REPORT; EXHIBITS,
    filed December 23, 2024,
    Docket No. 228...................................................................... 33

9.  VICTIM IMPACT STATEMENTS,
    filed December 27, 2024,
    Docket No. 229...................................................................... 36

10. GOVERNMENT'S SENTENCING POSITION; EXHIBITS,
    filed December 30, 2024,
    Docket No. 231...................................................................... 41

11. ORDER RE: MOTION FOR DISMISSAL FOR PROSECUTORIAL
    MISCONDUCT (ECF NO. 159); CONSOLIDATED POST-TRIAL
    MOTIONS FOR ACQUITTAL, DISMISSAL, AND NEW TRIAL
    (ECF NO. 194),
    filed January 14, 2025,
    Docket No. 238...................................................................... 17

12. REPORTER'S TRANSCRIPT OF PROCEEDINGS,
    Sentencing and Judgment,
    January 13, 2025,
    Docket No. 252.................................................................... 185

13. REPORTER'S TRANSCRIPT OF PROCEEDINGS,
    Ex Parte Application for Bond Pending Appeal,
    March 3, 2025,
    Docket No. 268.................................................................... 218

FILED
CLERK, U.S. DISTRICT COURT

03/16/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| UNITED STATES OF AMERICA, | CR 2:21-cr-00127-MCS |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 153: Embezzlement Against a Bankruptcy Estate] |
| DOUGLAS J. CHRISMAS, | |
| Defendant. | |

The Grand Jury charges:

COUNTS ONE THROUGH THREE

[18 U.S.C. § 153]

A.    INTRODUCTORY ALLEGATIONS

1.    At times relevant to this Indictment:

a.    Art and Architecture Books of the 21st Century, d.b.a. Ace Gallery ("Ace Gallery"), was a gallery that sold art in Los Angeles, California.  Defendant DOUGLAS J. CHRISMAS was the president and chief executive officer of Ace Gallery, and had control over Ace Gallery's operations, including its financial operations.

b.    On February 12, 2013, Ace Gallery filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States

GEX 1

1  Bankruptcy Court for the Central District of California as case

2  number 2:13-bk-14135-RK.

3          c.   When Ace Gallery filed a voluntary petition for

4  bankruptcy, a bankruptcy estate was created, and included all the

5  property owned by Ace Gallery and its claims on or rights to other

6  property, no matter where the property was or who possessed it when

7  the bankruptcy case began.

8          d.   After filing for bankruptcy, Ace Gallery continued to

9  operate, as debtor-in-possession, with defendant CHRISMAS continuing

10  as Ace Gallery's president, trustee, custodian, and overseer of Ace

11  Gallery's operations.  As the debtor-in-possession's trustee and

12  custodian, defendant CHRISMAS had access to property belonging to the

13  bankruptcy estate because it was his responsibility to control of all

14  property belonging to the bankruptcy estate. Defendant CHRISMAS

15  remained in control over Ace Gallery until April 6, 2016, when an

16  independent bankruptcy trustee was appointed over the bankruptcy

17  estate and defendant CHRISMAS was removed from the trustee and

18  custodian position.

19          e.   Corporation 1 was an entity that defendant CHRISMAS

20  owned and controlled, separate from the debtor-in-possession.

21  B.   THE EMBEZZLEMENT AGAINST THE ESTATE

22       2.   On or about the following dates, in Los Angeles County,

23  within the Central District of California, and elsewhere, defendant

24  CHRISMAS, who was an agent of Ace Gallery and acting as trustee and

25  custodian for the bankruptcy court, knowingly and fraudulently

26  appropriated to his own use, embezzled, spent, and transferred the

27  property described below belonging to the bankruptcy estate of Ace

28

GEX 2

1  Gallery, which property came into his charge and custody as agent of

2  Ace Gallery and trustee and custodian for the bankruptcy court:

| COUNT | DATE | PROPERTY |
|-------|------|----------|
| ONE | 3/30/2016 | $50,000 via Check No. 3164, signed by defendant CHRISMAS, drawn against Ace Gallery's bankruptcy estate account, and paid to Corporation 1 |
| TWO | 3/30/2016 | $100,000 owed to Ace Gallery by a third party for the purchase of artwork, but paid to Corporation 1 at defendant CHRISMAS'S direction |
| THREE | 4/1/2016 | $114,595.32 owed to Ace Gallery by a third party for the purchase of artwork, but paid to Corporation 1's creditor at defendant CHRISMAS'S direction |

A TRUE BILL

_/S/_ _____

Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

MONICA E. TAIT
Assistant United States Attorney
Deputy Chief, Major Frauds Section

VALERIE L. MAKAREWICZ
Assistant United States Attorney
Major Frauds Section

3

GEX 3

1 | E. MARTIN ESTRADA
United States Attorney
2 | MACK E. JENKINS
Assistant United States Attorney
3 | Chief, Criminal Division
VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
4 | DAVID W. WILLIAMS (Cal. Bar No. 295204)
Assistant United States Attorneys
5 |      Major Frauds/Appeals Sections
      1100 United States Courthouse
6 |      312 North Spring Street
      Los Angeles, California 90012
7 |      Telephone: (213) 894-0756/8485
      Facsimile: (213) 894-6265
8 |      Email:    Valerie.makarewicz@usdoj.gov
                david.williams3@usdoj.gov
9 |
Attorneys for Plaintiff
10 | UNITED STATES OF AMERICA

11 |                  UNITED STATES DISTRICT COURT

12 |               FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 | UNITED STATES OF AMERICA,          No. 2:21-cr-00127-MCS

14 |          Plaintiff,               JOINT PROPOSED JURY INSTRUCTIONS

15 |             v.                    Trial Date:   October 24, 2023
                                       Trial Time:   8:30 a.m.
16 | DOUGLAS CHRISMAS                   Location:     Courtroom of the
                                                     Hon. Mark C.
17 |          Defendant.                               Scarsi

18 |

19 |       Plaintiff United States of America, by and through its counsel

20 | of record, the United States Attorney for the Central District of

21 | California and Assistant United States Attorney Valerie L.

22 | Makarewicz and David W. Williams, and defendant Douglas Chrismas, by

23 | and through his attorney of record, Adam Braun, hereby submit their

24 | joint proposed jury instructions.

25 |       Unless otherwise noted, the parties' joint proposed jury

26 | instructions use the most recent version (as of May 2023) of the

27 | Manual of Model Criminal Jury Instructions found on the Ninth

28 |

i

GEX 4

1      **COURT'S INSTRUCTION NO. _____**

2      **JOINT PROPOSED INSTRUCTION NO. 31**

3      **COURT'S INSTRUCTION NO. _____**

4      **JOINT PROPOSED INSTRUCTION NO. 28**

5          It's a Federal crime for the trustee or custodian of a

6    bankruptcy estate to knowingly and fraudulently embezzle or

7    appropriate any property belonging to the bankruptcy estate.

8          The defendant can be found guilty of this crime only if all the

9    following facts are proved beyond a reasonable doubt:

10         (1) On or about the date charged, a bankruptcy case docketed as

11   In Re: Art and Architecture Books of the 21st Century, d.b.a. Ace

12   Gallery, Case Number 2:13-bk-14135-RK was pending in the United

13   States Bankruptcy Court for Central District of California, and Art

14   and Architecture Books of the 21st Century, d.b.a. Ace Gallery was

15   the Debtor;

16         (2) the property or interest described in the indictment was

17   part of the bankruptcy estate of the Debtor;

18         (3) the defendant had access to the property as a trustee or

19   custodian of the bankruptcy estate; and

20         (4) the defendant knowingly and fraudulently embezzled, spent,

21   transferred, or appropriated to the Defendant's own use property

22   belonging to the bankruptcy estate.

23         A "Debtor" is a person or corporation that's the subject of a

24   Federal bankruptcy case.

25         When a debtor files a voluntary petition for bankruptcy, the

26   bankruptcy estate is created. Among other things, it includes all

27   the property owned by the Debtor and the Debtor's claims on or

28

GEX 5

1    rights to other property, no matter where the property is or who
2    possessed it when the bankruptcy case began.
3         The Bankruptcy Court for the Central District of California has
4    the authority and power to appoint a custodian or trustee to
5    administer the bankruptcy estate of a Debtor. The custodian or
6    trustee is responsible for the control of all the property belonging
7    to the bankruptcy estate.
8         The heart of the charge in the indictment is the knowing and
9    fraudulent embezzlement or appropriation of property belonging to
10   the Debtor's estate.
11        "Fraudulent" means to knowingly deceive or mislead someone,
12   usually for personal gain.
13        To "embezzle" or "appropriate" means to wrongfully take
14   someone's property and spend it, transfer it, convert it to personal
15   use, or convert it to someone else's use.
16
17
18
19
20
21
22
23
24
25
26
27   Eleventh Circuit Model Criminal Jury Instructions, No. O4 (2020 ed.)
28   [Embezzlement of a Bankruptcy Estate]

GEX 6

MEGAN A. MAITIA (Bar No. 285271)
megan@summaLLP.com
JENNIFER L. WILLIAMS (Bar No. 268782)
jenn@summaLLP.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117
South Pasadena, California 91030
Telephone:  (213) 260-9455/52/56
Facsimile:   (213) 835-0939

Attorneys for Defendant
DOUGLAS J. CHRISMAS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DOUGLAS J. CHRISMAS,<br><br>    Defendant. | Case No. 2:21-CR-00127-MCS<br><br>**DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31**<br><br>**Judge:**    Hon. Mark C. Scarsi<br><br>**Hearing:**    TBD<br><br>**Trial**:    May 28, 2024 |

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On the eve of trial, the prosecutors are taking the position for the first time that to convict under 18 U.S.C. § 153, the Government need only prove that Mr. Chrismas knowingly and fraudulently transferred property belonging to the estate, regardless of the intended *use* of that property. (Dkt. 106, citing Jury Instruction 31 in Dkt. 45 at p.43.)

In doing so, the Government relies on grammatical gymnastics and fancy graphics. But its interpretation ignores the most important guide: common sense. When read in its entirety and, as the Court must, consistent with due process notice requirements counseled by the Rule of Lenity, the only common-sense interpretation of the embezzlement statute is the one *already* reflected in Jury Instruction 31, as adopted from the Eleventh Circuit Model Jury Instructions (and previously sanctioned by this same prosecution team). That is, 18 U.S.C. § 153 criminalizes one who (a) knowingly and fraudulently (b) embezzled, spent, transferred, or appropriated to the Defendant's own use (c) property belonging to the estate. "To the Defendant's own use" is a concept understood from the context, and reflected by the Model Instruction, that applies to each word in the series, which each incorporate the everyday, common sense meaning of embezzlement.

The Government, trying to score a conviction without the literal burden it is required to carry, now argues that it can convict where there was a "knowingly and fraudulent transfer," period (that is, a transfer that was concealed, even if the transfer was intended to benefit the estate). This sudden position exposes what the Government has now come to understand based on evidence it long ignored. Without such a contorted (and constitutionally defective) reading, it cannot win; as the Government now knows, the transfers were, in fact, intended to benefit the estate. But just as the Government cannot change the facts—try as it might—to fit the law of the crime it charged, it likewise cannot change the law—try as it might—to fit the facts it now knows.

Consistent with applicable case law on criminal embezzlement and common sense, Jury Instruction 31 should be read as drafted (*see* Dkt. 45 at pp. 42-43).

---

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

GEX 8

1    E. MARTIN ESTRADA
    United States Attorney
2    MACK E. JENKINS
    Assistant United States Attorney
3    Chief, Criminal Division
    VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
4    DAVID W. WILLIAMS (Cal. Bar No. 295204)
    Assistant United States Attorneys
5       Major Frauds/Appeals Sections
       1100 United States Courthouse
6       312 North Spring Street
       Los Angeles, California 90012
7       Telephone: (213) 894-0756/8485
       Facsimile: (213) 894-6265
8       Email:   valerie.makarewicz@usdoj.gov
             david.williams3@usdoj.gov
9
    Attorneys for Plaintiff
10   UNITED STATES OF AMERICA

11               UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13   UNITED STATES OF AMERICA,      No. 2:21-cr-00127-MCS

14        Plaintiff,         GOVERNMENT'S MOTION IN LIMINE TO
                            ADMIT 404(b) EVIDENCE AND FOR
15          v.              JUDICIAL INQUIRY; DECLARATION;
                            EXHIBITS
16   DOUGLAS CHRISMAS

17        Defendant.       Trial Date:   May 28, 2024
                            Trial Time:   8:30 a.m.
18                             Location:     Courtroom of the
                            Hon. Mark C.
19                             Scarsi

20
        Plaintiff United States of America, by and through its counsel
21
  of record, the United States Attorney for the Central District of
22
  California and Assistant United States Attorneys Valerie L.
23
  Makarewicz and David W. Williams, hereby submits the Government's
24
  Motion in Limine to Admit 404(b) Evidence, and for Judicial Inquiry.
25
  ///
26
  ///
27
  ///
28

GEX 9

1               **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3      Defendant embezzled assets from the Ace Gallery bankruptcy

4 estate in early 2016.  If allowed by the Court, he plans to argue at

5 trial that he only took the bankruptcy estate assets in order to

6 benefit the estate itself.[1]  Briefly, defendant claims he transferred

7 estate assets from Ace Gallery to the unaffiliated/unrelated Ace

8 Museum, a 501(c)(3) nonprofit, so that Ace Museum could exercise a

9 valuable purchase option on a piece of real property, and that Ace

10 Gallery itself would have benefited in turn from the exercise of that

11 option.

12      Defendant's claim -- that his motive for taking Ace Gallery's

13 money was in fact to benefit Ace Gallery -- is contradicted by recent

14 events.  The government therefore requests permission to present

15 404(b) evidence contradicting defendant's argument, showing that

16 defendant never had any intent to benefit the Ace Gallery estate at

17 all, and showing that his true motive was personal profit.

18      In December 2023, defendant sold real property in Tuna Canyon,

19 and he personally received sale proceeds of $352,247.15.  (ECF 117-1

20 ¶¶ 3-4.)  He did so without alerting either the estate or this Court,

21 in spite of an order compelling him to obtain permission for any

22 transactions greater than $50,000.  And, rather than pay back some of

23 what he had previously stolen from Ace Gallery -- as reflected, at

24 least, by the $14 million judgment against him -- defendant kept the

25 Tuna Canyon profits for himself.  Then, in the aftermath of this

26 _____

27      [1] This potential defense may be affected by the resolution of
Government's Motion in Limine #5.  (See ECF 91.)  It may also be

28 affected by the resolution of the parties' briefing on Jury
Instruction #31.  (See ECF 102, 106, 109.)

1  | sale, defendant falsely told a representative of the estate that he
2  | was judgment-proof and "uncollectible."  And defendant did all this
3  | even though Ace Gallery itself had paid the property taxes on
4  | defendant's Tuna Canyon land during the bankruptcy period.

5  | In other words, even when defendant has identifiable assets at
6  | his disposal, and even when the bankruptcy estate has an interest in
7  | those assets, defendant still does not seek to "benefit the estate"
8  | of Ace Gallery.  Instead, he hides those assets for his own benefit.
9  | The government has provided 404(b) notice, and now moves for the
10 | Court to admit evidence concerning the Tuna Canyon sale and asset
11 | transfers at trial.

12 | Additionally, the government requests that the Court inquire
13 | into any potential conflicts created by defense counsel's continued
14 | participation in this case.  Defense counsel personally profited from
15 | the Tuna Canyon sale, and counsel have indicated that they represent
16 | another individual who participated in that sale.

17 | **II.   REQUEST TO ADMIT EVIDENCE UNDER RULE 404(b)**

18 | **A.   Relevant Law**

19 | "Evidence of other crimes, wrongs, or acts is not admissible to
20 | prove the character of a person in order to show action in conformity
21 | therewith."  Fed. R. Evid. 404(b)(1).  However, evidence of such
22 | other acts may "be admissible for other purposes, such as proof of
23 | motive, opportunity, intent, preparation, plan, knowledge, identity,
24 | absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

25 | The Ninth Circuit has "uniformly recognized that [Rule 404(b)]
26 | is one of inclusion and that other acts evidence is admissible
27 | whenever relevant to an issue other than the defendant's criminal
28 | propensity."  <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th

Exhibit A

Inv - 631

# ACE GALLERY NEW YORK

5514 WILSHIRE BOULEVARD ·11TH FLOOR
LOS ANGELES · CALIFORNIA · 90036 · TEL 323.935.0088

## BILL OF SALE

JUNE 9, 2015

PAGE 1 OF 1

L█████ M.█████ IS PURCHASING THE FOLLOWING ARTWORKS FROM ACE GALLERY:

| | | |
|---|---|---|
| ARTIST: | MARY CORSE | |
| TITLE: | *UNTITLED (WHITE, BLACK & RED)*, 2015 | |
| MEDIUM: | GLASS MICROSPHERES IN ACRYLIC ON CANVAS | |
| SIZE: | 90" (H) X 90" (W) | |
| PRICE: | | $275,000.00 |

| | | |
|---|---|---|
| ARTIST: | MARY CORSE | |
| TITLE: | *UNTITLED (WHITE INNER BAND WITH FLAT WHITE OUTER BAND)*, 2012 | |
| MEDIUM: | GLASS MICROSPHERES IN ACRYLIC ON CANVAS | |
| SIZE: | 6'6"(H) X 4'11" (W) | |
| PRICE: | | $165,000.00 |

| | |
|---|---|
| SUBTOTAL: | $440,000.00 |
| MINUS 20% DISCOUNT FOR RECEIPT OF FUNDS 6/9/15: | - $88,000.00 |
| NO SALES TAX (RESALE CERTIFICATE ON FILE) | |
| SUBTOTAL: | $352,000.00 |

| | |
|---|---|
| 60% OF TOTAL DUE TO ACE GALLERY: | $211,200.00 |

*signature* June 9/15
DOUGLAS CHRISMAS               DATE
DIRECTOR AND CHIEF CURATOR
INVOICE # 2081

DIRECTOR'S SIGNATURE ABOVE VERIFIES AND DOCUMENTS AUTHENTICITY OF THE ABOVE DESCRIBED ARTWORK. FULL AND CLEAR TITLE IN THE DESCRIBED ARTWORKS PASSES TO THE BUYER UPON RECEIPT OF PAYMENT IN FULL.

CLIENT IS RESPONSIBLE FOR INSURANCE, PACKING, DELIVERY, AND INSTALLATION. IT IS UNDERSTOOD AND AGREED THAT ALL ARTWORK REMAINS THE PROPERTY OF ACE GALLERY LOS ANGELES UNTIL PAYMENT IN FULL. IN THE EVENT OF A RESALE, IT IS ADVISED TO RETAIN THIS INVOICE AS PROOF OF OWNERSHIP AFTER FULFILLMENT OF THE TERMS OF SALE. A COPY OF THIS INVOICE WITH THE SIGNATURE OF THE ISSUER IS RECORDED IN GALLERY'S ARCHIVES. PURCHASER AGREES TO PAY 3% PER MONTH INTEREST ON DELINQUENT ACCOUNTS. ALL SALES ARE FINAL. IF THERE IS A DISPUTE ALL LEGAL FEES WILL BE PAID BY THE LOSING PARTY. WHEN THE PURCHASER BUYS THE ABOVE LISTED ARTWORK ANY AND ALL RESPONSIBILITY AND LIABILITY OF THIS ARTWORK WILL TRANSFER TO THE PURCHASER WHEN THE PURCHASED ARTWORK(S) PHYSICALLY LEAVE THE GALLERY. IF THE TERMS OF THE INVOICE ARE NOT MET THEN THE INVOICE WILL BE CONSIDERED NULL AND VOID, ANY DEPOSIT BE RECEIVED FOR THE ABOVE ACQUISITIONS WILL NOT BE REFUNDED AND THE SALE WILL BE DEEMED CANCELLED. IF THE CLIENT WISHES TO RESELL THE ARTWORK, ACE GALLERY MUST BE NOTIFIED IN WRITING BEFORE SUCH SALE TAKES PLACE AND ACE GALLERY WILL HAVE THE RIGHT OF FIRST REFUSAL TO MATCH THE THIRD PARTY'S OFFER WITHIN FIVE CALENDAR DAYS FROM THE MOMENT IT RECEIVES WRITTEN NOTIFICATION FROM THE CLIENT.

00530

USAO_00038140

GEX 13

Case 2:15-ap-01679-RK    Doc 1001-4    Filed 06/09/21    Entered 06/09/21 17:19:52
Desc Exhibit Part 4    Page 81 of 150

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CNB | 287 | UBS AG | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140522 | 2014 | 889.2 |
| CNB | 287 | FIRST REPUBLIC BANK | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140527 | 5397 | 179850 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | 8402 | ART AND ARCHITECTURE BOOKS OF THE | | | 20140602 | 3813 | 30400 |
| CNB | 287 | CITIBANK, NEW YORK | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140605 | 228 | 50000 |
| CNB | 287 | HSBC BANK USA, NA | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140611 | 3083 | 57000 |
| CNB | 287 | CITIBANK, NEW YORK | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140630 | 2625 | 325000 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | 8402 | ART AND ARCHITECTURE BOOKS OF THE | | | 20140701 | 6693 | 250000 |
| CNB | 8287 | CITIBANK, NEW YORK | 8402 | ART AND ARCHITECTURE BOOKS OF THE | | | 20140710 | 2058 | 83500 |
| CNB | 287 | CITIBANK, NEW YORK | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140716 | 3651 | 19390 |
| CNB | 287 | UBS AG | 229 | ACE GALLERY NEW YORK CORPORATION | | | 20140807 | 3103 | 200000 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | 3126 | FX WIRE CLEARING - CNY | | | 20140807 | 3892 | 45559.53 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | 8287 | UNION BANK OF CALIFORNIA | | | 20140812 | 6811 | 4000 |
| CNB | 3126 | FX WIRE CLEARING - CNY | | | | | 20140820 | 7257 | 44036.62 |
| CNB | 287 | TD BANK, NA | 229 | | | | 20140912 | 4979 | 12885 |
| CNB | 287 | CITIBANK, NEW YORK | 229 | | | | 20140922 | 6052 | 225000 |
| CNB | 8287 | BANK OF AMERICA, N.A., NY | 229 | | | | 20140924 | 5986 | 54000 |
| CNB | 8402 | ART AND ARCHITECTURE BOOKS OF THE | 229 | | | | 20140929 | 4284 | 20000 |
| CNB | 287 | CITIBANK, NEW YORK | 229 | | | | 20141006 | 2388 | 45000 |
| CNB | 287 | CITIBANK, NEW YORK | 287 | HSBC BANK USA, NA | | | 20141020 | 4741 | 37250 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | | | | | 20141027 | 4713 | 700 |
| CNB | 287 | WELLS FARGO BANK | 229 | | | | 20141204 | 361 | 15026 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20141218 | 652 | 319980 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150102 | 6172 | 219980 |
| CNB | 287 | BARCLAYS BANK, PLC | 229 | | | | 20150114 | 1729 | 19980 |
| CNB | 287 | BANKERS' BANK NORTHEAST | 229 | | | | 20150115 | 5240 | 188500 |
| CNB | 287 | WELLS FARGO BANK | 8287 | CHASE MANHATTAN BANK | | | 20150116 | 5041 | 43600 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | | | | | 20150116 | 5857 | 20000 |
| CNB | 287 | BARCLAYS BANK, PLC | 229 | | | | 20150120 | 2577 | 74261.2 |
| CNB | 287 | THE NORTHERN TRUST COMPANY | 229 | | | | 20150170 | 1012 | 8720 |
| CNB | 287 | CITIBANK, NEW YORK | 229 | | | | 20150211 | 2007 | 30000 |
| CNB | 229 | ACE GALLERY NEW YORK CORPORATION | | | | | 20150211 | 3284 | 30000 |
| CNB | 287 | BARCLAYS BANK, PLC | 287 | WELLS FARGO BANK | | | 20150212 | 5933 | 30000 |
| CNB | 287 | WELLS FARGO BANK | 229 | | | | 20150217 | 2969 | 108738.8 |
| CNB | 287 | CITIZENS BUSINESS BANK | 229 | | | | 20150224 | 6244 | 12000 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150319 | 5917 | 258000 |
| CNB | 287 | WELLS FARGO BANK | 229 | | | | 20150402 | 5281 | 60000 |
| CNB | 287 | WELLS FARGO BANK | 229 | | | | 20150424 | 9281 | 399200 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150428 | 9811 | 52300 |
| CNB | 287 | WELLS FARGO BANK | 229 | | | | 20150504 | 4694 | 7000 |
| CNB | 287 | FIVE POINTS BANK | 229 | | | | 20150515 | 6804 | 252000 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150515 | 678 | 99980 |
| CNB | 287 | WELLS FARGO BANK | 229 | | | | 20150529 | 2357 | 28000 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | ACE GALLERY NEW YORK CORPORATION | L | M | 20150609 | 6080 | 211200 |
| CNB | 8327 | WP6 RESTAURANT MANAGEMENT GROUP LLC | 229 | | | | 20150615 | 588 | 24080 |
| CNB | 287 | THE BANK OF NEW YORK MELLON | 229 | | | | 20150706 | 6135 | 48000 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150707 | 1999 | 165000 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150711 | 9066 | 108000 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150716 | 7558 | 108000 |
| CNB | 287 | BANK OF AMERICA, N.A., NY | 229 | | | | 20150728 | 3129 | 48000 |
| CNB | 8000 | WIRE SUSPENSE LIABILITY ACCOUNT | 229 | | | | 20150804 | 7239 | 159972 |
| CNB | 287 | CHASE MANHATTAN BANK | 229 | | | | 20150811 | 512 | 20165 |

CNB 000157

00531

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           CENTRAL DISTRICT OF CALIFORNIA

10    UNITED STATES OF AMERICA,            Case No. 2:21-cr-00127-MCS-1

11                Plaintiff,
                                           **ORDER ON DEFENDANT'S**
12                                         **MOTION TO COMPEL**
                                           **DISCOVERY (ECF NO. 97),**
13          v.                             **DEFENDANT'S MOTIONS IN**
                                           **LIMINE (ECF NOS. 85, 86), AND**
14    DOUGLAS J. CHRISMAS,                 **THE GOVERNMENT'S MOTIONS**
                                           **IN LIMINE (ECF NOS. 89, 91)**
15                Defendants.

16

17

18

19          Defendant Douglas J. Chrismas filed two motions in limine to exclude:

20    (1) evidence pertaining to Defendant's 1986 criminal case and (2) evidence of other

21    acts, specifically: uncharged financial transactions involving himself, evidence relating

22    to his violation of the bankruptcy rules, and evidence suggesting he wronged others in

23    contracts. (Def. MIL 1, ECF No. 85; Def. MIL 2, ECF No. 86.) The Government

24    opposed both motions. (Def. MIL 1 Opp'n, ECF No. 87; Def. MIL 2 Opp'n, ECF No.

25    88.) Defendant filed a reply. (Def. MIL Reply & Gov't MIL Opp'n, ECF No. 94.)

26          Separately, Defendant moved to compel the disclosure of grand jury transcripts

27    of witness testimony and legal instructions given to the grand jury in the instant case.

28    (MTC, ECF No. 97.) The Government opposed the motion. (MTC Opp'n, ECF No.

1

GEX 15

101.) Defendant did not file a reply.

The Government filed two motions in limine to exclude: (1) Defendant's presentation of a duress defense and (2) Defendant's presentation of a defense that he transferred funds with the intent to make a profit that would benefit Ace Gallery. (Gov't MIL 4, ECF No. 89; Gov't MIL 5, ECF No. 91.)[1] Defendant opposed both motions. (Def. MIL Reply & Gov't MIL Opp'n.)

The Court denied Defendant's motions in limine and the Government's fourth motion in limine at the April 22, 2024, status conference. Herein, the Court provides further reasoning in support of its oral rulings. Relatedly, the Court made tentative findings regarding Defendant's motion to compel and the Government's fifth motion in limine at the April 29, 2024, status conference. (4/29/24 Mins., ECF No. 105.) The Court requested supplemental briefing on issues pertaining to the remaining motions. (Suppl. Br. Order, ECF No. 102.) The Government filed a responsive brief, (Gov't Suppl. Br., ECF No. 106), which Defendant opposed, (Def. Suppl. Br. Opp'n, ECF No. 117). Defendant filed a responsive brief, (Def. Suppl. Br., ECF No. 109), which the Government opposed, (Gov't Suppl. Br. Opp'n, ECF No. 114). The Court heard oral argument on the motions at the April 22 and 29 status conferences.

## I.   BACKGROUND

Defendant is charged with three counts of embezzlement against a bankruptcy estate in violation of 18 U.S.C. § 153. (Indictment, ECF No. 1.) Defendant was previously an officer of Art and Architecture Books of the 21st Century, a company operating as "Ace Gallery." (Joint Statement of the Case 3, ECF No. 51.) On February 12, 2013, Ace Gallery declared bankruptcy and filed a petition for bankruptcy protection in federal court. (*Id.*) When that petition was filed, a bankruptcy estate was created, which included all of the property owned by Ace Gallery. (*Id.*) After Ace

---

[1] The Court previously resolved three other motions in limine filed by the Government. (10/2/23 Mins., ECF No. 62.)

1  Gallery declared bankruptcy, Defendant became the trustee of the bankruptcy estate.

2  (*Id.*) In this role, he was responsible for controlling the bankruptcy estate's property.

3  (*Id.*) Defendant remained trustee of the Ace Gallery estate until April 6, 2016. (*Id.*)

4      The Government alleges that, during Defendant's time as trustee of the

5  bankruptcy estate, Defendant embezzled property from it. (*Id.*) Specifically, the

6  Government alleges that Defendant used his position as trustee to embezzle

7  approximately $264,595 from the bankruptcy estate over the course of three

8  transactions. (*Id.*) The Government alleges Defendant used this money to benefit a

9  different company, which he also controlled, and not to benefit Ace Gallery. (*Id.*)

10 Defendant denies the Government's allegations and has pleaded not guilty to all

11 charges. (*Id.* at 3–4.)

12 **II.    DISCUSSION**

13      **A.    Defendant's Motions**

14      Defendant filed two motions in limine, which the Court denied from the bench at

15 the April 22 status conference. Defendant subsequently filed a motion to compel

16 discovery from the Government, which the Court considers after receiving

17 supplemental briefing pertinent to the motion.

18           1.    Motion In Limine No. 1

19      Defendant seeks an order precluding the Government from introducing evidence

20 from Defendant's 1986 criminal case pursuant to Federal Rule of Evidence 609(b).

21 (Def. MIL 1.) The Government proffers it does not intend to introduce anything about

22 the 1986 case in its case-in-chief, but that evidence of the case is admissible pursuant

23 to Federal Rule of Evidence 404(b), particularly for impeachment purposes, if

24 Defendant opens the door. (Def. MIL 1 Opp'n 1.)

25      The Court denies the motion. Federal Rule of Evidence 609 "appl[ies] to

26 attacking a witness's character for truthfulness by evidence of a criminal conviction."

27 Fed. R. Evid. 609(a). By Defendant's own admission, his 1986 criminal case "did not

28 result in a conviction at all." (Def. MIL 1, at 3.) Therefore, Rule 609 does not apply.

GEX 17

1    at *1 (D. Idaho June 14, 2013) (denying unopposed motions in limine as moot). If

2    Defendant changes course and elects to present a duress defense at trial, he must do so

3    subject to the standard set forth in *Ibarra-Pino*, 657 F.3d at 1004. The Court reserves

4    ruling substantively on Defendant's ability to present a duress defense at trial.

5                    2.     Motion In Limine No. 5

6           The Government seeks an order precluding Defendant from presenting a defense

7    that he transferred property from the bankruptcy estate to a separate property with the

8    ultimate goal of having Ace Gallery emerge from bankruptcy. (Gov't MIL 5, at 1.)

9    Defendant asks the Court to deny the motion on the basis that he intends to prove that

10   the transactions at issue were "for the use and benefit of ACE Gallery." (Def. MIL Reply

11   & Gov't MIL Opp'n 6.) The crux of the dispute is whether Defendant can present a

12   defense that he is not guilty for the crimes for which he is charged, three counts of

13   violations of 18 U.S.C. § 153, on the basis that the transactions took place for the

14   eventual benefit of Ace Gallery. (*Compare* Def. MIL Reply & Gov't MIL Opp'n 1–2,

15   11–12, *with* Gov't Suppl. Br. 3, 10.)

16          Because the Ninth Circuit has no available case law interpreting 18 U.S.C. § 153,

17   the Court turns to a sister circuit to discern whether Defendant's proffered defense is

18   legally available. *United States v. Ross*, 206 F.3d 896, 899 (9th Cir. 2000) (finding "the

19   district court properly granted the government's motion *in limine* to preclude evidence

20   of the legally unavailable defense"). Here, *United States v. Love*, 17 F. App'x 796 (10th

21   Cir. 2001), is instructive. There, a defendant appealed his conviction for a number of

22   crimes, including embezzlement against a bankruptcy estate pursuant to pursuant to 18

23   U.S.C. §§ 2 and 153. 17 F. App'x at 798. The *Love* court affirmed conviction under

24   both statutes. *Id.* In affirming the conviction, the court found that, contrary to

25   defendant's position, 18 U.S.C. § 153 "prohibits knowing and fraudulent

26   embezzlement, spending, transference, etc., whether or not such activity is occasioned

27   toward the offender's own use." *Id.* at 801. In other words, the crime of embezzlement

28   from a bankruptcy estate was complete once a defendant, with the requisite mens rea,

GEX 18

1    acted pursuant to one of the statutory verbs, regardless of what happened to the funds

2    once they left the bankruptcy estate.[4]

3         The Government, both in its briefing and at the April 29 status conference, takes

4    the same position. (*See* Tr. 22–23, ECF No. 110 ("The fact that the money went out of

5    the estate is where the focus should be . . . .").) The statute itself reads, in relevant part,

6    that it applies to a person "who knowingly and fraudulently appropriates to the person's

7    own use, embezzles, spends, or transfers any property or secretes or destroys any

8    documenting belonging to the estate of a debtor." 18 U.S.C. § 153(a). As the

9    Government discusses in its supplemental brief, Defendant disclosed at the April 29

10   status conference that he interprets the clause "to the person's own use" to apply

11   antecedently to each verb within the relevant portion of the statute. By Defendant's

12   reading, therefore, the statute applies to a person who (1) knowingly and fraudulently,

13   (2) appropriates to the person's own use; embezzles to the person's own use; spends to

14   the person's own use; or transfers to the person's own use any property belonging to

15   the bankruptcy estate. Given the Ninth Circuit does not have a model instruction for the

16   relevant portion of 18 U.S.C. § 153, the parties previously agreed to the relevant

17   Eleventh Circuit model instruction, which changes the order of the statutory text. Joint

18   Proposed Instruction No. 31 reads that 18 U.S.C. § 153 applies to someone who

19   "knowingly and fraudulently embezzled, spent, transferred, or appropriated to the

_____

21   [4] Defendant attempts to distinguish his case from *Love* by arguing that the *Love*

22   defendant was only charged under § 153 because of his role in aiding and abetting his
     codefendant, who was the trustee of the estate. (Def. Suppl. Br. Opp'n 7.) Defendant

23   fails to marry his argument with the language of *Love*. Even though the *Love* defendant

24   was found liable because of his role in assisting his codefendant, the court's substantive
     findings regarding liability pursuant to 18 U.S.C. § 153 were not premised in the role

25   he played in commissioning the offense. What's more, amendments to the statute

26   between 1993 and now do not bear on the actions for which a defendant can be found
     liable, but bear on the person who can be charged pursuant to the statute. *Compare* 18

27   U.S.C. § 153 (1993), *with* 18 U.S.C. § 153. This difference is irrelevant for purposes of

28   analogizing *Love* here.

13

1  Defendant's own use property belonging to the bankruptcy estate." (Joint Proposed Jury
2  Instructions 35, ECF No. 45.)

3      The Court agrees, in part, with the reasoning of the *Love* court. It interprets 18
4  U.S.C. § 153 to apply to a person who (1) knowingly and fraudulently (2) appropriates
5  to the person's own use, embezzles, spends, or transfers any property or secretes or
6  destroys any documents belonging to the estate of a debtor." 18 U.S.C. § 153.[5] "[T]o
7  the person's own use" follows only the verb "appropriates," and applying the clause
8  across all other verbs in the statute would be an atextual interpretation. *See Nielsen v.*
9  *Preap*, 139 S. Ct. 954, 965 (2019) ("Because '[w]ords are to be given the meaning that
10 proper grammar and usage would assign them,' the 'rules of grammar govern' statutory
11 interpretation 'unless they contradict legislative intent or purpose.'") (citations omitted)
12 (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 140
13 (2012)). Defendant does not cite, and the Court has not located, any legislative history
14 or case law suggesting that the legislature intended to distribute the clause "to the
15 person's own use" to each verb in the statute. Therefore, the Court does not interpret 18
16 U.S.C. § 153 under the tortured reading proposed by Defendant, but instead interprets
17 the statutory verbs to require appropriation of funds to a defendant's own use, or transfer
18 of the funds, or spending of the funds, or embezzlement of the funds.

19      The Court, consistent with its prior decision precluding Defendant from
20 presenting a defense that he intended to repay the bankruptcy estate, (10/2/23 Mins.,
21 ECF No. 62), grants the Government's motion in part. Pursuant to the statutory
22 language, Defendant may argue that he is not liable under 18 U.S.C. § 153 because he
23 did not appropriate funds from the bankruptcy estate to his own use, that he did not
24 transfer the funds from the bankruptcy estate, that he did not spend the funds from the

25 _____

26 [5] While the *Love* court "[did] not read . . . § 153 to require appropriation of funds to
27 one's own use," the Court finds that, if appropriation is the verb on which the
   Government intends to prove its case, then it must show that the funds at issue were
28 appropriated to Defendant's own use.

14

1    bankruptcy estate, that he did not embezzle the funds from the bankruptcy estate, and

2    that he did not secrete or destroy any documents belonging to the bankruptcy estate.

3    Defendant is precluded from arguing that he evades liability under the statute on the

4    basis that he did not transfer, spend or embezzle funds from the bankruptcy estate for,

5    or to, his own use. This defense is not legally available to him. *See Ross*, 206 F.3d at

6    898. The Court reserves the ability to modify this ruling, as appropriate, at any point

7    during trial.

8    **III.   CONCLUSION**

9          Defendant's motions in limine are denied. Defendant's motion to compel is

10   denied. The Government's fourth motion in limine is denied. The Government's fifth

11   motion in limine is granted in part and denied in part. All decisions on motions in limine

12   are subject to reevaluation at trial. *See* Fed. R. Evid. 103 advisory committee's note to

13   2000 amendment ("Even where the court's ruling is definitive, nothing . . . prohibits the

14   court from revisiting its decision when the evidence is to be offered."); *Luce v. United*

15   *States*, 469 U.S. 38, 41–42 (1984) ("[E]ven if nothing unexpected happens at trial, the

16   district judge is free, in the exercise of sound judicial discretion, to alter a previous *in*

17   *limine* ruling.").

18   **IT IS SO ORDERED.**

19

20    Dated: May 22, 2024                    _____

21                                           MARK C. SCARSI

                                             UNITED STATES DISTRICT JUDGE
22

23

24

25

26

27

28

1          **COURT'S INSTRUCTION NO. 27**

2          It's a Federal crime for the trustee or custodian of a

3    bankruptcy estate to knowingly and fraudulently embezzle any

4    property belonging to the bankruptcy estate.

5          The defendant can be found guilty of this crime only if all the

6    following facts are proved beyond a reasonable doubt:

7          (1) On or about the date charged, a bankruptcy case docketed as

8    In Re: Art and Architecture Books of the 21st Century, d.b.a. Ace

9    Gallery, Case Number 2:13-bk-14135-RK was pending in the United

10   States Bankruptcy Court for Central District of California, and Art

11   and Architecture Books of the 21st Century, d.b.a. Ace Gallery was

12   the Debtor;

13         (2) the property or interest described in the indictment was

14   part of the bankruptcy estate of the Debtor;

15         (3) the defendant had access to the property as a trustee or

16   custodian of the bankruptcy estate; and

17         (4) the defendant knowingly and fraudulently embezzled, spent,

18   or transferred property belonging to the bankruptcy estate.

19         A "Debtor" is a person or corporation that's the subject of a

20   Federal bankruptcy case.

21         When a debtor files a voluntary petition for bankruptcy, the

22   bankruptcy estate is created. Among other things, it includes all

23   the property owned by the Debtor and the Debtor's claims on or

24   rights to other property, no matter where the property is or who

25   possessed it when the bankruptcy case began.

26         The Bankruptcy Court for the Central District of California has

27   the authority and power to appoint a custodian or trustee to

28   administer the bankruptcy estate of a Debtor. The custodian or

GEX 22

1  trustee is responsible for the control of all the property belonging

2  to the bankruptcy estate.

3      The heart of the charge in the indictment is the knowing and

4  fraudulent embezzlement or appropriation of property belonging to

5  the Debtor's estate.

6      "Fraudulent" means to knowingly deceive or mislead someone,

7  usually for personal gain.

8      To "embezzle" means to wrongfully take someone's property and

9  spend it, or transfer it.

10      If you find the Defendant committed embezzlement, intent to

11  repay or return property is not a defense.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GEX 23

1

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3          HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,

6                         Plaintiffs,

7         vs.                            Case No. CR 21-127

8   DOUGLAS J. CHRISMAS,

9                         Defendants.
                                          /
10  _____

11

12

13

              REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
14                 TRIAL DAY 1 - AFTERNOON SESSION
                     Tuesday, May 28, 2024
15                        12:47 p.m.
                   LOS ANGELES, CALIFORNIA
16

17

18

19

20

21

22   _____

23          TERRI A. HOURIGAN, CSR NO. 3838, CCRR
             FEDERAL OFFICIAL COURT REPORTER
24           350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2849


              UNITED STATES DISTRICT COURT

GEX 24

123

| | | |
|---|---|---|
| | 1 | Q     Does a debtor in possession have to be appointed or named? |
| | 2 | A     No.  It's automatic.  When a debtor files bankruptcy, it |
| | 3 | begins as debtor in possession. |
| | 4 | Q     In 2013 through 2016, who was running the |
| 04:04PM | 5 | debtor-in-possession Ace Gallery? |
| | 6 | MS. MAITIA:  Objection.  Foundation. |
| | 7 | THE COURT:  You can answer. |
| | 8 | THE WITNESS:  Douglas Chrismas. |
| | 9 | BY MS. MAKAREWICZ: |
| 04:04PM | 10 | Q     Did that designation of being a debtor in possession |
| | 11 | change how the defendant could run the company now that it was |
| | 12 | in bankruptcy court? |
| | 13 | MS. MAITIA:  Objection.  Foundation.  702. |
| | 14 | THE COURT:  Objection is sustained. |
| 04:05PM | 15 | BY MS. MAKAREWICZ: |
| | 16 | Q     What responsibilities did the defendant have to the Court |
| | 17 | by running as a debtor in possession? |
| | 18 | MS. MAITIA:  Same objection. |
| | 19 | THE COURT:  Objection is sustained. |
| 04:05PM | 20 | BY MS. MAKAREWICZ: |
| | 21 | Q     Could the defendant make any decisions independently while |
| | 22 | in bankruptcy from 2013 to 2016? |
| | 23 | MS. MAITIA:  Same objection, Your Honor. |
| | 24 | THE COURT:  Objection is sustained. |
| 04:05PM | 25 | BY MS. MAKAREWICZ: |

**UNITED STATES DISTRICT COURT**

GEX 25

134

|  | 1 | describe? |
|---|---|---|
|  | 2 | A    It divides the debtor's inventory into two primary |
|  | 3 | categories, artwork that was consigned and artwork that was |
|  | 4 | owned outright by the debtor. |
| 04:20PM | 5 | Q    Is the inventory owned by Ace Gallery that is valued at |
|  | 6 | $3.4 million part of the bankruptcy estate? |
|  | 7 | A    Yes. |
|  | 8 | Q    In this case, in the bankruptcy case, when the defendant |
|  | 9 | sold a piece of art that was owned by the debtor Ace Gallery |
| 04:20PM | 10 | and part of this $3.4 million of inventory, what happened?  Or |
|  | 11 | what should have happened to that money. |
|  | 12 |         MS. MAITIA:  Objection.  702. |
|  | 13 |         THE COURT:  Objection sustained. |
|  | 14 | BY MS. MAKAREWICZ: |
| 04:20PM | 15 | Q    What is a consignment? |
|  | 16 |         MS. MAITIA:  Objection.  702.  Foundation. |
|  | 17 |         THE COURT:  Objection sustained. |
|  | 18 | BY MS. MAKAREWICZ: |
|  | 19 | Q    Let's look at page 11, please. |
| 04:21PM | 20 |     I want you to take a look and let me know when you are |
|  | 21 | done at 11 through 27, sir. |
|  | 22 | A    Yes.  I have looked through it again. |
|  | 23 | Q    In pages 11 through 27, what do these pages of the |
|  | 24 | document list?  What does this pertain to? |
| 04:22PM | 25 | A    These are three schedules that list the different -- three |

UNITED STATES DISTRICT COURT

GEX 26

135

| | | |
|---|---|---|
| | 1 | different categories of creditors of the estate. |
| | 2 | Q    Which are? |
| | 3 | A    The first in Schedule D is creditors who hold secured |
| | 4 | claims. |
| 04:22PM | 5 | And that, as you can see in the schedule, is often |
| | 6 | tax-type claims like the Employment Development Department. |
| | 7 | Secured loan claims, a couple at the bottom that would describe |
| | 8 | sort of this pawn dealers of art, and then artists on the next |
| | 9 | page who are owed fees under their consignment agreements with |
| 04:23PM | 10 | the debtor. |
| | 11 | And then in Schedule E, it's unsecured priority claims. |
| | 12 | These are employees' wages that were left unpaid before the |
| | 13 | petition date. |
| | 14 | And then in Schedule E you have unsecured -- sorry, the |
| 04:23PM | 15 | priority claims also include some tax claims like the City of |
| | 16 | Los Angeles and the Franchise Tax Board. |
| | 17 | And then you come to Schedule F which is what we |
| | 18 | refer to as unsecured creditors.  It's creditors holding |
| | 19 | unsecured claims.  It can be as simple as, you can see at the |
| 04:23PM | 20 | top, the trash removal company.  It can be someone who might be |
| | 21 | owed millions of dollars for an unsecured loan. |
| | 22 | It's typically the largest number of creditors in any |
| | 23 | bankruptcy case. |
| | 24 | Q    And is this what brought you, this list of unsecured claim |
| 04:24PM | 25 | holders, is this what brought you into this matter? |

UNITED STATES DISTRICT COURT

GEX 27

136

```
 1   A    Yes, it is.
 2        There is a -- in any medium to large bankruptcy case,
 3   someone is appointed --
 4             MS. MAITIA:  Objection, Your Honor.  702.
 5             THE COURT:  Well, yeah, I will sustain the
 6   objection.  Wait until the witness is finished with his answer,
 7   though, before you object.
 8             But, counsel, can you ask a new question?
 9             MS. MAKAREWICZ:  Yes.
10   BY MS. MAKAREWICZ:
11   Q    Who did you represent in the bankruptcy?
12   A    Sulmeyer Kupetz and myself represented the official
13   committee of unsecured creditors.
14   Q    Let's turn to page 34.  Who signs this document?
15   A    Douglas Chrismas.
16   Q    On what date?
17   A    April 4th, 2013.
18   Q    Okay.  Let's turn the page to page 35.
19        Page 35 through 40, can you review that, sir, and let me
20   know when you are done.
21   A    Yes.  I have reviewed it again.
22   Q    And what portion -- what are these pages as part of the
23   document?  What do they describe?
24   A    They are called the Statement of Financial Affairs and
25   they break down the debtor's financial information into more
```

04:24PM — line 5
04:24PM — line 10
04:25PM — line 15
04:25PM — line 20
04:26PM — line 25

UNITED STATES DISTRICT COURT

GEX 28

145

1    answer.

2            THE COURT:  Objection is sustained.  The jury will

3    disregard the question and the answer.

4            MS. MAITIA:  And it was leading, also, Your Honor.

04:36PM  5    Thank you.

6    BY MS. MAKAREWICZ:

7    Q    Are you aware that defendant sent money that belonged to

8    Ace Gallery's bankruptcy estate to Ace Museum directly?

9            MS. MAITIA:  Objection, Your Honor.  This is

04:36PM 10    leading.  Calls for a legal conclusion.  402.  403.

11            THE COURT:  Objection overruled.  You can answer.

12            THE WITNESS:  Yes, I am.

13    BY MS. MAKAREWICZ:

14    Q    How do you know that?

04:37PM 15    A    As part of my job, I undertook an investigation that was

16    basically my full-time job for about a year and a half to two

17    years, looking into all of the transactions that the debtor

18    undertook, searching through bank records, e-mails, invoices,

19    everything I could find to create a very long, comprehensive

04:37PM 20    timeline of all of these transactions to show how sale proceeds

21    that should have come into the estate's bank accounts would

22    instead have gone elsewhere in order to pay Ace Museum's rent.

23    Q    You said it was your full-time job?

24    A    As a full-time lawyer, this was by far the largest case on

04:37PM 25    my desk.  I didn't have any other large cases at the time.

**UNITED STATES DISTRICT COURT**

GEX 29

146

```
         1   Q     And, again, what documents did you look at?

         2   A     I would look at all bank records, corporate records of the

         3   various entities, Ace Museum and the debtor e-mails, invoices.

         4   So, for example, these would be e-mails with purchasers of an

04:38PM  5   artwork.

         6            Well, to give you a simple example, if the debtor

         7   sold an artwork, there would be documents that deal with the

         8   history of the artwork.  Who owned it, how it came into the

         9   debtor's possession, either as an owned artwork or consigned

04:38PM  10  artwork.  It would be e-mails with the buyer, sometimes

         11  confirming a price if it wasn't done in person; e-mails that

         12  would send the invoice and the wire instructions, unless the

         13  purchaser was paying by check.  And then bank records that

         14  would show what would happen to the money, where it would go.

04:38PM  15            And so, I piece all of these things together.  In

         16  some cases, they were documents I would find on the debtor's

         17  computers.  If we couldn't find them in files, I searched --

         18  spent many days searching through the debtor's computers for

         19  files, hidden files, deleted files, everything I could find.

04:39PM  20  Q     Was it organized?

         21  A     Somewhat.  Organized, I guess, is a subjective term.

         22  Q     How did you find the records?

         23  A     So, some records had been produced to us during the

         24  bankruptcy case as part of litigation.  We asked that certain

04:39PM  25  categories of documents be given to us, so those were the first
```

**UNITED STATES DISTRICT COURT**

GEX 30

147

```
           1   documents we could go through.  Examples would be some of the

           2   bank statements and invoices.

           3         And then when I went to the location, they are in the

           4   accounting office, the accountant's office inside the gallery,

04:39PM    5   there were computers, there were filing cabinets, and it was

           6   just a process of going through files of paperwork and the

           7   computers and the hard drives to find everything we could.

           8   Q    So, in your investigation and your review of all of those

           9   records, did I find that the defendant diverted money to

04:39PM   10   another business?

          11         MS. MAITIA:  Objection, Your Honor.  Leading.  702.

          12   Calls for a legal conclusion.

          13         THE COURT:  Objection overruled.  You can answer.

          14         THE WITNESS:  Yes, I did.

04:40PM   15   BY MS. MAKAREWICZ:

          16   Q    What did you find?

          17   A    So, Mr. Chrismas set up another company right at the time

          18   that he filed bankruptcy for Ace Gallery.  It was by the name

          19   Ace Gallery New York.

04:40PM   20         And he had a different bank account set up for that and

          21   it was outside of the bankruptcy court's jurisdiction.

          22         And frequently -- in fact, more often than not, when

          23   someone would buy an artwork from the debtor, Mr. Chrismas or

          24   someone under his direction would e-mail them an invoice and

04:40PM   25   banking instructions that would be for the Ace Gallery New York
```

UNITED STATES DISTRICT COURT

GEX 31

148

1    bank account so that the funds would be transferred into the

2    Ace Gallery New York account.

3    Q    Let's look at Exhibit 24, please.

4            THE COURT:  Counsel, just whenever you are at a good

04:40PM  5    breaking point, we will stop for the day.

6            MS. MAKAREWICZ:  Here is fine.

7            THE COURT:  Okay.  Great.  We will knock off a

8    little bit earlier today.  We will let you get a little bit of

9    a jump on the traffic.

04:41PM  10           We will start tomorrow morning right at

11   9 o'clock.  I'm going to have the lawyers here earlier and we

12   will try to eliminate some of those back and forth, some of

13   those sidebar objections.  Sorry about that.

14           Have a good night.  Don't talk about the case.

04:41PM  15   We will see you in the morning.  Thank you.

16           THE COURTROOM DEPUTY:  All rise.

17           THE COURT:  Have a seat.  I just want to give the

18   parties a little bit of rhyme or reason in the rulings on these

19   objections because they're -- how I'm trying to parse them out

04:42PM  20   is that I don't want this witness to give opinion -- to give

21   legal opinions because I think that is improper.

22           But to the extent this witness has personal

23   experience from working in this bankruptcy, looking at the

24   bankruptcy, making determinations in bankruptcy, what he did

04:42PM  25   with respect to this bankruptcy proceeding, he can answer.

**UNITED STATES DISTRICT COURT**

GEX 32

1  E. MARTIN ESTRADA
   United States Attorney
2  LINDSAY GREER DOTSON
   Assistant United States Attorney
3  Chief, Criminal Division
   VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
4  DAVID W. WILLIAMS (Cal. Bar No. 295204)
   Assistant United States Attorneys
5      Major Frauds/Appeals Sections
       1100 United States Courthouse
6      312 North Spring Street
       Los Angeles, California 90012
7      Telephone: (213) 894-0756/8485
       Facsimile: (213) 894-6265
8      Email:   valerie.makarewicz@usdoj.gov
                david.williams3@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                 UNITED STATES DISTRICT COURT

12             FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,        No. 2:21-cr-00127-MCS

14         Plaintiff,               GOVERNMENT'S OBJECTIONS TO THE
                                    PRESENTENCE REPORT; EXHIBITS
15         v.

16 DOUGLAS J. CHRISMAS

17         Defendant.

18

19      Plaintiff United States of America, by and through its counsel

20 of record, the United States Attorney for the Central District of

21 California and Assistant United States Attorneys Valerie L.

22 Makarewicz and David W. Williams, hereby objects to the Presentence

23 Report (PSR) by the United States Pretrial and Probation Office,

24 Docket No. 224, filed on December 9, 2024.

25 I.    THE PRESENTENCE REPORT AND GUIDELINES CALCULATION

26      The PSR recommends placing defendant in criminal history

27 Category I.  (PSR ¶¶ 48-48.)  It calculates a total offense level of

28 32:  a base offense level 6 (USSG §2B1.1(a)(2)), plus 20 for a loss

GEX 33

| | 549. | The diverted funds were not used to benefit the Debtor, but to pay for Chrismas's personal obligations, including monthly rent of non-Debtor Ace Museum, Defendant Chrismas's controlled entity. | Uncontroverted Facts, Nos. 1-545.<br><br>Declaration of Sam Leslie in Support of Plaintiff's Ex Parte Application of Sam Leslie, Plan Agent, ECF 73 ("Leslie Decl. I"), ¶ 6.<br><br>Kincaid Decl. at ¶¶ 69, 70.<br><br>Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto.<br><br>Ziegler Decl. III at 3-4 and Ziegler Report, Exhibit 1 attached thereto. |
| | 550. | Proceeds from sales of Debtor's property was diverted to "repay" non-Debtor Ace Museum's debt to the Debtor, that is, funds were diverted to Ace Museum and then paid to Debtor to reduce the amount of the alleged loan indebtedness of Ace Museum to Debtor on Debtor's books and records. | Uncontroverted Facts, Nos. 1-545.<br><br>Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto, at 21-26 (internal page citations).<br><br>Ziegler Decl. III at 3-6 and Ziegler Report, Exhibit 1 attached thereto, at 21-26 (internal page citations).<br><br>Declaration of Jennifer Ziegler in Support of Plaintiff's Motion to Interpret Confirmation Order and Confirmed Plan ("Ziegler Decl. I"), ECF 542, filed on March 21, 2019, at ¶¶ 10-14 |
| | 551. | Debtor suffered $14,242,884[8] in damages by | Uncontroverted Facts, Nos. |

[8] Chrismas is liable to the Debtor for $14,243,884 of damages he caused the debtor to incur. Regarding his conversion claim, the Plan Agent asserts Chrismas is liable to the Debtor for $15,392,536 of damages he caused the debtor to incur. This was the gross amount of the funds from sales of the Debtor's assets diverted to non-debtor parties as determined by the Plan Agent's expert witness, Jennifer Ziegler, as detailed in her report at 21 ($14,359,941 to Ace Gallery New York Corporation and Inc., $918,000 to Ace Museum and $114,595 to 400 South La Brea, LLC). However, as discussed in her report at 21-23, Ziegler made adjustments in the gross amount of diverted sales proceeds to account for additional diversions of Debtor's DIP (Debtor in Possession) and other loan proceeds ($916,822 to Ace Museum and $2,614,862 to Ace Gallery New York

*(continued)*

GEX 34

| | | |
|---|---|---|
| having funds representing the sales of its artwork assets by Defendant Chrismas diverted to accounts other than its own, namely, the sales of Debtor's property with the sales proceeds being diverted to, or on their behalf of, non-Debtor entities controlled by Defendant Chrismas, Ace Gallery New York Corporation and Ace Museum (e.g., rent payments on behalf of Ace Museum to its landlord, 400 South La Brea, LLC). | 1-545; Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto. Ziegler Referenced Exhibit C (Diverted Art Sales Chart). Ziegler Decl. III at 3-4 and Ziegler Report, Exhibit 1 attached thereto, at 21-26 (internal page citations). |

### ADDITIONAL FACTS RE: BREACH OF FIDUCIARY DUTY

| | | |
|---|---|---|
| 552. | Chrismas caused the transfer of funds into the Debtor's operating account of over $250,000 immediately before turnover of control of the Debtor's bankruptcy estate to the Plan Agent pursuant to the confirmed Plan of Reorganization, depriving the Plan Agent of any operating funds to manage the Reorganized debtor. | Leslie Decl. II, ¶ 5. Status Report and Declaration of Sam S. Leslie in Support Thereof, ECF 2478, Main Bankruptcy Case, at 4, 5, 24 and Exhibit A. |
| 553. | Chrismas knowingly signed the Monthly Operating Reports filed and submitted to this Court in this bankruptcy case on behalf of the Debtor with falsified important account balances. | Ziegler Decl. I at ¶¶ 6 and 9. |
| 554. | Debtor's Monthly Operating Reports signed by | Ziegler Decl. I at ¶¶ 15-16. |

---

Corporation for a total of $3,531,684) and further diversions of funds from the Debtor in transfers to Ace Museum ($322,180) and Ace Gallery New York Corporation ($20,000) for a total of $342,180, and to account for repayments of the Debtor's DIP loans by transfers back from Ace Gallery New York Corporation ($68,257 and $421,186) for a total of $489,443 and other transfers to Debtor by Ace Museum ($1,434,692) and Ace Gallery New York Corporation ($4,533,072) for a total of $5,967,764. Based on her analysis in her report at 22, reflecting these adjustments, Ziegler computed that the net Debtor's funds not returned totaled $12,809,192. The court adjusts this net amount of diverted funds of $12,809,192 upwards by the amount of $1,434,692 repaid by Ace Museum to the Debtor, which was credited against the outstanding loan by the Debtor to Ace Museum because Ace Museum should not be credited with a repayment of its loan for this amount because these funds were Debtor's sales proceeds, that is, Ace Museum was using Debtor's money to repay its loan to the Debtor as explained by Ziegler in her report at 21-22 based on her prior analysis in her declaration dated March 6, 2019. Thus, the court determines that the amount of damages suffered by the Debtor from the conversion of its funds by Chrismas is $14,243,884.

GEX 35

1  E. MARTIN ESTRADA
   United States Attorney
2  LINDSAY GREER DOTSON
   Assistant United States Attorney
3  Chief, Criminal Division
   VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
4  DAVID W. WILLIAMS (Cal. Bar No. 295204)
   Assistant United States Attorneys
5       Major Frauds/Appeals Sections
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-0756/8485
        Facsimile: (213) 894-6265
8       Email:  valerie.makarewicz@usdoj.gov
                david.williams3@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                  UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,          No. 2:21-cr-00127-MCS

14          Plaintiff,                VICTIM IMPACT STATEMENTS

15              v.

16 DOUGLAS J. CHRISMAS

17          Defendant.

18

19

20

21

22

23

24

25

26

27

28

GEX 36

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION


TO THE HONORABLE MARK C. SCARSI, UNITED STATES DISTRICT JUDGE:

   Re:  United States v. Douglas J. Chrismas, No. 2:21-cr-00127 MCS (C.D. Cal.)

Dear Judge Scarsi:

   The United States Attorney's Office has advised the undersigned United States Bankruptcy Judge on behalf of the United States Bankruptcy Court that the Bankruptcy Court is considered a victim in the above-captioned criminal case of Defendant Douglas J. Chrismas for purposes of the Crime Victims' Rights Act and may submit a victim impact statement in the case.

   I am the presiding judge in the bankruptcy case of In re Art and Architecture Books of the 21st Century, No. 2:13-bk-14135-RK Chapter 11 (Bankr. C.D. Cal., bankruptcy petition filed on February 19, 2013), and in this capacity, I am submitting this victim impact statement on behalf of the Bankruptcy Court.

   Art and Architecture Books of the 21st Century is a California corporation which operated an art gallery in Los Angeles, California, under the name of Ace Gallery.  Defendant Chrismas was the president of the corporation, and in this capacity, he caused the corporation to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C., which commenced the corporation's bankruptcy case.  The corporation was in financial distress and needed reorganization because as reflected on its initial bankruptcy schedules, as of the date the bankruptcy petition was filed, the corporation's debts valued at $22 million substantially exceeded its assets valued at $12 million (Bankruptcy Docket No. 74, No. 2:13-bk-14135-RK).  Because Art and Architecture Books of the 21st Century filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, the business reorganization chapter of the code, it remained in possession of its assets through the protection of the Bankruptcy Code as a debtor-in-possession under the management of Defendant Chrismas as its president.  Art and Architecture Books of the 21st Century as a debtor-in-possession, and its president, Defendant Chrismas, who controlled it, owed fiduciary duties to the corporation's creditors pursuant to 11 U.S.C. § 1107.  In re Perez, 30 F.3d 1209, 1214 and n. 5 (9th Cir. 1994) (citations omitted); In re Woodson, 839 F.2d 610, 614 and n. 5 (9th Cir. 1988).  As stated in In re Intermagnetics America, Inc., 926 F.2d 912, 917 (9th Cir. 1991) (citations omitted), "Officers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties."  As part of their fiduciary duties, bankruptcy debtors are required to file accurate, complete and truthful schedules and statements in their bankruptcy cases, and they are required to subscribe to, and file, their bankruptcy schedules and statements under penalty of perjury.  Federal Rule of Bankruptcy Procedure 1008; see also, Cusano v. Klein, 264 F.3d 936, 946 (9th Cir. 2001); In re Rolland, 317 B. R. 402, 413-414 (Bankr. C.D. Cal. 2004).  As noted in In re Searles, 317 B.R. 368, 378 (9th Cir. BAP 2004), "the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs."  Moreover, bankruptcy estate assets are considered held in trust by the

bankruptcy fiduciaries for the benefit of creditors and may not be used or distributed without court
authorization.  In re Woodson, 839 F.2d at 614 and n. 5; see also, 11 U.S.C. §§ 363, 726 (Chapter 7
distributions) and 1129 (Chapter 11 plan distributions).

        Defendant Chrismas violated his fiduciary duties as an officer of Art and Architecture Books of
the 21st Century, the debtor-in-possession, to its creditors in committing the crimes of embezzlement of
funds of the estate in the approximate amount of $264,000 as charged in the indictment in the criminal
case.  These crimes of embezzlement of funds of approximately $264,000 as found in the criminal case
were only "the tip of the iceberg," that is, only a part of a pervasive pattern and practice of wrongful
diversion of funds of the bankruptcy estate by Defendant Chrismas during the pendency of the
corporate bankruptcy case to his controlled entities outside the supervision of the Bankruptcy Court,
resulting in losses of over $14 million to the bankruptcy estate.  In an adversary proceeding in the
bankruptcy case brought by the plan agent of the confirmed reorganization plan of Art and Architecture
Books of the 21st Century, as set forth in my report and recommendation to the United States District
Court, Defendant Chrismas had converted over funds from sales of over 150 artworks owned by or
consigned to the corporation during the administration of its bankruptcy case and use of diverted funds
to his controlled entity, Ace Museum, to improperly repay its loan debts to the debtor with funds
diverted from the debtor while he was in control of the debtor between 2013 and 2016, resulting in
losses of over $14 million to the bankruptcy estate.  Leslie v. Ace Gallery New York Corp., et al., No. 2:13-
bk-14135-RK Chapter 11, Adv. No. 2:15-ap-01679, 2022 WL 481880 (Bankr. C.D. Cal., report and
recommendation filed and entered on February 16, 2022).  Defendant Chrismas had formed a shell
entity with no assets or business of its own, Ace Gallery New York Corp., several days before he caused
Art and Architecture Books of the 21st Century to file for bankruptcy, and much of the funds diverted
from the bankruptcy estate was funneled to this shell entity for transfer to other entities controlled by
Defendant Chrismas by his instructing the customers of Art and Architecture Books of the 21st Century
to send the money for purchases of artwork owned by or consigned to Art and Architecture Books of the
21st Century to the bank account of the shell entity named Ace Gallery New York, very similar to the
debtor's name of Ace Gallery, that he controlled rather than to the bankruptcy estate.  Because Art and
Architecture Books of the 21st Century filed a voluntary petition for relief under Chapter 11 of the
Bankruptcy Code, it remained in possession of its assets under the protection of the Bankruptcy Code as
a debtor-in-possession under the management of Defendant Chrismas as its president.   Thus,
Defendant Chrismas hid his diversions of bankruptcy estate assets by keeping these sales and the
proceeds off the books of the bankruptcy estate and the debtor's bankruptcy statements filed with the
Bankruptcy Court to evade the scrutiny of the creditors and the Bankruptcy Court in the bankruptcy case
as the diverted sales proceeds were not reported in the monthly operating reports that he signed under
penalty of perjury for Art and Architecture Books of the 21st Century as debtor-in-possession under
Defendant Chrismas's control was required to file under 11 U.S.C. §§ 1106(a)(1), 1107(a) and 704(a)(8);
see also, www.justice.gov/ust (regarding United States Trustee monthly operating report requirements).
Defendant Chrismas's diversion scheme is described in great detail by the plan agent in his brief and
declaration describing Chrismas's "unclean hands" in Bankruptcy Docket No. 2485 and 2486, No. 2:13-
bk-14135-RK, filed on June 12, 2019).

        My report and recommendation determining Defendant Chrismas's conversion of bankruptcy
estate assets resulting in losses of over $14 million to the bankruptcy estate was adopted by the
Honorable Percy Anderson, United States District Judge, who approved the report and recommendation

and entered a final judgment.  In re Art and Architecture Books of the 21st Century, No. 2:22-cv-01265
PA, 2022 WL 1405660 (C.D. Cal. May 3, 2022).  No appeal of this judgment was taken.

Defendant Chrismas's $14 million conversion of assets of the bankruptcy estate of Art and
Architecture Books of the 21st Century defrauded its creditors, and his fraudulent actions in breach of his
fiduciary duties to the creditors undermined the integrity of the bankruptcy court system, which
depends on the full, complete and candid disclosure of a bankruptcy debtor's financial affairs.
Defendant Chrismas's creation of a shell entity to siphon off bankruptcy estate funds before putting the
corporation into bankruptcy was a premediated exploitation of the bankruptcy system to stymie the
corporate debtor's creditors by restricting their nonbankruptcy collection remedies through the
reorganization bankruptcy case while shielding his unfettered control and use of corporate bankruptcy
assets for his personal purposes by diverting the assets to his shell entity, Ace Gallery New York Corp.,
and another controlled entity, Ace Museum, outside of bankruptcy, and hiding his fraudulent diversions
and dissipation of bankruptcy estate assets from the creditors and the Bankruptcy Court by failing to
disclose such diversions by not reporting the sales of corporate assets on the debtor's required monthly
operating reports.  Defendant Chrismas's diversion scheme and his dishonest lack of candid disclosures
deluded the creditors and the court and lulled them into a false sense of security in the reorganization
bankruptcy case that the estate assets were under the supervision and protection of the bankruptcy
system while he was surreptitiously diverting and dissipating bankruptcy estate assets to the tune of $14
million.

Defendant Chrismas's diversion scheme also did intangible harm to the bankruptcy system
though his breaches of his fiduciary duties to the creditors of Art and Architecture Books of the 21st
Century by ignoring his obligations of complete and candid voluntary disclosure of its financial affairs as
an officer of a debtor-in-possession, forcing a costly investigation by the plan agent, the successor
fiduciary, on behalf of the creditors to uncover Defendant Chrismas's embezzlement and conversion of
bankruptcy estate assets.  As stated in Payne v. Wood, 775 F.2d 202, 206 (7th Cir. 1985) (citations
omitted), also cited and quoted in In re Woodson, 839 F.2d at 614, in upholding denial of discharge of
bankruptcy debtors in a Chapter 7 liquidation case, the court stated: "[t]he operation of the bankruptcy
system depends on honest reporting.  If debtors could omit assets at will, with the penalty that they had
to file an amended claim once caught, cheating would be altogether too attractive.  The omission of
assets may be a good reason to deny or revoke a discharge.  When it is hard to detect an effort to evade
the law, the penalty must exceed the profits of the evasion."

Defendant Chrismas's fraudulent acts and lack of honest reporting of the debtor's financial
affairs caused intangible harm to the bankruptcy system by thwarting its effective and cost-efficient
operation to protect the interests of creditors, resulting in costly investigation and litigation to uncover
his fraudulent acts and diminishing the recovery for creditors.  That is, while the parties and their
counsel and the Bankruptcy Court were busily engaged in extensive and expensive litigating and
negotiating activities in the bankruptcy case to work out disputes diligently and in good faith to
reorganize the business of the debtor, Art and Architecture Books of the 21st Century, and to develop a
confirmable plan of reorganization, unbeknownst to the parties and the Bankruptcy Court, at the same
time, Defendant Chrismas, despite his being an officer of the court as a bankruptcy fiduciary, was busily
subverting the bankruptcy reorganization efforts of the parties and the Bankruptcy Court in bad faith in
depleting the bankruptcy estate by diverting and substantially dissipating its assets for his personal
purposes, including his pet project, the Ace Museum, and making it difficult for the other parties and the

Bankruptcy Court to detect his fraud.   In this court's view, Defendant Chrismas's fraud arose out of his arrogance and disrespect for the legal system, and an appropriate sentence is needed to deter such arrogance and disrespect.

On behalf of the United States Bankruptcy Court, the undersigned respectfully submits that the great intangible harm caused by Defendant Chrismas's fraudulent acts to the integrity of the bankruptcy system as described herein be considered in determining the appropriate sentence for his crimes.

Sincerely,

/s/ ROBERT N. KWAN, United States Bankruptcy Judge

GEX 40

1  E. MARTIN ESTRADA
   United States Attorney
2  LINDSEY GREER DOTSON
   Assistant United States Attorney
3  Chief, Criminal Division
   VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0756
7       Facsimile: (213) 894-6265
        Email:valerie.makarewicz@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10                UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        No. 2:21-CR-127-MCS

13           Plaintiff,              GOVERNMENT'S SENTENCING POSITION;
                                     DECLARATION OF VALERIE L.
14           v.                      MAKAREWICZ; EXHIBITS

15  DOUGLAS J. CHRISMAS,

16           Defendant.

17

18       Plaintiff United States of America, by and through its counsel

19  of record, the United States Attorney for the Central District of

20  California and Assistant United States Attorney Valerie L.

21  Makarewicz, hereby files its Sentencing Position.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

1    The Sentencing Position is based upon the attached memorandum of

2  points and authorities, the Presentence Report ("PSR") (ECF 224), the

3  Victim Impact Statements (ECF 229), the files and records in this

4  case, and such further evidence and argument as the Court may permit.

5    The government respectfully requests the opportunity to

6  supplement its position or respond to defendant or the probation

7  officer as may become necessary.

8

9  Dated: December 30, 2024          Respectfully submitted,

10                                     E. MARTIN ESTRADA
                                       United States Attorney
11
                                       LINDSEY GREER DOTSON
12                                     Assistant United States Attorney
                                       Chief, Criminal Division
13

14                                      /s/ Valerie L. Makarewicz
                                       VALERIE L. MAKAREWICZ
15                                     Assistant United States Attorney

16                                     Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA
17

18

19

20

21

22

23

24

25

26

27

28

ii

GEX 42

## Table of Contents

I.    INTRODUCTION...................................................1

II.   FACTUAL BACKGROUND..............................................2

III.  THE PRESENTENCE REPORT AND GUIDELINES CALCULATION..............4

IV.   LEGAL FRAMEWORK................................................5

V.    THE GOVERNMENT'S REQUESTED SENTENCE............................6

      A.    Nature and Circumstances of the Offense...................6

      B.    History and Characteristics of the Defendant............10

      C.    Other § 3553(a) Factors.................................14

VI.   FINE & RESTITUTION.............................................15

VII.  CONCLUSION....................................................16

GEX 43

1                    **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.    INTRODUCTION**

3        Defendant embezzled millions of dollars from the Ace Gallery

4   bankruptcy estate between 2013 and 2016.  He was criminally charged

5   for the final transactions in that series -- a $264,595 subset of the

6   total.  A jury found him guilty as charged.  He has never shown any

7   remorse.

8        Defendant first promised to return the money in April 2016,

9   shortly after being caught.  He never did.  The estate then obtained

10  a $14 million civil judgment against him.  But he stonewalled,

11  repeatedly insisting that he could not pay, telling the estate that

12  he was "uncollectible," and refusing to allow it to conduct a

13  financial examination.  Consequently, to date, defendant has returned

14  a grand total of $0 -- even though he received a $350,000 cash

15  infusion in late 2023 (after selling land that he had maintained with

16  money he embezzled from the estate), and even though (by his own

17  admission) defendant's current income exceeds $450,000 per year.

18       Although the PSR correctly places defendant in criminal history

19  category I, this is not even the first time he has engaged in similar

20  conduct.  In the 1980s, he was convicted of grand theft in state

21  court; like here, he had had sold artwork that belonged to someone

22  else, then pocketed the proceeds himself.  Like the current case, it

23  took almost 20 years for that victim to be made whole.

24       Nothing about defendant or this case warrants a downward

25  departure or variance.  Defendant caused harm, finally and

26  emotionally, to dozens of creditors.  But perhaps more important,

27  defendant's years long fraud caused significant intangible harm upon

28

                                    1

GEX 44

1   the Bankruptcy Court and its system, which rely upon truthfulness and

2   honesty when appearing before it.

3        The Court should impose a Guidelines sentence, which the PSR

4   correctly calculates (for offense level 32) at 121 to 151 months.

5   The government respectfully requests a 121-month prison term, a

6   $12,809,192 restitution award, and 3 years of supervised release.

7   **II.  FACTUAL BACKGROUND**

8        On February 19, 2013, Ace Gallery declared bankruptcy.  When it

9   did so, defendant (the president and CEO of Ace Gallery) reported

10  that it had $9 million in total assets and $17.7 million in total

11  liabilities.  (Trial Ex. 15 ("Bk. Pet.") at 6.)

12       Defendant continued to manage Ace Gallery's day-to-day business

13  (i.e., selling fine art) during the bankruptcy.  He also embezzled

14  $15.3 million, stealing the proceeds of Ace Gallery's art sales.

15  Specifically, defendant redirected the proceeds from selling about

16  158 pieces of art away from Ace Gallery.  (See Ex. 1, Case No. 2:22-

17  cv-1265-PA, In re Art & Architecture Books, Dkt. No. 2 ("Bankruptcy

18  R&R") ¶ 18.)

19       A detailed analysis of the transactions is attached.  (See Ex. 1

20  (the Bankruptcy R&R) and Ex. 2 ("Ziegler Report"); Appendix 1

21  (summary table of embezzlements).)[1]  Notably, defendant ultimately

22  embezzled almost enough from Ace Gallery's art sales to repay all of

23  its original liabilities combined -- $15.3 million embezzled vs.

24

25

_____

26       [1] Some (but not all) of the transactions described in the
    Bankruptcy R&R and Ziegler Report include a reference to defendant's
27  invocation of his Fifth Amendment rights.  The government expressly
    does not rely on any such references, and the Court likewise should
28  not rely on them.  Even without those references, the loss analysis
    is complete.

                                    2

1   $17.7 million in pre-petition liabilities.  (Ziegler Report at 21-22;

2   Bankruptcy R&R ¶¶ 546-551 & n.8.)[2]

3      Some of the money defendant stole was used to pay rent for Ace

4   Museum, a distinct entity and a 501(c)(3) nonprofit, which defendant

5   personally controlled.  For example, in 2013, defendant sold a piece

6   of Ace Gallery art called Flor De Incino for $172,000, then he used

7   $150,000 of the proceeds to pay for Ace Museum's rent.  (Ziegler

8   Report at 17.)

9      Some of the stolen money was used for other purposes too,

10   including defendant's personal expenses.  For instance, in June 2015,

11   defendant used $1,414 from Ace Gallery's bankruptcy estate to pay the

12   property taxes on a piece of land in Topanga Canyon, on which he held

13   title.  (See ECF 144 at 3-4 & Ex. A.)

14      Some of the stolen money was even repaid to Ace Gallery.  While

15   defendant embezzled $15,392,536 from art sales, he repaid about $2.5

16   million of it -- and in doing so, he made it seem as though some

17   entities that owed money to Ace Gallery were solvent and able to

18   repay their debts.  (See Section VI, Fine & Restitution, below.)  For

19   example, as described above, Ace Museum used $150,000 of the proceeds

20   from the Flor De Incino sale for its own rent.  But it then sent

21   $15,000 back to Ace Gallery, giving the appearance that it had assets

22   of its own, even though those assets really belonged to Ace Gallery

23   in the first place.  After accounting for these repayments, the net

24   amount of embezzled-but-not-repaid money was $12,809,192.

25

26 ─────────────────

27      [2] Defendant also diverted millions in non-art funds, such as loans that should have gone to Ace Gallery's accounts but were instead sent to either Ace Museum or Ace New York.  (See Ziegler

28   Report at 22.)  Including those sums, defendant took almost $19 million out of the estate.  (Id.)

1     With all this embezzlement, Ace Gallery failed to make headway

2  in clearing its debts.  So its creditors eventually asked the

3  bankruptcy judge to appoint an independent trustee to manage the

4  business, and the court did so, naming Sam Leslie to fill that role

5  in early 2016.

6     However, before Leslie took over on April 6, 2016, defendant

7  embezzled a final $264,595 from the estate:  two transactions on

8  March 30, 2016, and one transaction on April 1, 2016.  Like many of

9  the prior acts of embezzlement, these transactions were part of

10  defendant's effort to use Ace Gallery money to pay the rent for Ace

11  Museum.

12     The trustee confronted defendant about the final $264,595

13  embezzlement a few weeks later.  Defendant (falsely) described it as

14  a loan, and promised to pay it back.  (See Ex. 3 ("Shemano Letter").)

15  He never did.  (See ECF 120, Ex. B.)

16     The bankruptcy judge eventually referred the matter for criminal

17  prosecution, defendant was charged with the final $264,595, and in

18  May 2024, a jury found defendant guilty of bankruptcy embezzlement.

19  **III. THE PRESENTENCE REPORT AND GUIDELINES CALCULATION**

20     The PSR recommends placing defendant in criminal history

21  Category I.  (PSR ¶¶ 48-48.)  It calculates a total offense level of

22  32: a base offense level 6 (USSG §2B1.1(a)(2)), plus 20 for a loss

23  amount between $9.5 million and $25 million (USSG §2B1.1(b)(1)(K)),

24  plus 2 for causing substantial financial hardship (USSG

25  §2B1.1(b)(2)(A)), plus 2 for involving a misrepresentation or fraud

26  during the court of a bankruptcy proceeding (USSG §2B1.1(b)(9)(B)).

27  (PSR ¶¶ 24-41.)

28

4

GEX 47

1    The government agrees with this calculation, which corresponds

2    to a Guidelines range of 121 to 151 months in prison.  As explained

3    in the government's previously-filed Objections to the Presentence

4    Report, the loss amount is slightly lower than the amount identified

5    in the original PSR, and the 2-point enhancement under USSG

6    §2B1.1(b)(2)(A) is supported under USSG §2B1.1(b)(2)(A)(iii)

7    (substantial loss, as identified by the PSR) and also by USSG

8    §2B1.1(b)(2)(A)(i) (more than ten victims). (ECF 228).  However,

9    neither of these issues alters the ultimate Guidelines calculation.

10   **IV.  LEGAL FRAMEWORK**

11    A sentencing court "shall impose a sentence sufficient, but not

12   greater than necessary, to comply with the purposes set forth in" 18

13   U.S.C. § 3553(a)(2).  There are four sentencing purposes set forth in

14   Section 3553(a)(2): (1) just punishment or retribution ("to reflect

15   the seriousness of the offense, to promote respect for the law, and

16   to provide just punishment for the offense"); (2) deterrence ("to

17   afford adequate deterrence to criminal conduct"); (3) incapacitation

18   ("to protect the public from further crimes of the defendant"); and

19   (4) rehabilitation ("to provide the defendant with needed educational

20   or vocational training, medical care, or other correctional treatment

21   in the most effective manner").  See Rita v. United States, 551 U.S.

22   338, 348 (2007) (using these four terms); see also Gall v. United

23   States, 552 U.S. 38, 50 n.6 (2007); cf. Tapia v. United States, 564

24   U.S. 319, 335 (2011) ("a court may not impose or lengthen a prison

25   sentence to enable an offender to complete a treatment program or

26   otherwise to promote rehabilitation").

27    In determining a sentence that complies with these four

28   sentencing purposes, a sentencing court must consider the "nature and

5

GEX 48

circumstances of the offense and the history and characteristics of
the defendant," the "kinds of sentences available," the Sentencing
Guidelines range and Sentencing Commission's relevant policy
statements, the "need to provide restitution to any victims of the
offense," and the "need to avoid unwarranted sentence disparities
among defendants with similar records who have been found guilty of
similar conduct."  18 U.S.C. § 3553(a)(1), (3)-(7).  When considering
these factors, the Sentencing Guidelines range "should be the
starting point and the initial benchmark." Gall, 552 U.S. at 49.
Any deviation must be reasonable, and a "major departure" from the
Guidelines range "should be supported by a more significant
justification than a minor one." Id. at 50.

## V.    THE GOVERNMENT'S REQUESTED SENTENCE

The Court should impose a Guidelines sentence of 121 months in
prison.

### A.    Nature and Circumstances of the Offense

The $12.8 million defendant stole would have paid most of Ace
Gallery's debts.  Instead, Ace Gallery was forced to liquidate its
assets and go out of business.  (PSR ¶ 28.)  And defendant's
creditors -- dozens of victims -- received fractions, at most, of
what they were entitled to.

The Plan Agent recounts several creditors, artists, collectors,
and a public educational institution, who defendant failed to pay,
causing these persons signification financial and emotional harm.
(ECF 229 at 9-10).  Artist Justin Bower described the money defendant
stole from him as "massively significant" and life changing.  (ECF
228-3 at 1).  Getting into business with defendant was a paradoxical
situation — defendant was artistically good for artist Laurie

6

1  Lipton's career, but very stressful financially. (<u>Id.</u> at 3; <u>see</u>

2  <u>also</u>, <u>id.</u> at 1 ("Bower simply considered his interactions with

3  Chrismas as a financial loss..."), <u>id.</u> at 10 ("Chrismas helped

4  [Melanie] Pullen's art career but lied to her about his sales of her

5  artwork."), <u>id.</u> at 14 ("Chrismas helped [Corse Bridgman's] art career

6  but lied to her about his sales of her artwork."), <u>id.</u> at 16

7  ("[Armando] Lerma was impressed by Chrismas because Chrismas had

8  represented many renowned artists, and thought that it would be a

9  'great opportunity' for them...Lerma believed they were unpaid by

10 Chrismas for artwork Chrismas sold..."). As recounted by the attorney

11 for the creditor's committee, an artist whose proceeds of sales from

12 consigned artwork were converted by defendant "spoke of him as a

13 bully who constantly made threats including lawsuits against any

14 artist who dared to take issue with his conversion of the proceeds of

15 sale of artwork they had consigned to him." (ECF 229 at 118.)

16      Defendant also undermined the integrity of the court system

17 itself. As the bankruptcy judge observed, the court and creditors

18 must rely upon a debtor's representations in bankruptcy proceedings.

19      Defendant Chrismas's diversion scheme also did intangible
        harm to the bankruptcy system though (sic) his breaches of
20      his fiduciary duties to the creditors of Art and
        Architecture Books of the 21st Century by ignoring his
21      obligations of complete and candid voluntary disclosure of
        its financial affairs as an officer of a debtor-in-
22      possession, forcing a costly investigation by the plan
        agent, the successor fiduciary, on behalf of the creditors
23      to uncover Defendant Chrismas's embezzlement and conversion
        of bankruptcy estate assets.
24
25 (ECF 229 at 4.) The Bankruptcy Court highlighted defendant's mindset

26 at the time of filing bankruptcy – defendant never intended to be

27 honest or forthright.

28      [Defendant's] creation of a shell entity to siphon off
        bankruptcy estate funds before putting the corporation into

7

GEX 50

1    bankruptcy was a premediated exploitation of the bankruptcy
      system to stymie the corporate debtor's creditors by
2    restricting their nonbankruptcy collection remedies through
      the reorganization bankruptcy case while shielding his
3    unfettered control and use of corporate bankruptcy assets
      for his personal purposes by diverting the assets to his
4    shell entity, Ace Gallery New York Corp., and another
      controlled entity, Ace Museum, outside of bankruptcy, and
5    hiding his fraudulent diversions and dissipation of
      bankruptcy estate assets from the creditors and the
6    Bankruptcy Court by failing to disclose such diversions by
      not reporting the sales of corporate assets on the debtor's
7    required monthly operating reports.

8    (Id. (emphasis added).)

9        Witness David Richardson, attorney for creditor's counsel,

10   echoed the same sentiment at trial:

11       BY MS. MAITIA:

12           Q And you could have declined to meet with them [the

13       government] for the several preparatory sessions you had?

14           A I certainly didn't want to, I already made a criminal

15       referral of my own. I wanted to see it pursued.

16           Q    You spent five years of your life going after Mr.

17       Chrismas?

18           A No.

19       MS. MAKAREWICZ: Objection. Form, argumentative.

20       THE COURT: Objection sustained.

21       BY MS. MAITIA:

22           Q You wanted to help the government?

23       MS. MAKAREWICZ: Objection, same.

24       THE COURT: He can answer.

25       THE WITNESS: I wanted to see the system protected. I have been

26       working 30 years in this system. I believe in it. When someone

27       abuses it the way I saw here, I wanted to stand up and protect

28       it, yes.

                                    8

1    BY MS. MAITIA:

2         Q You wanted to help the government, yes, correct?

3         A I wanted justice, yes.

4    (ECF 183 at 42:4-24.)

5         Bankruptcy only works if the parties are honest; for years,

6    defendant had sole control over Ace Gallery's books and proceeds, and

7    the creditors mostly had to take him at his word.  His dishonesty,

8    then, violated the fundamental premise and promise of bankruptcy

9    proceedings.  It also forced a simple matter to drag on for years

10   beyond its sell-by date.  Defendant's actions "thwarted its effective

11   and cost-effective operation to protect the interest of creditors,

12   resulting in costly investigation and litigation to uncover his

13   fraudulent acts and diminishing the recovery for creditors."  (Id.)

14   Instead,

15       [W]hile the parties and their counsel and the Bankruptcy
         Court were busily engaged in extensive and expensive
16       litigating and negotiating activities in the bankruptcy
         case to work out disputes diligently and in good faith to
17       reorganize the business of the debtor, Art and Architecture
         Books of the 21st Century, and to develop a confirmable
18       plan of reorganization, unbeknownst to the parties and the
         Bankruptcy Court, at the same time, Defendant Chrismas,
19       despite his being an officer of the court as a bankruptcy
         fiduciary, was busily subverting the bankruptcy
20       reorganization efforts of the parties and the Bankruptcy
         Court in bad faith in depleting the bankruptcy estate by
21       diverting and substantially dissipating its assets for his
         personal purposes, including his pet project, the Ace
22       Museum, and making it difficult for the other parties and
         the Bankruptcy Court to detect his fraud.
23
     (Id. at 4-5.)
24
         If defendant had not embezzled, the bankruptcy case would have
25
     been brief.  Ace Gallery could have substantially repaid its debts.
26
     Compare ("Bk. Pet.") at 6 ($17.7 million in petition liabilities)
27
     with Bankruptcy R&R ¶ 551 & n.8 ($12,809,192 net unreturned assets).
28

                                 9

                                                              GEX 52

1   But keeping up with Ace Museum's rent payments bled Ace Gallery dry.

2   Because he embezzled, the bankruptcy case dragged on interminably,

3   forcing a murder of lawyers to spend years -- and more than 4,800

4   docket entries -- unravelling his mess.[3]  See In re Art and

5   Architecture Books of the 21st Century, C.D.Cal. Bk. Case No. 2:13-bk-

6   14135 (docket sheet with 2,766 entries) and related adversary

7   proceedings in Case No. 2:13-ap-01747-RK (220 docket entries); 2:14-

8   ap-01771-RK (139 docket entries); 2:15-ap-01101-RK (6 docket

9   entries); 2:15-ap-01102-RK (32 docket entries); 2:15-ap-01103-RK (74

10  docket entries); 2:15-ap-01105-RK (62 docket entries); 2:15-ap-01571-

11  RK (17 docket entries); 2:15-ap-01679-RK (1,438 docket entries);

12  2:15-ap-01680-RK (87 docket entries).

13      **B.   History and Characteristics of the Defendant**

14      Defendant's personal history and characteristics present further

15  aggravating factors that justify a significant custodial sentence.

16      Ever since he was caught, defendant has done his best to avoid

17  responsibility.  In the bankruptcy case, upon his appointment, the

18  Plan Agent learned that the "diversion was not an isolated incident

19  but a part of a pattern of false representations to the Bankruptcy

20  Court and steps to hide that conduct from the Court and his own

21  counsel." (ECF 229 at 8 (emphasis added).) Defendant acted in ways to

22  make the investigation into his conduct more difficult.  (Id. at 8-

23

24      [3] "Had Chrismas filed accurate and truthful Monthly Operating
    Reports, as he was required to do [in the bankruptcy proceedings], he
25  would have been promptly replaced by a Chapter 11 trustee and none of
    this would have occurred.  To avoid that, he deliberately
26  misrepresented virtually every aspect of the Debtor's operations,
    from reporting fictitious accounts receivable, using estate funds to
27  pay non-estate rents, selling works of art and failing to pay the
    artists, and failing to disclose his personal expenses being paid by
28  the Debtor, even though he stated, under oath, he was foregoing any
    compensation from the Debtor."  (ECF 229 at 7.)

                                    10

9.) Upon his appointment, the Plan Agent learned that most artists
who were owed money by defendant or had works on consignment had not
been informed of Ace Gallery's bankruptcy and had not filed a claim
prior to plan confirmation. (Ex. 5.)  The Plan Agent filed at least
eleven stipulations for the artists to permit them pre- and post-
petition claims for the amounts owed to them, or for the return of
their works.  One artist had not been paid for work sold by defendant
in 2002.  (Id. at 95.)

   While he promised to repay what he took (see Shemano Letter), he
has given nothing back.  (ECF 229 at 119 ("Christmas has not paid
anything towards satisfaction of that claims (the $14 million
judgment) even though the Judgment against him is nearly three years
old.").)  Instead, he has refused numerous attempts to get him to sit
for a debtor's exam, frustrating his victims' ability to even attempt
to collect on their $14 million civil judgment against him.  (E.g.,
ECF 211-1.)  He told the Ace Gallery estate in February 2024 that he
was "uncollectible" (ECF 144 at 34) and, when the estate asked about
his finances in January 2023, in an attempt to collect on its
judgment, he refused to give any information.  Instead he wrote,
"[w]hat you are asking me to do, will cost me time (not a lot of
time) . . . Could you please indicate to me why it might be to my
advantage to focus time now on the judgment"?  (ECF 144 at 32.)

   All of this in spite of the fact that, as he has now admitted,
defendant has ample resources – enough that the Probation Officer
recommended an immediate payment towards restitution. (PSR 81, 83.)
Defendant reports a monthly income of at least $30,000, along with
his social security payment of $3,400, and spends over $5,000 in rent

1    alone, along with driving a 2020 Range Rover.[4]  (PSR 75.)  As

2    highlighted in trial, defendant does what he wants, when he wants,

3    and paying the litany of creditors before abandoning the lifestyle to

4    which he is accustomed is not to "his advantage." (ECF 144 at 32.)

5        As the Court is aware from past briefing, defendant received

6    more than $350,000 cash in December 2023, when he sold the Tuna

7    Canyon property.  He kept all of it.  But on top of that, he has now

8    admitted that he has a total monthly income of $38,471 -- a yearly

9    gross of more than $460,000.  In other words, he easily could repay

10   his victims (and he should, seeing as Judge Anderson has already

11   ordered him to do so).  He simply chooses not to, because it would

12   not "be to [his] advantage."  (Id.)

13       Defendant also has a history of engaging in behavior similar to

14   the counts of conviction.  In the 1980s, he stole between $650,000

15   and $1,300,000 from an art collector named Charles Frederick

16   Stimpson.  (PSR ¶ 46.)  As detailed in news reports at the time,

17   defendant was "one of the nation's leading dealers of contemporary

18   art" even back then.  (Ex. 4 (LA Times Article, Aug. 7, 1986) at 1.)

19   He used this position of trust to take advantage of Stimpson,

20   stealing seven pieces worth as much as $1.3 million.  (Id.)

21   "Stimpson had left the seven pieces in Chrismas' care over a period

22   of years," and defendant "sold some of the pieces and used others as

23   collateral for loans."  (Id. at 2.)  Defendant ultimately pled guilty

24   _____

25       [4] The PSR does not indicate the Probation Officer conducted a
     home inspection.  Defendant lives on the top floor of "a luxury
26   apartment community conveniently located in the Miracle Mile."
     https://www.lafusionapts.com/ogden/features.html. All of the units
27   are 2-bedroom, 2-bathroom comprising of 1,185 to 1,340 sq. feet.
     (Id.) Plan Agent Sam Leslie noted to the Court that according to his
28   review, defendant used $174,977.79 of debtor funds funneled through
     Ace NY to pay defendant's rent. (ECF 229 at 9.)

12

GEX 55

1   to felony grand theft.  (PSR ¶ 46.)  But he repaid the money some 14

2   years after the plea, and in so doing persuaded the state court to

3   reduce and dismiss the conviction.  (PSR ¶ 46; Ex. 4 (the victim "has

4   taken a forgiving attitude . . . and as long as the funds are paid he

5   does not seek a prison sentence").)

6       Like he did with Stimpson, part of defendant's scheme is to prey

7   upon and abuse victims' patience, their lack of sophistication, and

8   endurance to demand payment.  In addition to the multitude of artists

9   he stiffed, defendant cheated collectors who consigned their

10  collections through Ace Gallery, never paying them for art he sold or

11  accounting for missing inventory.  (See ECF 228-3 at 6 (Wilson

12  describing missing 7-8 pieces), at 8 (Sears enlisted a lawyer and

13  police detective to assist with payment for "Rockets"), at 17 (Lang,

14  despite being owed as much as one million dollars, "has moved on with

15  his life").

16      Defendant will likely seek a lower sentence because he is 80

17  years old.  And age can sometimes be a basis for lowered sentences.

18  The Guidelines even contemplate such reductions where "the defendant

19  is elderly and infirm."  USSG § 5H1.1.  But not here.

20      Defendant has suffered some physical decline -- some degree of

21  hearing loss, memory loss, and a predisposition to melanoma.  (PSR

22  ¶ 67.)  But his own self-assessment belies any claim of infirmity:

23  he "reported no serious health issues despite his age."  (PSR ¶ 67.)

24  In fact, if anything, his health report militates in favor of a

25  longer sentence:  his only mental health concern was reported as

26  "situational depression."  (PSR ¶ 68.)  A situational depression that

27  comes from the fact that, "the instant offense" has had an "impact on

28  his employment opportunities."  (PSR ¶ 68.)

1    In other words, defendant's most serious medical condition
2  appears to be a troubling case of narcissism and self-pity.  He is
3  sorry that he has difficulty working, but he still ignores the
4  effects his actions have had on other people -- because repaying them
5  would not "be to [his] advantage."  (ECF 144 at 32.)  In the
6  Bankruptcy's court's view, defendant's "fraud arose out of his
7  arrogance and disrespect for the legal system."  (ECF 229 at 5.)
8  Lawyers involved in untangling his mess explain, "I do not like him
9  personally, but that is because of what he has done in this
10  Bankruptcy Case."  (Id. at 119.)  Considering the widespread
11  instances of defendant's failing of responsibilities to the creditors
12  and blatant misrepresentations to the Court, "this is simply not an
13  instance where the defendant's age should entitle him to the Court's
14  mercy."  (Id. at 7.)

15    **C.   Other § 3553(a) Factors**

16    The discussion above goes hand in glove with the remaining
17  § 3553(a) factors.  No sentence short of a lengthy term of
18  incarceration (18 U.S.C. § 3553(a)(3) would provide adequate
19  punishment, reflect the seriousness of the offense, or promote
20  respect for the law (18 U.S.C. § 3553(a)(2)(A)).  Both general and
21  specific deterrence (18 U.S.C. § 3553(a)(2)(B)) require serious
22  consequences, at peril of future similar frauds (18 U.S.C.
23  § 3553(a)(2)(C)).  The Sentencing Range and policy statements
24  likewise demand a lengthy sentence (18 U.S.C. § 3553(a)(4), (a)(5)).

25    And giving defendant a break here would cause, rather than
26  avoid, "unwarranted sentence disparities among defendants with
27  similar records who have been found guilty of similar conduct."  18
28  U.S.C. § 3553(a)(7).

1    Bankruptcy fraud is seldom successfully prosecuted.  But

2    embezzlement is common, and attorney embezzlement is akin to the sort

3    of embezzlement defendant committed here, as a trustee for the Ace

4    Gallery bankruptcy estate.  Both sorts of crimes defraud the court

5    system itself.  And, in attorney embezzlement cases, judges routinely

6    sentence within the Guidelines.  For instance, one judge in this

7    district imposed a 144-month sentence where a lawyer stole about $7.5

8    million from a client and litigation lender.  See United States v.

9    Layfield, C.D.Cal. Case No. 2:18-cr-124-MWF, Dkt. No. 452.)  And

10   another lawyer who embezzled $12.4 million from his client settlement

11   funds received a 168-month sentence.  See United States v. Avenatti,

12   C.D.Cal. Case No. 8:19-cr-61-JVS, Dkt. No. 1054.

13       For this sort of offense, in other words, a lengthy Guidelines

14   sentence is appropriate.

15   **VI.  FINE & RESTITUTION**

16       Under the Mandatory Victims Restitution Act, restitution is

17   mandatory in this case.  As previously described in the Objections to

18   the PSR, defendant originally embezzled more than $15 million from

19   Ace Gallery.  But, after accounting for the money he returned, the

20   net Ace Gallery funds that were embezzled but not returned totaled

21   $12,809,192.  (Bk. R&R at 88-89, fn.8.)  Accordingly, the government

22   requests that the Court order defendant to pay $12,809,192 in

23   restitution – and agrees that the Court should order an immediate

24   payment. (PSR 83.)

25       Apart from restitution, the Court must impose a $100 special

26   assessment for each count, for a total of $300.

27

28

15

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 121 months' prison; (ii) 3 years' supervised release; (iii) restitution of $12,809,192; and (iv) a mandatory special assessment of $300. This sentence is sufficient, but not greater than necessary to reflect the exceedingly seriousness of defendant's offenses perpetrated upon the creditor-victims and the integrity of the Bankruptcy Court. This sentence will provide a just punishment for defendant's offenses brazenly undertaken by a thief who gamed a system designed to protect those in financial desperation. This sentence will promote respect for the law with someone who has none – someone who played with what he needed to disclose to the Court for years, even up until weeks before his own trial. And lastly, this sentence will protect the public from further crimes committed by the defendant upon aspiring artists, collectors, and business owners who provide services to defendant, only to be ripped off or bullied into non-payment or exhausted from attempted collection. Defendant's crimes were not impulsive or one-off; he engaged in a long running, cynical scheme to enrich himself. Defendant's crimes had severe consequences and a Guideline sentence as recommended should be imposed upon defendant.

16

GEX 59

| | |
|---|---|
| 1 | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>**FEB 24 2022**<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____RS_____ DEPUTY | **2:22-CV-01265-PA** |

FILED & ENTERED

**FEB 16 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY vandenst DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>ART & ARCHITECTURE BOOKS OF THE 21st CENTURY,<br><br>       Debtor. | Case No. 2:13-bk-14135-RK<br><br>Chapter 11<br><br>Adv. No. 2:15-ap-01679-RK |
| SAM LESLIE, PLAN AGENT FOR ART & ARCHITECTURE BOOKS OF THE 21st CENTURY,<br><br>       Plaintiff,<br><br>    vs.<br><br>ACE GALLERY NEW YORK CORPORATION, a California corporation; ACE GALLERY NEW YORK, INC., a dissolved New York corporation; ACE MUSEUM, a California corporation; DOUGLAS CHRISMAS, an individual; 400 S. LA BREA, LLC, a California limited liability company, JENNIFER KELLEN, an individual, CATHAY BANK, a California corporation, DARYOUSH DAYAN, an individual, KAMRAN GHARIBIAN, an individual, and MICHAEL D. SMITH, an individual,<br><br>       Defendants. | **REPORT AND RECOMMENDATION OF THE UNITED STATES BANKRUPTCY COURT THAT THE UNITED STATES DISTRICT COURT ADOPT THE BANKRUPTCY COURT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR CONVERSION AND BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT DOUGLAS CHRISMAS AND GRANT SUMMARY JUDGMENT ON THESE CLAIMS**<br><br>Date:        July 8, 2021<br>Time:       2:00 p.m.<br>Courtroom:  U.S. Bankruptcy Court<br>              Courtroom 1675<br>              255 E. Temple St.<br>              Los Angeles, CA 90012 |
| 400 S. La Brea, LLC, a California limited liability company,<br><br>       Cross-Complainant,<br><br>    v. | |

-1-

GEX 60

1  ACE GALLERY NEW YORK CORPORATION, a
   California corporation; ACE GALLERY NEW YORK,
2  INC., a dissolved New York corporation; ACE MUSEUM,
   a California corporation; DOUGLAS CHRISMAS, an
3  individual; SAM LESLIE as TRUSTEE OF THE PLAN
   TRUST FOR ART & ARCHITECTURE BOOKS OF
4  THE 21st CENTURY,

5          Cross-Defendants.

6

7  **TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF**

8  **CALIFORNIA:**

9          The United States Bankruptcy Court hereby issues the following report and recommendation

10 pursuant to Federal Rules of Bankruptcy Procedure 7056 and 9033 on the Motion of Plaintiff Sam

11 S. Leslie, in his exclusive capacity as Plan Agent ("Plaintiff" or "Plan Agent") for Debtor Art &

12 Architecture Books of the 21st Century, under the confirmed Second Amended Plan of

13 Reorganization of the Official Committee of Unsecured Creditors (the "Plan") for Summary

14 Judgment on Plaintiff's Claims for Conversion and Breach of Fiduciary Duty Against Defendant

15 Douglas Chrismas, Electronic Case Filing No. ("ECF" or Docket No.) 870, filed on February 12,

16 2021, in the above-captioned adversary proceeding. Plaintiff's claims for conversion and breach of

17 fiduciary duty against Defendant Douglas Chrismas are the eleventh and seventeenth claims for

18 relief in the Sixth Amended Consolidated Complaint, ECF 699, filed on February 19, 2020.

19         The United States Bankruptcy Court recommends that the United States District Court for

20 the Central District of California adopt the following Statement of Uncontroverted Facts and

21 Conclusions of Law on the Motion of Plaintiff for Summary Judgment on Plaintiff's Claims for

22 Conversion and Breach of Fiduciary Duty Against Defendant Douglas Chrismas and issue an order

23 granting summary judgment in favor of Plaintiff on his claims for conversion and breach of

24 fiduciary duty against Defendant Douglas Chrismas.

25         The United States Bankruptcy Court determines that it may not enter a final judgment on

26 Plaintiff's claims for conversion and breach of fiduciary duty against Defendant Douglas Chrismas

27 based on the following circumstances. Plaintiff's claims against Defendant Chrismas for conversion

28 and breach of fiduciary duty are noncore claims based on nonbankruptcy law under state law or the

                                                -2-

1  common law.

2      The United States Bankruptcy Court has subject matter jurisdiction over Plaintiff's claims

3  for conversion and breach of fiduciary duty against Defendant Douglas Chrismas under its

4  jurisdiction of 28 U.S.C. § 1334(b) over matters related to a bankruptcy case under the Bankruptcy

5  Code, 11 U.S.C., because such claims are based on alleged tortious acts against the Debtor and its

6  bankruptcy estate as the Plaintiff Plan Agent on behalf of the Debtor seeks to vindicate its rights

7  pursuant to the confirmed plan of reorganization.  The Bankruptcy Court may enter final judgment

8  on noncore claims within its related to jurisdiction if such claims relate to the claims allowance

9  process or when the parties consent to the bankruptcy court jurisdiction.  *Wellness International*

10  *Network, Ltd. v. Sharif,* 575 U.S. 665, 674-686 (2015).  The plan agent has expressly consented to

11  bankruptcy court jurisdiction in this adversary proceeding by his statements of consent in status

12  reports filed in this adversary proceeding.  Defendant Chrismas in his answers to Plaintiff's

13  complaints expressly stated that he does not consent to the jurisdiction of the bankruptcy court to

14  enter a final judgment.

15      The United States Bankruptcy Court finds that Defendant Chrismas has not impliedly

16  consented to bankruptcy court jurisdiction to enter a final judgment to determine Plaintiff's claims

17  against him.  Absent consent of all of the parties to Plaintiff's claims for conversion and breach of

18  fiduciary duty against Defendant Chrismas, this court lacks jurisdiction to enter a final judgment on

19  these claims.

20      The United States Bankruptcy Court, however, does have jurisdiction to hear Plaintiff's

21  claims for conversion and breach of fiduciary duty against Defendant Chrismas, which are noncore

22  claims under its "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b) and issue proposed

23  findings of fact and conclusions of law for *de novo* review by the United States District Court.  28

24  U.S.C. § 157 (c)(1); *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 39-40 (2014).

25  Accordingly, the United States Bankruptcy Court determines that it may issue proposed findings of

26  fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9033 in submitting

27  its ruling on the motion as a report and recommendation to the United States District Court for the

28  Central District of California for *de novo* review.

-3-

Having considered the papers and oral and written arguments of the parties on Plaintiff's pursuant to Federal Rules of Bankruptcy Procedure 7056 and Local Bankruptcy Rule 7056-1, including the Proposed Statement of Uncontroverted Facts and Conclusions of Law submitted by Plaintiff, [1] which the bankruptcy court has independently reviewed and modified, the bankruptcy court adopts the following Statement of Uncontroverted Facts and Conclusions of Law, subject to *de novo* review of the United States District Court.

| NO. | UNCONTROVERTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | **GENERAL FACTS** | |
| 1. | From February 19, 2013, the date on which Debtor commenced this bankruptcy case by filing its petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"), through the Effective Date of the confirmed Plan of reorganization (the "Plan") in Debtor's bankruptcy case (the "Effective Date"), April 6, 2016, Chrismas managed the Debtor's business as a Debtor-in-Possession ("DIP") and was its principal and sole shareholder and its primary officer, responsible for its day-to-day management. | Sixth Amended Consolidated Complaint ("6AC"), ECF 699, filed on February 19, 2020, at ¶¶ 1, 23, 25, 26, 27.<br><br>Defendant Chrismas's Answer to the Sixth Amended Complaint ("Ans."), ECF 703, filed on March 16, 2020, at ¶ 1, 17, 18, 19, 20. |

---

[1] Pursuant to the Court's April 27, 2021 tentative ruling for a hearing on the pending summary judgment motion against Douglas Chrismas scheduled for April 28, 2021, Plaintiff Sam S. Leslie, in his exclusive capacity as Plan Agent (the "Plan Agent" or "Plaintiff") for Art & Architecture Books of the 21st Century, under the confirmed Second Amended Plan of Reorganization of the Official Committee of Unsecured Creditors (the "Plan"), hereby submitted a Supplemental Statement of Uncontroverted Facts and Conclusions of Law ("SSUF") in support of his Motion for Summary Judgment Against Defendant Douglas Chrismas previously filed pursuant to Federal Rule of Bankruptcy Procedure 7056 and Local Bankruptcy Rule 7056-1 (ECF 1000, filed on June 9, 2021). Included as Exhibit A to Plaintiff's SSUF is Exhibit C to the Expert Report of Jennifer Ziegler, which is a chart representing, as stated on the exhibit, "Debtor's Art Sales Deposited into Ace Gallery New York Corporation & Inc., Ace Museum, and 400 S. La Brea, LLC," and the chart has been modified only to add line item references and is referred to herein as "Ziegler Referenced Exhibit C (Diverted Art Sales Chart)". The Expert Report of Jennifer Ziegler, dated October 30, 2020, is attached as Exhibit 1 to the Declaration of Jennifer E. Ziegler in Support of Plaintiff's Motion for Summary Judgment ("Ziegler Decl. II"), ECF 873, filed on February 12, 2021, and to the [Corrected] Supplemental Declaration of Jennifer E. Ziegler, CPA, in Support of Motion for Summary Judgment on Plaintiff's Claims for Conversion and Breach of Fiduciary Duty against Defendant Douglas Chrismas, ECF 1196, filed on December 20, 2021.

GEX 63

| 2. | At various times prior to the Effective Date, Chrismas was in control of Defendants Ace Gallery NY Corporation ("Ace NY"), Ace Gallery NY, Inc. ("Old Ace NY"), and Ace Museum, a non-profit California Corporation. | 6AC at ¶ 21.<br>Ans. at ¶ 15. |
|---|---|---|
| 3. | On April 6, 2016, the effective date of the Plan Agent's appointment under the Plan (the "Effective Date"), Plan Agent took control and possession of the Debtor's premises and operations located at: (i) 5514 Wilshire Blvd, Los Angeles, CA 90036 (the "Mid-Wilshire Location"); and (ii) 9430 Wilshire Blvd., Beverly Hills, CA 90212 (the "BH Gallery"). | Declaration of Sam S. Leslie in Support of Plaintiff's Motion for Summary Judgment ("Leslie Decl. II"), ECF 872, filed on February 12, 2021, at ¶ 3. |

**FACTS RELATED TO PLAN AGENT'S INVESTIGATION**

**OF DEBTOR AND ACE NYC**

| 4. | When Plan Agent took over Debtor, Plan Agent immediately took steps to capture the data on the computers on the premises of the Debtor, among other things, by "mirroring" all the hard drives of the computers on site and ensuring that all paper files were all preserved, maintained and safeguarded. | Leslie Decl. II at ¶ 4. |
|---|---|---|
| 5. | Based on the preservation of the data on and subsequent review of the Debtor's computer system and files and from my interviews with former employees who helped to prepare and maintain the Debtor's books and records, by taking control of the Debtor's computers and files, Plan Agent was also able to obtain the books and records of certain corporations owned and operated by Mr. Chrismas because they were all maintained on the same computers and server over which the Plan Agent had control. | Leslie Decl. II at ¶ 4. |
| 6. | These additional records included accounting information for Ace Museum, Ace Gallery New York Corporation, and the dissolved Ace Gallery New York Inc. (collectively, the "Non-Debtor Entities"), as well as certain "paper" files. | Leslie Decl. II at ¶ 4. |
| 7. | When Plan Agent took over the Debtor's business, he needed to gain an immediate and intricate understanding of the Debtor's ordinary course business operations so that he could continue to operate the business as required under the Court's order appointing the Plan | Leslie Decl. II at ¶ 5. |

GEX 64

| | | | |
|---|---|---|---|
| | | Agent. | |
| 1 | 8. | On April 6, 2016, Mr. Chrismas admitted to Plan Agent that he had taken funds from the Debtor's bank account to pay rent for Ace Museum. | Leslie Decl. II at ¶ 5. |
| 2, 3 | 9. | Over the course of the initial weeks of Plan Agent's engagement, he became familiar with the Debtor's inventory of owned artworks, inventory of consigned artworks, past customers, artists under contract, employees and vendors. | Leslie Decl. II at ¶ 6. |
| 4, 5, 6 | 10. | In addition, Plan Agent became familiar with the basic business operations of Debtor, such as the form contracts used with artists, the accounting program, the procedures for invoicing purchasers, and other such ordinary course practices. | Leslie Decl. II at ¶ 6. |
| 10, 11, 12, 13 | 11. | As a result of this analysis, Plan Agent developed an extensive understanding of the Debtor's pre and post-petition operations, including the details of the fraud that was carried out by Douglas Chrismas during his tenure running the Debtor's operations prior to and after the Effective Date. | Leslie Decl. II at ¶ 7. |
| 14, 15, 16, 17, 18 | 12. | Plan Agent and his staff discovered that Douglas Chrismas had not accurately recorded proceeds from Art Property for sales in the Debtor's books and records and bank accounts, but instead had deposited proceeds from the sales to non-debtor accounts, i.e., the non-debtor entity Ace Gallery New York Corporation ("Ace NYC") and others even though the sale proceeds were property of the Debtor's estate. | Leslie Decl. II at ¶ 7. Declaration of Timothy Kincaid in Support of Plaintiff's Motion for Preliminary Injunction, ECF 216 ("Kincaid Decl.") at 1-15 and exhibits attached thereto. |
| 19, 20 | 13. | Plan Agent's investigation revealed that Ace NYC was a shell entity that had no actual business or assets of its own. | Leslie Decl. II at ¶ 8. |
| 21, 22, 23 | 14. | The investigation revealed that Ace NYC was a corporate name and a bank account that was used by Mr. Chrismas to funnel assets of Debtor's Bankruptcy Estate to third parties. | Leslie Decl. II at ¶ 8. Kincaid Decl. at 1-15 and exhibits attached thereto. |
| 24, 25, 26, 27 | 15. | The Plan Agent's investigation revealed that although all of the artist contracts and consignment agreements that Plan Agent located in the Debtor's and Non-Debtor Entities' books and records were contracts between the artist and the Debtor, many of the sales invoices recorded the sale as having been carried out by Ace NYC rather than by the Debtor. | Leslie Decl. II at ¶ 9. Kincaid Decl. at 1-15 and exhibits attached thereto. |
| 28 | | | |

GEX 65

| 16. | The Plan Agent's investigation revealed that the post-petition sales that were alleged to have been carried out by Ace NYC were actually sales of the Debtor's property. | Leslie Decl. II at ¶ 9. Kincaid Decl. at 1-15 and exhibits attached thereto. |
|---|---|---|
| 17. | Mr. Chrismas incorporated Ace Gallery New York Corporation ("Ace NYC") on February 14, 2013, five days before the Petition Date. | Leslie Decl. II at ¶ 12. Kincaid Decl. at ¶ 7. Declaration of Victor Sahn Submitted in Support of Motion for Summary Judgment ("Sahn Decl."), ECF 874, at Exhibit 6 attached thereto (January 28, 2016 Chrismas Deposition) at page 11, lines 2-13 ("Q. Does Ace New York have an artwork that it owns or has on consignment? A. Maybe one or two pieces. It's a – it's consulting."). |
| 18. | During the post-petition period, Plan Agent's investigation revealed that there were approximately 158 sales of artworks that were the property of Debtor, yet the funds from these sales were deposited into Non-Debtor Entities accounts. Sales proceeds from 147 sales of artwork were deposited into the Ace NY Account. Sales proceeds from 9 pieces of artwork were directly deposited into an Ace | Leslie Decl. II at ¶ 20 and Exhibit D attached thereto, Chart entitled "Debtor's Art Sales Deposited into Ace Gallery New York Corporation & Inc., Ace Museum, and 400 S. La Brea, LLC,"("Diverted Art Sales Chart").[2] |

---

[2] Regarding this exhibit, Exhibit D to Leslie Decl. II, Plan Agent stated in his SSUF, ECF 1000, filed on June 9, 2021, that consistent with Federal Rule of Evidence 1006, the entirety of the underlying banking records original Ziegler Report Exhibit C summary are too voluminous to resubmit and were therefore presented in factual summary form. "Leslie Decl. II at ¶ 20 and Exhibit D thereto" is the original spreadsheet prepared by Jennifer Ziegler (*i.e.*, Ziegler Referenced Exhibit C (Diverted Art Sales Chart)) summarizing evidence related to Debtor's post-petition sales and depositing of proceeds into non-Debtor entity Accounts, and incorporates and synthesizes the sales, deposits and total amounts as reflected in the banking records and statements and invoices in the record. The bank records and statements themselves were previously submitted as Exhibits A, B and U to the Declaration of Timothy Kincaid in Support of Plaintiff's Motion for Preliminary Injunction, ECF 216 ("Kincaid Decl.") at 3. A set of Ace NYC banking records are also currently submitted as Exhibits A, A1, B, B1 and C to the Leslie Decl. II. At this court's request, Plan Agent submitted a Compendium of Exhibits, ECF 1001, filed on June 9, 2021, which organized this evidence consisting of artist contracts, sales invoices and bank records and statements showing the Debtor's artwork sales and deposits of the sales proceeds into non-Debtor entity bank accounts by

*(continued)*

-7-

GEX 66

| | | | |
|---|---|---|---|
| 1 | | Museum account. Sale proceeds from the sale of 2 pieces of artwork were directly deposited into a 400 S. La Brea account. | Kincaid Decl. at 1-15 and exhibits attached thereto. |
| 2 | | | |
| 3 | 19. | The investigation revealed that the 158 pieces of artwork sold during this post-petition period belonged to Debtor. | Leslie Decl. II at ¶¶ 20 and 21, and Exhibit D thereto (Diverted Art Sales Chart). |
| 4 | | | |
| 5 | | | Kincaid Decl. at 1-15 and exhibits attached thereto. |
| 6 | | | |
| 7 | 20. | During the post-petition period, Non-Debtor Entities, Ace Museum and Ace Gallery New York Corporation, received proceeds from the sales of Debtors artworks by Mary Corse, Gary Lang, Helen Pashgian, Natalie Arnoldi, Justin Bower, Laurie Lipton, De Wain Valentine, Alexander Yulish, Peter Alexander, Alex Berg, Matt Hope, the Date Farmers, Ruth Pastine, Ben Jones, Phil Frost, Bernar Venet, Gisela Colon, Ellsworth Kelly, Johnathan Monk, Tara Donovan, Brian Willis, Robert Morris, Sylvie Fleury, Carl Andre and Robert Rauchenberg, many of whom were artists with which the Debtor had agreements to sell their artwork and others representing artwork owned by the Debtor outright. | Leslie Decl. II at ¶¶ 20 and 21, and Exhibit D thereto (Diverted Art Sales Chart). |
| 8 | | | |
| 9 | | | Kincaid Decl. at 1-15 and exhibits attached thereto. |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | 21. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | 22. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | 23. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching |
| 25 | | | |
| 26 | | | |
| 27 | | | |

28

transaction, and his supplemental declaration authenticating the evidence in the Compendium of Exhibits, ECF 1117, filed on October 4, 2021.

GEX 67

| | | | |
|---|---|---|---|
| 1 | | | copy of Helen Pashgian Contract). |
| 2 | 24. | Natalie Arnoldi and the Debtor are parties to a contract dated December 29, 2014, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Natalie Arnoldi (the "Arnoldi Contract"). | Natalie Arnoldi Contract at Leslie Decl. II at ¶ 31 (discussing factual foundation regarding Natalie Arnoldi contract) and Exhibit L thereto (attaching copy of Natalie Arnoldi Contract). |
| 25. | Justin Bower and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Justin Bower (the "Bower Contract"). | Justin Bower Contract at Leslie Decl. II at ¶ 32 (discussing factual foundation regarding Justin Bower contract) and Exhibit M thereto (attaching copy of Justin Bower Contract). |
| 26. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 27. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). |
| 28. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "Yulish Contract"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| | | | |

-9-

GEX 68

| | | |
|---|---|---|
| 29. | Peter Alexander and the Debtor are parties to a Consignment Agreement dated August 24, 2015, by which the Debtor had the exclusive right thereafter to sell certain consigned artworks by Peter Alexander (the "Alexander Contract"). | Peter Alexander Contract at Leslie Decl. II at ¶ 36 (discussing factual foundation regarding Peter Alexander contract) and Exhibit Q thereto (attaching copy of Peter Alexander Contract). |
| 30. | Alex Berg and the Debtor are parties to a contract dated August 21, 2013, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alex Berg (the "Berg Contract"). | Alex Berg Contract at Leslie Decl. II at ¶ 37 (discussing factual foundation regarding Alex Berg contract) and Exhibit R thereto (attaching copy of Alex Berg Contract). |
| 31. | Matt Hope and the Debtor are parties to a contract dated September 22, 2006, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Matt Hope (the "Hope Contract"). | Matt Hope Contract at Leslie Decl. II at ¶ 38 (discussing factual foundation regarding Matt Hope contract) and Exhibit S thereto (attaching copy of Matt Hope Contract). |
| 32. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| 33. | Ruth Pastine and the Debtor are parties to two Consignment Agreements dated February 25, 2015, and October 1, 2015 (the "Pastine Contract"). | Ruth Pastine Contract at Leslie Decl. II at ¶ 40 (discussing factual foundation regarding Ruth Pastine contract) and Exhibit U thereto (attaching copy of Ruth Pastine Contract). |
| | | |

GEX 69

| 34. | The Debtor sold artworks by Ben Jones in sales dating from March 28, 2013. | Ben Jones sales documents at Leslie Decl. II at ¶ 41 (discussing factual foundation Ben Jones sale) and Exhibit V thereto (attaching copy of sales documents). |
| --- | --- | --- |
| 35. | The Debtor sold artworks by Phil Frost in sales dating from June 25, 2013. | Phil Frost sales documents at Leslie Decl. II at ¶ 42 (discussing factual foundation Phil Frost sale) and Exhibit W thereto (attaching copy of sales documents). |
| 36. | In July 2013, the Debtor hosted a show of sculptures by Bernar Venet at its Wilshire Blvd. and Beverly Hills location. | Bernar Venet sales documents at Leslie Decl. II at ¶ 43 (discussing factual foundation Bernar Venet sale) and Exhibit X thereto (attaching copy of sales documents). |
| 37. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 38. | The Ellsworth Kelly artwork was owned by a private collector, and was sold as a secondary art sale using the Debtor's facilities for displaying the artwork and the Debtor's staff and costs for shipping the piece.  In addition, internal emails from Debtor discussing the provenance and describing the artwork on Ace Gallery Los Angeles Letterhead were found in Debtors' records. | Ellsworth Kelly sales documents at Leslie Decl. II at ¶ 45 (discussing factual foundation Ellsworth Kelly sale) and Exhibit Z thereto (attaching copy of sales documents). |
| 39. | The Debtor sold artworks from Jonathan Monk on March 30, 2016 which is reflected on Ace | Ace Gallery Invoice K1012 at Leslie Decl. II at ¶ 46 and |

-11-

| | | | |
|---|---|---|---|
| 1 2 3 | | Gallery invoice No. K-1012, a true and correct copy of which is attached hereto as Exhibit AA. The invoice demonstrates that Debtor sold the artwork and was entitled to the proceeds funds from the sale. | Exhibit AA thereto. |
| 4 5 6 7 8 9 | 40. | The Debtor sold artworks from Tara Donovan on March 30, 2016 which is reflected on Ace Gallery invoice No. K-1012, a true and correct copy of which is attached hereto as Exhibit BB. The Debtor also sold artworks from Tara Donovan on March 26, 2013 which is reflected on Ace Gallery invoice No. 1592, a true and correct copy of which is attached hereto as Exhibit BB. The invoices demonstrate that Debtor sold the artwork and was entitled to the proceeds funds from the sales. | Ace Gallery Invoice K1012 at Leslie Decl. II at ¶ 47 and Exhibit BB thereto. |
| 10 11 12 13 14 15 | 41. | The Debtor sold artwork by John Millei on June 5, 2013 (entitled "Maritime #18") as evidenced by Ace Gallery Invoice No. 2005. On May 30, 2013, the Estate of Pentti J.K. Kouri filed a "Notice of Motion and Motion for Relief from the Automatic Stay under 11 U.S.C. Section 362" seeking return of various artwork from Debtor that was subject to a consignment agreement between the Kouri estate and Debtor including the John Millei artwork referred to here. | Ace Gallery Invoice 2005 at Leslie Decl. II at ¶ 48 and Exhibit CC thereto. |
| 16 17 18 19 | 42. | The Debtor sold artworks from Brian Willis on March 5, 2013, which is reflected on Ace Gallery invoice No. 2003. The invoice demonstrates that Debtor sold the artwork and was entitled to the proceeds funds from the sale. These works were consigned from another gallery pursuant to a consignment agreement. | Ace Gallery Invoice 2003 at Leslie Decl. II at ¶ 49 and Exhibit DD thereto. |
| 20 21 | 43. | The Debtor sold artworks from Robert Morris on March 20, 2013, which is reflected on Ace Gallery invoice No. 2005. | Ace Gallery Invoice 2005 at Leslie Decl. II at ¶ 50 and Exhibit EE thereto. |
| 22 23 | 44. | The Debtor sold artworks from Sylvie Fleury on March 16, 2016, which is reflected on Ace Gallery Los Angeles Invoice No. K-1013. | Ace Gallery Invoice K1013 at Leslie Decl. II at ¶ 51 and Exhibit FF thereto. |
| 24 25 | 45. | The Debtor sold artwork from Robert Rauschenberg on June 22, 2015 that is reflected on Ace Gallery Los Angeles Invoice No. 1819. | Ace Gallery Invoice 1819 at Leslie Decl. II at ¶ 52 and Exhibit GG thereto. |
| 26 27 28 | 46. | The Debtor sold artworks from Carl Andre on May 17, 2013 (including fees from the sale on May 22, 2013), which is reflected on Ace Gallery Los Angeles Invoice Nos. 2012 and 2014. | Ace Gallery Invoice 2012 and 2014 at Leslie Decl. II at ¶ 53 and Exhibit HH thereto. |

-12-

GEX 71

| | **FACTS RELATED TO DOUGLAS CHRISMAS'S POST-PETITION CONVERSION OF DEBTOR'S PROPERTY THROUGH ACE NEW YORK** | |
|---|---|---|
| | **MR. CHRISMAS ASSERTED THE FIFTH AMENDMENT PRIVILEGE REGARDING QUESTIONS POSED ABOUT HIS CONVERSION OF FUNDS THROUGH ACE NEW YORK[3]** | |
| 47. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that ACE NY carried out sales on behalf of artists with whom Debtor had consignment contracts that were in force at the time of such sales." | Declaration of Victor Sahn Submitted in Support of Motion for Summary Judgment ("Sahn Decl."), ECF 874, ¶¶ 1-11; Exhibits 1 (Request for Admission to Douglas Chrismas, Set 1, RFA No. 1. |
| 48. | Mr. Chrismas asserted the Fifth Amendment in response to Interrogatories requesting that he identify all assets that belonged to ACE NYC when it was incorporated on the eve of the Debtor's Chapter 11 bankruptcy case in 2013. | Sahn Decl., Exhibit 2 (Interrogatories to Douglas Chrismas, Set 1, Nos. 63, 64 and 65). |
| 49. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that ACE NYC obtained funds of Debtor during the post-petition period." | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 17 and Douglas Chrismas Response to the same). |
| 50. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that you used ACE NYC to process sales of artwork that were owned by or subject to the consignment agreements of Debtor." | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 18 and Douglas Chrismas Response to the same). |
| 51. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that ACE NYC never had an inventory of artworks to which it had legal title." | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, |

---

[3] This section outlines a number of key questions related to Mr. Chrismas's conversion of Debtor's funds related to Debtor's artwork assets sold during the post-petition time period. The facts in this section are relevant to each transaction listed below. Plan Agent requested that these facts be incorporated into each set of facts related to the Invoices outlined below to the extent an adverse inference determination is made by the Court. Where appropriate, Plan Agent had cited in the SSUF Chrismas's specific invocations of the Fifth Amendment regarding specific artists, invoices or artworks as they relate to the specific transactions.

GEX 72

| | | | |
|---|---|---|---|
| | | | No. 25 and Douglas Chrismas Response to the same). |
| 52. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that ACE NYC never entered into a fully executed consignment agreement with any artists prior to April 6. 2016." | | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 26 and Douglas Chrismas Response to the same). |
| 53. | Mr. Chrismas asserted the Fifth Amendment in response to the following Request for Admission "Admit that you never disclosed to the Bankruptcy Court during the pendency of the Chapter 11 proceedings that sales proceeds received by ACE NYC arising from the sales of artworks belonging to Debtor or subject to Debtor's consignment agreements were not being transferred to Debtor." | | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 27 and Douglas Chrismas Response to the same). |
| 54. | Mr. Chrismas asserted the Fifth Amendment in response to the following Request for Admission "Admit that between February 19, 2013 and April 16, 2016 you diverted Debtor Funds to ACE NYC." | | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 54 and Douglas Chrismas Response to the same). |
| | **FEBRUARY 2013 POST-PETITION SALES AND DEPOSITS** | | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1541** | | |
| 55. | On February 18, 2103, Debtor charged its client for packing and shipping costs for the sale of two Laurie Lipton paintings in the amount of $600.00 as reflected on Ace Gallery Los Angeles Invoice No. 1541. | | Invoice No. 1541, Exhibit 1 of Compendium of Evidence, ECF 1001, filed on June 9, 2021, p. 2; Supplemental Declaration of Sam Leslie in Support of Plaintiff's Motion for Summary Adjudication, ECF 1117, filed on October 4, 2021 (setting forth evidentiary foundation for Compendium of Evidence). |

-14-

GEX 73

| | | [4] |
|---|---|---|
| 56. | The total amount of the sale on Invoice No. 1541 was $600.00. | *Id.* |
| 57. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 58. | On February 26, 2013, $600.00 was deposited into Ace New York checking account no. ending in #0229 at City National Bank. | Ace NY Bank Records, Ex. 1 of Compendium of Evidence, pp. 3-4. |
| **ACE GALLERY INVOICE NO. 2000A** | | |
| 59. | On February 18, 2013, Debtor sold two pieces of artwork by the Date Farmers -- Duk Fug, 2012 and Jerk Off 2012 as reflected on Ace Gallery Invoice No. 2000A. | Invoice No. 2000A, Ex. 2 of Compendium of Evidence, p. 6. |
| 60. | The total amount of the sale on Invoice No. 2000A was $38,368.00. | *Id.* |
| 61. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| 62. | On February 19, 2013, $38,368.00 was deposited into Ace New York account ending in #9951 at Wells Fargo. | Ace NY Bank Records, Exhibit 2 of Compendium of Evidence, pp. 7-8. |
| 63. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2000A. | Chrismas Deposition, at [page:line(s)] 153:7-165:21; and Exhibits 84-91 attached |

---

[4] The references to Plaintiff's Compendium of Evidence are supported by the Supplemental Declaration of Sam Leslie in Support of Plaintiff's Motion for Summary Adjudication, ECF 1117, filed on October 4, 2021, which provides the evidentiary foundation for the exhibits attached to the Compendium.

GEX 74

| | | | |
|---|---|---|---|
| 1 | | | thereto. |
| 2–3 | | **ACE GALLERY NEW YORK INVOICE NO. 2000** | |
| 4–8 | 64. | On February 20, 2013, Debtor sold nine pieces of artwork by The Date Farmers – Ateen, 2010, Southern Comfort (Hello Kitty), 2010; Armagetnoutofhre, 2011; medU.S.A., 2011; Child Soldier, 2011, Regal Beer, 2010; Butterscotch, 2010. Chang044, 2010, and Plastico, 2011 as reflected on Ace Gallery New York Invoice No. 2000. | Invoice No. 2000, Exhibit 3 of Compendium of Evidence, p. 23. |
| 9 | 65. | The total amount of the sale on Invoice No. 2000 was $84,210.00 for all nine art pieces. | *Id.* |
| 10–15 | 66. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| 16–17 | 67. | On March 1, 2013, $84,177.00 was deposited into Ace New York account no. ending in #9951 at Wells Fargo. | Ace NY Bank Records, Exhibit 3 of Compendium of Evidence, pp. 24-25. |
| 18–20 | 68. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2000. | Chrismas Deposition, 181:17-185:1; 185:2-190:23; and Exhibits 59, 98-99 attached thereto. |
| 21–22 | | **ACE GALLERY INVOICE NO. 2001A** | |
| 23–24 | 69. | On February 26, 2013, Debtor sold two pieces of artwork by Laurie Lipton – Reality TV, 2009 and Icon, 2003 as reflected on Ace Gallery Invoice No. 2001A. | Invoice No. 2001A, Exhibit 4 of Compendium of Evidence, p. 31. |
| 25–26 | 70. | The total amount of the sale on Invoice No. 2001A was $32,000.00. | *Id.* |
| 27–28 | 71. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual |

GEX 75

| | | |
|---|---|---|
| | Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 72. | On March 8, 2013, $32,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 4 of Compendium of Evidence, pp. 32-33. |
| | **ACE GALLERY INVOICE NO. 1557A** | |
| 73. | On February 28, 2013, Debtor sold one piece of artwork by Mary Corse – Untitled (Grey Grid with Red), 1988 as reflected on Ace Gallery Invoice No. 1557A. | Invoice No. 1557A, Exhibit 5 of Compendium of Evidence, p. 35. |
| 74. | The total amount of the sale on Invoice No. 1557A was $200,000.00. | *Id.* |
| 75. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 76. | On March 8, 2013, 199,980.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 5 of Compendium of Evidence, pp. 36-37. |
| 77. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 1557A. | Chrismas Deposition, 171:4-175:10; 178:14-18; and Exhibit 95 attached thereto. |
| | | |

GEX 76

| | **MARCH 2013 POST-PETITION SALES AND DEPOSITS** | |
|---|---|---|
| | **ACE GALLERY INVOICE NO. 2001** | |
| 78. | On March 1, 2013, Debtor SOLD five pieces of artwork by The Date Farmers – 44 Skull, 2010, Vampirito, 2010, Pro Sports, 2010, Albert Medina, 2010, and Amor, 2009 – as reflected on Ace Gallery Invoice No. 2001. | Invoice No. 2001, Exhibit 6 of Compendium of Evidence, pp. 40-41. |
| 79. | The total amount of the sale on Invoice No. 2001 was $27,860.00. | *Id.* |
| 80. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| 81. | On March 20, 2013, $27,835.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 6 of Compendium of Evidence, pp. 42-43. |
| | **ACE GALLERY INVOICE NO. 2002** | |
| 82. | On March 1, 2013, Debtor sold two pieces of artwork by The Date Farmers – O Lord My Mistakes, 2010 and Old School, 2011 – as reflected on Ace Gallery Invoice No. 2002 | Invoice No. 2002, Exhibit 7 of Compendium of Evidence, p. 46. |
| 83. | The total amount of the sale on Invoice No. 2002 was $11,900.00 | *Id.* |
| 84. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers |

-18-

GEX 77

| | | | |
|---|---|---|---|
| | | | Contract). |
| | 85. | On March 15, 2013, $11,900.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 7 of Compendium of Evidence, pp. 47-48. |
| | | **ACE GALLERY INVOICE NO. 2003** | |
| | 86. | On March 5, 2013, Debtor sold one piece of artwork by Brian Wills – Untitled (Spectrum), 2013 – as reflected on Ace Gallery Invoice No. 2003. | Invoice No. 2003, Exhibit 8 of Compendium of Evidence, p. 51. |
| | 87. | The total amount of the sale on Invoice No. 2003 was $14,824.00. | *Id.* |
| | 88. | On March 7, 2013, $25,288.00 was deposited into Ace New York checking account ending in #0229 at City National Bank (for both invoice 2003 and invoice 1557B). | Ace NY Bank Records, Ex. 8 of Compendium of Evidence, pp. 53-54. |
| | | **ACE GALLERY INVOICE NO. 1557B** | |
| | 89. | On March 5, 2013, Debtor sold one piece of artwork by The Date Farmers – Watermelon Spider, 2011 – as reflected on Ace Gallery Invoice No. 1557B. | Invoice No. 1557B, Ex. 9 of Compendium of Evidence, p. 58. |
| | 90. | The total amount of the sale on Invoice No. 1557B was $10,464.00. | *Id.* |
| | 91. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| | 92. | On March 7, 2013, $25,288.00 was deposited into Ace New York checking account ending in #0229 at City National Bank (for both invoice 2003 and invoice 1557B). | Ace NY Bank Records, Ex. 9 of Compendium of Evidence, pp. 59-60. |

-19-

GEX 78

| ACE GALLERY INVOICE NO. 2005A | | |
|---|---|---|
| 93. | On March 5, 2013, Debtor sold one piece of artwork by Gary Lang – Ayre, 2015 – as reflected on Ace Gallery Invoice No. 2005A. | Invoice No. 2005A, Exhibit 10 of Compendium of Evidence, p. 63. |
| 94. | The total amount of the sale on Invoice No. 2005A was $45,000.00. | *Id.* |
| 95. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| 96. | On March 18, 2013, $45,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 10 of Compendium of Evidence, pp. 64-67. |
| 97. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2005A. | Chrismas Deposition, 191:23-194:12; and Exhibit 101 attached thereto. |
| ACE GALLERY INVOICE NO. 2006 | | |
| 98. | On March 18, 2013, Debtor sold four pieces of artwork by Mary Corse – Untitled (White 4 Inner Band Beveled) 2012, Untitled (White 1 Inner Band Beveled) 2012 SH29/LN7, Untitled (White 1 Inner Band Beveled) 2012 SH30/LN1, and Untiled (White 1 Inner Band W/Outer Band, Beveled) 2012 – as reflected on Invoice No. 2006. | Invoice No. 2006, Exhibit 11 of Compendium of Evidence, pp. 69-70. |
| 99. | The total amount of the sale on Invoice No. 2006 was $430,000.00 less special discount of $215,000.00 for a total of $215,000.00. | *Id.* |
| 100. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). |

-20-

GEX 79

| | | |
|---|---|---|
| | | *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 101. | On March 1, 2013, $150,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 11 of Compendium of Evidence, pp. 71-72. |
| 102. | On March 27, 2013, $65,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 11 of Compendium of Evidence, pp. 71-72. |
| 103. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2006. | Chrismas Deposition, 165:22-172:3; and Exhibits 92-94 attached thereto. |
| **ACE GALLERY INVOICE NO. 2005** | | |
| 104. | On March 20, 2013, Debtor sold one piece of artwork by Robert Morris – Working Drawing for Vertical Column, Horizontal Column, Hanging Slab, 1973 – as reflected on Invoice No. 2005. | Invoice No. 2005, Exhibit 12 of Compendium of Evidence, p. 75. |
| 105. | The total amount of the sale on Invoice No. 2005 was $18,000.00. | *Id.* |
| 106. | On March 21, 2013, $18,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 12 of Compendium of Evidence, pp. 76-77. |
| **ACE GALLERY INVOICE NO. 2007** | | |
| 107. | On March 28, 2013, Debtor sold one piece of artwork by Ben Jones – Roadtrip Video Painting, 2013 – as reflected on Invoice No. 2005. | Invoice No. 2007, Exhibit 13 of Compendium of Evidence, p. 80. |
| 108. | The total amount of the sale on Invoice No. 2007 was $26,160.00. | *Id.* |
| 109. | On March 28, 2013, $26,160.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 13 of Compendium |

GEX 80

| | | |
|---|---|---|
| | | of Evidence, pp. 81-82. |
| | **APRIL 2013 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY INVOICE NO. 2009** | |
| 110. | On April 15, 2013, Debtor sold one piece of artwork by Gary Lang – Metal Painting #2, 2011 – as reflected on Invoice No. 2009. | Invoice No. 2009, Exhibit 14 of Compendium of Evidence, p. 85. |
| 111. | The total amount of the sale on Invoice No. 2009 was $49,050.00. | *Id.* |
| 112. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| 113. | On April 22, 2013, $49,387.50 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 14 of Compendium of Evidence, p. 86. |
| | **ACE GALLERY INVOICE NO. 2010** | |
| 114. | On April 16, 2013, Debtor received 50% of the cost of an advertisement related to gallery artists Benar Venet on the back cover of the May/June issue of Flash Art Magazine as reflected on Invoice No 2010. | Invoice No. 2010, Ex. 15 of Compendium of Evidence, p. 90. |
| 115. | The total amount of the sale on Invoice No. 2010 was $3,600.00. | *Id.* |
| 116. | On April 22, 2013, $3,600.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 15 of Compendium of Evidence, p. 91. |
| | **ACE GALLERY INVOICE NO. 2011** | |
| 117. | On April 26, 2013, Debtor sold one piece of | Invoice No. 2011, Exhibit |

-22-

GEX 81

| | | | |
|---|---|---|---|
| | | artwork by Justin Bower – Spaceboy V, 2013 – as reflected on Invoice No. 2011. | 16 of Compendium of Evidence, p. 95. |
| | 118. | The total amount of the sale on Invoice No. 2011 was 18,750.00, less a discount per the agreement for a total of $9,375.00. | *Id.* |
| | 119. | Justin Bower and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Justin Bower (the "Bower Contract"). | Justin Bower Contract at Leslie Decl. II at ¶ 32 (discussing factual foundation regarding Justin Bower contract) and Exhibit M thereto (attaching copy of Justin Bower Contract). |
| | 120. | On May 6, 2013, $9,355.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 16 of Compendium of Evidence, pp. 96-97. |

### MAY 2013 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY INVOICE NO. 2012

| | | | |
|---|---|---|---|
| | 121. | On May 17, 2013, Debtor sold one piece of artwork by Carl Andre – 100 Ace Zinc Square, 2007 – as reflected on Invoice No. 2012. | Invoice No. 2012, Exhibit 17 of Compendium of Evidence, p. 102. |
| | 122. | The total amount of the sale on Invoice No. 2012 was $533,500.00. | *Id.* |
| | 123. | On May 20, 2013, $533,500.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 17 of Compendium of Evidence, pp. 103-204. |
| | 124. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2012. | Chrismas Deposition, 203:22-206:11; 211:6-213:7; and Exhibits 108-109; 113 attached thereto. |

### ACE GALLERY INVOICE NO. 2013

| | | | |
|---|---|---|---|
| | 125. | On May 17, 2013, Debtor sold one piece of artwork by Mary Corse – Untitled (White Inner Band), 2012 – as reflected on Invoice No. 2013. | Invoice No. 2013, Exhibit 18 of Compendium of Evidence, p. 109. |

-23-

GEX 82

| 126. | The total amount of the sale on Invoice No. 2013 was $125,225.00. | *Id.* |
|---|---|---|
| 126.5. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 127. | On May 21, 2013, $125,225.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 18 of Compendium of Evidence, p. 110. |

### ACE GALLERY INVOICE NO. 2014

| 128. | On May 22, 2013, Debtor sold one piece of artwork by Carl Andre – 100 Ace Zinc Square, 2007 – as reflected on Invoice No 2012.  The freight for that sale was charged to the client who purchased the artwork as reflected on Invoice No. 2014 | Invoice No. 2014, Exhibit 19 of Compendium of Evidence, p. 115. |
|---|---|---|
| 129. | The total amount of the sale on Invoice No. 2014 was $3,535.00. | *Id.* |
| 130. | On May 22, 2013, $3,535.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 19 of Compendium of Evidence, p. 116. |

### ACE GALLERY INVOICE NO. 2015A

| 131. | On May 24, 2013, Debtor sold one piece of artwork by John Millei – Maritime #18 (Black Pearl), 2004 – as reflected on Invoice No. 2015A. | Invoice No. 2015A, Exhibit 20 of Compendium of Evidence, p. 121. |
|---|---|---|

| 132. | The total amount of the sale on Invoice No. 2015A was $140,000.00. | *Id.* |
|---|---|---|
| 133. | On June 5, 2013, $140,000.00 was deposited into Ace New York checking account ending in #0029 at City National Bank. | Ace NY Bank Records, Ex. 20 of Compendium of Evidence, p. 122. |
| 134. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2015A. | Chrismas Deposition, 221:2-226:6, and Exhibits 118-120 attached thereto. |

### ACE GALLERY INVOICE NO. 2015

| 135. | On May 28, Debtor sold one piece of artwork by The Date Farmers – Untitled, (American Flag Theme), 2013 – as reflected on Invoice No. 2015. | Invoice No. 2015, Exhibit 21 of Compendium of Evidence, p. 126. |
|---|---|---|
| 136. | The total amount of the sale on Invoice No. 2015 was $18,000.00. | *Id.* |
| 137. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| 138. | On June 18, 2013, $8,980.00 was deposited into Ace New York checking account ending in #0029 at City National Bank. | Ace NY Bank Records, Exhibit 21 of Compendium of Evidence, pp. 127-128. |
| 139. | On September 4, 2013, another $8,980.00 was deposited into Ace New York checking account ending in #0029 at City National Bank. | Ace NY Bank Records, Exhibit 21 of Compendium of Evidence, pp. 127, 131. |

### ACE GALLERY INVOICE NO. 2016

| 140. | On May 31, 2013, Debtor sold one piece of artwork by Laurie Lipton – Wanda Always Wanted to Be A Sex Object, 1991 – as reflected on Invoice No. 2016. | Invoice No. 2016, Exhibit 22 of Compendium of Evidence, p. 135. |
|---|---|---|
| 141. | The total amount of the sale on Ace Gallery Invoice No. 2016 was $15,260.00. | *Id.* |

-25-

GEX 84

| 142. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| --- | --- | --- |
| 143. | On June 3, 2013, $15,260.00 was deposited into Ace New York checking account ending in #0029 at City National Bank. | Ace NY Bank Records, Ex. 22 of Compendium of Evidence, p. 136. |

### ACE GALLERY INVOICE NO. 2017

| 144. | On June 5, 2013, Debtor sold one piece of artwork by Justin Bower – Untitled, 2013 – as reflected on Invoice No. 2017. | Invoice No. 2017, Exhibit 23 of Compendium of Evidence, p. 140. |
| --- | --- | --- |
| 145. | The total amount of the sale on Invoice No. 2017 was $20,000.00. | *Id.* |
| 146. | Justin Bower and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Justin Bower (the "Bower Contract"). | Justin Bower Contract at Leslie Decl. II at ¶ 32 (discussing factual foundation regarding Justin Bower contract) and Exhibit M thereto (attaching copy of Justin Bower Contract). |
| 147. | On June 6, 2013, $20,000.00 was deposited into Ace New York checking account ending in #0029 at City National Bank. | Ace NY Bank Records, Ex. 23 of Compendium of Evidence, pp. 141-142. |

### ACE GALLERY NEW YORK INVOICE NO. 2019

| 148. | On June 25, 2013, Debtor sold one piece of artwork by The Date Farmers – Meteor Shower, 2013 – as reflected on Invoice No. 2019. | Invoice No. 2019, Exhibit 24 of Compendium of Evidence, p. 146. |
| --- | --- | --- |
| 149. | The total amount of the sale on Invoice No. 2019 was $20,000.00. | *Id.* |
| 150. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers") and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date |

GEX 85

| | | | |
|---|---|---|---|
| | | right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Farmers Contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| | 151. | On July 3, 2013, $20,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 24 of Compendium of Evidence, pp. 147-148. |
| | | **JULY 2013 POST-PETITION SALES AND DEPOSITS** | |
| | | **ACE GALLERY NEW YORK INVOICE NO. 2020** | |
| | 152. | On July 2, 2013, Debtor sold one piece of artwork by David Amico – Fast Line 2006; one piece of artwork by Phil Frost – Untitled, 2013 [4' x' 3']; and one piece of artwork by Gary Lang – One (With The) Sting #3, 2011 – as reflected on Invoice No. 2020. | Invoice No. 2020, Exhibit 25 of Compendium of Evidence, p. 152. |
| | 153. | The total amount of the sale on Invoice No. 2020 was $132,000.00. | *Id.* |
| | 154. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| | 155. | On July 2, 2013, $132,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Ex. 25 of Compendium of Evidence, pp. 152-154. |
| | 156. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2020. | Chrismas Deposition, 396:14-399:3; and Exhibit 184 attached thereto. |
| | | **ACE GALLERY NEW YORK INVOICE NO. 2020A** | |
| | 157. | On July 3, 2013, Debtor sold three pieces of artwork by Helen Pashgian – Untiled, #18, 2012; Untitled #19, 2012; and Untitled (Blue Sphere), | Invoice No. 2020A, Exhibit 26 of Compendium of |

-27-

GEX 86

| | | | |
|---|---|---|---|
| 1 | | 2013 – as reflected on Invoice No. 2020A. | Evidence, p. 158. |
| 2 | 158. | The total amount of the sale on Invoice No. 2020A was $51,200.00 | *Id.* |
| 3-11 | 159. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 12-13 | 160. | On July 8, 2013, $51,200.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 26 of Compendium of Evidence, pp. 159-160. |
| 14-16 | | **ACE GALLERY INVOICE NO. 2021** | |
| 17-18 | 161. | On July 22, 2013, Debtor sold one piece of artwork by Phil Frost – Untitled, 2013 [5' x 4'] – as reflected on Invoice No. 2021. | Invoice No. 2021, Exhibit 27 of Compendium of Evidence, p. 164. |
| 19 | 162. | The total amount of the sale on Invoice No. 2021 was $52,320.00 | *Id.* |
| 20-21 | 163. | On July 19, 2013, $52,320.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 27 of Compendium of Evidence, p. 165. |
| 22-23 | 164. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2021. | Chrismas Deposition, 391:3-393:24; and Exhibit 181 attached thereto. |
| 24-26 | | **ACE GALLERY NEW YORK INVOICE NO. 2022** | |
| 27-28 | 165. | On July 30, 2013, Debtor sold one piece of artwork by Bernar Venet,– Indetermined Line, 1990 and one piece of artwork by Charles Fine – Flor De Incino, 2012, as reflected on Invoice No. | Invoice No. 2022, Exhibit 28 of Compendium of Evidence, p. 169. |

-28-

| | | |
|---|---|---|
| | 2022. | |
| 166. | The total amount of the sale on Invoice No. 2015A was $172,000.00. | *Id.* |
| 167. | On August 2, 2013, $172,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 28 of Compendium of Evidence, pp. 170-171; 174. |
| 168. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2022. | Chrismas Deposition, 234:24-240:15; and Exhibits 127-131 attached thereto. |
| 169. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2022. | Chrismas Deposition, 387:10-389:20; and Exhibit 179 attached thereto. |
| | **SEPTEMBER 2013 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1614A** | |
| 170. | On September 12, 2013, Debtor invoiced the commission due on a direct sale of art by Helen Pashgian. | Invoice No. 1614A, Exhibit 29 of Compendium of Evidence, p. 176. |
| 171. | The total amount of the sale on Invoice No. 1614A was $10,000.00. | *Id.* |
| 172. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 173. | On September 20, 2013, $10,000.00 was deposited into Ace New York checking account | Ace NY Bank Records, Exhibit 29 of Compendium |

-29-

GEX 88

| 1 | | ending in #0229 at City National Bank. | of Evidence, p. 177. |
|---|---|---|---|
| 2 | | | |
| 3 | | **OCTOBER 2013 POST-PETITION SALES AND DEPOSITS** | |
| 4 | | | |
| 5 | | **ACE GALLERY NEW YORK INVOICE NO. 2026** | |
| 6 | | | |
| 7 | 174. | On October 11, 2013, Debtor sold one piece of artwork by Alex Berg – Young Girls Hair, 2012 – as reflected on Invoice No. 2026. | Invoice No. 2026, Exhibit 30 of Compendium of Evidence, p. 181. |
| 8 | | | |
| 9 | 175. | The total amount of the sale on Invoice No. 2026 was $1,962.00. | *Id.* |
| 10 | 175.5 | Alex Berg and the Debtor are parties to a contract dated August 21, 2013, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alex Berg (the "Berg Contract"). | Alex Berg Contract at Leslie Decl. II at ¶ 37 (discussing factual foundation regarding Alex Berg contract) and Exhibit R thereto (attaching copy of Alex Berg Contract). |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | 176. | On October 17, 2013, $1,962.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 30 of Compendium of Evidence, pp. 182-183. |
| 17 | | | |
| 18 | | **ACE GALLERY NEW YORK INVOICE NO. 2027** | |
| 19 | | | |
| 20 | 177. | On October 14, 2013, Debtor sold two pieces of artwork by Gary Lang – Metallines 1, 2013 and Metal Lines 2, 2013 – as reflected on Invoice No. 2027. | Invoice No. 2027, Exhibit 31 of Compendium of Evidence, p. 187. |
| 21 | | | |
| 22 | | | |
| 23 | 178. | The total amount of the sale on Invoice No. 2027 was $120,000.00. | *Id.* |
| 24 | 179. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

| 180. | On October 16, 2013, $120,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 31 of Compendium of Evidence, p. 188. |
|---|---|---|
| 181. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2027. | Chrismas Deposition, 259:10-263:10; and Exhibits 143-145 attached thereto. |

**ACE GALLERY NEW YORK INVOICE NO. 2028**

| 182. | On October 17, 2013, Debtor sold one piece of artwork by Helen Pashgian – Untitled, (Elliptical Spheroid), 1969 – as reflected on Invoice No. 2028. | Invoice No. 2028, Exhibit 32 of Compendium of Evidence, p. 192. |
|---|---|---|
| 183. | The total amount of the sale on Invoice No. 2028 was $37,060.00. | *Id.* |
| 184. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint ECF 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 185. | On October 18, 2013, $37,060.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 32 of Compendium of Evidence, pp. 193-194. |

**NOVEMBER 2013 POST-PETITION SALES AND DEPOSITS**

**ACE GALLERY NEW YORK INVOICE NO. 2030**

| 186. | On November 25, 2013, Debtor sold two pieces of artwork by Mary Corse – 1 White Painting, | Invoice No. 2030, Exhibit 33 of Compendium of |
|---|---|---|

-31-

GEX 90

| | | | |
|---|---|---|---|
| 1 | | 1968 and 1 Black Painting, 1979 – as reflected on Invoice No. 2030. | Evidence, p. 198. |
| 2 3 | 187. | The total amount of the sale on Invoice No. 2030 was $300,000.00. | *Id.* |
| 4 5 6 7 8 9 10 11 12 13 | 188. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 14 15 | 189. | On November 25, 2013, $200,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 33 of Compendium of Evidence, pp. 199-200. |
| 16 17 | 190. | On November 25, 2013, $100,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 33 of Compendium of Evidence, pp. 199-200. |
| 18 19 20 | 191. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2030. | Chrismas Deposition, 266:15-267:22; 270:17-271:1; 273:4-274:2; and Exhibits 147-149 attached thereto. |
| 21 22 | | **<u>ACE GALLERY LOS ANGELES INVOICE NO. 1660</u>** | |
| 23 24 25 | 192. | On November 27, 2013, Debtor sold three pieces of artwork by De Wain Valentine – Column Gray, 1972-75 [1 of 2]; Column Gray, 1972-75 [2 of 2], and Skyline 001, 2004 – as reflected on Invoice No. 1660. | Invoice No. 1660, Exhibit 34 of Compendium of Evidence, p. 204. |
| 26 27 | 193. | The total amount of the sale on Invoice No. 1660 was $153,900.00. | *Id.* |
| 28 | 194. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts | De Wain Valentine Contract at Leslie Decl. II |

GEX 91

| | | | |
|---|---|---|---|
| | | by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| | 195. | On February 18, 2014, $153,900.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 34 of Compendium of Evidence, pp. 205-206. |
| | 196. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 1660. | Chrismas Deposition, 274:3-276:19; Chrismas Depo. Exs. 150-152. |
| | | **ACE GALLERY INVOICE NO. 1661** | |
| | 197. | On November 27, 2013, Debtor sold three pieces of artwork by De Wain Valentine – Column Gray #5, 1970; Column Gray #1, 1970; and Column Gray #2, 1970 – as reflected on Invoice No. 1661. | Invoice No. 1661, Ex. 35 of Compendium of Evidence, p. 211. |
| | 198. | The total amount of the sale on Invoice No. 1661 was $225,000.00. | *Id.* |
| | 199. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |

-33-

GEX 92

| | | |
|---|---|---|
| 200. | On December 24, 2013, $50,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Ex. 35 of Compendium of Evidence, pp. 212-213. |
| 201. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 1661. | Chrismas Deposition, 276:20-277:25; and Exhibit 153 attached thereto. |

### DECEMBER 2013 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2031A

| | | |
|---|---|---|
| 202. | On December 8, 2013, Debtor sold one piece of artwork by De Wain Valentine – Column Gray With Cloud, 1969-70 – as reflected on Invoice No. 2031A. | Invoice No. 2031A, Exhibit 36 of Compendium of Evidence, p. 217. |
| 203. | The total amount of the sale on Invoice No. 2031A was $480,000.00. | *Id.* |
| 204. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| 205. | On December 13, 2013, $240,000.00 (two payments of $120,000.00) was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 36 of Compendium of Evidence, pp. 218-291. |
| 206. | On January 3, 2014, $240,000.00 (two payments of $120,000.00) was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 36 of Compendium of Evidence, pp. 218, 222. |

GEX 93

| 207. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2031A. | Chrismas Deposition, 278:1-282:1; and Exhibits 154-157 attached thereto. |
|---|---|---|
| | **ACE GALLERY NEW YORK INVOICE NO. 2031** | |
| 208. | On December 17, 2013, Debtor sold one piece of artwork by De Wain Valentine – Diamond Column Blue, 1968 – as reflected on Invoice No. 2031. | Invoice No. 2031, Exhibit 37 of Compendium of Evidence, p. 226. |
| 209. | The total amount of the sale on Invoice No. 2031 was $37,060.00. | *Id.* |
| 210. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| 211. | On December 18, 2013, $37,060.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 37 of Compendium of Evidence, p. 227. |
| | **2014 POST-PETITION SALES AND DEPOSITS** | |
| | **JANUARY 2014 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2032** | |
| 212. | On January 16, 2014, Debtor sold one piece of | Invoice No. 2032, Exhibit |

GEX 94

| | | | |
|---|---|---|---|
| | | artwork by Gisela Colon – Rectangle Torque Glo-Pod (Iridescent Hot Red/Pink), 2013 – and one piece of artwork by Helen Pashgian – Sphere (Red, Pale Blue Eyes), 2013 – as reflected on Invoice No. 2032. | 38 of Compendium of Evidence, p. 231. |
| | 213. | The total amount of the sale on Invoice No. 2032 was $64,310.00. | *Id.* |
| | 214. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| | 215. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation of Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| | 216. | On January 16, 2014, $64,310.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 38 of Compendium of Evidence, p. 232. |
| | 217. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2032. | Chrismas Deposition, 351:25-354:10; 354:9-357:17; and. Exhibits 166-167 attached thereto. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2033** | | |
| | 218. | On January 16, 2014, Debtor sold one piece of artwork by Gisela Colon – Skewed Square Glo-Pod (iridescent Indigo Glue), 2014 – as reflected on Invoice No. 2033. | Invoice No. 2033, Exhibit 39 of Compendium of Evidence, p. 236. |

GEX 95

| 219. | The total amount of the sale on Invoice No. 2033 was $12,000.00. | *Id.* |
|---|---|---|
| 220. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 221. | On January 17, 2014, $12,000.00 (within the $80,000.00 deposit) was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 39 of Compendium of Evidence, pp. 237-283. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2034** | |
| 222. | On January 19, 2014, Debtor sold one piece of artwork by Justin Bower – Untitled, 2009 – as reflected on Invoice No. 2034. | Invoice No. 2034, Exhibit 40 of Compendium of Evidence, p. 242. |
| 223. | The total amount of the sale on Invoice No. 2034 was $29,750.00. | *Id.* |
| 224. | Justin Bower and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Justin Bower (the "Bower Contract"). | Justin Bower Contract at Leslie Decl. II at ¶ 32 (discussing factual foundation regarding Justin Bower contract) and Exhibit M thereto (attaching copy of Justin Bower Contract). |
| 225. | On January 21, 2014, $5,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 40 of Compendium of Evidence, pp. 243-244. |
| 226. | On January 23, 2014, $9,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 40 of Compendium of Evidence, pp. 243-244. |
| 227. | On January 24, 2014, $7,500.00 ($15,750.00 total deposit) was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 40 of Compendium of Evidence, pp. 243-244. |
| 228. | On January 24, 2014, $8,250.00 ($15,750.00 total deposit) was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 40 of Compendium of Evidence, pp. 243-244. |

GEX 96

| 229. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2034. | Chrismas Deposition, 357:22-360:5; and Exhibit 168 attached thereto. |
|---|---|---|

**ACE GALLERY NEW YORK INVOICE NO. 2035**

| 230. | On January 19, 2014, Debtor sold one piece of artwork by Gisela Colon – Dome Melt Glo-Pod (Iridescent Blue Green), 2014– as reflected on Invoice No. 2035. | Invoice No. 2035, Exhibit 41 of Compendium of Evidence, p. 247. |
|---|---|---|
|  | The total amount of the sale on Invoice No. 2035 was $14,715.00. | *Id.* |
| 231. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Colon sales) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 232. | On January 21, 2014, $14,715.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 41 of Compendium of Evidence, p. 248. |
| 233. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2035. | Chrismas Deposition, 366:22-369:4; 369:5-371:9; 371:10-372:10; and Exhibits 170-173 attached thereto. |

**FEBRUARY 2014 POST-PETITION SALES AND DEPOSITS**

**ACE GALLERY NEW YORK INVOICE NO. 2037**

| 234. | On February 5, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled (White Inner Bank with Flat White Outer Bands, Beveled), 2012 – as reflected on Invoice No. 2037. | Invoice No. 2037, Exhibit 42 of Compendium of Evidence, p. 252. |
|---|---|---|
| 235. | The total amount of the sale on Invoice No. 2037 was $72,000.00. | *Id.* |
| 236. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the | Mary Corse Contract at Leslie Decl. II at ¶ 28 |

| | | |
|---|---|---|
| | Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract).<br><br>*See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 237. | On January 16, 2014, $72,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 42 of Compendium of Evidence, pp. 253-254. |
| **ACE GALLERY NEW YORK INVOICE NO. 2036** | | |
| 238. | On February 11, 2014, Debtor sold one piece of artwork by Peter Alexander – Seven Part Bar, 2013 – as reflected on Invoice No. 2036. | Invoice No. 2036, Exhibit 43 of Compendium of Evidence, p. 258. |
| 239. | The total amount of the sale on Invoice No. 2032 was $163,500.00. | *Id.* |
| 240. | Peter Alexander and the Debtor are parties to a Consignment Agreement dated August 24, 2015, by which the Debtor had the exclusive right thereafter to sell certain consigned artworks by Peter Alexander (the "Alexander Contract"). | Peter Alexander Contract at Leslie Decl. II at ¶ 36 (discussing factual foundation regarding Peter Alexander contract) and Exhibit Q thereto (attaching copy of Peter Alexander Contract). |
| 241. | On February 4, 2014, $150,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 43 of Compendium of Evidence, pp. 259-260. |
| 242. | On February 12, 2014, $13,500.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 43 of Compendium of Evidence, pp. 259-260. |
| 243. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2036. | Chrismas Deposition, 373:11-377:15; and Exhibit |

GEX 98

| | | |
|---|---|---|
| | | 174 attached thereto. |
| | **MARCH 2014 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2038** | |
| 244. | On March 19, 2014, Debtor sold three pieces of artwork by Gisela Colon – Slab Glo-Pod (Iridescent Green Blue), 2013– as reflected on Invoice No. 2038; Ovoid Glo-Pod (Iridescent Aqua Violet), 2013; and Ovoid Glo-Pod (Iridescent Aqua Gold), 2013 – as reflected on Invoice No. 2038. | Invoice No. 2038, Exhibit 44 of Compendium of Evidence, pp. 264-265. |
| 245. | The total amount of the sale on Invoice No. 2038 was $38,368.00. | *Id.* |
| 246. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Colon sales) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 247. | On March 20, 2014, $38,368.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 44 of Compendium of Evidence, p. 266. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2040** | |
| 248. | On March 31, 2014, Debtor sold one piece of artwork by De Wain Valentine – Ring Agate, 1968 – as reflected on Invoice No. 2040. | Invoice No. 2040, Exhibit 45 of Compendium of Evidence, p. 270. |
| 249. | The total amount of the sale on Invoice No. 2040 was $150,000.00. | *Id.* |
| 250. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain |

-40-

| | | |
|---|---|---|
| | | Valentine Contract). |
| | | *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| 251. | On April 4, 2014, $150,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 45 of Compendium of Evidence, pp. 271-272. |
| | **APRIL 2014 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2041** | |
| 252. | On April 17, 2014, Debtor invoiced a part for the crating of the De Wain Valentine artwork Ring Agate, 1968 as reflected on Invoice No. 2041. | Invoice No. 2041, Exhibit 46 of Compendium of Evidence, p. 276. |
| 253. | The total amount of the sale on Invoice No. 2041 was $648.39. | *Id.* |
| 254. | On January 16, 2014, $648.39 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 46 of Compendium of Evidence, pp. 277-278. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2042** | |
| 255. | On April 23, 2014, Debtor sold one piece of artwork by Helen Pashgian – Untitled (Sphere), 2014 – as reflected on Invoice No. 2042. | Invoice No. 2042, Exhibit 47 of Compendium of Evidence, p. 282. |
| 256. | The total amount of the sale on Invoice No. 2042 was $39,240.00. | *Id.* |
| 257. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian |

GEX 100

| | | | |
|---|---|---|---|
| 1 | | | Contract). |
| 2 | | | *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | 258. | On April 30, 2014, $39,240.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 47 of Compendium of Evidence, p. 283. |
| 7 | | | |

**MAY 2014 POST-PETITION SALES AND DEPOSITS**

**ACE GALLERY NEW YORK INVOICE NO. 2043**

| | | | |
|---|---|---|---|
| 259. | On May 2, 2014, Debtor invoiced the delivery and installation for the Peter Alexander painting Seven Part bar, 2013 – as reflected on Invoice No. 2043. | Invoice No. 2043, Exhibit 48 of Compendium of Evidence, p. 287. |
| 260. | The total amount of the sale on Invoice No. 2043 was $889.20. | *Id.* |
| 261. | On May 22, 2014, $889.20 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 48 of Compendium of Evidence, pp. 288-289. |

**[NO LETTERHEAD] INVOICE NO. 2044**

| | | | |
|---|---|---|---|
| 262. | On May 9, 2014, Debtor sold two pieces of artwork by Alex Berg – Plane Crash, 2013 and Boy in Costume, 2013 – as reflected on Invoice No. 2044. | Invoice No. 2044, Exhibit 49 of Compendium of Evidence, p. 293. |
| 263. | The total amount of the sale on the Invoice No. 2032 was $2,725.00. | *Id.* |
| 264. | Alex Berg and the Debtor are parties to a contract dated August 21, 2013, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alex Berg (the "Berg Contract"). | Alex Berg Contract at Leslie Decl. II at ¶ 37 (discussing factual foundation regarding Alex Berg contract) and Exhibit R thereto (attaching copy of |

-42-

GEX 101

| | | |
|---|---|---|
| | | Alex Berg Contract). |
| 265. | On May 9, 2014, $2,725.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 49 of Compendium of Evidence, p. 294. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2045** | |
| 266. | On May 27, 2014, Debtor sold one piece of artwork by De Wain Valentine – Cantilevered Projections, 1965 – as reflected on Invoice No. 2045. | Invoice No. 2045, Exhibit 50 of Compendium of Evidence, p. 298. |
| 267. | The total amount of the sale on Invoice No. 2045 was $179,850.00. | *Id.* |
| 268. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| 269. | On May 27, 2014, $179,850.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 50 of Compendium of Evidence, pp. 299-300. |
| 270. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 2045. | Chrismas Deposition, 419:8-421:18; and Exhibit 196 attached thereto. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2046** | |
| 271. | On May 27, 2014, Debtor sold one piece of artwork by Helen Pashgian – Untitled, Sphere, 2013-14 – as reflected on Invoice No. 2046. | Invoice No. 2046, Exhibit 51 of Compendium of Evidence, p. 304. |

-43-

GEX 102

| | | |
|---|---|---|
| 272. | The total amount of the sale on Invoice No. 2046 was $36,000.00. | *Id.* |
| 273. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 274. | On January 16, 2014, $36,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 51 of Compendium of Evidence, pp. 305-306. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2047** | |
| 275. | On May 27, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled, White Inner Ban Beveled – as reflected on Invoice No. 2047 (Invoice No. 2044 marked out to reflect Invoice No. 2047). | Invoice No. 2047, Exhibit 52 of Compendium of Evidence, p. 309. |
| 276. | The total amount of the sale on Invoice No. 2047 was $57,000.00. | *Id.* |
| 277. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests |

GEX 103

| | | |
|---|---|---|
| | | in her artwork). |
| 278. | On January 16, 2014, $57,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 52 of Compendium of Evidence, pp. 310-311. |
| 279. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2047 (referred to as Invoice 2044 but sale reflecting same May 27, 2014 Mary Corse artwork as Invoice 2047). | Chrismas Deposition, 444:25-447:23; and Exhibit 206 attached thereto. |

### JUNE 2014 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2048

| | | |
|---|---|---|
| 280. | On June 5, 2014, Debtor sold two pieces of artwork by Justin Bower – Embedded, Beveled 2010 and Feed Back loop II, 2010– as reflected on Invoice No. 2048. | Invoice No. 2048, Exhibit 53 of Compendium of Evidence, p. 315. |
| 281. | The total amount of the sale on Invoice No. 2048 was $50,000.00. | *Id.* |
| 282. | Justin Bower and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Justin Bower (the "Bower Contract"). | Justin Bower Contract at Leslie Decl. II at ¶ 32 (discussing factual foundation regarding Justin Bower contract) and Exhibit M thereto (attaching copy of Justin Bower Contract). |
| 283. | On June 5, 2014, $50,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 53 of Compendium of Evidence, pp. 316-317. |

### ACE GALLERY INVOICE NO. 4449

| | | |
|---|---|---|
| 284. | On June 13, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled (White Multi Inner Band Beveled), 2013 – as reflected on Invoice No. 4449. | Invoice No. 4449, Exhibit 54 of Compendium of Evidence, p. 321. |
| 285. | The total amount of the sale on Invoice No. 4449 was $70,850.00 | *Id.* |

GEX 104

| 286. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
|---|---|---|
| 287. | On June 16, 2014, $70,850.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 54 of Compendium of Evidence, p. 322. |
| | **ACE GALLERY INVOICE NO. 2050** | |
| 288. | On June 29, 2014, Debtor sold one piece of artwork by Laurie Lipton – Hung Up and Over, 2003 – as reflected on Invoice No. 2050. | Invoice No. 2050, Exhibit 55 of Compendium of Evidence, pp. 326-327 |
| 289. | The total amount of the sale on Invoice No. 2050 was $18,530.00. | *Id.* |
| 290. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 291. | On June 26, 2014, $18,530.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 55 of Compendium of Evidence, pp. 328-329; 332. |
| | **ACE GALLERY INVOICE NO. 2051** | |

GEX 105

| | | |
|---|---|---|
| 292. | On June 25, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled (White Light Series), 1966 – as reflected on Invoice No. 2051. | Invoice No. 2051, Exhibit 56 of Compendium of Evidence, p. 334. |
| 293. | The total amount of the sale on Invoice No. 2051 was $325,000.00. | *Id.* |
| 294. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 295. | On June 30, 2014, $325,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 56 of Compendium of Evidence, pp. 335-336. |

**JULY 2014 POST-PETITION SALES AND DEPOSITS**

**ACE GALLERY LOS ANGELES INVOICE NO. 1739**

| | | |
|---|---|---|
| 296. | On July 14, 2014, Debtor sold one piece of artwork by Helen Pashgian – Untitled (Disc), 2014 – as reflected on Invoice No. 1739. | Invoice No. 1739, Exhibit 57 of Compendium of Evidence, pp. 340-341. |
| 297. | The total amount of the sale on Invoice No. 1739 was $200,000.00. | *Id.* |
| 298. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching |

-47-

GEX 106

| | | |
|---|---|---|
| | | copy of Helen Pashgian Contract). |
| | | *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| | On August 8, 2014, $200,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 57 of Compendium of Evidence, pp. 342-343. |

**ACE GALLERY INVOICE NO. 2052**

| | | |
|---|---|---|
| 299. | On July 22, 2014, Debtor sold one piece of artwork by De Wain Valentine – Smoke Grey Column, 1972 – as reflected on Invoice No. 2045. | Invoice No. 2052, Exhibit 58 of Compendium of Evidence, p. 347. |
| 300. | The total amount of the sale on Invoice No. 2052 was $115,812.50. | *Id.* |
| 301. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| 302. | On July 22, 2014, $115,812.50 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 58 of Compendium of Evidence, p. 348. |

**ACE GALLERY INVOICE NO. 2053**

GEX 107

| 303. | On July 22, 2014, Debtor invoiced a customer for a discussion with Douglas Chrismas and Laurie Lipton as reflected on Invoice No. 2045. | Invoice No. 2053, Exhibit 59 of Compendium of Evidence, p. 352. |
|---|---|---|
| 304. | The total amount of the sale on Invoice No. 2053 was $13,090.00. | *Id.* |
| 305. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 306. | On July 23, 2014, $13,090.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 59 of Compendium of Evidence, pp. 353-354. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2054** | |
| 307. | On July 29, 2014, Debtor sold one piece of artwork by Helen Pashgian – Untitled (Column #1), 2010 – as reflected on Invoice No. 2054. | Invoice No. 2054, Exhibit 60 of Compendium of Evidence, p. 358. |
| 308. | The total amount of the sale on Invoice No. 2054 was $174,400.00. | *Id.* |
| | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 309. | On July 30, 2014, $174,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 60 of Compendium |

Case: 25-324, 03/07/2025, DktEntry: 17.1, Page 141 of 259

Case 2:15-ap-01679-RK-SB Doc 344 Filed 02/16/22 Entered 02/16/22 15:58:03 Page 50 of 100
Main Document #354 Page 50 of 100

| | | of Evidence, p. 359. |
|---|---|---|
| | **SEPTEMBER 2014 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2058** | |
| 310. | On September 11, 2014, Debtor sold one piece of artwork by Laurie Lipton – Bone China, 2009 – as reflected on Invoice No. 2058. | Invoice No. 2058, Exhibit 61 of Compendium of Evidence, p. 363. |
| 311. | The total amount of the sale on Invoice No. 2058 was $12,885.00. | *Id.* |
| 312. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 313. | On September 12, 2014, $12,885.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 61 of Compendium of Evidence, pp. 364-365. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2059A** | |
| 314. | On September 17, 2014, Debtor invoiced a customer for the rental of Ace Gallery Beverly Hills, as reflected on Invoice No. 2059A. | Invoice No. 2059A, Exhibit 62 of Compendium of Evidence, pp. 369-370. |
| 315. | The total amount of the sale on Invoice No. 2059A was $3,500.00. | *Id.* |
| 316. | On September 18, 2014, $3,500.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 62 of Compendium of Evidence, p. 371. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2060** | |
| 317. | On May 27, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled, 2010 and one | Invoice No. 2060, Exhibit |

GEX 109

| | | | |
|---|---|---|---|
| 1 | | piece of artwork by Gary Lang – Lluvial, 1991 – as reflected on Invoice No. 2060. | 63 of Compendium of Evidence, p. 375. |
| 2 3 | 318. | The total amount of the sale on Invoice No. 2060 was $225,000.00. | *Id.* |
| 4 5 6 7 8 9 10 11 12 13 | 319. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 14 15 16 17 18 | 320. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| 19 20 | 321. | On September 22, 2014, $225,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 63 of Compendium of Evidence, pp 376-377. |
| 21 22 | | **ACE GALLERY NEW YORK INVOICE NO. 2061** | |
| 23 24 25 | 322. | On September 24, 2014, Debtor sold one piece of artwork by Helen Pashgian – Untitled (Blue & Green with Acrylic Rod), 2014 – as reflected on Invoice No. 2061. | Invoice No. 2061, Exhibit 64 of Compendium of Evidence, p. 381. |
| 26 | 323. | The total amount of the sale on Invoice No. 2061 was $54,000.00. | *Id.* |
| 27 28 | 324. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 |

GEX 110

| | | | |
|---|---|---|---|
| | | Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 325. | | On September 24, 2014, $54,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 64 of Compendium of Evidence, pp. 382-383. |

### OCTOBER 2014 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2062

| | | | |
|---|---|---|---|
| 326. | | On October 10, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled (Black/White Bands Beveled) 2005 – as reflected on Invoice No. 2062. | Invoice No. 2062, Exhibit 65 of Compendium of Evidence, p. 387. |
| 327. | | The total amount of the sale on Invoice No. 2062 was $27,250.00. | *Id.* |
| 328. | | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests |

GEX 111

| | | in her artwork). |
|---|---|---|
| 329. | On October 10, 2014, $27,250.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 65 of Compendium of Evidence, pp. 388-389. |
| | **NOVEMBER 2014 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 1769** | |
| 330. | On November 18, 2014, Debtor invoiced a customer for crating and packaging of a Judy Fox painting entitled Snow White as reflected on Invoice No. 1769. | Invoice No. 1769, Exhibit 66 of Compendium of Evidence, p. 393. |
| 331. | The total amount of the sale on Invoice No. 1769 was $650.00. | *Id.* |
| 332. | On November 20, 2014, $650.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 66 of Compendium of Evidence, p. 394. |
| | **DECEMBER 2014 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2063** | |
| 333. | On December 3, 2014, Debtor sold one piece of artwork by Ruth Pastine – Blue Orange 5-V6032 (Orange Ocre), Interplay Series, 2005 – as reflected on Invoice No. 2063. | Invoice No. 2063, Exhibit 67 of Compendium of Evidence, p. 398. |
| 334. | The total amount of the sale on Invoice No. 2063 was $15,696.00. | *Id.* |
| 335. | Ruth Pastine and the Debtor are parties to two Consignment Agreements dated February 25, 2015, and October 1, 2015 (the "Pastine Contract"). | Ruth Pastine Contract at Leslie Decl. II at ¶ 40 (discussing factual foundation regarding Ruth Pastine contract) and Exhibit U thereto (attaching copy of Ruth Pastine Contract). |

GEX 112

| 336. | On December 4, 2014, $15,696.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 63 of Compendium of Evidence, pp. 399-400. |
|---|---|---|
| | **<u>ACE GALLERY NEW YORK INVOICE NO. 2064</u>** | |
| 337. | On December 22, 2014, Debtor sold one piece of artwork by Mary Corse – Untitled (White Multi Inner Band Beveled), 2012; one piece of artwork by Helen Pashgian – Untitled (Red), 1991; and one piece of artwork by De Wain Valentine – Circle, Sepia to Rose, 1970 as reflected on Invoice No. 2064. | Invoice No. 2064, Exhibit 68 of Compendium of Evidence, pp. 404-405. |
| 338. | The total amount of the sale on Invoice No. 2045 was $203,000.00. | *Id.* |
| 339. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "<u>Corse Contract</u>"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract).<br><br>*See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 340. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "<u>Pashgian Contract</u>"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract).<br><br>*See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party |

-54-

GEX 113

| | | | |
|---|---|---|---|
| 1 | | | to a contract with Debtor). |
| 2 | 341. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the "Valentine Contracts"). | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract). *See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor). |
| 11 | 342. | On January 14, 2015, $19,980.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 68 of Compendium of Evidence, pp. 406-407. |
| 13 | 343. | On January 20, 2015, $74,261.20 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 68 of Compendium of Evidence, pp. 406-407. |
| 16 | 344. | On February 17, 2015, $108,738.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 68 of Compendium of Evidence, pp. 406, 410. |

### 2015 POST-PETITION SALES AND DEPOSITS

### JANUARY 2015 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2066

| | | | |
|---|---|---|---|
| 345. | On January 11, 2015, Debtor invoiced a customer for the delivery and sale of Mary Corse artworks, as reflected on Invoice No. 2066. | Invoice No. 2066, Exhibit 69 of Compendium of Evidence, p. 145. |
| 346. | The total amount of the sale on Invoice No. 2066 was $1,360.00. | *Id.* |

GEX 114

| 347. | On February 6, 2015, $1,360.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 69 of Compendium of Evidence, p. 416. |
|---|---|---|
| | **ACE GALLERY NEW YORK INVOICE NO. 2067** | |
| 348. | On January 14, 2015, Debtor sold one piece of artwork by Gary Lang – Three Planets, 2011 – as reflected on Invoice No. 2067. | Invoice No. 2067, Exhibit 70 of Compendium of Evidence, p. 421. |
| 349. | The total amount of the sale on Invoice No. 2067 was $188,500.00. | *Id.* |
| 350. | Gary Lang and the Debtor are parties to a contract dated December 24, 2007, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Gary Lang (the "Lang Contract"). | Gary Lang Contract at Leslie Decl. II at ¶ 29 (discussing factual foundation regarding Gary Lang contract) and Exhibit J thereto (attaching copy of Gary Lang Contract). |
| 351. | On January 15, 2015, $188,500.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 70 of Compendium of Evidence, pp. 422-423. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2068** | |
| 352. | On January 15, 2015, Debtor sold one piece of artwork by The Date Farmers – Varrio, 2012 – as reflected on Invoice No. 2068. | Invoice No. 2068, Exhibit 71 of Compendium of Evidence, p. 429. |
| 353. | The total amount of the sale on Invoice No. 2068 was $8,720.00. | *Id.* |
| 354. | Armando Lerma and Carlos Ramirez, a/k/a The Date Farmers (the "Date Farmers").and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by the Date Farmers (the "Date Farmers Contract"). | Date Farmers Contract at Leslie Decl. II at ¶ 39 (discussing factual foundation regarding Date Farmers contract) and Exhibit T thereto (attaching copy of Date Farmers Contract). |
| 355. | On January 20, 2015, $8,720.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 71 of Compendium |

GEX 115

| | | of Evidence, pp. 430-431. |
|---|---|---|
| | **ACE GALLERY NEW YORK INVOICE NO. 2069** | |
| 356. | On January 15, 2015, Debtor sold one piece of artwork by Justin Bower – Vivisection (1), 2012 – as reflected on Invoice No. 2069. | Invoice No. 2069, Exhibit 72 of Compendium of Evidence, p. 437. |
| 357. | The total amount of the sale on Invoice No. 2069 was $43,600.00. | *Id.* |
| 358. | Justin Bower and the Debtor are parties to a contract dated March 31, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Justin Bower (the "Bower Contract"). | Justin Bower Contract at Leslie Decl. II at ¶ 32 (discussing factual foundation regarding Justin Bower contract) and Exhibit M thereto (attaching copy of Justin Bower Contract). |
| 359. | On January 16, 2015, 43,600.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 72 of Compendium of Evidence, pp. 438-439. |
| | **FEBRUARY 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1790** | |
| 360. | On February 2, 2015, Debtor sold one piece of artwork by Peter Alexander – Flow Lime Exile Wedge, 2014 – as reflected on Invoice No. 1790. | Invoice No. 1790, Exhibit 73 of Compendium of Evidence, pp. 445-446. |
| 361. | The total amount of the sale on Invoice No. 1790 was $21,800.00. | *Id.* |
| 362. | Peter Alexander and the Debtor are parties to a Consignment Agreement dated August 24, 2015, by which the Debtor had the exclusive right thereafter to sell certain consigned artworks by Peter Alexander (the "Alexander Contract"). | Peter Alexander Contract at Leslie Decl. II at ¶ 36 (discussing factual foundation regarding Peter Alexander contract) and Exhibit Q thereto (attaching copy of Peter Alexander Contract). |

GEX 116

| 363. | On January 27, 2015, $21,800.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 73 of Compendium of Evidence, p. 447. |
|---|---|---|
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1792** | |
| 364. | On February 13, 2015, Debtor sold one piece of artwork by Laurie Lipton – Round and Round, 2012 – as reflected on Invoice No. 1792. | Invoice No. 1792, Ex. 74 of Compendium of Evidence, p. 453. |
| 365. | The total amount of the sale on Invoice No. 1792 was $35,970.00. | *Id.* |
| 366. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 367. | On February 17, 2015, $35,970.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 74 of Compendium of Evidence, pp. 454, 458. |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1797** | |
| 368. | On February 15, 2015, Debtor sold one piece of artwork by Mary Corse – Untitled, 2010 White Flat w 3 Inner Bands; one piece of artwork by Gisela Colon – Ultra Spheroid Glo-Pod (Iridescent Lilac), 2014; and one piece of artwork by Helen Pashgian – Untitled (Column #8), 2011 -- as reflected on Invoice No. 1797. | Invoice No. 1797, Exhibit 75 of Compendium of Evidence, pp. 460-463. |
| 369. | The total amount of the sale on Invoice No. 1979 was $258,000.00. | *Id.* |
| 370. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas |

GEX 117

| | | |
|---|---|---|
| | | Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 371. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 372. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 373. | On March 19, 2015, $258,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 75 of Compendium of Evidence, pp. 464-465. |
| 374. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice No. 1797. | Chrismas Deposition, 574:7-577:10; 577:11-579:15; and Exhibits 253-254 attached thereto. |
| | **[NO LETTERHEAD] INVOICE NO. 2074A** | |
| 375. | On February 17, 2015, Debtor sold one piece of artwork by Natalie Arnoldi – Red Eye, 2014 – as reflected on Invoice No. 2074A. | Invoice No. 2074A, Exhibit 76 of Compendium of Evidence, p. 470. |

GEX 118

| 376. | The total amount of the sale on Invoice No. 2074A was $12,000.00. | *Id.* |
|---|---|---|
| 377. | Natalie Arnoldi and the Debtor are parties to a contract dated December 29, 2014, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Natalie Arnoldi (the "Arnoldi Contract"). | Natalie Arnoldi Contract at Leslie Decl. II at ¶ 31 (discussing factual foundation regarding Natalie Arnoldi contract) and Exhibit L thereto (attaching copy of Natalie Arnoldi Contract). |
| 378. | On February 24, 2015, $12,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 76 of Compendium of Evidence, pp. 471-472. |
| **MARCH 2015 POST-PETITION SALES AND DEPOSITS** | | |
| **ACE GALLERY LOS ANGELES INVOICE NO. 1801** | | |
| 379. | On March 13, 2015, Debtor sold one piece of artwork by Gisela Colon – Ovoid Glo-Pod (Iridescent Orange), 2013 – as reflected on Invoice No. 1801. | Invoice No. 1801, Exhibit 77 of Compendium of Evidence, pp. 477-478. |
| 380. | The total amount of the sale on Invoice No. 1801 was $13,080.00. | *Id.* |
| 381. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013.  In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 382. | On March 20, 2015, $13,080.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 77 of Compendium of Evidence, p. 479. |
| **APRIL 2015 POST-PETITION SALES AND DEPOSITS** | | |
| | | |

GEX 119

| ACE GALLERY NEW YORK INVOICE NO. 2075 | | |
|---|---|---|
| 383. | On April 10, 2015, Debtor sold two pieces of artwork by Mary Corse – Untitled (Gold), 1975 and Untitled (White Inner Band Beveled), 2010; and one piece of art by Helen Pashgian (Untitled Sphere, (Bright Green With Crossed Rods), 2014 – as reflected on Invoice No. 2075. | Invoice No. 2075, Exhibit 78 of Compendium of Evidence, p. 484. |
| 384. | The total amount of the sale on Invoice No. 2075 was $85,000.00. | *Id.* |
| 385. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 386. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 387. | On April 13, 2015, $85,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 78 of Compendium of Evidence, p. 485. |

GEX 120

| | | ACE GALLERY LOS ANGELES INVOICE NO. 1828 | |
|---|---|---|---|
| | 388. | On April 11, 2015, Debtor sold one piece of artwork by Alexander Yulish – Sitting with Dolores, 2015 – as reflected on Invoice No. 1828. | Invoice No. 1828, Exhibit 79 of Compendium of Evidence, p. 489. |
| | 389. | The total amount of the sale on Invoice No. 1828 was $50,000.00. | *Id.* |
| | 390. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "Yulish Contract"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| | 391. | On February 11, 2016, $25,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 79 of Compendium of Evidence, pp. 490-491. |
| | 392. | On March 16, 2016, $25,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 79 of Compendium of Evidence, pp. 490, 494. |
| | | ACE GALLERY NEW YORK INVOICE NO. 2076 | |
| | 393. | On April 23, 2015, Debtor sold one piece of artwork by Natalie Arnoldi – Quarter Past, 2014 and one piece of artwork from Mary Corse – White Multiple Inner Band Beveled, 2012 as reflected on Invoice No. 2076. | Invoice No. 2076, Exhibit 80 of Compendium of Evidence, p. 497. |
| | 394. | The total amount of the sale on Invoice No. 2076 was $399,200.00 and $35,928.00 for sales tax. | *Id.* |
| | 395. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, |

| | | | |
|---|---|---|---|
| | | | 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| | 396. | Natalie Arnoldi and the Debtor are parties to a contract dated December 29, 2014, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Natalie Arnoldi (the "Arnoldi Contract"). | Natalie Arnoldi Contract at Leslie Decl. II at ¶ 31 (discussing factual foundation regarding Natalie Arnoldi contract) and Exhibit L thereto (attaching copy of Natalie Arnoldi Contract). |
| | 397. | On April 24, 2015, $399,200.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 80 of Compendium of Evidence, pp. 498-499. |
| | 398. | On November 18, 2015, $35,928.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 80 of Compendium of Evidence, pp. 502-502. |
| | 399. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2076. | Chrismas Deposition, 579:16-582:12; 591:14-592:9; and Exhibits 255, 259 attached thereto. |
| | | **ACE GALLERY NEW YORK INVOICE NO. 2079** | |
| | 400. | On April 25, 2015, Debtor sold two pieces of artwork by Mary Corse – Untitled, (White, Black & Red) 2014 and Untitled (Black, White), 2014 – as reflected on Invoice No. 2079. | Invoice No. 2079, Exhibit 81 of Compendium of Evidence, p. 506. |
| | 401. | The total amount of the sale on Invoice No. 2079 was $252,000.00. | *Id.* |
| | 402. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, |

GEX 122

| 403. | On May 15, 2015, $252,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 81 of Compendium of Evidence, pp. 507-508. |
|---|---|---|

49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). — appears in top row.

### ACE GALLERY NEW YORK INVOICE NO. 2077

| 404. | On April 27, 2015, Debtor sold one piece of artwork by Gisela Colon – Ultra Spheroid Glo-Pod (Iridescent Orange), 2014 – as reflected on Invoice No. 2077. | Invoice No. 2077, Exhibit 82 of Compendium of Evidence, p. 512. |
| 405. | The total amount of the sale on Invoice No. 2077 was $52,320.00. | Id. |
| 406. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013. In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 407. | On April 28, 2015, $52,320.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 82 of Compendium of Evidence, pp. 513-514. |

### MAY 2015 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2078

| 408. | On May 4, 2015, Debtor sold one piece of artwork by Natalie Arnoldi – Socket, 2001 – as reflected on Invoice No. 2078. | Invoice No. 2078, Exhibit 83 of Compendium of Evidence, p. 518. |
| 409. | The total amount of the sale on Invoice No. 2078 was $7,000.00. | Id. |

-64-

GEX 123

| 410. | Natalie Arnoldi and the Debtor are parties to a contract dated December 29, 2014, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Natalie Arnoldi (the "Arnoldi Contract"). | Natalie Arnoldi Contract at Leslie Decl. II at ¶ 31 (discussing factual foundation regarding Natalie Arnoldi contract) and Exhibit L thereto (attaching copy of Natalie Arnoldi Contract). |
|---|---|---|
| 411. | On May 4, 2015, $7,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 83 of Compendium of Evidence, pp. 519-520. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2080** | |
| 412. | On May 19, 2015, Debtor sold one piece of artwork by Alexander Yulish – Indrani (White, Black & Red), 2015 – as reflected on Invoice No. 2080. | Invoice No. 2080, Exhibit 84 of Compendium of Evidence, p. 524. |
| 413. | The total amount of the sale on Invoice No. 2080 was $28,000.00. | *Id.* |
| 414. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "Yulish Contract"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| 415. | On May 29, 2015, $28,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 84 of Compendium of Evidence, pp. 525-526. |
| | **JUNE 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2081** | |
| 416. | On June 9, 2015, Debtor sold two pieces of artwork by Mary Corse – Untitled (White, Black & Red), 2015 and Untitled (White Inner Band | Invoice No. 2081, Exhibit 85 of Compendium of |

GEX 124

| | | | |
|---|---|---|---|
| 1 | | With Flat White Outer Band), 2012 – as reflected on Invoice No. 2081. | Evidence, p. 530. |
| 2 | 417. | The total amount of the sale on Invoice No. 2081 was $211,200.00. | *Id.* |
| 3 | | | |
| 4 | 418. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint ECF 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | 419. | On June 9, 2015, $211,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 85 of Compendium of Evidence, pp. 531-532. |
| 15 | | | |
| 16 | | **ACE GALLERY NEW YORK INVOICE NO. 2082** | |
| 17 | | | |
| 18 | 420. | On June 12, 2015, Debtor sold one piece of artwork by Natalie Arnoldi – Untitled, 2015 – as reflected on Invoice No. 2082. | Invoice No. 2082, Exhibit 86 of Compendium of Evidence, p. 536. |
| 19 | | | |
| 20 | 421. | The total amount of the sale on No. 2082 was $24,080.00. | *Id.* |
| 21 | | | |
| 22 | 422. | Natalie Arnoldi and the Debtor are parties to a contract dated December 29, 2014, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Natalie Arnoldi (the "Arnoldi Contract"). | Natalie Arnoldi Contract at Leslie Decl. II at ¶ 31 (discussing factual foundation regarding Natalie Arnoldi contract) and Exhibit L thereto (attaching copy of Natalie Arnoldi Contract). |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | 423. | On June 15, 2015, $24,080.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 86 of Compendium of Evidence, p. 538. |
| 28 | | | |

GEX 125

| | **ACE GALLERY LOS ANGELES INVOICE NO. 1827** | |
|---|---|---|
| 424. | On June 24, 2015, Debtor sold one piece of artwork by Gisela Colon – Hyper Ellipsoid Glo-Pod (Iridescent Blue), 2014 – as reflected on Invoice No. 1827. | Invoice No. 1827, Exhibit 87 of Compendium of Evidence, pp. 542-543. |
| 425. | The total amount of the sale on Invoice No. 1827 was $96,000.00. | *Id.* |
| 426. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013. In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon documents). |
| 427. | On January 15, 2015, $48,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 87 of Compendium of Evidence, pp. 544-545. |
| | **JULY 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2082A** | |
| 428. | On January 14, 2015, Debtor by Jennifer Kellen, Director, "Ace Gallery Beverly Hills," invoiced a customer for the installation of photos by Martin Schoeller at a restaurant in Beverly Hills. California as reflected on Invoice No. 2082A. | Invoice No. 2082A, Exhibit 88 of Compendium of Evidence, p. 549. |
| 429. | The total amount of the sale on Invoice No. 2082A was $4,800.00. | *Id.* |
| 430. | On July 6, 2015, $4,800.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 88 of Compendium of Evidence, pp. 550-551. |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1826** | |

-67-

| 431. | On July 4, 2015, Debtor sold one piece of artwork by Mary Corse – Untitled (White, Black and Beveled), 2006 – as reflected on Invoice No. 1826. | Invoice No. 1826, Exhibit 89 of Compendium of Evidence, pp. 555-556. |
|---|---|---|
| 432. | The total amount of the sale on Invoice No. 1826 was $175,000.00. | *Id.* |
| 433. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint ECF 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 434. | On July 7, 2015, $165,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 89 of Compendium of Evidence, pp. 557-558. |

### ACE GALLERY NEW YORK INVOICE NO. 2084

| 435. | On July 15, 2015, Debtor sold three pieces of artwork by Mary Corse – Untitled (Blue, Black and White), 2015; Untitled (Yellow, Black, White), 2015; and Untitled (Black, White) 2014 – as reflected on Invoice No. 2084. | Invoice No. 2084, Exhibit 90 of Compendium of Evidence, p. 562. |
|---|---|---|
| 436. | The total amount of the sale on Invoice No. 2084 was $216,000.00. | *Id.* |
| 437. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas |

GEX 127

| | | |
|---|---|---|
| | | Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint ECF 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 438. | On July 15, 2015, $108,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 90 of Compendium of Evidence, pp. 563-564. |
| 439. | On July 16, 2015, $108,000.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 90 of Compendium of Evidence, pp. 563-564. |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1837** | |
| 440. | On July 25, 2015, Debtor sold one piece of artwork by Mary Corse – Untitled, (Black Light), 1989 – as reflected on Invoice No. 1837. | Invoice No. 1837, Exhibit 91 of Compendium of Evidence, pp. 568-569. |
| 441. | The total amount of the sale on Invoice No. 1837 was $160,000.00. | *Id.* |
| 442. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 443. | On August 4, 2015, $159,972.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 91 of Compendium of Evidence, pp. 570-571. |
| | | |

GEX 128

| | ACE GALLERY LOS ANGELES INVOICE NO. 1838 | |
|---|---|---|
| 444. | On July 25, 2015, Debtor sold one piece of artwork by Alexander Yulish – The Two of Them, 2014 – as reflected on Invoice No. 1838. | Invoice No. 1838, Exhibit 92 of Compendium of Evidence, pp. 575-577; 584. |
| 445. | The total amount of the sale on Invoice No. 1838 was $28,000.00. | *Id.* |
| 446. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "Yulish Contract"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| 447. | On August 6, 2015, $29,500.00 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 92 of Compendium of Evidence, pp. 578-579. |
| 448. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 1838. | Chrismas Deposition, 588:2-591:13; and Exhibit 258 attached thereto. |
| | ACE GALLERY LOS ANGELES INVOICE NO. 1836 | |
| 449. | On July 30, 2015, Debtor sold one piece of artwork by Natalie Arnoldi – Dume, 2012 – as reflected on Invoice No. 1836. | Invoice No. 1836, Exhibit 93 of Compendium of Evidence, p. 592. |
| 450. | The total amount of the sale on Invoice No. 1836 was $20,165.00. | *Id.* |
| 451. | Natalie Arnoldi and the Debtor are parties to a contract dated December 29, 2014, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Natalie Arnoldi (the "Arnoldi Contract"). | Natalie Arnoldi Contract at Leslie Decl. II at ¶ 31 (discussing factual foundation regarding Natalie Arnoldi contract) and Exhibit L thereto (attaching copy of Natalie Arnoldi Contract). |
| 452. | On August 11, 2015, $20,165.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 93 of Compendium of Evidence, pp. 593-594. |

GEX 129

| | | |
|---|---|---|
| | **AUGUST 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1846** | |
| 453. | On August 17, 2015, Debtor sold one piece of artwork by Mary Corse – Untitled (Red Double Arch), 1999 – as reflected on Invoice No. 1846. | Invoice No. 1846, Exhibit 94 of Compendium of Evidence, pp. 598-599. |
| 454. | The total amount of the sale on Invoice No. 1846 was $100,000.00. | *Id.* |
| 455. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 456. | On September 17, 2015, $100,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 94 of Compendium of Evidence, pp. 599-560. |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1848** | |
| 457. | On August 25, 2015, Debtor sold one piece of artwork by Alexander Yulish – The Two of Us, 2003 and With Dog, 2015 – as reflected on Invoice No. 1848. | Invoice No. 1848, Exhibit 95 of Compendium of Evidence, pp. 604-605. |
| 458. | The total amount of the sale on Invoice No. 1848 was $49,000.00. | *Id.* |
| 459. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 |

-71-

| | | |
|---|---|---|
| | Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "Yulish Contract"). | (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| 460. | On October 19, 2015, $48,965.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 95 of Compendium of Evidence, pp. 606-607. |
| | **SEPTEMBER 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2089** | |
| 461. | On September 3, 2015, Debtor sold two pieces of artwork by Matt Hope – Meltdown, 2008 and Meltdown, 2009 – as reflected on Invoice No. 2089. | Invoice No. 2089, Exhibit 96 of Compendium of Evidence, p. 611. |
| 462. | The total amount of the sale on Invoice No. 2089 was $33,572.00. | *Id.* |
| 463. | Matt Hope and the Debtor are parties to a contract dated September 22, 2006, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Matt Hope (the "Hope Contract"). | Matt Hope Contract at Leslie Decl. II at ¶ 38 (discussing factual foundation regarding Matt Hope contract) and Exhibit S thereto (attaching copy of Matt Hope Contract). |
| 464. | On September 3, 2015, $33,572.00 was deposited into Ace New York checking account ending in #0229 at City National Bank. | Ace NY Bank Records, Exhibit 96 of Compendium of Evidence, p. 512. |
| | **OCTOBER 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2092** | |

-72-

GEX 131

| | | |
|---|---|---|
| 465. | On October 10, 2015, Debtor sold two pieces of artwork by Mary Corse – Untitled (White Multiple Inner Band, Beveled) 2012 and Untitled, (White Inner Band), 2003– as reflected on Invoice No. 2092. | Invoice No. 2092, Exhibit 97 of Compendium of Evidence, pp. 615-616. |
| 466. | The total amount of the sale on Invoice No. 2092 was $240,000.00 and $21,600.00 for sales tax. | *Id.* |
| 467. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint ECF 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 468. | On September 30, 2015, $240,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 97 of Compendium of Evidence, pp. 617-618. |
| 469. | On November 2, 2015, $7,200.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 97 of Compendium of Evidence, p. 621. |
| 470. | On November 4, 2015, $14,400.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 97 of Compendium of Evidence, pp. 617, 621. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2093** | |
| 471. | On October 2, 2015, Debtor sold one piece of artwork by Ellsworth Kelly – Block Island II, 1960 – as reflected on Invoice No. 2093. | Invoice No. 2093, Exhibit 98 of Compendium of Evidence, pp. 624, 629. |
| 472. | The total amount of the sale on Invoice No. 2093 was $4,800,000.00. | *Id.* |
| 473. | The Ellsworth Kelly artwork was owned by a private collector, and was sold as a secondary art sale using the Debtor's facilities for displaying | Ellsworth Kelly sales documents at Leslie Decl. II at ¶ 45 (discussing factual |

| # | | |
|---|---|---|
| | the artwork and the Debtor's staff and costs for shipping the piece. In addition, internal emails from Debtor discussing the provenance and describing the artwork on Ace Gallery Los Angeles Letterhead were found in Debtors' records | foundation Ellsworth Kelly sale) and Exhibit Z thereto (attaching copy of sales documents). |
| 474. | On October 5, 2015, $4,800,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 98 of Compendium of Evidence, pp. 625-626. |
| 475. | On October 5, 2015, $432,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 98 of Compendium of Evidence, pp. 625-626. |
| 476. | Mr. Chrismas asserted the Fifth Amendment in response to specific questions regarding Invoice 2093. | Chrismas Deposition, 619:5-623:18; and Exhibits 274-275 attached thereto. |
| | **EMAIL INVOICE** | |
| 477. | On October 2, 2015, Debtor sold one piece of artwork by Mary Corse – Untitled (White Multiple Inner Band, Beveled) 2012 – as reflected on the Email Invoice. | Email Invoice, Exhibit 99 of Compendium of Evidence, pp. 631-645. |
| 478. | The total amount of the sale on the Email Invoice was $95,000.00. | *Id.* |
| 479. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 480. | On October 2, 2015, $95,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Email Invoice, Exhibit 99 of Compendium of Evidence, pp. 631-645; *see* |

GEX 133

| | | |
|---|---|---|
| | | *also* Ace NY Bank Records, Exhibit 101 of Compendium of Evidence, p. 652 (Lehmann-Maupin LLC Originator, Transaction No. 8167) (transaction not highlighted). |

### NOVEMBER 2015 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2094

| | | |
|---|---|---|
| 481. | On November 3, 2015, Debtor sold one piece of artwork by Sam Francis – Untitled, 1964 – as reflected on Invoice No. 2094. | Invoice No. 2094, Exhibit 100 of Compendium of Evidence, p. 647. |
| 482. | The total amount of the sale on Invoice No. 2094 was $15,000.00. | *Id.* |
| 483. | On January 15, 2015, $15,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 100 of Compendium of Evidence, p. 648. |

### DECEMBER 2015 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY NEW YORK INVOICE NO. 2095

| | | |
|---|---|---|
| 484. | On December 10, 2015, Debtor sold one piece of artwork by Mary Corse – Untitled (White/Yellow Innerband, Beveled) 2015 – as reflected on Invoice No. 2095. | Invoice No. 2095, Exhibit 101 of Compendium of Evidence, p. 651. |
| 485. | The total amount of the sale on Invoice No. 2095 was $125,000.00. | *Id.* |
| 486. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary |

GEX 134

| | | | |
|---|---|---|---|
| 1 | | by Mary Corse (the "Corse Contract"). | Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). |
| 2 | | | |
| 3 | | | *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | 487. | On December 11, 2015, $125,000.00 was deposited into Ace New York checking account ending in #4733 at City National Bank. | Ace NY Bank Records, Exhibit 101 of Compendium of Evidence, pp. 652-653. |
| 10 | | | |
| 11 | | | |
| 12 | | **2016 POST-PETITION SALES AND DEPOSITS** | |
| 13 | | | |
| 14 | | **JANUARY 2016 POST-PETITION SALES AND DEPOSITS** | |
| 15 | | | |
| 16 | | | |
| 17 | | **ACE GALLERY NEW YORK INVOICE NO. 2096** | |
| 18 | | | |
| 19 | 488. | On January 4, 2016, Debtor sold one piece of artwork by David Amico –Silver, 2014 – as reflected on Invoice No. 2096. | Invoice No. 2096, Exhibit 102 of Compendium of Evidence, p. 656. |
| 20 | | | |
| 21 | 489. | The total amount of the sale on Invoice No. 2096 was $36,000.00. | *Id.* |
| 22 | | | |
| 23 | 490. | On January 5, 2016, $36,000.00 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 102 of Compendium of Evidence, pp. 657-658. |
| 24 | | | |
| 25 | | | |
| 26 | | **ACE GALLERY NEW YORK INVOICE NO. 2097** | |
| 27 | | | |
| 28 | 491. | On January 25, 2016, Debtor sold one piece of artwork by Alexander Yulish – Movement in | Invoice No. 2097, Exhibit 103 of Compendium of |

GEX 135

| | | Time, 2015 – as reflected on Invoice No. 2097. | Evidence, p. 661. |
|---|---|---|---|
| | 492. | The total amount of the sale on Invoice No. 2097 was $32,427.50. | *Id.* |
| | 493. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "<u>Yulish Contract</u>"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| | 494. | On January 25, 2016, $32,427.50 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 103 of Compendium of Evidence, pp. 662-663. |
| | | **ACE GALLERY NEW YORK INVOICE NO. 2098** | |
| | 495. | On January 25, 2016, Debtor sold one piece of artwork by Alexander Yulish – In Limbo, 2015 – as reflected on Invoice No. 2098. | Invoice No. 2098, Exhibit 104 of Compendium of Evidence, p. 666. |
| | 496. | The total amount of the sale on Invoice No. 2098 was $32,427.50. | *Id.* |
| | 497. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "<u>Yulish Contract</u>"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract). |
| | 498. | On January 25, 2016, $32,427.50 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 104 of Compendium of Evidence, pp. 667-668. |
| | | **ACE GALLERY NEW YORK INVOICE NO. 2099** | |

-77-

GEX 136

| 499. | On January 25, 2016, Debtor sold one piece of artwork by Alexander Yulish – The Orange Shirt, 2015 – as reflected on Invoice No. 2099. | Invoice No. 2099, Exhibit 105 of Compendium of Evidence, p. 671. |
|---|---|---|
| 500. | The total amount of the sale on Invoice No. 2099 was $32,427.50. | *Id.* |
| 501. | Alexander Yulish and the Debtor are parties to a contract dated August 26, 2014, by which the Debtor had the exclusive right thereafter to represent and sell artworks by Alexander Yulish (the "Yulish Contract"). | Alexander Yulish Contract at Leslie Decl. II at ¶ 35 (discussing factual foundation regarding Alexander Yulish contract) and Exhibit P thereto (attaching copy of Alexander Yulish Contract) |
| 502. | On January 25, 2016, $32,427.50 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 105 of Compendium of Evidence, p. 672. |

**ACE GALLERY NEW YORK INVOICE NO. 2100**

| 503. | On January 26, 2016, Debtor sold one piece of artwork by Mary Corse – Untitled (White Diamond, Positive Strip), 1965– as reflected on Invoice No. 2100. | Invoice No. 2100, Exhibit 106 of Compendium of Evidence, p. 675. |
|---|---|---|
| 504. | The total amount of the sale on Invoice No. 2100 was $150,000.00. | *Id.* |
| 505. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 506. | On January 26, 2016, $150,000.00 was deposited | Ace NY Bank Records, |

GEX 137

| | | |
|---|---|---|
| | into Ace New York checking account ending in #4773 at City National Bank. | Exhibit 106 of Compendium of Evidence, pp. 676-677. |
| | **FEBRUARY 2016 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1881** | |
| 507. | On February 2, 2016, Debtor sold one piece of artwork by Ben Jones – Ladder Series, 2015 – as reflected on Invoice No. 1881. | Invoice No. 1881, Exhibit 107 of Compendium of Evidence, p. 680. |
| 508. | The total amount of the sale on Invoice No. 1881 was $12,000.00. | *Id.* |
| 509. | On March 10, 2016, $12,000.00 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 107 of Compendium of Evidence, pp. 681-682. |
| | **ACE GALLERY NEW YORK INVOICE NO. 2101** | |
| 510. | On February 23, 2016, Debtor sold one piece of artwork by Peter Alexander – 5/24/15 (Pink Puff), 2015 – as reflected on Invoice No. 2101. | Invoice No. 2101, Exhibit 108 of Compendium of Evidence, p. 685. |
| 511. | The total amount of the sale on Invoice No. 2101 was $73,575.00. | *Id.* |
| 512. | Peter Alexander and the Debtor are parties to a Consignment Agreement dated August 24, 2015, by which the Debtor had the exclusive right thereafter to sell certain consigned artworks by Peter Alexander (the "Alexander Contract"). | Peter Alexander Contract at Leslie Decl. II at ¶ 36 (discussing factual foundation regarding Peter Alexander contract) and Exhibit Q thereto (attaching copy of Peter Alexander Contract). |
| 513. | On February 25, 2012, $73,575.00 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Ex. 108 of Compendium of Evidence, p. 686-687. |

GEX 138

| ACE GALLERY NEW YORK INVOICE NO. 2102 | | |
|---|---|---|
| 514. | On February 26, 2016, Debtor sold one piece of artwork by Laurie Lipton – Illusion of Control Tower, 2012 – as reflected on Invoice No. 2102. | Invoice No. 2102, Exhibit 109 of Compendium of Evidence, p. 691. |
| 515. | The total amount of the sale on Invoice No. 2101 was $78,480.00. | *Id.* |
| 516. | Laurie Lipton and the Debtor are parties to a contract dated February 27, 2012, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Laurie Lipton (the "Lipton Contract"). | Laurie Lipton Contract at Leslie Decl. II at ¶ 33 (discussing factual foundation regarding Laurie Lipton contract) and Exhibit N thereto (attaching copy of Laurie Lipton Contract). |
| 517. | On February 29, 2016, $78,480.00 was deposited into Ace New York checking account ending in #4773 at City National Bank. | Ace NY Bank Records, Exhibit 109 of Compendium of Evidence, pp. 692-693. |
| **FACTS RELATED TO DOUGLAS CHRISMAS'S POST-PETITION CONVERSION OF DEBTOR'S PROPERTY THROUGH ACE MUSEUM** | | |
| **MR. CHRISMAS ASSERTED THE FIFTH AMENDMENT REGARDING QUESTIONS POSED ABOUT HIS CONVERSION OF FUNDS THROUGH ACE MUSEUM[5]** | | |
| 518. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that between February 19, 2013 and April 16, 2016 you diverted Debtor Funds to ACE MUSEUM." | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 55 and Douglas Chrismas Response to the same). |
| **FEBRUARY 2013 POST-PETITION SALES AND DEPOSITS** | | |
| | | |

---

[5] This fact should be incorporated into each of the following transfers related to Ace Museum.

GEX 139

| ACE GALLERY INVOICE NO. 1554 | | |
|---|---|---|
| 519. | On February 18, 2013, Debtor sold one piece of artwork by Mary Corse – Untitled (Shadow Painting, Black Beveled Series) 1983 – as reflected on Invoice No. 1554. | Invoice No. 1554, Exhibit 110 of Compendium of Evidence, p. 697. |
| 520. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |
| 521. | On February 20, 2013, $150,000.00 was deposited into Ace Museum account ending in #6347 at City National Bank. | Ace Museum Bank Records, Exhibit 110 of Compendium of Evidence, pp. 698-699. |

**SEPTEMBER 2013 POST-PETITION SALES AND DEPOSITS**

| ACE GALLERY NEW YORK INVOICE NO. 2025 | | |
|---|---|---|
| 522. | On September 21, 2013, Debtor sold one piece of artwork by De Wain Valentine – Smoke Grey Column, 1972-75– as reflected on Invoice No. 2025. | Invoice No. 2025, Exhibit 111 of Compendium of Evidence, p. 702. |
| 523. | The total amount of the sale on Invoice No. 2025 was $68,000.00. | *Id.* |
| 524. | De Wain Valentine and the Debtor were parties to a series of pre-petition consignment contracts by which the Debtor had the exclusive right to sell certain sculptures by De Wain Valentine (the | De Wain Valentine Contract at Leslie Decl. II at ¶ 34 (discussing factual foundation regarding De |

GEX 140

| 525. | On September 9, 2013, $68,000.00 was deposited into Ace Museum account ending in #6347 at City National Bank. | Ace Museum Bank Records, Exhibit 111 of Compendium of Evidence, pp. 703-704. |

"Valentine Contracts").

Wain Valentine contract) and Exhibit O thereto (attaching copy of De Wain Valentine Contract).

*See also* Answer of Douglas Chrismas at ¶ 51 (6th Amended Complaint Docket No. 703) (admitting De Wain Valentine was a party to a contract with Debtor).

### JULY 2014 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY LOS ANGELES INVOICE NO. 1726

| 526. | On June 26, 2014, Debtor sold one piece of artwork by Mary Corse – Black Glitter, White Beads, 1975 – as reflected on Invoice No. 1726. | Invoice No. 1726, Exhibit 112 of Compendium of Evidence, p. 708. |
| 527. | The total amount of the sale on Invoice No. 1726 was $175,000.00. | *Id.* |
| 528. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract). *See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts related to Debtor's interests in her artwork). |

-82-

GEX 141

| 529. | On July 18, 2014, $175,000.00 was deposited into Ace Museum account ending in #6347 at City National Bank. | Ace Museum Bank Records, Exhibit 112 of Compendium of Evidence, pp. 709-710. |
|---|---|---|
| | **JUNE 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. 1819** | |
| 530. | On June 22, 2015, Debtor sold one piece of artwork by Robert Rauschenberg – Joust (Jammer), 1976 – as reflected on Invoice No. 1819. | Invoice No. 1819, Exhibit 113 of Compendium of Evidence, p. 714. |
| 531. | The total amount of the sale on Invoice No. 1819 was $225,000.00. | *Id.* |
| 532. | On June 22, 2015, $200,000.00 was deposited into Ace Museum account ending in #6347 at City National Bank. | Ace Museum Bank Records, Exhibit 113 of Compendium of Evidence, pp. 715-716. |
| | **AUGUST 2015 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY NEW YORK INVOICE NO. 2088** | |
| 533. | On August 31, 2015, Debtor sold one piece of artwork by Gisela Colon – Slab Ovopoid Glo-Pod (iridescent Orange Pink), 2014; one piece of artwork by Helen Pashgian – Standing Disk, Yellow in Tine; and one piece of artwork by Robert Rauschenberg – Stallion Jammer, 1976 – as reflected on Invoice No. 2088. | Invoice No. 2088, Exhibit 114 of Compendium of Evidence, p. 719. |
| 534. | The total amount of the sale on Invoice No. 2088 was $225,000.00. | *Id.* |
| 535. | The Debtor sold artworks by Gisela Colon in sales dating from November 13, 2013. In addition, internal emails at Debtor show an exchange of a 2014 artist agreement between Ms. Colon and Debtor. | Gisela Colon documents at Leslie Decl. II at ¶ 44 (discussing factual foundation Gisela Colon sale) and Exhibit Y thereto (attaching Gisela Colon |

-83-

GEX 142

| | | |
|---|---|---|
| | | documents). |
| 536. | Helen Pashgian and the Debtor are parties to a contract dated August 9, 2010, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Helen Pashgian (the "Pashgian Contract"). | Helen Pashgian Contract at Leslie Decl. II at ¶ 30 (discussing factual foundation regarding Helen Pashgian contract) and Exhibit K thereto (attaching copy of Helen Pashgian Contract). *See also* Answer of Douglas Chrismas at ¶ 50 (6th Amended Complaint Docket No. 703) (admitting Helen Pashgian was a party to a contract with Debtor). |
| 537. | On August 31, 2015, $225,000 was deposited into Ace Museum account ending in #6347 at City National Bank. | Ace Museum Bank Records, Exhibit 114 of Compendium of Evidence, p. 720-721. |

### MARCH 2016 POST-PETITION SALES AND DEPOSITS

### ACE GALLERY LOS ANGELES INVOICE NO. K-1012

| | | |
|---|---|---|
| 538. | On March 30, 2016, Debtor sold one piece of artwork by Tara Donovan – Colony, 2002; and one piece of artwork by Jonathan Monk – The Moment Before You Realize You Are Not Lost, 2005 – as reflected on Invoice No. K-1012. | Invoice No. K-1012, Exhibit 115 of Compendium of Evidence, p. 725. |
| 539. | The total amount of the sale on Invoice No. K-1013 was $100,000.00 | *Id.* |
| 540. | On March 30, 2016, $100,000.00 was deposited into Ace Museum account ending in #6347 at City National Bank. | Ace Museum Bank Records, Exhibit 115 of Compendium of Evidence, pp. 726-727. |

### FACTS RELATED TO DOUGLAS CHRISMAS'S POST-PETITION CONVERSION OF DEBTOR'S PROPERTY THROUGH 400 S. LA BREA

GEX 143

| | | |
|---|---|---|
| | **MR. CHRISMAS ASSERTED THE FIFTH AMENDMENT REGARDING QUESTIONS POSED ABOUT HIS CONVERSION OF FUNDS THROUGH 400 S. LA BREA**[6] | |
| 541. | Mr. Chrismas asserted the Fifth Amendment in response to Request for Admission "Admit that between February 19, 2013 and April 16, 2016 you diverted Debtor Funds to 400 S. LA BREA." | Sahn Decl., Exhibits 3 and 4 (Request for Admissions to Douglas Chrismas, Set 2, No. 56 and Douglas Chrismas Response to the same). |
| | **MARCH 2016 POST-PETITION SALES AND DEPOSITS** | |
| | **ACE GALLERY LOS ANGELES INVOICE NO. K-1013** | |
| 542. | On March 30, 2016, Debtor sold one piece of artwork by Mary Corse – Untitled (Black Light Grid Series), 1987 and one piece of artwork by Sylvie Fleury – Life Can Get Heavy Mascara Shouldn't, 1999 -- as reflected on Invoice No. K-1013. | Invoice No. K1013, Exhibit 116 of Compendium of Evidence, pp. 731-734. |
| 543. | The total amount of the sale on Invoice No. K-1013 was $200,000.00. | *Id.* |
| 544. | Mary Corse and the Debtor are parties to a contract dated July 25, 2011, by which the Debtor had the exclusive right during the Bankruptcy Period to represent and sell artworks by Mary Corse (the "Corse Contract"). | Mary Corse Contract at Leslie Decl. II at ¶ 28 (discussing factual foundation regarding Mary Corse contract) and Exhibit I thereto (attaching copy of Mary Corse Contract).<br><br>*See also* Answer of Douglas Chrismas at ¶¶ 45, 46, 47, 49 and 67 (6th Amended Complaint Docket No. 703) (admitting Mary Corse was subject to contract with Debtor and other facts |

---

[6] This fact should be incorporated into each of the following transfers to 400 S. La Brea.

GEX 144

| | | |
|---|---|---|
| 545. | On April 1, 2016, $114,595.32 was deposited into 400 S. La Brea's account ending in #1679 at Cathay Bank. | 400 S. La Brea Bank Records, Exhibit 116 of Compendium of Evidence, pp. 735-736. |

## FACTS RELATED TO AMOUNTS CONVERTED BY MR. CHRISMAS

| | | |
|---|---|---|
| 546. | Between the Petition Date and the Effective Date, Defendant Chrismas sold $15,392,536 of Debtor's Art Property, from which proceeds were diverted to non-Debtor entity accounts controlled by Chrismas. The court infers that Chrismas sold Debtor's property and diverted the sales proceeds based on the uncontroverted facts that he was the principal of the Debtor, having management and supervisory control over the Debtor, that he set up a new entity controlled by him, Ace Gallery New York Corporation, right before Debtor filed for bankruptcy, Debtor's property was sold, the sales proceeds from the sales of Debtor's property were diverted to this new entity or to, or on behalf of, another entity controlled by him, Ace Museum, and he has refused to answer questions about these transactions involving the sales of Debtor's property and diversion of the sales proceeds to non-Debtor entities, invoking his Fifth Amendment testimonial privilege against self-incrimination. | Uncontroverted Facts, Nos. 1-545. [7]<br><br>Declaration of Timothy Kincaid in Support of Plaintiff's Motion for Preliminary Injunction, ECF 216 ("Kincaid Decl.") at 1-15 and exhibits attached thereto.<br><br>Declaration of Jennifer E. Ziegler in Support of Plaintiff's Motion for Summary Judgment ("Ziegler Decl. II"), ECF 873, filed on February 12, 2021, at 3-4 and Ziegler Report, Exhibit 1 attached thereto.<br><br>Ziegler Referenced Exhibit C (Diverted Art Sales Chart).<br><br>[Corrected] Supplemental Declaration of Jennifer E. Ziegler, CPA, in Support of Motion for Summary |

[7] In support of this uncontroverted fact, Plaintiff cited to the finding in in the court's December 6, 2019 Order on Rule 2004 Motion of Chrismas, Main Bankruptcy Case ECF 2568 ("2004 Order") at 17. The court does not rely upon its prior finding in determining this uncontroverted fact, but the underlying evidence submitted by Plaintiff supporting Uncontroverted Facts, Nos. 1-545, showing the sales of Debtor's artwork for which the sales proceeds were diverted to other non-Debtor entities that Chrismas controlled, based on evidence of specific diversions, including artists' contracts, sales invoices, and bank account statements. The Plaintiff's declaration and the declarations of Plaintiff's accountants, Kincaid and Ziegler, constitute demonstrative evidence in explaining how the evidence shows that the sales proceeds of Debtor's artwork were diverted to non-Debtor entities that Chrismas controlled.

GEX 145

| | | | |
|---|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 11 | | | Judgment on Plaintiff's Claims for Conversion and Breach of Fiduciary Duty against Defendant Douglas Chrismas ("Ziegler Decl. III"), ECF 1196, filed on December 20, 2021, at 3-4 and Ziegler Report, Exhibit 1 attached thereto.<br><br>Declaration of Sam S. Leslie in Support of Plaintiff's Motion for Summary Judgment ("Leslie Decl. II"), ECF 872, filed on February 12, 2021, at ¶¶ 2-53 and Exhibit D thereto (Diverted Art Sales Chart). |
| 12 13 14 15 16 17 18 | 547. | There were six invoices for the sale of Debtor's artwork reflecting sales proceeds totaling $918,000 that were deposited directly into City National Bank account #6347 owned by Ace Museum, Defendant Chrismas's controlled entity. | Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto, at 19 (internal page citation).<br><br>Ziegler Decl. III at 3, 5 and Ziegler Report, Exhibit 1 attached thereto, at 19 (internal page citation).<br><br>Leslie Decl. II at ¶¶ 20 and 21 and Exhibit D thereto (Diverted Art Sales Chart). |
| 19 20 21 22 23 24 25 26 27 | 548. | Two pieces of art, created by artists with signed contracts with the Debtor, were sold to a client for $200,000 with instructions to make one check payable to 400 S. La Brea LLC, Ace Museum's landlord, a non-Debtor entity, for $114,595.32 and one check payable to Ace Gallery for $85,404.68. | Leslie Decl. II at ¶¶ 20 and 21 and Exhibit D thereto (Diverted Art Sales Chart).<br><br>Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto, at 19-20 (internal page citations).<br><br>Ziegler Referenced Exhibit C (Diverted Art Sales Chart).<br><br>Ziegler Decl. III at 5-6 and Ziegler Report, Exhibit 1 attached thereto, at 19-20 (internal page citation). |
| 28 | | | |

-87-

| | 549. | The diverted funds were not used to benefit the Debtor, but to pay for Chrismas's personal obligations, including monthly rent of non-Debtor Ace Museum, Defendant Chrismas's controlled entity. | Uncontroverted Facts, Nos. 1-545. |
|---|---|---|---|
| | | | Declaration of Sam Leslie in Support of Plaintiff's Ex Parte Application of Sam Leslie, Plan Agent, ECF 73 ("Leslie Decl. I"), ¶ 6. |
| | | | Kincaid Decl. at ¶¶ 69, 70. |
| | | | Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto. |
| | | | Ziegler Decl. III at 3-4 and Ziegler Report, Exhibit 1 attached thereto. |
| | 550. | Proceeds from sales of Debtor's property was diverted to "repay" non-Debtor Ace Museum's debt to the Debtor, that is, funds were diverted to Ace Museum and then paid to Debtor to reduce the amount of the alleged loan indebtedness of Ace Museum to Debtor on Debtor's books and records. | Uncontroverted Facts, Nos. 1-545. |
| | | | Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto, at 21-26 (internal page citations). |
| | | | Ziegler Decl. III at 3-6 and Ziegler Report, Exhibit 1 attached thereto, at 21-26 (internal page citations). |
| | | | Declaration of Jennifer Ziegler in Support of Plaintiff's Motion to Interpret Confirmation Order and Confirmed Plan ("Ziegler Decl. I"), ECF 542, filed on March 21, 2019, at ¶¶ 10-14 |
| | 551. | Debtor suffered $14,242,884[8] in damages by | Uncontroverted Facts, Nos. |

---

[8] Chrismas is liable to the Debtor for $14,243,884 of damages he caused the debtor to incur. Regarding his conversion claim, the Plan Agent asserts Chrismas is liable to the Debtor for $15,392,536 of damages he caused the debtor to incur. This was the gross amount of the funds from sales of the Debtor's assets diverted to non-debtor parties as determined by the Plan Agent's expert witness, Jennifer Ziegler, as detailed in her report at 21 ($14,359,941 to Ace Gallery New York Corporation and Inc., $918,000 to Ace Museum and $114,595 to 400 South La Brea, LLC). However, as discussed in her report at 21-23, Ziegler made adjustments in the gross amount of diverted sales proceeds to account for additional diversions of Debtor's DIP (Debtor in Possession) and other loan proceeds ($916,822 to Ace Museum and $2,614,862 to Ace Gallery New York

*(continued)*

GEX 147

| | | |
|---|---|---|
| having funds representing the sales of its artwork assets by Defendant Chrismas diverted to accounts other than its own, namely, the sales of Debtor's property with the sales proceeds being diverted to, or on their behalf of, non-Debtor entities controlled by Defendant Chrismas, Ace Gallery New York Corporation and Ace Museum (e.g., rent payments on behalf of Ace Museum to its landlord, 400 South La Brea, LLC). | 1-545;<br><br>Ziegler Decl. II at 3-4 and Ziegler Report, Exhibit 1 attached thereto.<br><br>Ziegler Referenced Exhibit C (Diverted Art Sales Chart).<br><br>Ziegler Decl. III at 3-4 and Ziegler Report, Exhibit 1 attached thereto, at 21-26 (internal page citations). |
| **ADDITIONAL FACTS RE: BREACH OF FIDUCIARY DUTY** | | |
| 552. | Chrismas caused the transfer of funds into the Debtor's operating account of over $250,000 immediately before turnover of control of the Debtor's bankruptcy estate to the Plan Agent pursuant to the confirmed Plan of Reorganization, depriving the Plan Agent of any operating funds to manage the Reorganized debtor. | Leslie Decl. II, ¶ 5.<br><br>Status Report and Declaration of Sam S. Leslie in Support Thereof, ECF 2478, Main Bankruptcy Case, at 4, 5, 24 and Exhibit A. |
| 553. | Chrismas knowingly signed the Monthly Operating Reports filed and submitted to this Court in this bankruptcy case on behalf of the Debtor with falsified important account balances. | Ziegler Decl. I at ¶¶ 6 and 9. |
| 554. | Debtor's Monthly Operating Reports signed by | Ziegler Decl. I at ¶¶ 15-16. |

---

Corporation for a total of $3,531,684) and further diversions of funds from the Debtor in transfers to Ace Museum ($322,180) and Ace Gallery New York Corporation ($20,000) for a total of $342,180, and to account for repayments of the Debtor's DIP loans by transfers back from Ace Gallery New York Corporation ($68,257 and $421,186) for a total of $489,443 and other transfers to Debtor by Ace Museum ($1,434,692) and Ace Gallery New York Corporation ($4,533,072) for a total of $5,967,764. Based on her analysis in her report at 22, reflecting these adjustments, Ziegler computed that the net Debtor's funds not returned totaled $12,809,192. The court adjusts this net amount of diverted funds of $12,809,192 upwards by the amount of $1,434,692 repaid by Ace Museum to the Debtor, which was credited against the outstanding loan by the Debtor to Ace Museum because Ace Museum should not be credited with a repayment of its loan for this amount because these funds were Debtor's sales proceeds, that is, Ace Museum was using Debtor's money to repay its loan to the Debtor as explained by Ziegler in her report at 21-22 based on her prior analysis in her declaration dated March 6, 2019. Thus, the court determines that the amount of damages suffered by the Debtor from the conversion of its funds by Chrismas is $14,243,884.

GEX 148

| 555. | Chrismas and filed in this bankruptcy case indicated an increase in accounts receivable of $4.3 Million, most of which was invalid because it had already been paid by buyers. | |
|---|---|---|
| 555. | Debtor's Monthly Operating Reports signed by Chrismas and filed in this bankruptcy case contained a falsified reduction in Debtor's notes receivable in the Monthly Operating Reports by transferring Debtor's own diverted funds back to the Debtor and recording the transfers as payments from Ace Museum to the Debtor. | Ziegler Decl. I at ¶ 10. |

### OTHER FACTS RELATED TO CHRISMAS'S ASSERTION OF THE FIFTH AMENDMENT

| 556. | During his deposition, Mr. Chrismas asserted the Fifth Amendment to questions related to Ace Gallery and Debtor's bankruptcy. | Uncontroverted Facts, Nos. 1-545; Declaration of Victor Sahn Submitted in Support of Motion for Summary Judgment ("Sahn Decl.") ¶¶ 1-11; Exhibits 9, 10 and 11. |
|---|---|---|
| 557. | Mr. Chrismas asserted the Fifth Amendment in response to discovery served on him. | Uncontroverted Facts, Nos. 1-545; Sahn Decl. ¶ 1, Exhibits 3, 4, 5, and 6. |
| 558. | Mr. Chrismas refused to answer questions about the ownership of the proceeds from the sale of artwork rightfully belonging to Debtor and asserted the Fifth Amendment as the basis for his refusal to answer. | Uncontroverted Facts, Nos. 1-545; Sahn Decl. (August 7, 2019 Volume I Chrismas Deposition) at Exhibit 7 at 207, 4-10. |
| 559. | Mr. Chrismas refused to answer questions about the ownership of proceeds from the sales of Debtor's artwork assts used to pay Ace Museum's rent and asserted the Fifth Amendment as the basis for his refusal to answer. | Uncontroverted Facts, Nos. 1-545; Sahn Decl. (August 7, 2019 Volume I Chrismas Deposition) at Exhibit 7 at 179, 5-12; id. at 258:19-259:1; id. at 280:19-281:11. |
| 560. | Mr. Chrismas refused to answer questions regarding his diversion of sales proceeds from | Uncontroverted Facts, Nos. 1-545; |

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | | sales of artwork assets belonging to the Debtor into the Ace Gallery New York accounts and asserted the Fifth Amendment as the basis for his refusal to answer. | Sahn Decl. (August 7, 2019 Volume I Chrismas Deposition.) at Exhibit 7 at 280:19-281:11. |

**NO EVIDENCE OFFERED IN OPPOSITION TO THE EVIDENCE OFFERED**

**REGARDING THE CLAIMS FOR CONVERSION AND BREACH OF FIDUCIARY DUTY**

| | | | |
|---|---|---|---|
| | 561. | There was no evidence offered to dispute or raise a triable issue of fact regarding the Plan Agent's claims for Conversion and Breach of Fiduciary Duty in the Plan Agent's Summary Judgment Motion. | *See* Opposition to (related document(s): [870] Motion For Summary Judgment (With Proof of Service) filed by Counter-Defendant Sam S. Leslie, Plan Agent for Post-Confirmation Debtor Art & Architecture Books of the 21st Century filed by Douglas Chrismas, Docket No. 913; *See* Declaration of Jonathan S. Shenson in Support of Opposition to MSJ by Plan Agent Filed by Defendant Douglas Chrismas, Docket No. 914; *See* Declaration of Jonathan S. Shenson in Support of Opposition to MSJ by Plan Agent Filed by Defendant Douglas Chrismas, Docket No. 915; *See* Opposition to Motion for Summary Judgment of Plaintiff Sam S. Leslie, filed by 400 South La Brea LLC, Daryoush Dayan, Kamran Gharibian, and Michael D. Smith, Docket No. 910; *See* Statement of 400 South La Brea Defendants of the Genuine Issues in Support of Opposition of 400 South La Brea Defendants to Plan Agent's Motion for Summary Judgment on Conversion and Breach of |

GEX 150

| | | |
|---|---|---|
| | | Fiduciary Duty, Docket no. 911; *See* Statement of Genuine Issues for Opposition to Motion by Plan Agent for MSJ Filed by Defendant Douglas Chrismas, Docket No. 916; *See* Notice of lodgment of Transcript of Deposition of Sam S. Leslie relating to Opposition to Plan Agent's MSJ Filed by Defendant Douglas Chrismas, Docket No. 917. |

## CONCLUSIONS OF LAW

| <u>NO.</u> | <u>CONCLUSIONS OF LAW</u> | <u>SUPPORTING AUTHORITY</u> |
|---|---|---|
| 562. | This United States Bankruptcy Court has "related-to" jurisdiction and may properly issue findings of fact and conclusions of law to be submitted to the District Court for de novo review and entry of final judgment. | 28 U.S.C. §1334(b); 11 U.S.C. § 157(c)(1); *Executive Benefits Insurance Agency v. Arkison,* 573 U.S. 25, 37-40 (2014); *Maitland v. Mitchell (In re Harris Pine Mills)*, 44 F.3d 1431, 1436 (9th Cir. 1995). |
| 563. | This United States Bankruptcy Court specifically retained post-confirmation jurisdiction over the three adversary proceedings that were consolidated within the present Complaint. | Section 16.1 of the Modified Second Amended Plan of Reorganization of Official Committee of Unsecured Creditors, confirmed on March 18, 2016, Main Bankruptcy Case, ECF 1858. |
| | **<u>ASSERTION OF THE FIFTH AMENDMENT</u>** | |
| 564. | In each instance where Chrismas has asserted a Fifth Amendment right against self-incrimination, this Court may draw a negative inference that Chrismas is unable to deny the fact or allegation where, as here, there was a substantial need for the information withheld by Chrismas in asserting the privilege, there is not a less burdensome way to obtain such information, and there is independent evidence corroborating the facts asserted by Plaintiff as | *U.S. Securities & Exchange Commission v. Fujinaga,* 698 Fed.Appx. 865, 867 (9th Cir. 2017); *Nationwide Life Insurance Co. v. Richards,* 541 F.3d 903, 912 (9th Cir. 2008); |

GEX 151

| | | | |
|---|---|---|---|
| 1 | | constituting acts of conversion and breach of fiduciary duty. | *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997). |
| | 565. | The Court may strike any testimony Chrismas offers on topics to which he has asserted the Fifth Amendment privilege, because allowing him to testify now would be allowing him to mutilate the truth. Accordingly, Chrismas may not testify as to the ownership of the Debtor Artwork. | *U.S. v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 642 (9th Cir. 2012); *U.S. v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1277 (10th Cir. 2008). |

### FAILURE TO NAME AN EXPERT

| | | | |
|---|---|---|---|
| | 566. | Due to Chrismas's failure to comply with Fed.R.Civ.P. 26(a), he may not now name an expert to refute Ms. Ziegler's findings. | *ClearOne Communications, Inc. v. Biamp Systems*, 653 F.3d 1163, 1176 (10th Cir. 2011). |

### CONCLUSIONS OF LAW RE: CONVERSION

| | | | |
|---|---|---|---|
| | 567. | The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. | *Lee v. Hanley*, 61 Cal.4th 1225, 1240 (2015). |
| | 568. | It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use. | *Shopoff & Cavallo LLP v. Hyon*, 167 Cal.App.4th 1489, 1507 (2008). |
| | 569. | Any act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion. | *Plummer v. Day/Eisenberg, LLP*, 184 Cal.App.4th 38, 50 (2010). |
| | 570. | Artwork owned by the Debtor and rights of consignment of artworks are tangible and intangible personal property owned by the Plaintiff, susceptible to conversion. | *Don King Productions/ Kingvision v. Lovato*, 911 F.Supp. 419, 423 (N.D. Cal. 1995); *Welco Electronics, Inc. v. Mora*, 223 Cal.App.4th 202, 209 (2014). |
| | 571. | Neither an intention to return property to the rightful owner nor actual return of property to the rightful owner is relevant to a determination of liability for conversion of property. | *Los Angeles Federal Credit Union v. Madatyan*, 209 Cal.App.4th 1383, 1387 (2012); *Bradley v. Becerra*, Case No. CV 20-6479-ODW (KK), 2020 WL 7407918, at * 9 (C.D. Cal. 2020). |
| | 572. | The basis of a conversion action "rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results." | *Los Angeles Federal Credit Union v. Madatyan*, 209 Cal.App.4th 1383, 1387 (2012). |

GEX 152

| 573. | The disposal of the Debtor's property through unauthorized sale and diversion of proceeds for non-Debtor purposes is cognizable injury and damage. | *MTC Electronic Technologies Co., Ltd. v. Leung*, 889 F.Supp. 396, 403 (C.D. Cal. 1995);<br><br>*Cerra v. Blackstone,* 172 Cal.App.3d 604, 609 (1985). |
| --- | --- | --- |
| 574. | Chrismas wrongfully converted valuable property and rights owned by the Debtor, causing damage to the Debtor. | *Lee v. Hanley*, 61 Cal.4th 1225, 1240 (2015).<br><br>Uncontroverted Facts, Nos. 1-545. |
| 575. | Chrismas is liable to the Debtor for $14,243,884 of damages he caused the debtor to incur. | *Lee v. Hanley,* 61 Cal.4th 1225, 1240 (2015);<br><br>Uncontroverted Facts, Nos. 1-561. |
| **CONCLUSIONS OF LAW RE: BREACH OF FIDUCIARY DUTY** | | |
| 576. | The existence and scope of a fiduciary duty are questions of law. | *Kirschner Brothers Oil, Inc. v. Natomas Co.,* 185 Cal.App.3d 784, 790 (1986) |
| 577. | A Debtor-in-Possession is a fiduciary to the estate and its creditors. | *Thompson v. Margen (In re McConville)*, 110 F.3d 47, 50 (9th Cir. 1997);<br><br>*In re Pacific Forest Industries, Inc.*, 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989). |
| 578. | Officers and directors of Debtors-in-Possession owe fiduciary duties to the Debtor-in-Possession and its creditors. | *In re Intermagnetics America, Inc.*, 926 F.2d 912, 917 (9th Cir. 1991);<br><br>*In re Anchorage Nautical Tours, Inc.*, 145 B.R. 637, 643 (9th Cir. BAP 1992). |
| 579. | As the admitted primary officer of the Debtor, Chrismas owed fiduciary duties to the Debtor and to the creditors of the Debtor's bankruptcy estate. | *Id.;*<br><br>Uncontroverted Fact, No. 1. |
| 580. | An agent has a duty not to use the property of the principal for the agent's own purposes or those of a third party. | Restatement (Third) of Agency, § 8.05. |
| 581. | Chrismas violated his fiduciary duty by entering into transactions that benefitted himself and non-Debtor third parties to the detriment of the Debtor. | Restatement (Third) of Agency, § 8.02;<br><br>*Xum Speegle, Inc. v. Fields,* 216 Cal.App.2d 546, 554 (1963);<br><br>Uncontroverted Facts, Nos. 1-561. |

GEX 153

| | | |
|---|---|---|
| 582. | Chrismas's transfer of funds of about $250,000 into the Debtor's bank account before turning over the bankruptcy estate to Plaintiff was a breach of fiduciary duty to the Debtor. | *Id.* |
| 583. | Chrismas's signing and filing false Monthly Operating Reports submitted to the Court from February 28, 2013 to November 30, 2013 was a breach of fiduciary duty to the Debtor. | *Id.* |
| 584. | Chrismas's diverting the sales proceeds of Debtor's artwork assets for the benefit of Chrismas and non-Debtor third parties was a breach of fiduciary duty to the Debtor. | *Id.* |

## CONCLUSIONS OF LAW REGARDING CHRISMAS'S STATEMENT OF GENUINE ISSUES

| | | |
|---|---|---|
| 585. | The issue raised by defendant Chrismas whether the court can accept the Ziegler Report as subject to a rebuttal process (ECF 916) is not a genuine issue of material fact as Chrismas does not identify in his statement of genuine issues or otherwise submit admissible evidence in opposition to the Ziegler Report as required by Federal Rule of Civil Procedure 56(c) and Local Bankruptcy Rules 7056-1(c) and 9013-1(i). The opposing party must direct the court's attention to specific, triable facts by "citing to particular parts of materials in the record." [FRCP 56(c)(1)(A). | Fed. R. Civ. P. 56(c) (The opposing party must direct the court's attention to specific, triable facts by "citing to particular parts of materials in the record" pursuant to Fed. R. Civ. P. 56(c)(1)(A)); Fed. R. Bankr. P. 7056; Local Bankruptcy Rules 7056-1 and 9013-1(i). |
| 586. | The issue raised by defendant Chrismas whether the court should reject the Plan Agent's attempts to inject into this action its order in the bankruptcy case denying defendant Chrismas's Rule 2004 motion (ECF 916) is not a genuine issue of material fact as the court does not consider its order as relevant to this matter. | Memorandum Decision and Order thereon on Motion of Douglas Chrismas for Order Pursuant to Bankruptcy Rule 2004 and Bankruptcy Code Sections 105 and 1142, Main Bankruptcy Case ECF 2568 and 2569, filed and entered on December 6, 2019. The court's decision is also cited as *In re Art & Architecture Books of the 21st Century, Inc.,* 2019 WL 9243053 (Bankr. C.D. Cal. Dec. 6, 2019). |
| 587. | The issue raised by defendant Chrismas whether the conversion claim fails as a matter of law because the Plan Agent alleges that he, as opposed to the Debtor, did not consent to use of the debtor's property to fund rent payment for Ace Museum (ECF 916) is not a genuine issue of material fact because the conversion claim is based on whether Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code as shown by the uncontroverted facts. | 11 U.S.C. §§ 363 (authorization to use bankruptcy estate property out of the ordinary course of business requires court approval), 704, 1106 and 1107 (debtor in possession has fiduciary duty to creditors with respect to use of bankruptcy estate property, and unauthorized use of such |

GEX 154

| | | | |
|---|---|---|---|
| 1 | | | property is a breach of this fiduciary duty). |
| 2 | 588. | The issue raised by defendant Chrismas whether his actions are imputed to the debtor as a matter of law (ECF 916) is not a genuine issue of material fact because the conversion claim is based on whether Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code as shown by the uncontroverted facts. | The court rejects the defense raised by Chrismas that any alleged misconduct by him as the sole person in control of debtor is imputed to the postconfirmation Reorganized Debtor. Memorandum Decision and Order thereon on Motion of Douglas Chrismas for Order Pursuant to Bankruptcy Rule 2004 and Bankruptcy Code Sections 105 and 1142, Main Bankruptcy Case ECF 2568 and 2569, filed and entered on December 6, 2019. Although there is apparently no definitive case law in the Ninth Circuit regarding whether the so-called in pari delicto defense may be asserted against a bankruptcy trustee, or here, the plan agent, as to the bad acts of prior management post-petition, as recognized by the court in *C&S Wholesale Grocers, Inc. v. Delano Retail Partners, LLC* (*In re Delano Retail Partners, LLC*), 2014 WL 4966476, slip op. at *3-6 (Bankr. E.D. Cal. 2014), this court finds persuasive the Third Circuit's decision and opinion in *In re Personal and Business Insurance Agency*, 334 F.3d 239 (3d Cir. 2003), which held that under the doctrine of imputation, or in pari delicto, the bad acts of a debtor's principal could only be imputed to a bankruptcy trustee in the case of prepetition acts relating to a prepetition claim brought into the bankruptcy estate under 11 U.S.C. § 541, but rights arising under the Bankruptcy Code, such as avoidance claims for fraudulent transfer under 11 U.S.C. § 548, which are not brought into the bankruptcy estate by virtue of |

GEX 155

| | |
|---|---|
| 1 | 11 U.S.C. § 541, may not be affected by imputation. *Id.*, |
| 2 | citing *In re Personal and Business Insurance Agency*, |
| 3 | 334 F.3d at 242-247 (citing and distinguishing *Official* |
| 4 | *Committee of Unsecured Creditors v. R.F. Lafferty &* |
| 5 | *Co.*, 267 F.3d 340 (3d Cir. 2001), involving prepetition |
| 6 | claims brought into the estate under 11 U.S.C. § 541 to hold |
| 7 | that the so-called "sole actor exception" does not apply to |
| 8 | rights arising under other provisions of the Bankruptcy |
| 9 | Code, i.e., 11 U.S.C. § 548). The acts of Chrismas as the |
| 10 | person in control of the Debtor-in-Possession during |
| 11 | the post-petition administration of the Chapter |
| 12 | 11 bankruptcy case are not prepetition acts relating to a |
| 13 | prepetition claim brought into the bankruptcy estate under |
| 14 | 11 U.S.C. § 541, and therefore, do not implicate the |
| 15 | doctrine of imputation, so that any bad acts by him are |
| 16 | imputed to the Reorganized Debtor and the Plan Agent. |
| 17 | *Id.*; *see also*, *Notinger v. Migliaccio* (*In re Financial* |
| 18 | *Resources Mortgage, Inc.*). 454 B.R. 6, 24 (Bankr. D. |
| 19 | N.H. 2011) ("Courts have reasoned that it is inequitable |
| 20 | to impute a debtor's bad conduct to a trustee who |
| 21 | comes to the court with clean hands to pursue claims on |
| 22 | behalf of innocent creditors."), citing inter alia, |
| 23 | *In re Personal & Business Insurance Agency*, 334 F.3d |
| 24 | at 246-247 and *Cooper v. United States*, 362 F.Supp.2d |
| 25 | 649, 656 (W.D.N.C. 2005)("Imputing the bad acts |
| 26 | of the debtor onto the bankruptcy trustee in the |
| 27 | present case renders a categorically inequitable |
| 28 | result, that is, the innocent victimized creditors get |

GEX 156

| | | | |
|---|---|---|---|
| 1 | | | nothing."). |
| 2 3 4 5 | 589. | The issue raised by defendant Chrismas whether there was a lack of assent by the Debtor (ECF 916) is not a genuine issue of material fact because the conversion claim is based on whether Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code as shown by the uncontroverted facts. | Whether the Debtor consented to the conversion of its assets by Chrismas presents the same issue and concern raised by Chrismas's imputation argument addressed in the preceding entry. |
| 6 7 8 9 10 | 590. | The issue raised by defendant Chrismas whether the conversion claim is barred by the doctrine of in pari delicto (ECF 916) is not a genuine issue of material fact because the conversion claim is based on whether Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code. | Whether the Plan Agent's conversion claim against defendant Chrismas is barred by the doctrine of in pari delicto presents the same issues and concerns raised by Chrismas's imputation and consent arguments addressed in the preceding entries. |
| 11 12 13 14 15 16 17 18 19 | 591. | The issue raised by defendant Chrismas whether he knowingly acted against the Debtor's interest or acted on behalf of a party whose interests were adverse to the Debtor. | Whether Chrismas's defense against the Plan Agent's conversion claim that he did not knowingly act against the Debtor's interest presents the same issues and concerns raised by Chrismas's imputation, consent and in pari delicto arguments addressed in the preceding entries. Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code as shown by the uncontroverted facts. |
| 20 21 22 23 24 25 26 27 28 | 592. | The issue raised by defendant Chrismas whether his actions are imputed to the debtor as a matter of law (ECF 916) is not a genuine issue of material fact because the conversion claim is based on whether Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code as shown by the uncontroverted facts. | Whether Chrismas's defense against the Plan Agent's conversion claim that he did not knowingly act against the Debtor's interest presents the same issues and concerns raised by Chrismas's imputation, consent and in pari delicto arguments addressed in the preceding entries. Chrismas diverted property of the debtor's bankruptcy estate to non-debtor parties in violation of the Bankruptcy Code as shown by the uncontroverted facts. |

GEX 157

| | | |
|---|---|---|
| 593. | The issue raised by defendant Chrismas whether the subject claims for conversion and breach of fiduciary duty were released on grounds that he achieved certain milestones under the so-called Committee-Museum Stipulation Order (Adversary Proceeding No. 2:14-ap-01771, ECF 28) (ECF 950 and 1021) is not a genuine issue of material fact as Chrismas does not offer admissible evidence in opposition to the Ziegler Report as required by Federal Rule of Civil Procedure 56(c). | Fed. R. Civ. P. 56(c). |
| **CONCLUSIONS OF LAW RE: APPLICABILITY OF RULING TO OTHER PARTIES** | | |
| 594. | Because Plaintiff's Motion for Summary Judgment on Conversion and Breach of Fiduciary Duty Against Douglas Chrismas seeks entry of summary judgment against Douglas Chrismas and no other party, the motion does not seek relief against other parties, the other parties retain their rights to defend against any factual or legal allegations that may be the subject of the motion. | *See In re Flashcom, Inc.,* 361 B.R. 519, 522-527 (Bankr. C.D. Cal. 2007) (parties have a constitutional right to defend claims asserted against them before they can be deprived of their property), *affirmed,* 503 B.R. 99 (C.D. Cal. 2013), *affirmed,* 647 Fed.Appx. 689 (2016). |
| 595. | The court makes no determination of the applicability of the preclusive effect of the ruling on the motion since such applicability is not before the court at this time. | *Id.* *See also, e.g., Khaligh v. Hadaegh (In re Khaligh),* 338 B.R. 817, 824-825 (9th Cir. BAP 2006). |

Plaintiff's claims in his complaint against Defendant Chrismas for conversion and breach of fiduciary duty are discrete claims separate and apart from the other claims in this adversary proceeding, and therefore, the Bankruptcy Court recommends that the United States District Court expressly determine that there is no just reason for delay and that the District Court may and should direct entry of final judgment on these claims pursuant to Federal Rule of Civil Procedure 54(b) made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7054.

IT IS THEREFORE RECOMMENDED by the United States Bankruptcy Court that for the foregoing reasons, the United States District Court accept this Report and Recommendation, adopt the above-stated statement of uncontroverted facts and conclusions of law, and grant the motion for summary judgment. This Report and Recommendation containing the findings of uncontroverted

GEX 158

1  facts and recommended conclusions of law are submitted to the United States District Judge

2  assigned to the case, pursuant to the provisions of 28 U.S.C. § 157(c)(1) and Federal Rule of

3  Bankruptcy Procedure 9033. Accordingly, within fourteen days after being served with these

4  findings and recommendations, any party may file written objections with the court and serve a copy

5  on all parties. Such a document should be captioned "Objections to Bankruptcy Court's Report and

6  Recommendation." Failure to file objections within the specified time may waive the right to object

7  to this Report and Recommendation.  Federal Rule of Bankruptcy Procedure 9033; *In re Delano*

8  *Retail Partners, LLC,* No. 11-37711-B-7, Adv. No. 13-2250-B, 2014 WL 4966476, slip op. at *13

9  (Bankr. E.D. Cal. Sept. 29, 2014), *citing, Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir.1998) and

10  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.1991).

11       IT IS SO ORDERED.

12                 ###

13

14

15

16

17

18

19

20

21

22

23

24  Date: February 16, 2022

                                  Robert Kwan
                                  United States Bankruptcy Judge

25

26

27

28

GEX 159

Plan Agent Start Date is an exhibit to his declaration dated October 19, 2017.[56]  One objective of

my engagement in this matter was to evaluate and verify this analysis.

###### 6) Bases of Opinions

###### A) $15,392,536[57] of Debtor's money from Debtor's art sales was deposited and transferred to other entities from Petition Date to Plan Agent Start Date.

Kincaid's Analysis

Kincaid analyzed Debtor's activities from the date of the filing for protection under Chapter

11 on February 19, 2013, though the date Plan Agent took over Debtor's activities on April 6,

2016.  Kincaid found in is his analysis, contrary to what was reported to the bankruptcy court in

Debtor's Monthly Operating Reports (MOR),  that funds from Debtor's artwork sales were not

deposited into Debtor's bank accounts, that a payment from artwork sales was paid directly from

a purchaser directly to 400 S. La Brea, LLC, and DIP Loan proceeds and other loan proceeds were

not always deposited into Debtor's bank accounts.  Kincaid filed a declaration signed October 19,

2017, with the results of his analysis attached as exhibits.  I was asked to review, evaluate, and

come up with my own results based on the original documents coupled with the analysis Kincaid

prepared.

After Kincaid filed his analysis with the court, more information became available which

resulted in a better understanding of certain transactions.  My analysis includes this new

information and resulted in modifications to Kincaid's analysis.  I reviewed documents that

---

[56] Declaration of Timothy Kincaid in Support of Plaintiff's Motion for Preliminary Injunction dated
October 19, 2017, ¶ 9 and Exhibit C.

[57] Exhibit C – BRG's analysis of Debtor's art sales deposited into non-Debtor accounts of Ace Gallery
NY Corporation, Ace Gallery NY, Inc., and 400 S. La Brea, LLC.

USAO_00014079

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER
GEX 160

## UNITED STATES v. CHRISMAS

### 2:21-CR-127-MCS

### Summary Table of Artwork Proceeds Embezzled from Ace Gallery

| Number | Date Sale Initiated | Amount Transferred Out of Ace Gallery | Reference |
|---|---|---|---|
| 1 | 2/18/2013 | $ 600.00 | BK R&R ¶¶ 55 et seq.; Invoice #1541 |
| 2 | 2/18/2013 | $ 38,368.00 | BK R&R ¶¶ 59 et seq.; Invoice #2000A |
| 3 | 2/20/2013 | $ 84,177.00 | BK R&R ¶¶ 64 et seq.; Invoice #2000 |
| 4 | 2/26/2013 | $ 32,000.00 | BK R&R ¶¶ 69 et seq.; Invoice #2001A |
| 5 | 2/28/2013 | $ 199,980.00 | BK R&R ¶¶ 73 et seq.; Invoice #1557A |
| 6 | 3/1/2013 | $ 27,835.00 | BK R&R ¶¶ 78 et seq.; Invoice #2001 |
| 7 | 3/1/2013 | $ 11,900.00 | BK R&R ¶¶ 82 et seq.; Invoice #2002 |
| 8 | 3/5/2013 | $ 25,288.00 | BK R&R ¶¶ 86 et seq.; Invoice #2003 & 1557B |
| 9 | 3/5/2013 | $ 45,000.00 | BK R&R ¶¶ 93 et seq.; Invoice #2005A |
| 10 | 3/18/2013 | $ 215,000.00 | BK R&R ¶¶ 98 et seq.; Invoice #2006 |
| 11 | 3/20/2013 | $ 18,000.00 | BK R&R ¶¶ 104 et seq.; Invoice #2005 |
| 12 | 3/28/2013 | $ 26,160.00 | BK R&R ¶¶ 107 et seq.; Invoice #2007 |
| 13 | 4/15/2013 | $ 49,387.50 | BK R&R ¶¶ 110 et seq.; Invoice #2009 |
| 14 | 4/16/2013 | $ 3,600.00 | BK R&R ¶¶ 114 et seq.; Invoice #2010 |
| 15 | 4/26/2013 | $ 9,355.00 | BK R&R ¶¶ 117 et seq.; Invoice #2011 |
| 16 | 5/17/2013 | $ 533,500.00 | BK R&R ¶¶ 121 et seq.; Invoice #2012 |
| 17 | 5/17/2013 | $ 125,225.00 | BK R&R ¶¶ 125 et seq.; Invoice #2013 |
| 18 | 5/22/2013 | $ 3,535.00 | BK R&R ¶¶ 128 et seq.; Invoice #2014 |

GEX 161

<u>UNITED STATES v. CHRISMAS</u>

**2:21-CR-127-MCS**

| Number | Date Sale Initiated | Amount Transferred Out of Ace Gallery | Reference |
|---|---|---|---|
| 19 | 5/24/2013 | $ 140,000.00 | BK R&R ¶¶ 131 et seq.; Invoice #2015A |
| 20 | 5/28/2013 | $ 17,960.00 | BK R&R ¶¶ 135 et seq.; Invoice #2015 |
| 21 | 5/31/2013 | $ 15,260.00 | BK R&R ¶¶ 140 et seq.; Invoice #2016 |
| 22 | 6/5/2016 | $ 20,000.00 | BK R&R ¶¶ 144 et seq.; Invoice #2017 |
| 23 | 6/25/2013 | $ 20,000.00 | BK R&R ¶¶ 148 et seq.; Invoice #2019 |
| 24 | 7/2/2013 | $ 132,000.00 | BK R&R ¶¶ 152 et seq.; Invoice #2020 |
| 25 | 7/3/2013 | $ 51,200.00 | BK R&R ¶¶ 157 et seq.; Invoice #2020A |
| 26 | 7/22/2013 | $ 52,320.00 | BK R&R ¶¶ 161 et seq.; Invoice #2021 |
| 27 | 7/30/2013 | $ 172,000.00 | BK R&R ¶¶ 165 et seq.; Invoice #2022 |
| 28 | 9/12/2013 | $ 10,000.00 | BK R&R ¶¶ 170 et seq.; Invoice #1614A |
| 29 | 10/11/2013 | $ 1,962.00 | BK R&R ¶¶ 174 et seq.; Invoice #2026 |
| 30 | 10/14/2013 | $ 120,000.00 | BK R&R ¶¶ 177 et seq.; Invoice #2027 |
| 31 | 10/17/2013 | $ 37,060.00 | BK R&R ¶¶ 182 et seq.; Invoice #2028 |
| 32 | 11/25/2013 | $ 300,000.00 | BK R&R ¶¶ 186 et seq.; Invoice #2030 |
| 33 | 11/27/2013 | $ 153,900.00 | BK R&R ¶¶ 192 et seq.; Invoice #1660 |
| 34 | 11/27/2013 | $ 50,000.00 | BK R&R ¶¶ 197 et seq.; Invoice #1661 |
| 35 | 12/8/2013 | $ 480,000.00 | BK R&R ¶¶ 202 et seq.; Invoice #2031A |
| 36 | 12/17/2013 | $ 37,060.00 | BK R&R ¶¶ 208 et seq.; Invoice #2031 |
| 37 | 1/6/2014 | $ 64,310.00 | BK R&R ¶¶ 212 et seq.; Invoice #2032 |
| 38 | 1/16/2014 | $ 12,000.00 | BK R&R ¶¶ 218 et seq.; Invoice #2033 |

## UNITED STATES v. CHRISMAS

### 2:21-CR-127-MCS

| Number | Date Sale Initiated | Amount Transferred Out of Ace Gallery | Reference |
|--------|---------------------|---------------------------------------|-----------|
| 39 | 1/19/2014 | $ 29,750.00 | BK R&R ¶¶ 222 et seq.; Invoice #2034 |
| 40 | 1/19/2014 | $ 14,715.00 | BK R&R ¶¶ 230 et seq.; Invoice #2035 |
| 41 | 2/5/2014 | $ 72,000.00 | BK R&R ¶¶ 234 et seq.; Invoice #2037 |
| 42 | 2/11/2014 | $ 163,500.00 | BK R&R ¶¶ 238 et seq.; Invoice #2036 |
| 43 | 3/19/2014 | $ 38,368.00 | BK R&R ¶¶ 244 et seq.; Invoice #2038 |
| 44 | 3/31/2014 | $ 150,000.00 | BK R&R ¶¶ 248 et seq.; Invoice #2040 |
| 45 | 4/17/2014 | $ 648.39 | BK R&R ¶¶ 252 et seq.; Invoice #2041 |
| 46 | 4/23/2014 | $ 39,240.00 | BK R&R ¶¶ 255 et seq.; Invoice #2042 |
| 47 | 5/2/2014 | $ 889.20 | BK R&R ¶¶ 259 et seq.; Invoice #2043 |
| 48 | 5/9/2014 | $ 2,725.00 | BK R&R ¶¶ 262 et seq.; Invoice #2044 |
| 49 | 5/27/2014 | $ 179,850.00 | BK R&R ¶¶ 266 et seq.; Invoice #2045 |
| 50 | 5/27/2014 | $ 36,000.00 | BK R&R ¶¶ 271 et seq.; Invoice #2046 |
| 51 | 5/27/2014 | $ 57,000.00 | BK R&R ¶¶ 275 et seq.; Invoice #2047 |
| 52 | 6/5/2014 | $ 50,000.00 | BK R&R ¶¶ 280 et seq.; Invoice #2048 |
| 53 | 6/13/2014 | $ 70,850.00 | BK R&R ¶¶ 284 et seq.; Invoice #4449 |
| 54 | 6/29/2014 | $ 18,530.00 | BK R&R ¶¶ 288 et seq.; Invoice #2050 |
| 55 | 6/25/2014 | $ 325,000.00 | BK R&R ¶¶ 292 et seq.; Invoice #2051 |
| 56 | 7/14/2014 | $ 200,000.00 | BK R&R ¶¶ 296 et seq.; Invoice #1739 |
| 57 | 7/22/2014 | $ 115,812.50 | BK R&R ¶¶ 299 et seq.; Invoice #2052 |
| 58 | 7/22/2014 | $ 13,090.00 | BK R&R ¶¶ 303 et seq.; Invoice #2053 |

GEX 163

<u>UNITED STATES v. CHRISMAS</u>

**2:21-CR-127-MCS**

| Number | Date Sale Initiated | Amount Transferred Out of Ace Gallery | Reference |
|--------|---------------------|---------------------------------------|-----------|
| 59 | 7/29/2014 | $    174,000.00 | BK R&R ¶¶ 307 et seq.; Invoice #2054 |
| 60 | 9/11/2014 | $     12,885.00 | BK R&R ¶¶ 310 et seq.; Invoice #2058 |
| 61 | 9/17/2014 | $      3,500.00 | BK R&R ¶¶ 314 et seq.; Invoice #2059A |
| 62 | 5/27/2014 | $    225,000.00 | BK R&R ¶¶ 317 et seq.; Invoice #2060 |
| 63 | 9/24/2014 | $     54,000.00 | BK R&R ¶¶ 322 et seq.; Invoice #2061 |
| 64 | 10/10/2014 | $     27,250.00 | BK R&R ¶¶ 326 et seq.; Invoice #2062 |
| 65 | 11/18/2014 | $        650.00 | BK R&R ¶¶ 330 et seq.; Invoice #1769 |
| 66 | 12/3/2014 | $     15,696.00 | BK R&R ¶¶ 333 et seq.; Invoice #2063 |
| 67 | 12/22/2014 | $    202,979.20 | BK R&R ¶¶ 337 et seq.; Invoice #2064 |
| 68 | 1/11/2015 | $      1,360.00 | BK R&R ¶¶ 345 et seq.; Invoice #2066 |
| 69 | 1/14/2015 | $    188,500.00 | BK R&R ¶¶ 348 et seq.; Invoice #2067 |
| 70 | 1/15/2015 | $      8,720.00 | BK R&R ¶¶ 352 et seq.; Invoice #2068 |
| 71 | 1/15/2015 | $     43,600.00 | BK R&R ¶¶ 356 et seq.; Invoice #2069 |
| 72 | 2/2/2015 | $     21,800.00 | BK R&R ¶¶ 360 et seq.; Invoice #1790 |
| 73 | 2/13/2015 | $     35,970.00 | BK R&R ¶¶ 364 et seq.; Invoice #1792 |
| 74 | 2/15/2015 | $    258,000.00 | BK R&R ¶¶ 368 et seq.; Invoice #1797 |
| 75 | 2/17/2015 | $     12,000.00 | BK R&R ¶¶ 375 et seq.; Invoice #2074A |
| 76 | 3/13/2015 | $     13,080.00 | BK R&R ¶¶ 379 et seq.; Invoice #1801 |
| 77 | 4/10/2015 | $     85,000.00 | BK R&R ¶¶ 383 et seq.; Invoice #2075 |
| 78 | 4/11/2015 | $     50,000.00 | BK R&R ¶¶ 388 et seq.; Invoice #1828 |

GEX 164

## UNITED STATES v. CHRISMAS

### 2:21-CR-127-MCS

| Number | Date Sale Initiated | Amount Transferred Out of Ace Gallery | Reference |
|---|---|---|---|
| 79 | 4/23/2015 | $ 435,128.00 | BK R&R ¶¶ 393 et seq.; Invoice #2076 |
| 80 | 4/25/2015 | $ 252,000.00 | BK R&R ¶¶ 400 et seq.; Invoice #2079 |
| 81 | 4/27/2015 | $ 52,320.00 | BK R&R ¶¶ 404 et seq.; Invoice #2077 |
| 82 | 5/4/2015 | $ 7,000.00 | BK R&R ¶¶ 408 et seq.; Invoice #2078 |
| 83 | 5/19/2015 | $ 28,000.00 | BK R&R ¶¶ 412 et seq.; Invoice #2080 |
| 84 | 6/9/2015 | $ 211,000.00 | BK R&R ¶¶ 416 et seq.; Invoice #2081 |
| 85 | 6/12/2015 | $ 24,080.00 | BK R&R ¶¶ 420 et seq.; Invoice #2082 |
| 86 | 6/24/2015 | $ 48,000.00 | BK R&R ¶¶ 424 et seq.; Invoice #1827 |
| 87 | 1/14/2015 | $ 4,800.00 | BK R&R ¶¶ 428 et seq.; Invoice #2082A |
| 88 | 7/4/2015 | $ 165,000.00 | BK R&R ¶¶ 431 et seq.; Invoice #1826 |
| 89 | 7/15/2015 | $ 216,000.00 | BK R&R ¶¶ 435 et seq.; Invoice #2084 |
| 90 | 7/25/2015 | $ 159,972.00 | BK R&R ¶¶ 440 et seq.; Invoice #1837 |
| 91 | 7/25/2015 | $ 29,500.00 | BK R&R ¶¶ 444 et seq.; Invoice #1838 |
| 92 | 7/30/2015 | $ 20,165.00 | BK R&R ¶¶ 449 et seq.; Invoice #1836 |
| 93 | 8/17/2015 | $ 100,000.00 | BK R&R ¶¶ 453 et seq.; Invoice #1846 |
| 94 | 8/25/2015 | $ 48,965.00 | BK R&R ¶¶ 457 et seq.; Invoice #1848 |
| 95 | 9/3/2015 | $ 33,572.00 | BK R&R ¶¶ 461 et seq.; Invoice #2089 |
| 96 | 10/10/2015 | $ 261,600.00 | BK R&R ¶¶ 465 et seq.; Invoice #2092 |
| 97 | 10/2/2015 | $ 5,232,000.00 | BK R&R ¶¶ 471 et seq.; Invoice #2093 |
| 98 | 10/2/2015 | $ 95,000.00 | BK R&R ¶¶ 477 et seq.; Invoice #NA/EMAIL |

GEX 165

<u>UNITED STATES v. CHRISMAS</u>

**2:21-CR-127-MCS**

| Number | Date Sale Initiated | Amount Transferred Out of Ace Gallery | Reference |
|---|---|---|---|
| 99 | 11/3/2015 | $ 15,000.00 | BK R&R ¶¶ 481 et seq.; Invoice #2094 |
| 100 | 12/10/2015 | $ 125,000.00 | BK R&R ¶¶ 484 et seq.; Invoice #2095 |
| 101 | 1/4/2016 | $ 36,000.00 | BK R&R ¶¶ 488 et seq.; Invoice #2096 |
| 102 | 1/25/2016 | $ 32,427.50 | BK R&R ¶¶ 491 et seq.; Invoice #2097 |
| 103 | 1/25/2016 | $ 32,427.50 | BK R&R ¶¶ 495 et seq.; Invoice #2098 |
| 104 | 1/25/2016 | $ 32,427.50 | BK R&R ¶¶ 499 et seq.; Invoice #2099 |
| 105 | 1/26/2016 | $ 150,000.00 | BK R&R ¶¶ 503 et seq.; Invoice #2100 |
| 106 | 2/2/2016 | $ 12,000.00 | BK R&R ¶¶ 507 et seq.; Invoice #1881 |
| 107 | 2/23/2016 | $ 73,575.00 | BK R&R ¶¶ 510 et seq.; Invoice #2101 |
| 108 | 2/26/2016 | $ 78,480.00 | BK R&R ¶¶ 514 et seq.; Invoice #2102 |
| 109 | 2/18/2013 | $ 150,000.00 | BK R&R ¶¶ 519 et seq.; Invoice #1554 |
| 110 | 9/21/2013 | $ 68,000.00 | BK R&R ¶¶ 522 et seq.; Invoice #2025 |
| 111 | 6/26/2014 | $ 175,000.00 | BK R&R ¶¶ 526 et seq.; Invoice #1726 |
| 112 | 6/22/2015 | $ 200,000.00 | BK R&R ¶¶ 530 et seq.; Invoice #1819 |
| 113 | 8/31/2015 | $ 225,000.00 | BK R&R ¶¶ 533 et seq.; Invoice #2088 |
| 114 | 3/30/2016 | $ 100,000.00 | BK R&R ¶¶ 538 et seq.; Invoice #K-1012 |
| 115 | 3/30/2016 | $ 114,595.32 | BK R&R ¶¶ 542 et seq.; Invoice #K-1013 |
| | | | |
| | Total: | $ 15,391,935.61 | |
| Note: entries 114 and 115 were charged conduct in the current criminal case Note: total entries is less than the ~158 pieces of art sold, because several entries include multiple pieces | | | |

6

GEX 166

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DOUGLAS J. CHRISMAS,<br><br>Defendant. | Case No. 2:21-cr-00127-MCS-1<br><br>**ORDER RE: MOTION FOR DISMISSAL FOR PROSECUTORIAL MISCONDUCT (ECF NO. 159); CONSOLIDATED POST-TRIAL MOTIONS FOR ACQUITTAL, DISMISSAL, AND NEW TRIAL (ECF NO. 194)** |

Defendant Douglas J. Chrismas moves for dismissal based on prosecutorial misconduct, (MFD, ECF No. 159; Mot., ECF No. 194), and acquittal based on lack of evidence or, in the alternative, a new trial, (Mot.). The Government opposes, (MFD Opp'n, ECF No. 201; Opp'n, ECF No. 204), and Defendant replied, (Reply, ECF No. 212). The Court heard argument at the hearing for post-trial motions. (Mins., ECF No. 223.) For the reasons listed below the Court **DENIES** Defendant's remaining motions.

## I.    BACKGROUND

The Government indicted Defendant on three counts of embezzlement of a bankruptcy estate in violation of 18 U.S.C. § 153 for three transactions, two on March

1

1    30, 2016, and one on April 1, 2016. (Indictment, ECF No. 1.)

2         Defendant was an officer of the company Art and Architecture Books of the 21st

3    Century, doing business as Ace Gallery. (Jt. Stmt. 3, ECF No. 51.) After Ace Gallery

4    filed for bankruptcy protection in February 2013, Defendant became the trustee of the

5    bankruptcy estate. (*Id.*) The Government accused Defendant of transferring $264,595

6    from the bankruptcy estate to benefit a nonprofit corporation, Ace Museum, which

7    Defendant owned. (Indictment 2–3; Jt. Stmt. 3.)

8         The Court held a four-day jury trial starting on May 28, 2024. (*See* Trial Mins.,

9    ECF Nos. 163, 167, 170–171.) The jury returned a verdict of guilty on all counts on

10   May 31, 2024. (*See* Redacted Jury Verdict, ECF No. 178.) Defendant submitted pre-

11   and post-trial motions seeking (1) an order dismissing the indictment, or alternatively

12   imposing sanctions, for prosecutorial misconduct, (*see generally* MFD; Mot. 5–23);

13   (2) a judgment of acquittal on all counts, (Mot. 2–5); and (3) a new trial, (Mot. 23–26).

14

15   **II.    LEGAL STANDARDS**

16        **A.    Sanctions for Prosecutorial Misconduct**

17             1.    Dismissal Where Misconduct Violates Due Process

18        Due process principles allow a federal court to dismiss a prosecution based on

19   outrageous government conduct. *United States v. Pedrin*, 797 F.3d 792, 795 (9th Cir.

20   2015). "Dismissing an indictment for outrageous government conduct, however, is

21   limited to extreme cases in which the defendant can demonstrate that the government's

22   conduct violates fundamental fairness and is so grossly shocking and so outrageous as

23   to violate the universal sense of justice." *United States v. Black*, 733 F.3d 294, 302 (9th

24   Cir. 2013) (internal quotation mark omitted).

25        "The standard for dismissal on this ground is extremely high." *Pedrin*, 797 F.3d

26   at 795 (internal quotation marks omitted); *see also United States v. Ryan*, 548 F.2d 782,

27   789 (9th Cir. 1976) ("[T]he due process channel which *Russell* kept open is a most

28   narrow one . . . ."); *Black*, 733 F.3d at 302 ("[T]here are only two reported decisions in

2

1    which federal appellate courts have reversed convictions under this doctrine."); *United*

2    *States v. Sapper*, No. 2:12-cr-00435-GMN-CWH, 2013 U.S. Dist. LEXIS 128939, at

3    *7–8 (D. Nev. Apr. 15, 2013) ("To be sure, the only successful assertion of outrageous

4    government conduct in the Ninth Circuit was in *Greene v. United States*, 454 F.2d 783

5    (9th Cir. 1971), which predates *Russell* and *Hampton*."), *R. & R. adopted*, 2013 U.S.

6    Dist. LEXIS 128941 (D. Nev. Sept. 10, 2013).

7

8                    2.    Dismissal Under Supervisory Powers

9          "A court may exercise its supervisory powers to dismiss an indictment in

10   response to outrageous government conduct that falls short of a due process violation."

11   *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004) (citing *United States v.*

12   *Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)). Dismissal of an indictment for

13   prosecutorial misconduct is an extreme remedy, "frequently discussed but rarely

14   invoked" because it "encroach[es] on the constitutionally-based independence of the

15   prosecutor and grand jury." *United States v. Samango*, 607 F.2d 877, 881 (9th Cir.

16   1979). "Because the drastic step of dismissing an indictment is a disfavored remedy, a

17   district court may properly dismiss an indictment only if the prosecutorial misconduct

18   (1) was flagrant, and (2) cause substantial prejudice to the defendant." *United States v.*

19   *Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988) (citations omitted). A district court "may not

20   exercise its 'supervisory power' . . . unless there is a clear basis in fact and law for doing

21   so." *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977).

22          In evaluating alleged prosecutorial misconduct, courts ask whether the conduct

23   is "flagrant in its disregard for the limits of appropriate professional conduct." *United*

24   *States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993) (citing *Barrera-Moreno*, 951 F.2d at

25   1093). A showing of substantial prejudice requires that the prosecution's misconduct

26   "had at least some impact on the verdict and thus redounded to [the defendant's]

27   prejudice." *Id.* (alteration in original) (quoting *United States v. Owen*, 580 F.2d 365,

28   368 (9th Cir. 1978)).

1
2  **B. Motion for Acquittal Under Rule 29**

3   Federal Rule of Criminal Procedure 29 provides that, after a jury verdict, a "court

4 may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). "Courts

5 reviewing a motion for judgment of acquittal under Rule 29(c) apply the same test as

6 they do in evaluating a challenge to the sufficiency of the evidence." *United States v.*

7 *Richardson*, No. 8:19-CR-00182-CAS, 2021 WL 4459363, at *1 (C.D. Cal. Sept. 29,

8 2021) (citing *United States v. Ladum*, 141 F.3d 1328, 1337 (9th Cir. 1988)). When

9 considering a Rule 29 motion, a court must determine whether "any rational trier of fact

10 could have found the essential elements of the crime beyond a reasonable doubt."

11 *United States v. Hursh*, 217 F.3d 761, 767 (9th Cir. 2000).

12   "First, a reviewing court must consider the evidence presented at trial in the light

13 more favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th

14 Cir. 2010). "Second, . . . the reviewing court must determine whether this evidence, so

15 viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of

16 the crime beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Jackson v.*

17 *Virginia*, 443 U.S. 307, 319 (1979)). "The hurdle to overturn a jury's conviction based

18 on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d

19 1144, 1153 (9th Cir. 2010). "[A]ny conflicts in the evidence are to be resolved in favor

20 of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02

21 (9th Cir. 2000).

22
23  **C. Motion for New Trial Under Rule 33**

24   Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion,

25 the court may vacate any judgment and grant a new trial if the interest of justice so

26 requires." Fed. R. Crim. P. 33(a). Rule 33 motions are generally disfavored and should

27 only be granted in "exceptional circumstances." *United States v. Del Toro-Barboza*, 673

28 F.3d 1136, 1153 (9th Cir. 2012) (citing *United States v. Pimentel*, 654 F.2d 538, 545

1  (9th Cir. 1981)). Nonetheless, "[t]he defendant bears the burden of proving that he is

2  entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule

3  33, a district court must find that there is a real concern that an innocent person may

4  have been convicted." *United States v. Halali*, No. 14-cr-00627-SI-1, 2017 WL

5  3232566, at *2 (N.D. Cal. July 28, 2017) (quoting *United States v. McCourty*, 562 F.3d

6  458, 475 (2d Cir. 2009)). "The court is not obliged to view the evidence in the light

7  most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself

8  the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th

9  Cir. 2000). A court has discretion to set aside a jury verdict and grant a new trial if,

10  "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence

11  preponderates sufficiently heavily against the verdict that a serious miscarriage of

12  justice may have occurred." *Id.* (internal quotation marks omitted).

13

14  **III.    DISCUSSION**

15      **A.    Sanctions for Prosecutorial Misconduct**

16      The Court first addresses Defendant's arguments concerning prosecutorial

17  misconduct, which are the subject of both motions. In his original motion, Defendant

18  raised three allegations of prosecutorial misconduct: (1) the Government made

19  "knowingly false statements . . . to the Court to ensure Mr. Chrismas would be detained

20  pre-trial," (MFD 6); (2) the Government "abus[ed] the grand jury process to obtain

21  discovery for trial," (*id.* at 7); and (3) the Government "us[ed] the guise of grand jury

22  investigation to intimidate [the defendant] and interfere with his choice of counsel," (*id.*

23  at 8). In his consolidated post-trial motions Defendant adds five additional allegations

24  of prosecutorial misconduct. Defendant alleges that (1) the Government constructively

25  amended the indictment or caused a fatal variance from the indictment, (Mot. 6); (2) the

26  Government improperly relied on an "appropriation to one's own use" theory, (*id.* at

27  10); (3) the Government further abused the grand jury process and lied to the Court in

28  seeking pretrial detention, (*id.* at 14); (4) the Government elicited improper testimony,

1    (*id.* at 16); and (5) the Government intentionally elicited out-of-court testimony, (*id.* at
2    20). The Court considers each of Defendant's arguments in turn.

3         Defendant does not clearly indicate whether he seeks dismissal under a theory of
4    a due process violation or under the Court's supervisory powers. Defendant urges
5    dismissal because prosecutorial misconduct was "flagrant and caused substantial
6    prejudice" but then cites *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987), a case
7    construing the outrageous conduct standard. (Mot. 5.) Because of Defendant's citation
8    to *Simpson* and the Government's briefing responding to a potential outrageous conduct
9    argument, the Court evaluates the prosecution's conduct under both standards. In either
10   case, Defendant's arguments fail.

11

12         1.    <u>Government Statements Made Relating to Tuna Canyon Sale</u>

13        Defendant alleges that "[t]he Government has made knowingly false
14   statements . . . to the Court" relating to the sale of his Tuna Canyon property in order
15   "to ensure Mr. Chrismas would be detained pre-trial." (MFD 6.)[1] Defendant takes issue
16   with three statements made by the Government when it sought revocation of
17   Defendant's bond: (1) "that Mr. Chrismas 'hid' the sale from 'the government, and
18   likely his creditors,'" (*id.* at 1 (quoting Mot. to Rev. Bond 6, ECF No. 115)); (2) "that
19   he kept the proceeds 'rather than surrendering it' to the estate 'consistent with' the
20   estate's civil judgment against Mr. Chrismas," (*id.* at 1–2 (quoting Suppl. to Mot. to
21   Rev. Bond 3, ECF No. 120)); and (3) "that the estate's civil judgment 'compel[led]'
22   Mr. Chrismas to transfer the proceeds of the sale to the estate," (*id.* at 2 (alteration in
23   original) (quoting Suppl. to Mot. to Rev. Bond 4)).

24        The Court disagrees with Defendant's assertion that the Government knowingly
25

26   _____

27   [1] This is the same argument Defendant made in his consolidated post-trial motion. (Mot.
     14–16.) Because the arguments are substantially the same, the Court addresses them
28   together here.

1   made false statements to the Court. Without passing on the accuracy of the statements

2   themselves, the Government has presented a sufficient explanation of the prosecutors'

3   understanding of Defendant's communications with creditors and the effect of the civil

4   judgment to satisfy the Court that the prosecutors did not intend to misrepresent the

5   facts or law to the Court. (*See* MFD Opp'n 6–8.) For example, the prosecutors'

6   argument before trial that Defendant "hid" a transaction from the Court in that he

7   purportedly violated a court order precluding the transaction is well within the bounds

8   of zealous advocacy. (*Id.* at 7.) The prosecutors' statements do not "violate[]

9   fundamental fairness," nor is it "so grossly shocking and so outrageous as to violate the

10  universal sense of justice." *Black*, 733 F.3d at 302 (internal quotation marks omitted).

11  Nor is it "flagrant in its disregard for the limits of appropriate professional conduct."

12  *Lopez*, 4 F.3d at 1464. Moreover, Defendant cannot demonstrate he was substantially

13  prejudiced by the Government's statements. *Jacobs*, 855 F.2d at 655. As the Court told

14  Defendant after hearing argument on this very issue before voir dire, the Court based

15  its ruling revoking bond on the fact that the Defendant's sale of the property clearly

16  violated Defendant's bond conditions. (Tr. Day 1 AM, at 12, ECF No. 189.)

17

18          2.     Alleged Abuse of the Grand Jury Process

19          Defendant alleges that the Government abused the grand jury process by issuing

20  subpoenas related to his sale of the Tuna Canyon property. (MFD 7–8.)[2] Specifically,

21  Defendant alleges that the Government issued grand jury subpoenas immediately prior

22  to Defendant's bond revocation hearing. (*Id*. at 4–5.) Defendant alleges the Government

23  elected to issue grand jury subpoenas instead of trial subpoenas to get the records sought

24  _____

25  [2] Defendant also argued in his pretrial motion that the Government "us[ed] the guise of
26  grand jury investigation to intimidate the defense and interfere with his choice of
    counsel, seeking a judicial inquiry into a non-existent conflict of interest that Court will
27  hear Day 1 of the trial." (MFD 7–8.) To the Court's recollection, this issue was not aired
28  at trial, nor was it addressed anywhere in Defendant's consolidated post-trial motions.

GEX 173

1  in time for the detention hearing. (*Id.* at 8.) If true, this would be an abuse of the grand

2  jury process.

3        The Government largely fails to respond to Defendant's allegations, claiming that

4  it is unable to respond publicly because grand jury proceedings are secret. (MFD Opp'n

5  9 (citing Fed. R. Crim. P. 6(e)).) Even assuming the prosecutors abused the grand jury

6  process, however, Defendant has not shown substantial prejudice from their

7  misconduct. *Jacobs*, 855 F.2d at 655. As already explained, the Court revoked

8  Defendant's bond because Defendant violated the terms of the bond. And the Court

9  precluded all evidence related to the Tuna Canyon sale from being introduced at trial.

10 (Tr. Day 1 AM, at 8.) So any evidence gathered by an improper grand jury subpoena

11 cannot have prejudiced Defendant.

12

13                    3.    Government's Preclusion of "Use or Benefit" Defense

14       Defendant argues that when the Government successfully moved to exclude

15 testimony related to a "use or benefit" defense, it either constructively amended the

16 indictment or caused a fatal variance from the indictment. (Mot. 2.) This dispute

17 essentially rests on Defendant's view that the statute requires the Government prove

18 that Defendant intended to use the funds that were transferred from the bankruptcy

19 estate for himself, while the Government argued it only had to prove he knowingly

20 intended the funds to leave the estate without the permission of the bankruptcy court.

21 The Court notes that this issue was substantially litigated both leading up to and during

22 trial. (*See* 10/2/23 Mins., ECF No. 62; Order Re: Def.'s Mot. to Compel 12–15, ECF

23 No. 153; Tr. Day 4, at 4–8, ECF No. 192.) Because this argument underpins

24 Defendant's dismissal motion and his Rule 29 and Rule 33 motions, the Court briefly

25 recounts the relevant background here.

26       The Government charged Defendant with three counts of violating 18 U.S.C.

27 § 153 when he caused certain funds to leave Ace Gallery's bankruptcy estate. (*See*

28 *generally* Indictment, ECF No. 1.) The statute states in relevant part:

8

GEX 174

1            A person described in subsection (b) who knowingly and

2            fraudulently appropriates to the person's own use, embezzles,

3            spends, or transfers any property or secretes or destroys any

4            document belonging to the estate of a debtor shall be fined

5            under this title, imprisoned not more than 5 years, or both.

6 18 U.S.C. § 153(a). Accordingly, in the indictment returned by the grand jury, the

7 Government alleged that Defendant "knowingly and fraudulently appropriated to his

8 own use, embezzled, spent, and transferred the property . . . belonging to the bankruptcy

9 estate of Ace Gallery." (Indictment 2–3.) Defendant has consistently espoused the view

10 that, based on the phrase "to the person's own use," the statute required a showing that

11 Defendant intended to personally benefit from the funds. (*E.g.*, ECF Nos. 91–92, 94,

12 105, 117, 160.)

13       After reviewing the Tenth Circuit's case law interpreting 18 U.S.C. § 153, the

14 Eleventh Circuit's model instructions, legislative history, and principles of statutory

15 interpretation, the Court declined to "interpret 18 U.S.C. § 153 under the tortured

16 reading proposed by Defendant, but instead interpret[ed] the statutory verbs to require

17 appropriation of funds to a defendant's own use, or transfer of the funds, or spending of

18 the funds, or embezzlement of the funds." (Order Re: Def.'s Mot. to Compel 14.)

19 Indeed, Defendant acknowledges as much. (Mot. 3 n.1.) Defendant now argues that,

20 regardless of whether the reading of the statute adopted by the Court is correct, when

21 the Government advocated for this reading, it deviated from the crime charged in the

22 original indictment. (Mot. 6.)

23       Defendant argues first that, in adopting a reading which did not require a showing

24 that Defendant intended to use or benefit, the Court and the Government constructively

25 amended the indictment. (*Id.*) Defendant argues that the Government appeared to

26 initially frame its theory of the case around Defendant's improper use and benefit of the

27 funds. (*Id.* 6–7.) Defendant asserts that after settlement talks between the parties failed,

28 the Government shifted its focus from the intended use and benefit of the funds to

1   whether they were transferred without permission of the bankruptcy court. (*Id.* at 7–8.)

2       While the Court disagrees with Defendant's reading of the statute, even if he were

3   correct, he still does not prove constructive amendment. Constructive amendment of an

4   indictment occurs when either (1) "there is a complex of facts [presented at trial]

5   distinctly different from those set forth in the charging instrument" or (2) "the crime

6   charged [in the indictment] was substantially altered at trial, so that it was impossible

7   to know whether the grand jury would have indicted for the crime actually proved."

8   *United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017) (alterations in original)

9   (quoting *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002)).

10      Defendant argues under the second prong that when the Government sought to

11  exclude Defendant's "use and benefit" defense and similarly removed language relating

12  to "use and benefit" from the jury instruction, it substantially altered the crime charged.

13  (Mot. 8–9.) The Court disagrees. Contrary to Defendant's contention, it is not at all

14  "clear that the grand jury indicted Mr. Chrismas on a theory that he transferred funds

15  for his own use and that he did not have the intent to benefit the estate." (*Id.* at 9.) To

16  be sure, the indictment includes the phrase "appropriated to his own use," but this

17  language mirrors that of the statute—as does the rest of the indictment.

18      More fundamentally, Defendant's argument ignores the disjunctive nature of 18

19  U.S.C. § 153. As the Court noted when it declined to adopt Defendant's reading of the

20  statute, all that the statutory language requires for a finding of embezzlement is that "a

21  defendant, with the requisite mens rea, *acted pursuant to one of the statutory verbs*,

22  regardless of what happened to the funds once they left the bankruptcy estate." (Order

23  Re: Def.'s Mot. to Compel 12–13 (emphasis added).) This is in contrast to *Davis*, where

24  "the jury instructions afforded jurors a *third* option for convicting" the defendant that

25  the indictment did not include. *Davis*, 854 F.3d at 605.

26      Lastly, the Court never foreclosed the applicability of the statute's "use and

27  benefit" language. It merely clarified its applicability based on the statutory text. In

28  contrast to the Tenth Circuit, which "did not read § 153 to require appropriation of funds

10

to one's own use, the Court found that, if appropriation is the verb on which the Government intends to prove its case, then it must show that the funds at issue were appropriated to Defendant's own use." (Order Re: Def.'s Mot. to Compel 14 n.5 (cleaned up).) Neither the Court nor the Government constructively amended the indictment.

Defendant argues alternatively that "the trial evidence prove[d] facts materially different from those alleged in the indictment," resulting in a fatal variance. (Mot. 10 (citing *United States v. Ward*, 747 F.3d 1184, 1189–90 (9th Cir. 2014)).) This argument relies on the faulty premise that the grand jury indicted Defendant based on facts alleging that he used funds for his own benefit and use. The facts alleged in the indictment—Defendant owned Ace Gallery, Ace Gallery sought bankruptcy protection, Defendant was the debtor-in-possession trustee and custodian, and Defendant violated 18 U.S.C. § 153 through the three transactions on March 30 and April 1, 2016—did not materially differ from those introduced at trial. (*See generally* Indictment.)

The Government's efforts to prosecute this case using one of several potential statutory bases for liability was not improper, let alone sufficient for a finding of prejudice or a due process violation requiring dismissal of the indictment.

### 4. Government's Trial Theme and Inconsistent Arguments

Defendant argues next that the Government's trial theme improperly placed his "intended personal use and benefit of the transfers at the center of its presentations to the jury" and made allegedly inconsistent arguments. (Mot. 11.) Generally, the Defendant objects to characterizations made by the Government in its opening statement and closing argument. (*Id*.) But Defendant has not cited any legal authority holding that the Government's argument in opening and closing is improper, let alone of such a flagrant or prejudicial nature as to merit dismissal. Nor has Defendant explained why the Court's instruction to the jury that opening statements and closing arguments by counsel are not evidence would have been insufficient to cure any

1  potential prejudice. (*See* Tr. Day 4, at 23–24.)

2       Defendant also argues that the Government adopted inconsistent legal positions
3  when arguing that the Tuna Canyon property was part of the estate but Ace Museum
4  was not. (Mot. 12–13.) Defendant points to the Government's argument on the first day
5  of trial that evidence of the Tuna Canyon sale ought to be admissible because when the
6  Defendant used Ace Museum funds to pay its property taxes, he created an equitable
7  interest in the property. (*Id.* (quoting Tr. Day 1 AM, at 9–11).) But the Court did not
8  credit this theory and instead excluded evidence of the Tuna Canyon sale. (*Id.* at 8.)
9  Defendant then points to Government's closing argument, where it emphasized that
10 "Ace Gallery was part of the bankruptcy estate, but Ace Museum wasn't." (Tr. Day 4,
11 at 37.) Defendant asserts that this position is inconsistent with the Government's earlier
12 theory of equitable interests because the Museum "owed" the estate. (Mot. 13.) That the
13 Government took a position whose underlying premise was inconsistent with an
14 unsuccessful argument made out of hearing of the jury is different from the examples
15 cited by Defendant. It does not demonstrate the kind of conscious bad faith that the case
16 law requires. *See Thompson v. Calderon*, 120 F.3d 1045, 1057–59 (9th Cir. 1997)
17 (finding prosecutorial misconduct where prosecutor manipulated evidence and
18 witnesses and "essentially ridiculed the theory he had used to obtain a conviction" in
19 another trial).

20

21           5.    <u>Government Witness David Richardson's Testimony</u>

22      Defendant argues that the prosecution used its witness David Richardson to
23 provide improper expert and fact testimony. (Mot. 16–20.) Defendant correctly notes
24 that Mr. Richardson was not qualified to testify as an expert—nor was he proffered as
25 one by the Government. Defendant argues that the Government asked Mr. Richardson
26 to opine on bankruptcy law generally, to define terms such as debtor and debtor-in-
27 possession, and to opine on how funds can properly leave a bankruptcy estate. (*Id.* at
28 17.) Defendant raised this objection at trial and, after discussion at sidebar, the Court

GEX 178

ruled that Mr. Richardson, as a practicing bankruptcy attorney, could offer his understanding of how relevant terms such as debtor and creditor are defined. (Tr. Day 1 PM, at 118–20, ECF No. 181.) And when Defendant later objected to Mr. Richardson offering testimony on what a debtor is and is not permitted to do in Chapter 11, the Court sustained Defendant's renewed objection. (*Id.* at 122–23.) Thus, aside from some explanation about what a bankruptcy estate is and explaining what debtors, creditors, and debtors-in-possession are, the Court excluded the kind of expert testimony of which Defendant complains. Regardless, Defendant has not shown how the Government's attempted solicitation of improper expert testimony is outrageous or flagrant, or how Defendant was prejudiced when the Court actively took steps to exclude improper expert testimony.

Defendant argues that Mr. Richardson provided improper testimony as to facts of which he did not have personal knowledge. (Mot. 18–20.) All of Mr. Richardson's testimony concerning Ace Gallery and Defendant came from his experience working as an attorney investigating the transactions that Ace Gallery had undertaken while in bankruptcy. (Tr. Day 1 PM, at 126.) Mr. Richardson's testimony was generally limited to describing what he had observed about Defendant and Ace Gallery in the course of his investigation and reading documents with which he was familiar. Here, too, Defendant frequently raised objections, many of which the Court sustained or responsively required the Government to rephrase or move on in its line of questioning. (*See generally id*. 126–48.) As already explained, while the Government's attempt to elicit favorable testimony in the adversarial setting of trial might sometimes push the envelope of zealous advocacy, it does not constitute outrageous or flagrant conduct sufficient to justify dismissal. Nor has Defendant explained what, if any, specific allegedly improper fact testimony caused him substantial prejudice.

## 6.    Alleged Out-of-Court Testimony

Lastly, Defendant argues that the Government engaged in prosecutorial misconduct by eliciting out of court testimony in violation of the Sixth Amendment's

1   Confrontation Clause. (Mot. 20–23 (citing *Crawford v. Washington*, 541 U.S. 36, 50–

2   51 (2004)).) Defendant asserts that when the government elicited testimony through Mr.

3   Richardson concerning information about Ace Museum, which relied on statements

4   made in sworn declarations, the Government improperly introduced testimonial hearsay

5   without Defendant having an opportunity to confront the declarants. (*Id.* at 21–22.) As

6   Defendant notes, the Court agreed and issued a curative instruction to the jury. (*Id.* at

7   22.) The Government and Defendant dispute whether the declarations at issue constitute

8   testimonial hearsay, which would be subject to *Crawford*, or evidentiary hearsay, which

9   would create no constitutional injury.

10      Assuming *arguendo* that Mr. Richardson offered impermissible testimonial

11  hearsay, Defendant has not demonstrated that the Government's conduct was so

12  outrageous or flagrant as to warrant vacation of the verdict and dismissal of the

13  indictment. But the Government's attempts to limit Mr. Richardson's responses to

14  conveying information from his own personal knowledge of Ace Museum's business

15  records undermines Defendant's assertions of misconduct. (*See generally* Tr. Day 3

16  PM, at 48–52, ECF No. 183; *see also id.* at 61 ("I interrupted him and asked him in the

17  middle of his answer to just answer my question, what was on the paper. [¶] I didn't

18  elicit—I can make an offer of proof that I or the government has never shown those

19  statements to Mr. Richardson in our trial preparation.").)

20      Contrary to Defendant's assertion, the Government's actions, while arguably

21  overzealous, were not flagrant and do not shock the conscience. Under either theory

22  misconduct, the circumstances justifying this extraordinary relief are not present. The

23  Court **DENIES** Defendant's motion for dismissal based on prosecutorial misconduct.[3]

24  _____

25  [3] Because the Court does not find the Government engaged in misconduct, it declines

26  to impose any sanctions. *Jacobs*, 855 F.2d at 655. ("In cases involving prosecutorial
    misconduct which is neither flagrant nor prejudicial, a district judge can still sanction

27  the misconduct, but the sanction chosen must be proportionate to the misconduct.")

28  (citing *United States v. Cadet*, 727 F.2d 1453, 1470 (9th Cir. 1984).

14

### B.     Motion for Acquittal Under Rule 29

Defendant moves for an acquittal under Rule 29, arguing that the Government offered no evidence to support the central premise that money could not leave the bankruptcy estate without permission from the bankruptcy court. (Mot. 4.) That permission was required for funds to leave the bankruptcy estate is a critical basis for any rational juror to conclude under the Government's theory of the case the Defendant wrongfully embezzled, spent, or transferred the funds outside the estate. The Government argues that it met its burden as to this element through (1) Exhibit 17, a letter from Defendant's former personal attorney, David Shemano, (Opp'n 8); (2) Exhibit 29 and testimony of Ron Bender, Defendant's former bankruptcy attorney, (*id.* at 9); and (3) the testimony of David Richardson, (*id.* at 10–12).

A rational juror could interpret Mr. Shemano's letter more than one way. The Government points out the phrase, "Douglas recognizes that the loaned funds must be promptly repaid." (Tr. Day 2 AM, at 114–15, ECF No. 190; *see* Opp'n 8.) The Government argues that "[h]ad defendant not needed court permission to 'loan' the funds, defendant would not have promised to repay the funds, plus interest." (Opp'n 8.) Defendant argues that loans are meant to be repaid; there is no logical connection between the intent to have Ace Museum pay back the loan and whether the loan required court approval. (Reply 5.) But given Defendant's prior experiences with bankruptcy, the jurors were entitled to make the reasonable inference that Defendant did understand there to be a logical connection between repayment of intercompany loans and the regulation of the bankruptcy estate. In any case, "any conflicts in the evidence are to be resolved in favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).

The testimony of Mr. Bender and his discussion of Exhibit 29, a motion related to seeking a debtor-in-possession loan, could be employed by a rational juror to support an inference that bankruptcy courts are very involved in a debtor-in-possession's major financial decisions. Mr. Bender testified that Ace Gallery required permission from the

15

1    bankruptcy court to seek a loan as a debtor-in-possession, and that Defendant was aware
2    of this. (Tr. Day 3 AM, at 37–41, ECF No. 191.) Defendant correctly points out that
3    Mr. Bender did not testify as to whether permission was required for ACE Gallery to
4    *lend* money, as opposed to *be loaned* money. (Reply 4.) But a rational juror could come
5    to the conclusion that if a bankruptcy court retained control over the receipt of loans,
6    then is also controlled the extension of loans—common sense would dictate that
7    spending the funds of a bankruptcy estate would receive more, not less, scrutiny than
8    securing additional funding.

9        Mr. Richardson's testimony is the only evidence submitted at trial pertaining to
10   ACE Gallery's regular course of conduct. Defendant argues that Mr. Richardson's
11   testimony is invalid because he was, in effect, offering expert testimony that he was not
12   qualified to provide. (Mot. 4; Reply 11–13.) But as Defendant notes, the Court allowed
13   Mr. Richardson to testify over Defendant's objections. (Mot. 4 n.2.) As already
14   discussed, the Court took special care not to allow Mr. Richardson to offer improper
15   expert testimony. He testified that making loans was outside ACE Gallery's ordinary
16   course of business and likely would have required approval by the bankruptcy court—
17   testimony that the Court repeatedly instructed should only reflect his personal
18   understanding. (*See generally* Tr. Day 2 AM, at 78–81.) Furthermore, defense counsel
19   elicited testimony from Mr. Richardson that under the bankruptcy plan, Defendant
20   would have had to get permission to sell art. (*Id.* at 95.) To be sure, different jurors
21   might weigh Mr. Richardson's testimony as to his understanding of ACE Gallery's
22   ordinary course of business differently. But when "ruling on a Rule 29[] motion, a
23   district court must bear in mind that it is the exclusive function of the jury to determine
24   the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable
25   inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977)
26   (internal quotation marks omitted).

27       Outside of Mr. Richardson's testimony, the evidence presented at trial on this
28   issue is circumstantial. But the Government need not provide direct evidence of all

16

1    elements of the crime; circumstantial evidence and reasonable inferences are sufficient

2    to sustain a conviction. *See United States v. Cordova Barajas*, 360 F.3d 1037, 1041 (9th

3    Cir. 2004); *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992)

4    ("[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a

5    conviction."). And while some evidence might be susceptible to various interpretations,

6    "viewing the evidence in the light most favorable to the prosecution," *Nevils*, 598 F.3d

7    at 1163–64, the Court concludes that a rational jury could find beyond a reasonable

8    doubt that bankruptcy court permission was required to make the transfers at issue. The

9    Court **DENIES** Defendant's motion for acquittal.

10

11         **C.**      **Motion for New Trial Under Rule 33**

12         Lastly, Defendant moves for a new trial under Rule 33. Defendant makes four

13    arguments in support of his position. First, Defendant argues that the evidence

14    preponderates sufficiently against the verdict. (Mot. 23–24 (citing, inter alia, *United*

15    *States v. Ionutescu*, 752 F. Supp. 2d 1091, 1095 (D. Ariz. 2009)).) Second, Defendant

16    argues that prosecutorial misconduct more probably than not materially affected the

17    fairness of the trial, warranting a new one. (*Id.* at 24–25 (citing, inter alia, *United States*

18    *v. Reyes*, 577 F.3d 1069, 1079 (9th Cir. 2009)).) Third, evidentiary errors consisting of

19    improperly admitting Mr. Richardson's testimony and the alleged eliciting of

20    testimonial hearsay militate in favor of a new trial. (*Id.* at 25.) And fourth, while there

21    might not have been one fatal error, the cumulative effect of various errors in this trial

22    prejudiced Defendant. (*Id*. at 25–26 (citing, inter alia, *United States v. Frederick*, 78

23    F.3d 1370, 1381 (9th Cir. 1996)).)

24         A motion for a new trial "should be granted only in exceptional cases in which

25    the evidence preponderates heavily against the verdict." *Pimentel*, 654 F.2d at 545

26    (internal quotation marks omitted). Beyond rejecting the other grounds for relief above,

27    the Court declines to find evidentiary error in allowing the testimony of David

28    Richardson. As already discussed, the Court cabined Mr. Richardson's testimony so

1  that he did not veer into impermissible expert territory. Defendant correctly cites

2  *Frederick* for the proposition that even when no single trial error warrants reversal, "the

3  cumulative effect of multiple errors may still prejudice a defendant." *Frederick*, 78 F.3d

4  at 1381 (9th Cir. 1996) (citing *United States v. Green*, 648 F.2d 587 (9th Cir. 1981)).

5  Unlike the cases cited by Defendant, however, the Court has not found multiple errors

6  here. *See, e.g. Frederick*, 78 F.3d at 1381 ("We consider the cumulative effect of the

7  three principal errors in this case"); *United States v. Tory*, 52 F.3d 207, 211 (9th Cir.

8  1995) ("We find that the trial court erred in four rulings"); *Parle v. Runnels*, 505 F.3d

9  922, 932–33 (9th Cir. 2007) (upholding state court finding of cumulative error where

10  two errors went to heart of the central issue in the case). The Court **DENIES**

11  Defendant's motion for a new trial.

12

13  **IV.    CONCLUSION**

14     For the reasons stated above, the Court **DENIES** Defendant's motions for

15  dismissal, acquittal or, in the alternative, for a new trial.

16

17  **IT IS SO ORDERED.**

18

19   Dated: January 14, 2025

20                                          MARK C. SCARSI
                                           UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:21-cr-00127-MCS-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| DOUGLAS J. CHRISMAS, | ) | Monday, January 13, 2025 |
| | ) | |
| Defendant. | ) | (10:40 a.m. to 11:33 a.m.) |

SENTENCING AND JUDGMENT

BEFORE THE HONORABLE MARK C. SCARSI,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:              AUSA VALERIE L. MAKAREWICZ
                           United States Attorney's Office
                           312 North Spring Street
                           Los Angeles, CA 90012
                           213-894-0756

For Defendant:             JENNIFER L. WILLIAMS, ESQ.
                           MEGAN A. MAITIA, ESQ.
                           Summa, LLP
                           1010 Sycamore Avenue, Unit 117
                           South Pasadena, CA 91030
                           213-260-9456

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          Stephen Montes Kerr

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1    **Los Angeles, California; Monday, January 13, 2025; 10:40 a.m.**

2                        **(Call to Order)**

3          **THE CLERK:**  Calling Item Number 6, cr-21-127, *USA v.*

4    *Douglas J. Chrismas.*

5          Counsel, state your appearances, please.

6          **MS. MAKAREWICZ:**  Good morning, Your Honor.  Assistant

7    United States Attorney Valerie Makarewicz on behalf of the

8    Government.  With me at counsel table is FBI Special Agent

9    Allen Grove with the Court's permission.

10          **THE COURT:**  Good morning.

11          **MS. MAITIA:**  Good morning, Your Honor.  Megan Maitia

12   and Jennifer Williams on behalf of Defendant Douglas Chrismas,

13   who's present and out of custody today.

14          **THE COURT:**  Good morning.

15          Okay, we're here for sentencing.

16          **THE DEFENDANT:**  Good morning.

17          **THE COURT:**  I wanted to just --

18          Good morning.

19          I wanted to talk briefly about an issue that the

20   parties spent a lot of time discussing in their papers and I

21   just want to make sure I have a complete understanding of it

22   and that's the amount of restitution.  The Government is

23   seeking $12,809,192 in restitution and I just want to make sure

24   I understand how this interplays with the civil judgment

25   against Mr. Chrismas that was entered by Judge Anderson.

3

1          **MS. MAKAREWICZ:**  It will be almost like a joint and

2    several liability that the restitution would be paid to the

3    Clerk of the Court and then the Clerk of the Court would

4    transmit any restitution payments to the Clerk of the

5    Bankruptcy Court to be applied and then perhaps to the Trustee

6    thereafter.

7          **THE COURT:**  Okay, so there's no issue of double

8    counting.

9          **MS. MAKAREWICZ:**  Absolutely not.  The Government

10   doesn't seek two judgments.  It would only seek one.

11         **THE COURT:**  Okay.

12         **MS. MAKAREWICZ:**  The Government in whole, the

13   Bankruptcy Court as well as the United States Attorney's

14   Office.

15         **THE COURT:**  Okay.  Thank you.

16         And then I want to allow the Defendant -- the

17   Defendant is arguing that no restitution is due and in light of

18   the fact that this is essentially taking the civil judgment and

19   sitting on top of it, what's the argument that the Court

20   shouldn't order the twelve eight in restitution?

21         **MS. MAITIA:**  Well, the first reason the Court

22   shouldn't order the 12.8 million in restitution is that the law

23   says that absent an allegation in the indictment of a scheme

24   restitution is capped, limited to the counts of conviction,

25   which is 240 -- $264,000 and change here.  That's the first

4

1    thing that goes from the 12.8 million down to the 264,000.

2         Beyond that, the Government has not proved, has not

3    met its burden that restitution is warranted here.  The

4    complexities of this case are such that the record before the

5    Court should not allow a finding that any money is owed.  The

6    Government has done with sentencing and restitution and loss

7    what it has done with this case for the last several years,

8    which is to just take soundbites from the civil case and the

9    bankruptcy case and state them as undisputable fact supported

10   by law in the criminal case without argument, without a legal

11   basis.  And we've litigated -- we poured our hearts and souls

12   into the briefing before the Court and I'm going to restrain

13   myself from repeating that, but -- repeating what is in the

14   papers, but the complexities here we don't think the Government

15   has met its burden.

16        The Court need not find that our version is correct

17   that restitution is zero.  I know we're talking about

18   restitution but also similarly that loss is zero.  It can

19   simply find that the Government hasn't met its burden under the

20   circumstances.

21        **THE COURT:**  And you're arguing in the Sentencing

22   Guidelines the Court should be looking at actual loss as

23   opposed to intended loss.

24        **MS. MAITIA:**  Yes.

25        **THE COURT:**  And what do you say about the advisory

GEX 188

5

1   note that says the Court should be looking at intended --

2   should be looking at intended loss?

3          **MS. MAITIA:**  Well, two points on that.  First, the

4   Ninth Circuit case law says that under our ex post facto

5   argument about the prior version of the Guidelines that the

6   application note should be disregarded.  That's the Ninth

7   Circuit case law.

8          Our secondary argument is that intended loss versus

9   actual losses is almost irrelevant because the Government still

10  hasn't established intended loss with this loaded $12 million

11  amount.  So the Court again can find no loss, regardless of

12  actual versus intended loss.

13         This $12.8 million figure -- we mentioned this in our

14  briefing and despite what I just said I do think this is worth

15  saying in open court, is the Government has taken the legal

16  theory at trial for liability, which we heavily disputed.

17  Mr. Chrismas is guilty of embezzlement if he makes transfers

18  without Court permission and has just kind of dropped it into

19  the definition of loss, which is not the definition of loss and

20  a basis for restitution.

21         The one example that really highlights this in the

22  $12.8 million figure is almost $4 million was a single payment

23  to an artist for the sale of that artist's artwork.  And we

24  mentioned this in our -- in one of our briefings and I can get

25  the exact cite when I sit down, but that's one example --

6

1   nobody is disputing that this artist wasn't entitled to her

2   almost $4 million payment for the sale of her art.  We just

3   take into account that one example on this $12.8 million is cut

4   by a third.

5           There are many, many more examples of instances where

6   maybe there wasn't Bankruptcy Court permission, still unclear,

7   there has been no evidence before this Court that the Court can

8   consider of whether when Bankruptcy Court permission was

9   required, but, okay, let's assume transfers were made without

10  Court permission and let's even assume for purposes of this

11  argument that permission was required.  That's not the same

12  thing as loss and it's not the same thing as mandatory

13  restitution.

14          **THE COURT:**  Okay.  Let me hear a response from the

15  Government on the restitution point and then we'll get into

16  general arguments on sentencing.

17          **MS. MAKAREWICZ:**  I would -- the Government has

18  refuted these arguments in its sentencing position.  Loss is in

19  this case money embezzled from the bankruptcy estate.  Money

20  was embezzled from the bankruptcy estate by the Defendant in

21  264 of the counts of conviction plus the relevant conduct which

22  the Bankruptcy Court and the financial analyst have thoroughly

23  examined.

24          So in terms of restitution, under the four corners of

25  the Sentencing Guidelines the Government gave the Defendant the

7

1   benefit of its strict reading of the Sentencing Guidelines --

2   sentencing commentary in terms of money returned and that's how

3   the Government came to the 12.8.

4        If the Court has any other questions about the

5   Government's calculation, we're happy to respond.  But at that,

6   we'll submit on our brief about that portion.

7        **THE COURT:**  And just -- I mean the point being that

8   the money left the bankruptcy estate as a result of the

9   Defendant, regardless of where it went to its counted as loss.

10       **MS. MAKAREWICZ:**  Correct.

11       **THE COURT:**  Okay, thank you.  And thank you for that.

12       I just wanted also to let the parties know that the

13  post-trial motions that are pending, the Court has an order

14  that I'm finishing up there but just so the parties are aware,

15  the Court's going to deny those motions and you'll get the

16  order soon.

17       Let me just hear from the parties, let me hear from

18  the Defendant on your argument on sentencing.  As you know, the

19  guideline range, to the extent the Court accepts the PSR the

20  guideline range is 121 to 151 months.  You're advocating

21  probation and no custodial sentence.  And I've read the papers,

22  I've read -- I've spent a lot of time going through everything

23  and so I've read all the letters and I've read the briefing and

24  the papers filed.  But I want to give you an opportunity to

25  make an argument in favor of your sentencing position.

8

1          **MS. MAITIA:**  Thank you, Your Honor.

2          **MS. WILLIAMS:**  Can we take one moment, Your Honor?

3          **THE COURT:**  Sure.

4      **(Pause)**

5          **MS. MAITIA:**  The sentencing guideline range that the

6  Court just recited is driven by the loss amount which we

7  dispute.  The guidelines say that even if that's the loss

8  amount the Court has to consider money that either went back

9  into the estate or somehow benefited the estate or gave value

10 to the estate, fair market value.  The guidelines also allow --

11 those guidelines are the same whether Mr. Chrismas did

12 everything we said he did, which is to pay expenses for the

13 Gallery, to put money into the Museum, which we believe gave

14 value to the Museum, not only because it was storing art and a

15 place for artists to --

16         **THE COURT:**  Gave value to the Gallery.

17         **MS. MAITIA:**  -- to fabricate.  Right.  Not only

18 because of that but because he was being bullied and threatened

19 by aggressive lawyers to keep that Museum lease alive.  So the

20 guidelines that the Court just recited are the exact same as if

21 Mr. Chrismas actually pocketed the money and bought luxury

22 items and treated himself.  The guidelines say that we have to

23 account not only for the money that kind of went back into the

24 estate or benefited the estate -- and again the Court can make

25 a finding that this is too complicated under these facts.  The

9

```
1   Government hasn't met its burden.  But a variance is
2   appropriate when we have this incredibly high guideline range
3   under the circumstances here, which are very different --
4       (Phone rings)
5           MS. WILLIAMS:  Apologize, Your Honor.
6           MS. MAITIA:  Apologies, Your Honor.
7           THE DEFENDANT:  I apologize.
8           MS. MAITIA:  From what is --
9           THE COURT:  Just a reminder to anybody that's got a
10  cell phone on, please turn it on quiet.
11          MS. MAITIA:  Somebody who was buying luxury items,
12  truly the examples that were in the -- for the kind of unwanted
13  disparities argument by both parties, both parties cited the
14  Avenatti case where that lawyer -- I mean his sentence was
15  vacated by the Ninth Circuit and the resentencing is pending,
16  but he was stealing client money and funding a very luxury
17  lifestyle.  It puts Mr. Chrismas and what he did to try and get
18  his life back -- the Gallery is his life, there is no
19  difference between his career and his love of art and the
20  Gallery and his personal life and he just wanted it back and
21  he's going to -- he's prepared to speak to the Court today
22  about that.  But to put him equal to somebody like Michael
23  Avenatti, who was stealing client money and funding a luxury
24  lifestyle is what the variance for loss is for.  Those two
25  things should not be treated equally.
```

1          I did want -- this is in our papers but I'll put it

2    on the record here for the Court's benefit that the case

3    *United States v. Gamma Tech Industries*, 265 F.3d 917, Ninth

4    Circuit case from 2001, is the Ninth Circuit case that says

5    relevant conduct can't be considered unless the element of the

6    offense in the indictment has a scheme.

7         **(Pause)**

8          It feels uncomfortable and sensitive to talk about --

9    I feel very emotional today.  This is a culmination of a very

10   painful experience for everyone on our side.

11        **(Pause)**

12         The Government was quick to disregard Mr. Chrismas's

13   age in a way that was really shocking to me when I read the

14   Government's papers and the Government is asking the Court in a

15   heartless way with a tone that is so filled with vindictiveness

16   it really has given me pause about my own life and what I'm

17   doing with my life.  But the Government is just crassly asking

18   the Court to have Mr. Chrismas die in prison for making some

19   mistakes in a very, very complicated predatory situation where

20   he was not the predator.  The other lawyers involved, the Plan

21   agent, the people who were scheming against him just hoping for

22   his downfall were the predators.  And anyone who is kind of

23   lucky enough to have lived the life that Mr. Chrismas has, I

24   mean he's had such a beautiful but painful life, especially

25   within the last ten years with all of this litigation, and the

11

1  Court, the Court should weigh that heavily.

2          The Court can do whatever it wants to.  The

3  guidelines are what they are.  They are guidelines.  And we

4  can't even agree with the Government on what the law is here

5  and to make him have his life that he's just barely hanging on

6  to, his ability to just have a place to live and feed himself,

7  have that disrupted so that he could serve a custodial sentence

8  is not warranted under these circumstances.

9          Even if the Court finds, again, this very high

10  multimillion dollar loss amount, the Court can issue a split

11  sentence.  The Court can say the five days that Mr. Chrismas

12  served in custody in May, which we think is -- you know, was a

13  result of Government misconduct, is time served and can issue

14  home confinement as a term of supervised release.  That's

15  custody.  But his -- even a short sentence of a few months

16  could deteriorate Mr. Chrismas's life upon his release because

17  he will not be able to keep the plates spinning.  He will lose

18  where he lives.  It is very difficult for somebody of his age

19  to come back from that.

20      **(Pause)**

21          We prepared a motion.  We've been waiting for the

22  Court to order on the post-trial motions and anticipating an

23  order denying them and prepared -- under sentencing going

24  forward we did prepare a written motion for bond pending

25  appeal, which we will file -- I'll make an oral motion after

12

1  sentencing is issued and we can file that with the Court.  I'm

2  happy to go over any of the, any of the authorities we've

3  cited.  But in preparing that motion I was going through the

4  trial transcripts and the Court really grappled with the legal

5  issue of whether transfers, you know, whether the Court --

6  whether the Government could proceed on a without permission

7  theory, whether the Government could proceed by changing their

8  whole case when it became inconvenient to consider whether what

9  Mr. Chrismas was doing was for the benefit to the estate or

10 not, and the Court said on the record, this was day two or day

11 three of trial outside the presence of the jury, well, if we're

12 wrong then you have a good issue for appeal.

13        And so I'm going to pause and sit down, and obviously

14 I'm available to answer any of the Court's questions, but I

15 think that nobody in this room like is very comfortable with

16 what the law -- very comfortable with what the Ninth Circuit is

17 going to do on this legal issue that the Government is saying

18 Mr. Chrismas should serve a ten-year custodial sentence for.

19 So I just say that to highlight, well, this room is filled with

20 smart people and we can't even agree on the basic issue for

21 which he was found guilty by the jury.

22        So I apologize for my emotions.  It's been a

23 harrowing time for everybody in Los Angeles but also this

24 experience has been upsetting.

25        **THE COURT:**  Thank you, Counsel.

13

 1          Mr. Chrismas, would you like to address the Court?

 2          **THE DEFENDANT:**  Yes, if you'd allow me.

 3          **THE COURT:**  Sure.

 4      **(Pause)**

 5          **THE DEFENDANT:**  I didn't know how this process would

 6   go so I put a letter together that I thought would just be

 7   delivered to you and my attorney suggested that I should read

 8   it to you.  But they didn't prepare this letter.  This is from

 9   me.  So I'm not a public speaker but I'll proceed.

10          To you,

11          Thank you for allowing me to make this statement.  I

12   wish to acknowledge the gravity of my actions and the impact

13   they have had on others in connection with this case.

14          First and foremost, I want to express my sincere

15   apologies to the artists and the creditors.  I understand that

16   my choices have caused them undue financial stress and I am

17   truly remorseful for that.

18          My goal for as long as I can remember has been to

19   uplift artists, help them to realize and execute their artistic

20   visions and to educate, promote, and inspire through the

21   mounting of exhibitions for the many thousands of visitors and

22   for the artists.  Those exhibitions in turn I too was inspired

23   by to see beyond traditional boundaries that the artists taught

24   me to accept.  That is what has always propelled me forward and

25   for me embracing contemporary art means celebrating creativity,

14

1    the power to challenge and to provoke thought.

2           I came to understand my actions to realize Ace Museum

3    were at times misguided.  It saddens me that Ace Gallery and

4    Ace Museum are now closed.  I always intended to pay Ace

5    Gallery's creditors and to continue the Gallery's program.

6    That said, the United States Court, its representatives, and

7    the creditors of Ace Gallery deserve better.  I take full

8    responsibility for my decisions and I regret harm my actions

9    inflicted.

10           I understand that words alone cannot change the past,

11    but I hope to demonstrate through my actions that I am

12    dedicated to making amends.  For example, I have worked to pay

13    artists who were owed money by the bankruptcy estate.  By my

14    own I paid artist Helen Pashgian $422,187, all that was

15    entitled to -- she was entitled to receive from the bankruptcy

16    estate through sales.  I was able to generate her artwork and

17    promote it and thus be able to neutralize her debt, my debt to

18    her.  I have paid $58,000 to David Meikle (phonetic) after I

19    left Ace Gallery in monthly payments.  I would have continued

20    to make these payments but my legal cases have negatively

21    impacted my ability to sell art.  An extraordinary amount of

22    negative press.  I realize there are others and I will continue

23    to strive to make things right.

24           I am prepared to accept consequences of my actions

25    but I also ask for your mercy.  I am aiming to restore

GEX 198

15

1  relationships with those who have been hurt by this bankruptcy

2  proceeding and continue to work towards making it right.  Even

3  though I don't have many years left in this world, I still have

4  a lot to offer.  If the Court would allow, I would like to

5  spend the rest of my days volunteering my six decades long

6  experience with other young, mid-career, and senior artists to

7  help them and guide them.

8         Your Honor, I love art, I love this city, and I want

9  to give back and I thank you very much for your time.

10         **THE COURT:**  Thank you, Mr. Chrismas.

11         Would the Government like to make an argument on

12  sentencing?

13      **(Pause)**

14         **MS. MAKAREWICZ:**  Thank you, Your Honor.  A few

15  points.

16         First, the Defendant's explanation is both legally

17  and factually close to impossible.  We have debated for months

18  about the Defendant's theory and his reasoning behind

19  transferring money out of the Gallery.  The Court has heard

20  that legally the Gallery -- excuse me -- the Museum could not

21  pay back the Gallery anything more than what it had owed

22  pursuant to law.  And factually the Government has provided to

23  the Court a calculation of what economic sense Mr. Chrismas's

24  desired, which is a hairline's breath away from -- it's

25  impossible.

GEX 199

16

1          The line between a misunderstanding by the Defendant

2     and the criminality that the jury found is best shown through

3     the monthly operating reports.  As the Government argued, the

4     Defendant in his decisions alone by not truthfully reporting

5     accounts receivable when payable every month to even his own

6     lawyers deprived every one of the right to make best business

7     decisions on behalf of the estate.  The Government has shown

8     that the -- how the creditors were financially and emotionally

9     harmed.  The Government has shown that the harm Mr. Chrismas

10    has caused was intangible upon the legitimacy of the Bankruptcy

11    Court, its system, and its integrity.

12          The Government's position, along with the victims in

13    this case, is that the Defendant never intended to honestly

14    seek a Chapter 11 reorganization.  He used the bankruptcy

15    system for his personal benefit.  This was a premeditated

16    exploitation of the system provided to people in their most

17    dire needs.

18          The bankruptcy system allowed the Defendant to

19    facilitate his crime.  The Defendant is not magnanimous.  He is

20    arrogant and disrespectful.  With the most respect I can give

21    Mr. Chrismas and the parties here the Gallery wasn't his life.

22    The Museum was.  As the Government ID'd in its closing

23    argument, Defendant would rather bleed the Gallery and the

24    estate dry to support the Museum than to pay the creditors.  It

25    happened not once but for three years.

GEX 200

17

1          Counsel made a comment about keeping the plates

2     spinning.  That's what he was doing during this time.  And

3     thankfully today we have seen the Defendant own some

4     responsibility for what he has done, but this marks the first

5     time.  Throughout the bankruptcy the Defendant never took that

6     position.

7          If the Court has anything further, I would like to --

8     excuse me.

9          I would like to point out that the victims who have

10    submitted statements are here in the court.  Victor Sahn,

11    attorney for the Committee of Creditors, and Mr. Leslie along

12    with his attorney are here.  The Government, as well as the

13    Bankruptcy Court, took its position to protect victims given

14    the gravity of the loss that the Defendant has caused.

15         This type of fraud is seldom prosecuted, as this

16    Court knows.  I agree with counsel; I couldn't find a case and

17    throughout this proceeding we've had very little case law to go

18    off of under 18 U.S.C. 153.  And I know that right now I know

19    Defendant's crime was probably one of opportunity.  He won't

20    likely have that opportunity again.  But he uses that as a

21    shield in trying to find some legitimacy to what he did.

22         In addition to specific deterrents and recognizing

23    the harm caused by the Defendant, the Court has a very unusual

24    and less seldom opportunity to assure the public that the

25    integrity of the system is wrong -- is protected and those

18

1    entering into bankruptcy need to be honest, just like anyone

2    else in this court needs to be honest and forthright, and

3    through this judgment day the Government knows the significance

4    of its recommendation but knows also that the Court is in the

5    best position to make this decision given all of the factors

6    involved.

7         So we thank the Court for that and we submit.  If

8    there's anything else, we would happily respond.

9         **THE COURT:**  Thank you, Counsel.

10        Would the Defendant like to make any response before

11   the Court moves to sentencing?

12        **MS. MAITIA:**  Yes, Your Honor, briefly.

13        **(Pause)**

14        What the Government just said was a continuation of

15   what I had said earlier, just these bold statements that are

16   really unsupported.  For example, the Museum could not legally

17   pay back more than it was owed.  That was nothing to do with

18   Mr. Chrismas's intent when he was in bankruptcy.  That is a --

19   and it's also not an established legal position before this

20   Court.  We dispute that.  And it also doesn't take into account

21   that the victims, including one of the attorneys who's sitting

22   back here, was threatening Mr. Chrismas with involuntary

23   bankruptcy against the Museum unless he paid the rent, unless

24   he provided proof of payment of the Museum rent that day.  And

25   maybe he was lying, maybe that attorney was lying when he sent

19

1   that aggressive, bullying email to Mr. Chrismas, maybe he

2   didn't do his research. maybe he believe it to be true, but

3   that has nothing to do with what Mr. Chrismas's intent was when

4   he was paying the Museum rent.

5          Also, nothing that the Government just said makes

6   logical sense.  Mr. Chrismas was trying to pay creditors to get

7   out of bankruptcy, as evidenced by the fact that he put

8   $20 million into the estate in 2015.  That wasn't enough.

9   After -- and settlements that I'm not really sure what the

10  status of them are in the complicated bankruptcy case, but he

11  still paid a hundred thousand dollars to Sam Leslie pursuant to

12  a settlement agreement.  Cash.  We provided proof of payment in

13  our most recent filing before the Court.

14         He paid $350,000 on behalf of Eric Wilson's

15  (phonetic) settlement, the thing he received in the settlement,

16  which was the quote/unquote repurchase option of the Beverly

17  Hills Gallery which Sam Leslie gave away to Eric Wilson.

18  Mr. Chrismas tried to keep it alive by paying a $350,000

19  payment to LA Metro.

20         Why would he do all of this if anything the

21  Government just said is true?  He wouldn't.  He would have just

22  walked away.  He was -- in a misguided way he was doing his

23  best.  He was afraid of the pariahs trying to end him

24  financially.  And that was true.  He mis-stepped.  It does not

25  mean he -- anything the Government just characterized about his

20

1    intentions, which there's no evidence of, is true.

2            I'll stop there.  Thank you.

3            **THE COURT:**  Thank you.

4            Okay, I'll now state the sentence.  I've got all the

5    objections noted for the record.

6            I find the Presentence Report to be accurate and

7    correct.  I got the report and the calculation of the advisory

8    guidelines.  The advisory guidelines are the starting point and

9    the initial benchmark in the Court's analysis.  Looking at the

10   November 2024 edition of the Guidelines, the Offense Level

11   is 32, Criminal History Category is I, that gives us a

12   guideline range of 121 to 151 months.  The guideline range for

13   supervised release is a hundred and -- I'm sorry -- is one to

14   three years.

15           Counsel, you've looked at the terms and conditions

16   that are proposed for supervised release.  Any issues with

17   those?

18           **MS. MAKAREWICZ:**  Nothing from the Government.

19   Thank you.

20           **MS. WILLIAMS:**  Your Honor, I have one objection to

21   Number 6.  It states that the Defendant shall not be self-

22   employed nor be employed in a position that does not provide

23   regular pay stubs.  Mr. Chrismas's life has been self-

24   employment.  It's what he's been doing now.  I know it says

25   unless approved by the Probation Officer.  So I was just going

**EXCEPTIONAL REPORTING SERVICES, INC**

GEX 204

21

1  to suggest and ask the Court to modify it to simply that the

2  Defendant's employment must be approved by the Probation

3  Officer.

4          **THE COURT:**  Okay.  Does the Government have a

5  response to that?

6          **MS. MAKAREWICZ:**  We do, Your Honor.  We understand

7  Mr. Chrismas's livelihood; however, in terms of generating pay

8  stubs if Mr. Chrismas followed correct corporate procedures at

9  a corporation that could be overseed by an independent

10 bookkeeper he can also draw a salary that generates a W-2

11 income.  So the Government would request that this stay as it

12 is.

13         **THE COURT:**  Okay.

14     **(Pause)**

15         Okay, I'm going to keep the condition as it is, but

16 I'm going to add a sentence to the end of it.  The condition

17 reads unless -- ends with unless approved by the Probation

18 Officer.  I'm going to add there so it will read -- the entire

19 condition will read the Defendant shall not be self-employed

20 nor be employed in a position that does not provide regular pay

21 stubs with the appropriate deductions for taxes unless approved

22 by the Probation Officer, who shall take into account the

23 historic nature of Mr. Chrismas's employment and -- who shall

24 take into account the historic nature of Mr. Chrismas's

25 employment, period.

**EXCEPTIONAL REPORTING SERVICES, INC**

GEX 205

22

1      So I just want to signal to the Probation Officer to

2 work with Mr. Chrismas to be flexible, given the nature of his

3 past employment.

4      Okay.  So the guideline range for supervised release

5 is one to three years.  The guideline range for a fine is

6 35,000 to 250,000 and the special assessment to the Crime

7 Victims Fund is $300.

8      In making an individualized determination based on

9 the facts, I'm also considering the factors described in

10 18 U.S.C. 3553(a), especially, but not exclusively, the nature

11 and circumstances of the offense and the history and

12 characteristics of the Defendant, the need for the Defendant

13 for the sentence to reflect the seriousness of the offense, to

14 promote respect for the law and provide just punishment, the

15 importance for the sentence to afford adequate deterrence for

16 criminal conduct, to protect the public from further crimes of

17 the Defendant and provide Defendant with needed educational or

18 vocational training, medical care, or other correctional

19 treatment in the most effective manner.  I'm looking at the

20 kinds of sentences available, the kinds of sentence and

21 sentencing range established for the applicable category of the

22 offense.  I'm looking at the policy statements of the

23 Sentencing Guidelines and the need to avoid unwarranted

24 sentence disparities and the need to provide restitution to the

25 victims.

GEX 206

23

1          I find the following sentence to be reasonable and

2    sufficient, but no greater than necessary, to comply with the

3    purposes stated in 18 U.S.C. 3553(a).

4          It's ordered that the Defendant shall pay to the

5    United States a special assessment of $300 pursuant to

6    18 U.S.C. 3013(a)(2)(A), which is due immediately.

7          Pursuant to the Sentencing Reform Act of 1984, it's

8    the judgment of the Court that the Defendant, Douglas J.

9    Chrismas, is hereby sentenced in Counts One and Three of the

10   Indictment for a term of 24 months.

11         Upon release from imprisonment, the Defendant shall

12   be placed on supervised release for a term of three years under

13   the conditions provided to counsel along with the modification

14   made by the Court.

15         It's further ordered that the Defendant shall pay

16   restitution in the amount of 12,809,192 with the understanding

17   that there is no double counting between that and the civil

18   judgment.

19         The -- taking all of the factors into consideration,

20   including the seriousness of the offense, the need to protect

21   the public, and the history and characteristics of the

22   Defendant, a downward variance from the advisory guideline

23   range, namely, 24 months, is necessary.  A lengthy term of

24   incarceration above 24 months does not appear to be necessary

25   for Mr. Chrismas as is justified by your age, you've not --

EXCEPTIONAL REPORTING SERVICES, INC

GEX 207

24

1  you've demonstrated you're amenable to community supervision.

2  You've served no previous custodial sentences and your Criminal

3  History Category is Criminal History Category I.

4       The sentence provides just punishment but also

5  reflects the mitigating aspects of your history and

6  characteristics and accomplishes the goal of sentencing.  The

7  sentence is sufficient, but not greater than necessary, to

8  comply with the purposes of 18 U.S.C. 3553(a).

9       A three-year term of supervised release is also

10  recommended to achieve the goals of sentencing.  The

11  recommended period of supervision will help protect the

12  community from future crimes by closely monitoring the

13  Defendant's activities in the community.

14       So that's the sentence.  I know it's not the sentence

15  you were looking for.  The Court believes that -- I've spent a

16  lot of time going through everything.  Right?  So I've read the

17  information provided by the Government --

18       **(Clerk confers with Court)**

19       **THE COURT:**  Let me just finish putting something on

20  the record.  With respect to the special assessment of $300,

21  which is due immediately, any unpaid balance shall be due

22  during the period of imprisonment at the rate of not less than

23  $25 per quarter pursuant to the Bureau of Prisons Inmate

24  Financial Responsibility Program.  The restitutio -- the

25  restitution amount of 12,809,192 shall be paid as follows:

GEX 208

25

1          To the victim Sam S. Leslie as Trustee in the

2    complete amount the Court finds from the consideration of

3    records the Defendant's economic circumstances allow for

4    restitution payments pursuant to the following schedule:

5          A partial payment of $1,000 shall be paid

6    immediately.  The balance shall be due during the period of

7    imprisonment at a rate of not less than $25 per quarter

8    pursuant to the Bureau of Prisons Inmate Financial

9    Responsibility Program.  If any amount of the restitution

10   remains unpaid after release from custody, monthly payments of

11   at least 10 percent of Defendant's gross monthly income but not

12   less than $500, whichever is greater, shall be made during the

13   period of supervised release.  Payments shall begin 90 days

14   after the commencement of supervision.

15         Pursuant to 18 U.S.C. 3612(f)(3)(A) interest on the

16   restitution ordered is waived because the Defendant does not

17   have the ability to pay interest.

18         Payments may be subject to penalties for default and

19   delinquency pursuant to 18 U.S.C. 3612(g).

20         The Defendant shall comply with the Second Amended

21   General Order Number 20-04.

22         Pursuant to Guideline 5E1.2(a) all fines are waived

23   as the Court finds the Defendant has established he is unable

24   to pay and is not likely to become able to pay any fine.

25         So the sentence, going through everything, you know,

GEX 209

26

1    the letters from the creditors, the letters from the artists

2    that the Government provided, I've got to balance that, you

3    know, with all the positive letters I received on your behalf

4    from all the folks in the art world recognizing your commitment

5    to the community and to artists.

6            The reason why the Court didn't issue a guideline

7    sentence of 121 months to 151 months is I think this case is

8    much different from other cases I've seen where the -- a

9    defendant will typically commit financial crimes to enhance

10   their own lifestyle and I don't see that here.  I think that

11   some of the letters I have were pretty telling from people who

12   talk about, you know, you're driving around in your Jeep and

13   you're not -- you didn't use this money to enhance your own --

14   yourself with material goods but instead were interested in

15   trying to promote the Museum.

16           That being said, taking money from a bankruptcy

17   estate is a crime that the jury found you guilty of and so the

18   Court has to issue a sentence that has some respect for the

19   jury verdict.

20           So that's the sentence.  You've got 14 days to appeal

21   the sentence once the judgment is entered.

22           Just by way of -- so I'll get the order out on the

23   post-trial motions.  I apologize for the delay there.  I wanted

24   to get it out earlier this week but really -- but I'll get that

25   out, then I'll get the judgment out.  You have 14 days to

GEX 210

27

1    appeal after that.

2           And you indicated you were going to make a motion.

3    What I'm going to do is I'm going to set a self-surrender date

4    now and then we can modify that depending on the result of your

5    motion.

6           So the -- for now I'll set a self-surrender date --

7    30 days from today would be --

8           **MS. MAKAREWICZ:**  May I be heard, Your Honor, on that?

9           **THE COURT:**  Sure.

10          **MS. MAKAREWICZ:**  The Government does move for

11   immediate remand and the reasons for that, which it has

12   thoroughly thought through in making this, is that the

13   Defendant is not a citizen --

14          **THE COURT:**  You have to speak into a microphone.

15          **MS. MAKAREWICZ:**  Sorry.  The Government does make a

16   motion for an immediate remand and it has weighed what has

17   happened prior to coming in here to the Court to make its

18   decision and there are several factors.

19          The first and most paramount is that the Defendant is

20   not a citizen of this country.  He's a legal permanent

21   resident.  He's a citizen of Canada.  The Government believes

22   now with an imposition of a term of imprisonment the risk of

23   flight has changed.  In addition, the Defendant has had

24   plenty -- this matter has been continued several times.

25          And so for that the Government would move for

GEX 211

28

1    immediate remand and revocation.

2          **THE COURT:**  And just so I'm not -- in thinking back,

3    and I almost always allow people some time to self-surrender

4    but I've not dealt with the issue that you're bring up, which

5    is the issue of flight based on Canadian citizenship.

6          Is there -- okay, and I understand you're

7    representing to the Court that you're not making this argument

8    lightly.

9          **MS. MAKAREWICZ:**  Sincerely not, with all candor.

10         **THE COURT:**  Okay.  Let me hear a response from the

11   Defendant on self-surrender.

12         **MS. MAITIA:**  Mr. Chrismas has not been a citizen for

13   the last almost 81 years of the United States and especially

14   since he was charged in 2021.  The whole reason he went to

15   trial is because the immigration consequences of a plea would

16   negatively impact his ability to stay in the U.S.  That's the

17   whole reason we're here.  The whole reason he has given

18   everything he has and doesn't have into fighting this criminal

19   case is because he could not afford the immigration

20   consequences of a -- of a guilty verdict or conviction and he

21   intends to fight this on appeal because he does not want to

22   leave.

23         He has -- other than the one issue we had with his

24   financial transactions without Court permission on bond, which

25   has been dealt with with the Court, he has been perfectly

GEX 212

29

1    compliant on bond on release.

2         The Government can say that it's making this request

3    with due care and I receive it on behalf of my client as more

4    of the same of the vindictiveness that we've been experiencing

5    from the Government.  He has to be able to make arrangements.

6    We are going to file a bond pending appeal motion and notice of

7    appeal, which the Court recognized, again, during trial was

8    going to be a good appeal issue for us.  It's going to be

9    appealed with the Ninth Circuit.  He is going to fight this as

10   long as he has to.  If the Ninth Circuit disagrees with him,

11   then I expect that he will serve the sentence and then carry on

12   with his life.

13        He's been in the U.S. for 60 years.  He doesn't have

14   anywhere to go.  He doesn't have his passport.  It's in the

15   custody of Defense counsel.  And he has not traveled since he's

16   been charged or since he appeared.

17        **THE COURT:**  Okay.  And do you still have the passport

18   in your custody?

19        **MS. MAITIA:**  Yes.

20        **THE COURT:**  Okay.  Okay, thank you.  Thank you,

21   Counsel, for the arguments.

22        I'm going to -- I am going to allow Mr. Chrismas to

23   self-surrender.  The date for self-surrender will be

24   February 17, 2025.  He'll have to report to the -- if he is not

25   designated prior to that, he'll have to report to the

1    U.S. Marshals here in this building.

2         **MS. MAKAREWICZ:**  May we ask that, given the Court's

3    ruling, that the Defendant be placed on location monitoring and

4    increased supervision?  He is on no supervision with Pretrial

5    right now.  The Government would -- it would assuage the

6    Government's concerns if Mr. Chrismas is found and tracked

7    appropriately and legally under the Constitution by Probation

8    or Pretrial Services.

9         **THE COURT:**  Mr. Chrismas is currently on bond,

10   correct?

11        **MS. MAKAREWICZ:**  Correct.  It's a signature bond as

12   well as an unsecured bond by a colleague.

13        But location, given the Court's ruling and the

14   Government's increase of flight risk, the Defendant may want to

15   stay in this country but circumstances have changed today and

16   so if the Court is intending to give Mr. Chrismas that amount

17   of time the Government would urge the Court to increase his

18   supervision.

19        **THE COURT:**  And so you're suggesting that I require

20   location monitoring.

21        **MS. MAKAREWICZ:**  Location monitoring or check-ins,

22   however Pretrial handles -- he's just under no supervision at

23   all.

24     **(Court confers with Clerk)**

25        **THE COURT:**  Can I get a response from Defendant?

GEX 214

31

1          **MS. MAITIA:**  Yes, Your Honor.  What the Government

2    said is not true.  Mr. Chrismas has been under supervision

3    since 2021 and increased supervision since May of 2024 when his

4    bond was revoked and then reinstated.  He makes detailed

5    financial reportings monthly to his supervising officer.  The

6    officer -- I believe the officer calls him, but also I know

7    that very recently the officer showed up essentially

8    unannounced at 7:00 a.m. or quarter to 7:00 a.m. with another

9    officer and did a home inspection and that is something that is

10   part of his current bond.

11          I don't see -- the Government just keeps declaring

12   that circumstances have changed with respect to flight but this

13   feels like not even a well thought out academic exercise.  I

14   guess if the Court is inclined to impose location monitoring, I

15   mean we would do it for the sake of bond and continued bond.

16          It is -- my co-counsel just told me it is an expense.

17   I'm not sure it's necessary, but if that's what it takes to

18   address -- if the Court is concerned and that's what it takes,

19   then we would request that and not -- I mean it sounds like the

20   Court is already allowing self-surrender, so….

21          **THE COURT:**  Okay.  Okay, thank you.  Thank you for

22   the argument.  Thank you to the Government and thank you,

23   Counsel.

24          I'm going to go ahead and leave things as is.

25   Mr. Chrismas is still on bond.  So be mindful of your bond

32

1   conditions.  Pay attention to advice of counsel with respect to

2   appearances.  You'll have to self-surrender on February 17th,

3   unless there's further order from this Court.  You'll have to

4   do it at 1:00 o'clock here.  Noon, I'm sorry, here.  Noon on

5   the 17th.  You won't get any further communication from the

6   Court with respect to that unless we're having a new hearing.

7   So just pay attention to counsel and the motions.

8       **(Pause)**

9           Yes, the drug testing condition mandate by statute is

10  suspended based on the Court's determination that the Defendant

11  poses a low risk of future substance abuse.  And the bond will

12  be exonerated upon surrender.

13          Anything else?

14          **MS. MAKAREWICZ:**  Nothing from the Government.

15  Thank you.

16          **MS. MAITIA:**  Nothing from Defense.  Thank you.

17          **THE COURT:**  Okay, thank you.

18          Okay, best of luck, Mr. Chrismas, until we see you

19  again at a subsequent hearing or not.  We'll see.  Thank you.

20          **THE CLERK:**  All rise.  This Court's in recess.

21      **(This proceeding was adjourned at 11:33 a.m.)**

22

23

24

25

GEX 216

33

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                              __February 10, 2025__
        Signed                                               Dated


                    _TONI HUDSON, TRANSCRIBER_

EXCEPTIONAL REPORTING SERVICES, INC

GEX 217

<pre>
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    (WESTERN DIVISION - LOS ANGELES)



UNITED STATES OF AMERICA,      ) CASE NO: 2:21-cr-00127-MCS-1
                               )
              Plaintiff,       )            CRIMINAL
                               )
      vs.                      )     Los Angeles, California
                               )
DOUGLAS J. CHRISMAS,           )     Monday, March 3, 2025
                               )
_____Defendant._____)     (9:01 a.m. to 9:12 a.m.)


                        HEARING RE:

   EX PARTE APPLICATION FOR BOND PENDING APPEAL [DKT.NO.246]

             BEFORE THE HONORABLE MARK C. SCARSI,
                 UNITED STATES DISTRICT JUDGE



APPEARANCES:

For Plaintiff:            AUSA VALERIE L. MAKAREWICZ
                          United States Attorney's Office
                          312 North Spring Street
                          Los Angeles, CA 90012
                          213-894-0756

For Defendant:            JENNIFER L. WILLIAMS, ESQ.
                          MEGAN A. MAITIA, ESQ.
                          Summa, LLP
                          1010 Sycamore Avenue, Unit 117
                          South Pasadena, CA 91030
                          213-260-9456

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Stephen Montes Kerr

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988
Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
</pre>

2

1     <u>Los Angeles, California; Monday, March 3, 2025; 9:01 a.m.</u>

2                          --oOo--

3          **THE CLERK:**  USA versus Douglas J. Chrismas.

4          Counsel, state your appearances, please.

5          **MS. MAKAREWICZ:**  Good morning, Your Honor.  Assistant

6     United States Attorney Valerie Makarewicz on behalf of the

7     government.

8          **THE COURT:**  Good morning.

9          **MS. MAITIA:**  Good morning, Your Honor.  Megan Maitia,

10    together with my colleague, Jennifer Williams, appearing for

11    Mr. Douglas Chrismas who present and out of custody.

12         **THE COURT:**  Good morning.  Okay.  So we're here on

13    the motion by Defendant to remain out of custody on bond

14    pending appeal.  Government opposes the motion.

15         In looking at the standards here, judicial officer

16    shall order the person who has been found guilty of an offense

17    and sentenced to a term of imprisonment and who has filed an

18    appeal or petition for a writ of certiorari be detained unless

19    -- and the two issues are -- clear and convincing evidence, the

20    person's not likely to flee, and that the appeal is not for a

21    purpose of delay and raises a substantial question of law or

22    fact likely to result in a reversal, an order for a new trial,

23    a sentence that does not include a term of imprisonment or a

24    reduced sentence.  I know in the briefing Defendant is

25    separating those two things out, essentially saying that it

3

1  raises a substantial question of law or fact and then breaking

2  out from that the likely to result in reversal or new trial and

3  so on.

4          In looking at this, I don't see that there is an

5  issue of a substantial question of law or fact, at least one

6  that seemed like it is -- it's not clearly correct.

7          Tell me again, from the defense side, why is there a

8  substantial question here?

9          **MS. MAITIA:**  Thank you, Your Honor.

10         The substantial question and I think the big one --

11 so I'm going to focus on that -- is the issue of the jury

12 instruction which was the legal issue that we debated for weeks

13 and weeks with lots of briefing and I believe it was the day

14 before closing argument in the middle of trial, outside the

15 presence of the jury that we were still deciding what the jury

16 instruction should look like.  I will take a moment to find the

17 case but there is caselaw in our briefing that an error in jury

18 instruction requires reversal and a new trial so that is the

19 big one.  I know we've quoted Your Honor in our briefing from

20 the transcripts where you've -- where the Court has identified

21 that the jury instruction would be one -- would be a good issue

22 for appeal and it's the jury instruction error, if there is

23 one, that would require a reversal and a new trial.

24         **THE COURT:**  And the issue is the reading of the

25 elements to include personal use with respect to all of the

4

1   identified topics.

2       **MS. MAITIA:**  Correct.  The government proceeded on

3   the theory that the transfer alone without bankruptcy court

4   permission was enough to allow the jury to convict Mr. Chrismas

5   without regard to whether the transfer was for his own personal

6   use or for the benefit or use of the estate.

7       **THE COURT:**  And the ruling of the Court is that there

8   is not a substantial question here.  I think that the -- I know

9   we talked about it a lot and I think maybe the Court -- maybe

10  the Court gave parties the wrong impression by indulging the

11  argument over and over again because I think that we had this -

12  - we had come to -- at least the Court had come to a conclusion

13  on this prior to the trial during the pretrial conference when

14  it was brought up and we parsed through the language.

15      So the Court will issue a written order but the Court

16  denies the defendant's motion.

17      Self-surrender is today at noon, correct?

18      **MS. MAITIA:**  It is and we have a couple matters to

19  raise with the judge about that.

20      **THE COURT:**  Has there been a designation yet or no?

21      **MS. MAITIA:**  There -- Mr. Chrismas didn't receive his

22  formal designation notice.  I think it's supposed to come in

23  the mail.  We have made efforts to identify that.  And on

24  Thursday, court operations at U.S. Marshals in this building,

25  confirmed by email to me that his designation is at CI Big

GEX 221

5

1   Spring, Texas.

2          We would ask -- in the Court's order -- it's Docket

3   Entry 250 -- the Court -- that's when the Court set a briefing

4   schedule and this hearing date on this motion.  The Court said

5   he would reset -- would consider resetting the self-surrender

6   date if there's been a designation to allow Mr. Chrismas to

7   self-surrender at the facility, rather than here in Los Angeles

8   which I think our experience is that it would be likely he

9   would be at MDC for an extended period of time and it would be

10  to his benefit to surrender at the minimum security facility

11  directly.

12         **THE COURT:**  And how long would that take?

13         **MS. MAITIA:**  Well, I assume a couple of days to make

14  arrangements for a flight.  I think a week or so would be what

15  we would request but we would defer to the Court on what's

16  reasonable.

17         **THE COURT:**  Okay.  And what's the government's

18  position on that?

19         **MS. MAKAREWICZ:**  The defendant's sentence starts

20  today, Your Honor.  It's noon today and the Court was very

21  clear with all parties that the sentence was to start today.

22         If the Court is inclined to let him self-surrender;

23  one, we don't have any form from Counsel.  We're hopefully

24  relying upon an email from the marshal service.

25         But to Mr. -- the defendant should be on a plane

6

1    tonight.  I mean this is -- today starts the sentence, whether

2    it's here in MDC or in Big Springs, Texas.

3            **THE COURT:**  Yeah.  I think the Court's ruling is

4    going to be that because we don't have an official designation

5    yet, we haven't seen the form, the Court will keep the self-

6    surrender at noon today at the marshal's office here in this

7    courthouse.

8            **MS. MAITIA:**  The defense is happy to lodge a copy of

9    the email or forward it to the Court now or shortly after this

10   hearing to verify that.  And I apologize for not having

11   formally brought it to the Court's attention.  There's a lot

12   going on.  It's been a chaotic few days in general but

13   especially leading up to today and I apologize to the Court for

14   not having thought to file that.

15           We do have a further request to extend the noon

16   deadline to later today.  Mr. Chrismas' appellate counsel is at

17   her desk standing by to file a motion with the Ninth Circuit to

18   reconsider this ruling of bond pending appeal and we ask for a

19   little grace with more than two and a half hours or so for that

20   to get filed and ruled upon by the Ninth Circuit.  I do know

21   that they -- I don't know exactly how the innerworkings work at

22   the Ninth Circuit but I do know that there is more of a fast

23   track for these types of motions, and so we'd ask for a little

24   bit more leeway to allow that process to take its course.

25           **THE COURT:**  And do you anticipate hearing from the

7

1  Ninth Circuit today?

2     **MS. MAITIA:**  I believe that the Ninth Circuit would

3  stay the self-surrender until the Ninth Circuit could rule on

4  an independent motion for bond pending appeal.  That's how I

5  understand the rule.

6        We -- I know that every case is different and every

7  day is different but we've looked at a couple examples of this

8  issue playing out and the Ninth -- not on the immediate stay of

9  the self-surrender but on deciding briefing and deciding at the

10 Ninth Circuit bond pending appeal and having it -- to the

11 extent there's a reversal, having it remanded to the district

12 court can happen in less than a week.  So it is very fast.  So

13 the immediate request to the Ninth Circuit would be to stay the

14 self-surrender of noon today while this week-long process takes

15 its course.

16    **THE COURT:**  What's the government's position on that?

17    **MS. MAKAREWICZ:**  The government would object.  The

18 Court's ruling is the Court's ruling until the Ninth Circuit

19 says differently.

20       The Court also -- Defense Counsel, in order to appeal

21 this, needs your written ruling.  I mean we can lodge -- they

22 can lodge a Notice of Appeal on this oral ruling but we would

23 need to get a written ruling, the transcript.  If the defendant

24 is successful in getting a stay, he can be released from

25 custody.

8

1        **THE COURT:**  I'm going to deny the motion and keep the
2   self-surrender at noon today at the marshal's office here in
3   the building.

4        **MS. MAITIA:**  Thank you.  I have two more requests and
5   then I think I'll be done and I appreciate the Court's
6   indulgence and patience.

7            The first is that we get a forthwith order from the
8   Court so that we can proceed with the Ninth Circuit motion.

9            And the second would be that the Court include in one
10  of its orders from today a recommendation to BOP that
11  Mr. Chrismas be transferred to a location within 500 miles of
12  his home which I believe is the BOP policy.  I regret not
13  asking for that at sentencing.  I believe those facilities
14  would be FCI Terminal Island, or Lompoc I or II in Santa
15  Barbara.

16       **THE COURT:**  Okay.  Does the government have a view on
17  that?

18       **MS. MAKAREWICZ:**  The Court can do what it needs to
19  do.  I mean we would object to a forthwith subpoena -- a
20  forthwith order but it's within BOP's discretion but certainly
21  the Court is able to make a recommendation.

22       **THE COURT:**  If it's BOP policy that they try to keep
23  people within 500 miles of their home, I don't know that a
24  recommendation from the Court is really going to do much there.

25       **MS. MAITIA:**  I believe it was an error on my part not

EXCEPTIONAL REPORTING SERVICES, INC

9

1  requesting it at sentencing.  I believe that BOP for the

2  initial designation looks to the recommendation in the Judgment

3  and Commitment Order.

4          **THE COURT:**  Okay.  The Court will consider putting

5  that, issuing a modified order with that recommendation.

6          And we'll get an order out as soon as we can but I

7  can't promise anything.

8          **MS. MAITIA:**  I understand.  Thank you.

9          **THE COURT:**  Thank you.

10      **(Proceeding adjourned at 9:12 a.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GEX 226

10

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          March 6, 2025
         Signed                         Dated


*TONI HUDSON, TRANSCRIBER*

GEX 227