CA NO. 25-324

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,                    DC NO. 2:21-cr-00127-MCS-1

        Plaintiff-Appellee,

v.

DOUGLAS J. CHRISMAS,

        Defendant-Appellant.

––––––––––––––––––––––––––

**CHRISMAS' REPLY TO GOVERNMENT'S OPPOSITION TO
CHRISMAS' MOTION FOR RELEASE PENDING APPEAL**

––––––––––––––––––––––––––

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

HONORABLE MARK C. SCARSI
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
KATHRYN YOUNG
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
Email: Kathryn_Young@fd.org

Attorneys for Defendant-Appellant

**TABLE OF CONTENTS**

<div align="right">Page</div>

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................. 1

II.    DENIAL OF DEFENSE DUE TO ERRONEOUS JURY INSTRUCTIONS, AND CONSTRUCTIVE AMENDMENT OF INDICTMENT ..................................................................... 2

III.   IMPROPER AND UNNOTICED EXPERT TESTIMONY FROM PERCIPIENT WITNESS ...................................... 7

IV.   ERRONEOUS SENTENCING GUIDELINES RANGE DUE TO FAILURE TO ALLOW CREDITS AGAINST LOSS, AND BASING LOSS AND RESTITUTION ON UNCHARGED CONDUCT .................................................................... 9

V.    CHRISMAS IS NOT A FLIGHT RISK ......................... 11

VI.   CONCLUSION .......................................................... 12

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Sherman*,
603 F.3d 11 (1st Cir. 2010) ...................................................................4

*In re Straightline Invs., Inc.*,
525 F.3d 870 (9th Cir. 2008) .................................................................3

*Molina-Martinez v. United States*,
578 U.S. 189 (2016) .............................................................................11

*Pulsifer v. United States*,
601 U.S. 124 (2024) ...............................................................................5

*Shaw v. United States*,
580 U.S. 63 (2016) ..................................................................................6

*United States v. Bautista*,
989 F.3d 698 (9th Cir. 2021) ...............................................................11

*United States v. Holmes*,
2025 WL 583307 (9th Cir. 2025) ..........................................................7

*United States v. Knight*,
800 F.3d 491 (8th Cir. 2015) .................................................................8

*United States v. Love*,
17 F. App'x 796 (10th Cir. 2001)...........................................................5

*United States v. Miller*,
953 F.3d 1095 (9th Cir. 2020) ...............................................................6

*United States v. Saini*,
23 F.4th 1155 (9th Cir. 2022) ................................................................6

*United States v. Vogel*,
1994 U.S. App. LEXIS 28293 (4th Cir. 1994) (unpublished)...............8

*United States v. Young*,
955 F.2d 99 (1st Cir. 1992)................................................................4, 5

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Statutes**

11 U.S.C. §363(c)(1).................................................................3

18 U.S.C. §153.................................................................3, 5, 6

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The government's Opposition ("Opp.") failed to address, much less controvert, the arguments and evidence raised in Chrismas' Motion for Release Pending Appeal ("Motion").

Chrismas argues that the jury instructions deprived him of the right to present his defense that the charged transfers were made for the benefit of the bankruptcy estate and were not made for his own use. The government's Opposition and authorities support Chrismas' position that the jury should have been instructed on his defense.

In its discussion of lay witness Richardson's expert testimony, the government's Opposition cited instances in which the district court sustained objections to Richardson's testimony. But the government never addressed the numerous instances cited in the Motion in which the district court allowed Richardson--who comprised over two-thirds of the government's testimonial evidence--to present unduly prejudicial, highly improper and unnoticed expert testimony to the jury.

With respect to loss, the government argued that the district court allowed one specific credit against loss. But the government's Opposition never addressed the expert evidence cited in Chrismas' Motion that the district court failed to apply millions of dollars of credits against loss, which would reduce the loss to zero.

Ignoring the facts and the district court rulings, the government spuriously argued that Chrismas is a flight risk. The United States is Chrismas' home; Chrismas is 80 years old and has lived in Los Angeles for 60 years. Chrismas was released on bond throughout pretrial and posttrial proceedings. Under the same standard applicable here, the district court found Chrismas not to be a flight risk.

To prevail on his request for release pending appeal, Chrismas need only raise substantial questions of law or fact likely to result in specified relief. Chrismas is not required to show that "an appeal will likely be successful"; he need show only that his issues are "fairly debatable" or "fairly doubtful." Individually and cumulatively, Chrismas' issues meet the standard, and Chrismas should be allowed to remain on release during the pendency of his appeal.

## II. DENIAL OF DEFENSE DUE TO ERRONEOUS JURY INSTRUCTIONS, AND CONSTRUCTIVE AMENDMENT OF INDICTMENT

Chrismas established that the charged transfers were made for the benefit of the bankruptcy estate, not for Chrismas' own benefit. (Motion-4-8) For example, he proved that the Museum's purchase option was so critical to the bankruptcy estate that the creditors' committee aggressively placed increasing pressure on Chrismas to ensure that the Museum's rent was timely paid, to preserve the purchase option. (Chrismas' attached exhibits ("CEX")-107-125) Chrismas'

2

evidence was so powerful that the government characterized it as "moving the needle," and the government moved to preclude Chrismas' defense.

Chrismas was deprived of his defense when the jury was instructed and found that Chrismas was guilty merely because the charged transfers were not expressly authorized by the bankruptcy court. As the government's Opposition demonstrates, the jury should have been instructed on Chrismas' defense based on various elements of §153.

Preliminarily, the mere fact that a transfer was not authorized does not make it illegal. In a Chapter 11 bankruptcy case, the debtor continues to run its business, and is statutorily authorized to engage in transactions in the ordinary course of business, without court permission. 11 U.S.C. §363(c)(1). Under bankruptcy law, if a transaction is not in the ordinary course of business, it is avoidable but not necessarily criminal. §549(a). Whether a transaction is conducted in the ordinary course of business is a heavily factual determination that involves an extensive analysis of various factors. *In re Straightline Invs., Inc.*, 525 F.3d 870, 879-80 (9th Cir. 2008). For Chrismas to be convicted without the requisite analysis, simply based upon the testimony of lay witness Richardson, constitutes reversible error.

Furthermore, as the government's Opposition acknowledged, §153 prohibits "embezzlement from a bankruptcy estate." (Opp.-1, 6) The government's Opposition argued that mere transfer without authorization "comports with the

3

common law definition of embezzlement," citing *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010) (Opp.-14) But that's not what the government's authority *Sherman* held. *Sherman* held that the bankruptcy judge's ruling that "it was necessary to find that the debtor appropriated the victims' property for his own benefit with fraudulent intent" was "a substantially correct statement of law." *Sherman*, 603 F.3d at 13.

Additionally, *Sherman* relied upon *United States v. Young*, 955 F.2d 99 (1st Cir. 1992), which reviewed the history of the crime of embezzlement. The *Young* Court stated that the first embezzlement statute was designed to prohibit individuals "from converting the (lawfully obtained) money of others to their own use." Id. at 102. The heart of embezzlement, according to the First Circuit, is using "money entrusted to him by another person for his own purposes or benefit and in a way that he knows the 'entruster' did not intend or authorize." Id. at 102. Another definition cited by the First Circuit was the "fraudulent appropriation of a thing to one's own use and beneficial enjoyment, or an unauthorized assumption and exercise of dominion or right of ownership over it in defiance of, or exclusion of, the owner's rights." Id. at 102. The First Circuit further cited *Blacks Law Dictionary* for the definition of "fraudulently withholding, converting, or applying [property that is lawfully in one's possession] to or for one's own use and benefit, or to [the] use and benefit of any person other than the one to whom the money or

4

property belongs." Id. at 102-03. The First Circuit additionally cited cases holding that embezzlement is defined as "the appropriation to the defendant's own use of property delivered to him for a specified purpose other than his own enjoyment of it." Id. at 103. Accordingly, the government's own authority supports Chrismas' position that he was not guilty because he did not make the charged transfers *for his own use*, and that the jury instructions deprived Chrismas of his defense.

Since, as the government acknowledged, the purpose of §153 is to prohibit embezzlement, and since the government's authority requires conversion to one's own use as an element of embezzlement, then the government's Opposition confirms Chrismas' interpretation that conversion to one's own use is an element of all the §153 terms (appropriation, embezzlement, spending, and transfer). In disputing this interpretation, the government relies upon the "rule of the last antecedent." (Opp.-12) However, as the Supreme Court recently observed in *Pulsifer v. United States*, 601 U.S. 124 (2024), the choice between two grammatically permissible rules can sensibly be made only by reviewing text in context; "grammar is not the primary determinant of meaning." (Id. at 136) The government relies upon *United States v. Love*, 17 F. App'x 796 (10th Cir. 2001)(Opp.-13), which is inapposite since it involves a different provision. (CEX-9-10) The government further spuriously contends that Chrismas is relying upon an "intent to repay" defense. (Opp.-14) That is inaccurate; Chrismas' defense is that

5

the payments were made not as a loan from the bankruptcy estate but on behalf of the bankruptcy estate.

Other aspects of §153 similarly support the defense of which Chrismas was deprived. For example, §153 requires that the charged embezzlement, spending or transfer be knowing and fraudulent. The jury was instructed that: "'Fraudulent' means to knowingly deceive or mislead someone, usually for personal gain." (GEX) However, following the Supreme Court decision in *Shaw v. United States*, 580 U.S. 63, 72 (2016), the Ninth Circuit has increasingly held that fraudulent intent requires not just an intent to deceive, but also an intent to cheat. See, e.g., *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (intent to defraud for wire fraud and mail fraud requires intent to deceive and cheat); *United States v. Saini*, 23 F.4th 1155, 1163 (9th Cir. 2022) (intent to defraud for access device fraud requires intent to deceive and cheat). Chrismas contends that the element of fraud in bankruptcy embezzlement similarly requires an intent to deceive and cheat. This supports Chrismas' defense that he did not intend to cheat the bankruptcy estate because the charged transfers were for the benefit of the bankruptcy estate and not for Chrismas' own use.

The government's Opposition argued that there was no constructive amendment because "the government and the district court narrowed the indictment, not broadened it." (Opp.-17) To the contrary, as to Chrismas, the

6

indictment was broadened and his defense was narrowed (to the point of elimination) at trial. Under the indictment as filed, the defense that the charged transfers were not for his own use was available to Chrismas. Under the government's later amendment, Chrismas was deprived of that defense. Instead, Chrismas was wrongly found guilty merely because he failed to obtain bankruptcy court authorization for the charged transfers.

## III. IMPROPER AND UNNOTICED EXPERT TESTIMONY FROM PERCIPIENT WITNESS

The government's Opposition broadly claimed that the district court acted as gatekeeper for potential expert testimony from lay witness Richardson. But although the government recited instances in which the district court sustained objections, the government's Opposition notably was completely silent regarding the numerous instances in which the district court overruled objections and allowed Richardson to give unnoticed and improper expert testimony. (Motion-18-19; CEX-127-186) And the government never addressed the prejudice to Chrismas' defense resulting from the government's failure to give required Rule 16 notice of the introduction of such expert testimony.

The government asserted that reliance on *United States v. Holmes*, 2025 WL 583307, 2025 U.S. App. LEXIS 4175 (9th Cir. 2025), is misplaced because Richardson's testimony about the steps he took to conclude that Chrismas diverted

money from the bankruptcy estate was not based upon specialized knowledge. (Opp.-18-19)

But as the USAO has elsewhere contended, testimony about bankruptcy proceedings goes beyond the common knowledge of the average layperson. In *United States v. Vogel*, 1994 U.S. App. LEXIS 28293 (4th Cir. 1994) (unpublished) (CEX-193), the government argued that testimony elucidating the bankruptcy process constituted expert testimony: "As the government has argued, the testimony at issue here was admissible because it was helpful to the jury: 'Expert testimony on bankruptcy law was essential for the jury….'" Similarly, in *United States v. Knight*, 800 F.3d 491, 503 (8th Cir. 2015), both parties provided expert testimony regarding bankruptcy proceedings. such as the types of disclosures required in bankruptcy filings.

The government further argued that in *Holmes*, the court found the error harmless because the nondesignated lay witness would have qualified as an expert witness. The government spuriously claimed that: "The same is true of Richardson here." (Opp.-2) The district court disagreed. In its January 14, 2025 Order, the district court stated that "Defendant *correctly* notes that *Mr. Richardson was not qualified to testify as an expert*-nor was he proffered as one by the Government." (GEX-178; emphasis added)

Furthermore, the challenged expert testimony in Holmes' 43-day trial was minor compared to Richardson's role in this case. The presentation of evidence in Chrismas' trial lasted 2½ days, and Richardson testified on all three of those days. Richardson testified on every morning and every afternoon of trial testimony, and Richardson's testimony comprised 69% of the pages of trial testimony. The prejudicial impact of Richardson's testimony in this case cannot be overstated; as the district court acknowledged, without Richardson's testimony, the government's case was circumstantial. (GEX-182)

## IV. ERRONEOUS SENTENCING GUIDELINES RANGE DUE TO FAILURE TO ALLOW CREDITS AGAINST LOSS, AND BASING LOSS AND RESTITUTION ON UNCHARGED CONDUCT

It is undisputed that the government's Ziegler report on which the PSR and district court relied for the §2B1.1 loss amount intentionally omitted huge amounts of credits. Ziegler admitted under oath that the report did not take into account any amounts that Chrismas paid on behalf of the bankruptcy estate, unless that expense was approved by the court. Ziegler acknowledged that the report included only amounts transferred from the estate, and not amounts paid on behalf of the estate. (CEX-20, 21, 25, 28, 33-35) It was a one-sided accounting that did not comply with the Sentencing Guidelines requirements. This was established in the Motion (Motion-10-11), and the government's Opposition did not dispute any of this.

The defense submitted the Engel report, which included the credits omitted by Ziegler, and concluded that the bankruptcy estate would not be insolvent if such payments for the benefit of the estate were credited.   (CEX-42, 52, 62, 38-105)

Over defense objections, the PSR ignored the defense expert Engel report, in favor of the Ziegler report, which admittedly tallied only losses, and did not include credits against loss.  The government's Opposition responded that the government argued for one credit against loss. (Opp.-22) However, the government's Opposition significantly did not dispute that the Ziegler report omitted multi-millions of dollars in losses.  Thus it is irrefutable that the Ziegler report, and the PSR and district court, failed to apply credits against losses, in violation of Note 3(E)(i) to §2B1.1.

The government's Opposition conjectured that the Guidelines error was harmless because even if the Guidelines range were reduced from 121-151 months to 0-6 months, the district court would still have imposed the same 24-month sentence.  The government's unsupported speculation ignores this Court's and the Supreme Court's decisions.  As the Supreme Court held, when a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error.  This follows from the essential framework established by the

Guidelines. The Guidelines are the sentencing court's starting point, initial benchmark and lodestar. An improperly calculated Guidelines range constitutes a significant procedural error. *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016); see also *United States v. Bautista*, 989 F.3d 698, 705 (9th Cir. 2021).

## V. CHRISMAS IS NOT A FLIGHT RISK

The government claimed that the district court made no finding on the issue of whether defendant is likely to flee, §3143(b)(1)(A). (Opp.-24) To the contrary, in the face of the government's assertion that Chrismas was a flight risk, the district court maintained Chrismas on release. At sentencing, the government asked that Chrismas be immediately remanded because he was a flight risk. When the district court denied that request, the government asked that Chrismas be placed on location monitoring and increased supervision. (GEX-211-214) The district court rejected the government's requests. (GEX-215) The district court has thus found that Chrismas is not a flight risk.

The government contended that since Chrismas is deportable, it would "be irrational for defendant to stay in the United States to face justice." (Opp.-25) First, Chrismas has appealed and hopes to be vindicated by this Court. Second, the United States is Chrismas' home. He has lived here since the 1960's, when he was in his 20's. As defense counsel told the district court at sentencing, Chrismas intends to fight to remain in the United States. If he is unsuccessful in his appeal,

11

then he will serve his sentence and fight deportation.  Being deportable is not the same as being deported.

Throughout the pendency of these long, difficult and painful proceedings, Chrismas has not left the United States and has made every court appearance. Other than one issue regarding sale of property, he has remained compliant with the conditions of his release. After the district court ordered Chrismas to self-surrender at noon on March 3, he was in the Marshal's office waiting to be taken into custody when this Court issued a stay of the self-surrender date at noon on March 3. He is not a flight risk.

## VI.  CONCLUSION

The Court should permit Chrismas to remain released pending resolution of his appeal.

Respectfully submitted,

DATED:  March 13, 2025

_/s/ KATHRYN YOUNG_
KATHRYN YOUNG
Deputy Federal Public Defender

Attorney for Appellant
DOUGLAS J. CHRISMAS

12

# INDEX OF EXHIBITS

Ex. A - Defendant's Opposition to Government's
Interpretation of Jury Instruction 31
Docket No. 117 ..............................................................................CEX 1

Ex. B - Excerpts of Jennifer Ziegler Deposition
On 4/25/2022
Docket No. 232 ............................................................................CEX 14

Ex. C - Excerpts of Rebuttal Report of Jason Engel
Dated 9/1/2021
Docket No. 232 ............................................................................CEX 37

Ex. D - Excerpts of Emails from Victor Sahn on
Behalf of Creditors Committee
Docket No. 232 ..........................................................................CEX 106

Ex. E - Excerpts of Testimony of David Richardson
On 5/28/2024, 5/29/2024 and 5/30/2024
Docket No. 232 ..........................................................................CEX 126

Ex. F - *United States v. Vogel*,
1994 WL 556994 (4th Cir. 1994)(Unpublished) ........................................CEX 187

# EXHIBIT A

MEGAN A. MAITIA (Bar No. 285271)
megan@summaLLP.com
JENNIFER L. WILLIAMS (Bar No. 268782)
jenn@summaLLP.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117
South Pasadena, California 91030
Telephone:  (213) 260-9455/52/56
Facsimile:   (213) 835-0939

Attorneys for Defendant
DOUGLAS J. CHRISMAS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>      v.<br><br>DOUGLAS J. CHRISMAS,<br><br>             Defendant. | Case No. 2:21-CR-00127-MCS<br><br>**DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31**<br><br>**Judge:**     Hon. Mark C. Scarsi<br><br>**Hearing:**  TBD<br><br>**Trial**:      May 28, 2024 |

---

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On the eve of trial, the prosecutors are taking the position for the first time that to convict under 18 U.S.C. § 153, the Government need only prove that Mr. Chrismas knowingly and fraudulently transferred property belonging to the estate, regardless of the intended *use* of that property. (Dkt. 106, citing Jury Instruction 31 in Dkt. 45 at p.43.)

In doing so, the Government relies on grammatical gymnastics and fancy graphics. But its interpretation ignores the most important guide: common sense. When read in its entirety and, as the Court must, consistent with due process notice requirements counseled by the Rule of Lenity, the only common-sense interpretation of the embezzlement statute is the one *already* reflected in Jury Instruction 31, as adopted from the Eleventh Circuit Model Jury Instructions (and previously sanctioned by this same prosecution team). That is, 18 U.S.C. § 153 criminalizes one who (a) knowingly and fraudulently (b) embezzled, spent, transferred, or appropriated to the Defendant's own use (c) property belonging to the estate. "To the Defendant's own use" is a concept understood from the context, and reflected by the Model Instruction, that applies to each word in the series, which each incorporate the everyday, common sense meaning of embezzlement.

The Government, trying to score a conviction without the literal burden it is required to carry, now argues that it can convict where there was a "knowingly and fraudulent transfer," period (that is, a transfer that was concealed, even if the transfer was intended to benefit the estate). This sudden position exposes what the Government has now come to understand based on evidence it long ignored. Without such a contorted (and constitutionally defective) reading, it cannot win; as the Government now knows, the transfers were, in fact, intended to benefit the estate. But just as the Government cannot change the facts—try as it might—to fit the law of the crime it charged, it likewise cannot change the law—try as it might—to fit the facts it now knows.

Consistent with applicable case law on criminal embezzlement and common sense, Jury Instruction 31 should be read as drafted (*see* Dkt. 45 at pp. 42-43).

---

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

CEX 3

**II.    ARGUMENT**

      **A.    The Government's interpretation contradicts context, common sense, and applicable case law.**

    As drafted, 18 U.S.C. § 153 prohibits conduct when a person (a) "knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers" property belonging to a bankruptcy estate, (b) when the person has access to and is entrusted with that same property. The Government's brief fails to read the series in subsection (a) together and in light of subsection (b). But when the whole statute is considered together and in context, the instruction already reflected by the Eleventh Circuit prevails.

    First, the Government's tedious analysis of the Nearest Reasonable Referent and Series Qualifier Rule canons falls by the wayside as it disregards the "Whole Act Rule," the established canon of construction that, consistent with common sense, requires courts to look at the statute as a whole.

> When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature.

*Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (cleaned up); *Azarte v. Ashcroft*, 394 F.3d 1278, 1288 (9th Cir. 2005), *abrogated on other grounds by Dada v. Mukasey*, 554 U.S. 1 (2008), ("The key to the whole act approach is, therefore, that all provisions and other features of the enactment must be given force, and provisions must be interpreted so as not to derogate from the force of other provisions and features of the whole statute.").

    Mr. Chrismas has been charged with violations of § 153, an "Embezzlement against estate" statute by name. Federal case law defines "embezzlement" as "the fraudulent **appropriation** of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *United States v. Lequire*, 672 F.3d 724, 728 (9th Cir.

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

CEX 4

2012) (emphasis added) (collecting Ninth Circuit cases). Black's Law Dictionary similarly defines embezzlement as the "fraudulent **taking** of personal property with which one has been entrusted, especially as a fiduciary." EMBEZZLEMENT, Black's Law Dictionary (11th ed. 2019) (emphasis added). And Merriam-Webster defines to "embezzle" as "to appropriate (something, such as property entrusted to one's care) fraudulently **to one's own use**." "embezzle." Merriam-Webster.com. 2024. https://www.merriam-webster.com/dictionary/embezzle (6 May 2024) (emphasis added).

Though there is no Ninth Circuit model jury instruction for § 153, bankruptcy law defines embezzlement as "the fraudulent **appropriation** of property by a person to whom such property has been entrusted or into whose hands it has lawfully come," and requires proof of three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use **other than which [it] was entrusted**; and (3) circumstances indicating fraud." *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991) (citations omitted) (emphasis added).

In this context—where property is in one's hands for one purpose and then used for another—the words appropriate, embezzle, spend, and transfer are synonyms to describe the same conduct. Embezzlement (as understood in everyday life) requires that the alleged wrongdoer initially had lawful access to the property given his position of trust, *Lequire*, 672 F.3d at 728, and the crime occurs only when the property is used **in violation** of that position of trust. This, of course, requires the jury to evaluate *how* the defendant used (or, more to the point, intended to use) the property before it can vote to convict under § 153.

This interpretation is also consistent with, and does not make superfluous, the immediately preceding statute, 18 U.S.C. § 152, which criminalizes various acts when taken in relation to a bankruptcy proceeding, such as, for example, concealing assets of an estate (§ 152(1)) and making a false statement in relation to bankruptcy proceeding (§ 152(3)). Of note, § 152(7) criminalizes one who "knowingly and fraudulently transfers or conceals" property with the intent to defeat bankruptcy rules. The Government's interpretation of § 153 (as reflected in Jury Instruction 31)—that is, "embezzlement of the

CEX 5

1   estate" can be completed where one, in the course of a bankruptcy proceeding, knowingly

2   and fraudulently transfers money from an estate—is no different than what is already

3   proscribed in § 152(7). The Government's interpretation would, therefore, mean Congress

4   criminalized the same conduct twice, in back-to-back statutes.  Such interpretation is not

5   only inconsistent with common sense, but also not endorsed by caselaw. *See e.g., Mackey*

6   *v. Lanier Collection Agency*, 486 U.S. 825, 836-37 (1988) (declining "to adopt an

7   interpretation of a congressional enactment which renders superfluous another portion of

8   the same law").

9        The defense's commonsense interpretation of Jury Instruction 31 also follows the

10  Ninth Circuit model instruction for the analogous 18 U.S.C. § 641, Theft of Government

11  Money or Property, which criminalizes conduct when the defendant "embezzles, steals,

12  purloins, or knowingly converts to his use or the use of another" government property.

13  According to the model instruction, the Government must prove beyond a reasonable

14  doubt:

15            [T]he defendant knowingly [[embezzled] [stole] [converted to the

16            defendant's use] [converted to the use of another]] [money]

17            [property of value] with the intention of depriving the owner of

18            the use or benefit of the [money] [property]."

19  Ninth Circuit Model Criminal Jury Instruction 23.1. Thus for § 641, embezzlement,

20  stealing, and conversion are synonyms to describe the ways for a defendant to commit the

21  crime, that is, wrongfully depriving the government of the *use or benefit* of its own

22  property. *United States v. Dupee*, 569 F.2d 1061, 1064 (9th Cir. 1978) (affirming

23  conviction under 18 U.S.C. § 641 when the defendant, a postal office clerk, failed to turn

24  over money he received for processing customer money orders) ("This is a classic case of

25  embezzlement the fraudulent conversion of the property of another by one who is lawfully

26  in possession of it."); *United States v. Bui*, 2004 WL 57082, at *4 (E.D. Pa. Jan. 9, 2004),

27  aff'd, 152 F. App'x 159 (3d Cir. 2005) (denying motion for judgment of acquittal following

28  conviction under 18 U.S.C. § 1711, Misappropriation of Postal funds) ("[T]he gravamen of

---

4

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

1  the offense is the **personal use** of the money or property by the employee.") (emphasis

2  added).

3      The defense's interpretation is reinforced by the traditional canon of construction,

4  *noscitur a sociis*, which "dictates that 'words grouped in a list should be given related

5  meaning." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990). In *Dole*, the

6  question involved the Office of Management and Budget's scope under the Paperwork

7  Reduction Act in regulating other agencies' requests to businesses for "a written report

8  form, application form, schedule, questionnaire, reporting or recordkeeping requirement,

9  collection of information requirement, or other similar method calling for the collection of

10  information." *Id*. at 34. The question was whether OMB's authority to regulate "reporting

11  or recordkeeping requirements" included the authority to approve the Department of

12  Labor's substantive OSHA-related disclosure rules for hazardous chemicals. The Supreme

13  Court, relying on *noscitur a sociis* and the Whole Act Rule, said, obviously, no:

14      The other examples listed in the definitions of "information

15      collection request" and "collection of information" are forms for

16      communicating information to the party requesting that

17      information. If "reporting and recordkeeping requirements" is

18      understood to be analogous to the examples surrounding it, the

19      phrase would comprise only rules requiring information to be

20      sent or made available to a federal agency, not disclosure rules.

21  *Id.*; *United States v. Williams*, 553 U.S. 285, 294 (2008) (describing *noscitur a sociis* as the

22  "commonsense canon" that "counsels that a word is given more precise content by the

23  neighboring words with which it is associated").

24      Finally, but perhaps most importantly, the defense's position is supported by the

25  Rule of Lenity, which tips the balance in favor of the defendant not only when faced with

26  ambiguous text but also when faced with ambiguous legislative history. *Liparota v. United*

27  *States*, 471 U.S. 419, 427 (1985) ("Although the rule of lenity is not to be applied where to

28  do so would conflict with the implied or expressed intent of Congress, it provides a time-

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

CEX 7

1 honored interpretive guideline when the congressional purpose is unclear."). Here, the

2 Government does not cite, and the defense has not located, any legislative history to

3 support the Government's interpretation of Jury Instruction 31. The Rule of Lenity

4 prohibits such an interpretation because it would necessarily impose criminal liability on

5 the public under an embezzlement statute without proof of the everyday meaning of

6 embezzlement, the *wrongful use* of property. The Court's "job is always in the first instance

7 to follow Congress's directions. But if those directions are unclear, the tie goes to the

8 presumptively free citizen and not the prosecutor." *United States v. Rentz*, 777 F.3d 1105,

9 1113 (10th Cir. 2015); *Wooden v. United States*, 595 U.S. 360, 389 (2022) (GORSUCH, J.,

10 concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an

11 individual's liberty always prevails over ambiguous laws.") (offering detailed history on

12 the Rule of Lenity).

13    **B.    The commonsense interpretation of 18 U.S.C. § 153 is supported by**
14         **the plain language of Jury Instruction 31.**

15    The actual instructive language in Jury Instruction 31 confirms the defense's position

16 here: "embezzle" and "appropriate" mean the same thing, and those terms are further

17 defined by the synonyms "spend," "transfer," and "convert," when the spending, transfer,

18 or conversion is for personal use or someone else's use (and not for the use of the

19 bankruptcy estate):

20         The heart of the charge in the indictment is the knowing and

21         fraudulent embezzlement or appropriation of property belonging

22         to the Debtor's estate.

23         "Fraudulent" means to knowingly deceive or mislead someone,

24         **usually for personal gain**.

25         To "embezzle" or "appropriate" means to **wrongfully take**

26         **someone's property and spend it, transfer it, convert it to**

27         **personal use, or convert it to someone else's use**.

28

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

CEX 8

1  (Dkt. 45 at PACER p.43 (emphasis added).) The Government sanctioned this explanatory

2  language in Jury Instruction 31 when these prosecutors filed the Joint Proposed Jury

3  Instructions. But the Government ignored this language in their brief and offered no basis

4  for the Court to excise it from Jury Instruction 31.

5      The case law cited by the Government does not change the analysis. The

6  Government first cites *United States v. Love*, 17 F. App'x 796 (10th Cir. 2001), arguing

7  that the debtor (FACC) "did not relinquish control transferred to Impact [FACC's affiliate]

8  accounts," and the Tenth Circuit affirmed the § 153(a) convictions because the "statute

9  prohibits knowing and fraudulent embezzlement, spending, transference, etc., whether or

10  not such activity is occasioned toward the offender's own use." (Dkt. 106 at 9-10 and n.8,

11  citing *Love*, 17 App'x at 800.) The Government's characterization of *Love* is misleading.

12      The focus of *Love* was the defendant's criminal "concealment of bankruptcy assets"

13  from creditors as prohibited under 18 U.S.C. § 152, a statute the Government has not

14  charged here. Love was convicted based on evidence that he (the CFO of FACC)

15  transferred FACC money from the bankruptcy estate to the affiliate company "in order to

16  conceal [the] property from its creditors," and the money was "almost entirely depleted" by

17  the time the affiliate's assets were consolidated with the bankruptcy estate. *Id*. at 800. But

18  Love was charged under the 1993 version of 18 U.S.C. § 153, which applied only to

19  "property that came into one's charge as trustee or other officer of the court." *Love*, 17 F.

20  App'x at 801. Love was neither and argued that his § 153 conviction should be overturned

21  he was outside the statute's reach. The Court affirmed the conviction because Love was

22  charged under 18 U.S.C. § 2 for aiding and abetting his co-defendant who *was* the trustee,

23  and in this context, the Court explained, the "embezzlement, spending, transference, etc."

24  need not be for the aiding and abetting offender's own use. The court did not speak to, let

25  alone adopt, the interpretation the Government now presses. *Id*.

26      Unlike *Love*, Mr. Chrismas is charged with violating § 153 directly (not through a

27  § 2 aiding and abetting theory of liability). Consistent with his charges, his defense is that

28  he made the Museum rent payments to preserve the Museum lease as an asset to the estate

<center>7</center>

---

<center>DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31</center>

and its creditors. The Government tries to cut off this defense by arguing that the Museum would have been "legally prohibited from giving money back to Ace Gallery in the manner defendant now suggests" (even though the Government knows, because the defense told the prosecutors, that the ACE Gallery creditors had legally enforceable financial interests to the Museum) (Dkt. 106 at 11 n.9.) The Government can make this "closing argument" to the jury, but it is far from conclusive on the legal issue before the Court and says nothing about Chrismas's *intent*, which is the main issue in the case.[1]

The Government then cites *United States v. Klupt*, 475 F.2d 1015 (2d Cir. 1973) (*see* Dkt. 106 at 10). Like *Love*, *Klupt* turned on 18 U.S.C. § 152, the "concealment of bankruptcy assets" statute that the Government has not charged here and does not govern the jury instructions in a § 153 embezzlement case. Last, the Government cites *United States v. Coin*, 753 F.2d 1510 (9th Cir. 1985) for the argument that embezzlement is a crime because the "victim of the crime is deprived of its right to make decisions about how its property or funds are to be used." (Dkt. 106 at 11, arguing that "[s]o too here," "Ace Gallery was deprived of its right to make decisions about the embezzled property the moment that property left the bankruptcy estate.") But *Coin* supports the defense's position on Jury Instruction 31: the defendant was convicted of embezzling tribal funds because he, as vice-chairman of the tribe, used some tribal funds ostensibly to pay bills related to the tribe and "*used the remainder for his personal benefit*." *Coin*, 753 F.2d 1510 (emphasis added).

### C. The Government's position lacks credibility because it is inconsistent with its previous position.

For this entire case, the Government has put forth a legal theory consistent with the plain reading of Jury Instruction 31. And in every substantive filing, the Government has

---

[1] Factually, at the time of the charged transactions, Mr. Chrismas was the debtor in possession of the bankruptcy estate and authorized to operate the business, and he was permitted to enter many transactions that did not require prior approval from the bankruptcy court.

argued that the charged transactions violated § 153 because they benefitted the Museum to the exclusion of the ACE Gallery bankruptcy estate:

> In March and April 2016, defendant embezzled $264,595 from the bankruptcy estate of Ace Gallery. He was the estate's trustee at the time, and he used this position to transfer assets out of the estate **for the benefit of a different company, which he also controlled, called Ace Museum**. . . .
>
> Prior to the appointment of the independent trustee, though, defendant embezzled $264,595 from the bankruptcy estate over the course of three separate transactions. . . . **Defendant used that money to benefit a completely different company, Ace Museum, wherein he was the chief executive and financial officers**.

(Dkt. 47 at 3-4; *see also* Gvt. filings at Dkt. 48 at 3-4 (same), Dkt. 54 at 3-4 (same), Dkt. 87 at 3 (same), Dkt. 88 at 3 (same), Dkt. 89 at 3-4 (same), Dkt. 91 at 3, 6 (same).)

In the Joint Statement of the Case, which the Government has asked this Court to read to the jury pool, the Government summarized its theory as follows:

> The government alleges that during his time as trustee of the bankruptcy estate, Mr. Chrismas embezzled property belonging to Ace Gallery's bankruptcy estate. Specifically, the government alleges that Mr. Chrismas used his position as trustee to embezzle approximately $264,595 from the bankruptcy estate over the course of three separate transactions -- two transactions on March 30, 2016, and one transaction on April 1, 2016 -- **by using that money to benefit a completely different company, which he also controlled, and not using it to benefit Ace Galle[r]y**.

1    (Dkt. 51 at 3 (emphasis added); *see also* Department of Justice's archived Criminal

2    Resource Manual § CRM 500-99, part of DOJ's Justice Manual, which characterizes the

3    relevant § 153 language as prohibiting "embezzling property" and nothing else.)

4        A few weeks ago, the defense provided evidence to the prosecutors that the ACE

5    Gallery bankruptcy estate had legal interests in the Museum lease, such that payments to

6    preserve the lease would benefit the bankruptcy estate, and the Government *agreed* that

7    this evidence changed its view of the case in an exculpatory way. (*See* Dkt. 94-1 at ¶¶ 8-

8    10). But now, heading to trial and realizing their case is legally flawed, the Government

9    has suddenly changed its theory:

10           MS. MAKAREWICZ: The focus is wrong, Your Honor. It

11           doesn't have to do with the benefit of the estate. **It has to do**

12           **with the fact that it left the estate. The fact that the money**

13           **was moved from the debtor**. Even if we take the defendant at

14           his word, he is allowed to present [his defense], that is not

15           relevant, **because the fact that it went to the landlord is where**

16           **the focus needs to be, because then [the money] definitely left**

17           **the estate**. . . .

18           That's why the use and benefit is the wrong analysis, Your

19           Honor. **The fact that the money went out of the estate is where**

20           **the focus should be, because it did.**

21    (April 29, 2024 Tr. at pp. 22:7-23:18 (emphasis added).)

22

23

24

25

26

27

28

---

10

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

1    This about face is the Government's attempt to win by default without meeting their

2   burden of proof.[2] The Court should reject the Government's interpretation of Jury

3   Instruction 31, read the instruction to the jury as drafted at Docket 45, and allow Mr.

4   Chrismas to put on a defense consistent with the plain language of this instruction.

5

6   Dated: May 6, 2024                    Respectfully submitted,
                                          Summa LLP
7

8                                          /s/ Megan A. Matia
                                          Megan A. Maitia
9                                         Jennifer L. Williams

10

11                                        Attorneys for Defendant
                                          DOUGLAS J. CHRISMAS
12

13

14

15

16

17

18

19

20

21

22

23

24   _____

25   [2] The Government's theory change here raises new constitutional issues, that the
     Government seeks to convict Mr. Chrismas for a theory not presented to the grand jury and
26   for conduct not charged in the indictment. If true, this could amount to a constructive
     amendment or fatal variance of the indictment in violation of the 5th Amendment and
27   require reversal of any conviction. *United States v. Ward*, 747 F.3d 1184, 1188–89 (9th Cir.
     2014).
28

                                          11

DEFENDANT'S OPPOSITION TO GOVERNMENT'S INTERPRETATION OF JURY INSTRUCTION 31

# EXHIBIT B

```
 1                   UNITED STATES BANKRUPTCY COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3                        LOS ANGELES DIVISION
 4
 5      _____
                                           )
 6      ART & ARCHITECTURE BOOKS OF THE    )
        21st CENTURY,                      )
 7                                         )
                          Debtor.          )  Case No.
 8                                         )  2-13-bk-14135-RK
        _____)  Chapter 11
 9                                         )  Adv. No.
        SAM LESLIE, Plan Agent for Art     )  2:15-ap-01679-RK
10      & Architecture Books of the 21st   )  Consolidated with:
        Century,                           )  Adv. No.
11                                         )  2:14-ap-01771-RK
                          Plaintiff,       )
12                                         )
                     vs.                   )
13                                         )
        ACE GALLERY NEW YORK CORPORATION,  )
14      a California corporation, et al.,  )
                                           )
15                        Defendants.      )
        _____)
16      AND RELATED COUNTERCLAIMS AND      )
        CROSSCLAIMS.                       )
17      _____)
18            REMOTE DEPOSITION OF JENNIFER ZIEGLER
19                   Monday, April 25, 2022
20                        Volume I
21
22      Reported Remotely and Stenographically by:
23      Gail E. Kennamer, CSR 4583, CCRR
24      Job No. 5199878
25      Pages 1 - 221
```

<div align="right">Page 1</div>

USAO_00020010

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 15

```
 1                 UNITED STATES BANKRUPTCY COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
 3                    LOS ANGELES DIVISION
 4
 5     _____
                                       )
 6     ART & ARCHITECTURE BOOKS OF THE )
       21st CENTURY,                   )
 7                                     )
                       Debtor.         ) Case No.
 8                                     ) 2-13-bk-14135-RK
       _____) Chapter 11
 9                                     ) Adv. No.
       SAM LESLIE, Plan Agent for Art  ) 2:15-ap-01679-RK
10     & Architecture Books of the 21st) Consolidated with:
       Century,                        ) Adv. No.
11                                     ) 2:14-ap-01771-RK
                       Plaintiff,      )
12                                     )
                       vs.             )
13                                     )
       ACE GALLERY NEW YORK CORPORATION,)
14     a California corporation, et al.,)
                                       )
15                     Defendants.     )
       _____
16     AND RELATED COUNTERCLAIMS AND   )
       CROSSCLAIMS.                    )
17     _____)
18
19          Remote Deposition of Jennifer Ziegler, Volume I,
20     taken on behalf of Defendants, beginning at 9:30 a.m. and
21     ending at 5:39 p.m.; Monday, April 25, 2022, before
22     Gail E. Kennamer, CSR 4583, CCRR.
23
24
25
                                                  Page 2
```

USAO_00020011
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 16

```
 1      REMOTE APPEARANCES:

 2

 3      For Plaintiff Plan Agent Sam Leslie:

 4

 5           SULMEYER KUPETZ

 6           BY: STEVEN F. WERTH, ESQ.

 7           333 South Grand Avenue, Suite 3400

 8           Los Angeles, California 90071

 9           swerth@sulmeyerlaw.com

10

11

12      For Defendant Cathay Bank:

13

14           BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LICENBERG &

15           RHOW, PC.

16           BY: ELLIOT C. HARVEY SCHATMEIER, ESQ.

17           1875 Century Park East, 23rd Floor

18           Los Angeles, California 90067-2501

19           ehs@birdmarella.com

20

21

22

23

24

25      (Continued on following page.)
```

Page 3

USAO_00020012
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 17

```
 1      REMOTE APPEARANCES (Continued):

 2

 3      For Defendants 400 South La Brea, LLC, Daryoush Dayan,

 4      Kamran Gharibian and Michael D. Smith:

 5

 6          GREENBERG GLUSKER FIELDS & CLAMAN & MACHTINGER, LLP

 7          BY: BRIAN L. DAVIDOFF, ESQ.

 8          and KEITH PATRICK BANNER, ESQ.

 9          2049 Century Park East, Suite 2600

10          Los Angeles, California 90067

11          bdavidoff@ggfirm.com

12

13

14

15

16

17

18

19

20      Also Remotely Present:

21          Nicholas Trosack, Expert

22          Neil Martin, Veritext Concierge

23          Brandon Engel

24          Jason Engel

25

                                            Page  4
```

USAO_00020013
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 18

```
 1         Q.   Okay.  So my question is somewhat generalized.    10:08

 2       Other than the exhibits that you have updated in your

 3   rebuttal report, those are the only changes to the

 4   exhibits that were attached to your original report; is

 5   that correct?                                             10:08

 6         A.   The rebuttal report, combined with the original

 7   report, has all of the exhibits with all of my changes.

 8         Q.   And those exhibits are the basis upon which you

 9   rendered your opinions in the initial report and the

10   rebuttal report; is that correct?                         10:09

11         A.   That's correct.

12         Q.   Going now back again to your initial report.

13       In Paragraph B on page 1 you say you were asked to

14   "Form and express opinions regarding net amounts, if any,

15   belonging to" the "Debtor that went to the following      10:09

16   defendants between February 19, 2013" -- I'm going to

17   paraphrase -- and April 6, 2016 and the defendants that

18   you are referring to are Ace Gallery New York Corporation,

19   Ace Gallery New York, Inc., Ace Museum, 400 South La Brea,

20   the owners of 400 South La Brea, and Cathay Bank.         10:10

21       And my question to you is: When you say that you were

22   asked to form and express opinions regarding the net

23   amounts, if any, belonging to the debtor that went to

24   those parties, how did you go about computing the net

25   amounts?                                                  10:10
```

Page 30

USAO_00020039
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 19

```
 1         A.   Well, the net amount is a net amount of cash      10:10
 2    that was transferred between the accounts.
 3         Q.   Well, that would be the gross amount, wouldn't
 4    it?
 5         A.   Well, no.  If there is a transfer one way and     10:10
 6    then a transfer back, you net the two -- excuse me.  I'm
 7    sorry.  Still a little, something froggy.
 8         Q.   So net amounts means if monies went from the
 9    debtor to one of those entities, you would net out any
10    transfers back from one of those entities to the debtor?   10:11
11         A.   Yes.
12         Q.   And would net amounts take into account any
13    expenses that those entities may have paid on behalf of
14    the debtor?
15         A.   No.  Only those that were approved by the Court.  10:11
16         Q.   When you say, "Only those that were approved by
17    the Court," only what that was approved by the Court?
18         A.   Only an expense that was approved by the Court.
19         Q.   So if an expense wasn't approved by the Court,
20    it wasn't taken into account?                              10:12
21         A.   That's correct.
22         Q.   From an economic point of view, if an expense is
23    paid on behalf of the debtor, wouldn't it result in a
24    reduction of the amount due irrespective of whether the
25    Court approved it or not?                                  10:12
```

Page 31

USAO_00020040
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 20

```
1          A.   Well, because it's supposed to be court       10:12
2     approved, it can't be paid; so you can't look at it unless
3     the Court has approved it as a payment.  So no, it
4     wouldn't.  It would not.
5          Q.   Well, the Court approval is a legal concept, is   10:12
6     it not?
7          A.   Well, the legal approval when someone is in
8     bankruptcy court is a process by which funds are
9     distributed.
10         Q.   So regardless of the financial impact, you're    10:12
11    saying that if it wasn't approved by the Court, then you
12    didn't take it into account?
13              MR. WERTH:  Objection.  Asked and answered three
14    times.
15              THE WITNESS:  That's correct.            10:13
16      BY MR. DAVIDOFF:
17         Q.   So why is it that you then took into account the
18    repayments from these third parties to the debtor to net
19    it out?  Were those repayments Court approved?
20         A.   You need to be more specific.  When you say,    10:13
21    "these repayments," what does that mean?
22         Q.   All right.  What you indicated earlier is that
23    net amounts to you -- your indication of net amounts means
24    the amount paid by the debtor to one of these third
25    parties, net of any transfers back to the debtor; is that   10:13
```

<div align="right">Page 32</div>

USAO_00020041
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 21

| | | |
|---|---|---|
| 1 | correct? | 10:13 |
| 2 | A.   Yes. | |
| 3 | Q.   Okay.  Were those transfers back to the debtor | |
| 4 | approved by the Court? | |
| 5 | A.   Not that I'm aware of -- or maybe, but not that | 10:13 |
| 6 | I'm aware of. | |
| 7 | Q.   So why would you take those into account in | |
| 8 | order to calculate the net amount? | |
| 9 | MR. WERTH:  I'm going to object as | |
| 10 | argumentative.  There are two separate things being | 10:14 |
| 11 | discussed here.  There is transfers of dollars, and then | |
| 12 | there is a discussion of expenses. | |
| 13 | BY MR. DAVIDOFF: | |
| 14 | Q.   You can still answer the question, Ms. Ziegler. | |
| 15 | A.   So when it's a cash transfer and then a cash | 10:14 |
| 16 | transfer back, I netted them.  But if it was for payment | |
| 17 | of expenses, I did not. | |
| 18 | Q.   Right, no, I appreciate that is what you did. | |
| 19 | And I'm trying to understand the distinction between | |
| 20 | if you have two expenses -- Strike that. | 10:14 |
| 21 | If you have two cash transactions, one being a | |
| 22 | payment back to the debtor and one being a payment to a | |
| 23 | third party, why do you -- what's your explanation as to | |
| 24 | why you only take into account the payment back to the | |
| 25 | debtor to determine net amounts and do not take into | 10:14 |

Page 33

USAO_00020042

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 22

| | | |
|---|---|---|
| 1 | account a payment to a third party on behalf of the | 10:14 |
| 2 | debtor? | |
| 3 | A.  Because expenses paid to third parties needs to | |
| 4 | be approved by the Court.  The transfer of cash between | |
| 5 | the entities, I netted them because I'm looking at the | 10:15 |
| 6 | whole amount going out and what came back to give them | |
| 7 | credit for what came back. | |
| 8 | Q.  So if let's say, for example, that there was an | |
| 9 | expense of $100 that one of these third parties paid that | |
| 10 | was an expense of the debtors, not Court approved, let's | 10:15 |
| 11 | just assume there was $100 that a third party paid, Ace | |
| 12 | Gallery New York paid, and that $100 was an actual expense | |
| 13 | of the debtor.  If Ace New York paid that, it relieved the | |
| 14 | debtor from that obligation, did it not, from an economic | |
| 15 | point of view? | 10:16 |
| 16 | A.  I think that's a legal conclusion that I can't | |
| 17 | draw.  I don't know if it relieved them of the obligation. | |
| 18 | Q.  Okay.  I'm not asking you, of course, to give a | |
| 19 | legal opinion because that's not what you are here for | |
| 20 | today. | 10:16 |
| 21 | I'm asking you from an accounting point of view, if a | |
| 22 | third party paid $100 of the debtor's expenses, that would | |
| 23 | relieve the debtor from that obligation to pay the $100, | |
| 24 | would it not? | |
| 25 | A.  Not necessarily. | 10:16 |

Page 34

USAO_00020043
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 23

```
1         Q.   How would it not be?                          10:16

2         A.   Because the Court might not have approved it and

3    might decide to draw it back and say, "You can't pay that

4    person.  It should have gone somewhere else."

5         Q.   And what you're describing now is the basis on   10:16

6    which you throughout your reports computed the net amount,

7    again taken into account repayments back to the debtor but

8    not payments to third parties?

9         A.   That's correct.

10        Q.   Was there at any point that you considered       10:17

11   taking into account payments to third parties that might

12   have been paid by a non-debtor party in determining the

13   net amounts?

14        (Reporter clarification.)

15        A.   I don't understand that question completely.     10:17

16   Can you break it down?

17        Q.   Sure.

18        So I'm asking you: In connection with the preparation

19   of your report and your rebuttal report, were there any

20   expenses that were paid by a third party for the benefit   10:17

21   of the debtor that you took into account in evaluating net

22   amounts?

23        A.   From, like, Mr. Wilson, is that what you are

24   talking about, a non-debtor?  I'm not sure what you are

25   asking me exactly.                                        10:18
```

                                                    Page 35

USAO_00020044
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER
CEX 24

```
 1          Q.   Okay.  So let's -- Let me be specific, and I      10:18
 2    think you said Mr. Wilson.  I don't know but --
 3          A.   Yes.
 4          Q.   Okay.  My name is Davidoff.
 5          A.   No, I said, are you talking about Mr. Wilson --   10:18
 6          Q.   Oh, excuse me.
 7          A.   -- as the third party.
 8          Q.   Well, no, I'm not.  So let me be specific.
 9          Let's talk about the debtor, and let's talk about Ace
10    Gallery New York.                                            10:18
11          And my question to you is: If Ace Gallery New York
12    made a payment to anyone else on behalf of the debtor that
13    reduced an expense that otherwise would be payable by the
14    debtor, was there at any point in the preparation of your
15    report or your rebuttal report where one of those expenses  10:19
16    might have been taken into account?
17          A.   There shouldn't have been; and if there was,
18    it's a mistake.  But no, I don't believe so.
19          Q.   So let me ask you, please, now to look at page 2
20    of your report, Number E, which is part of what you say     10:19
21    you were asked to do which is: "Quantify damages, if any,
22    Debtor incurred prior to the Petition Date
23    ('Pre-Petition') and after Petition Date through Plan
24    Agent Start Date ('Post-Petition') based on the transfer
25    of funds to others."                                        10:20
```

Page 36

USAO_00020045
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 25

```
 1          So what is it that you did in order to compute that    10:20
 2     calculation?
 3          A.   Are you talking about --
 4          (Reporter clarification.)
 5          A.   Item E as in Edward on page 2?                     10:20
 6          Q.   I am, yes.
 7          A.   Okay.  This is the analysis quantifying
 8     everything that was not repaid to the debtor.  So
 9     everything that the debtor is out money, the total amount.
10          Q.   So when you say, "everything that the debtor is    10:21
11     out money," what does that mean?
12          A.   That means all of the art sales that were
13     deposited into another account and the money did not come
14     back to the debtor.
15          Q.   So if Ace Gallery paid an artist $100, that if     10:21
16     the debtor had sold that art and -- Strike that.
17          Let me give you an assumption and let me lay a
18     foundation for it.
19          Let's assume that there is a piece of art for $1,000,
20     sold for $1,000, and let's also assume that the artist is    10:21
21     owed $500 on account of the sale of that art, okay.  If
22     the debtor sells that art, how would you account for that?
23          A.   If the debtor sold the art?
24          Q.   Yes.
25          A.   And the money was deposited into the debtor's      10:22
```

                                                        Page 37

USAO_00020046

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 26

```
 1        account?                                              10:22

 2            Q.   Yes.

 3            A.   Okay.  So it would be a sale, and then the cash

 4        received on the sale.

 5            Q.   All right.  And now, assuming that the artist is  10:22

 6        owed $500 on account of that $1,000 sale, and let's assume

 7        that the debtor actually fulfills its obligations and pays

 8        the artist, what would you do then?  How do you account

 9        for that?

10            A.   Well, you would pay it, pay the bill, and        10:22

11        decrease the cash.

12            Q.   And the net economic result to the debtor is

13        what as a result of that transaction?

14            A.   Assuming it's all approved by the Court, it

15        would be $500,000, like you said, or $500 if you use      10:22

16        $1,000.

17            Q.   Okay.  So the debtor's net profits or net

18        income, whatever you want to call it, the net result of

19        that would be $500; is that correct?

20            A.   That's correct.                                  10:23

21            Q.   All right.  So now let's assume that Ace

22        New York sells a piece of art for $1,000 and let's also

23        assume that Ace New York pays the artist $500.

24            Under that scenario and assuming that that piece of

25        art belonged to the debtor, what is the claim of the      10:23
```

Page 38

USAO_00020047

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 27

```
 1       debtor against Ace New York?                         10:23

 2           (Reporter clarification.)

 3       A.   It's $1,000.

 4       Q.   Okay.  Let's assume, then, that the debtor

 5   actually recovers $1,000 from Ace New York.  Is the debtor  10:24

 6   still obligated to pay the $500 to the artist?

 7       A.   If the Court approves it, if it applies for it,

 8   and the Court approves it, yes.

 9       Q.   So the economic result, if the Court hasn't

10   approved it, if I understand what you are saying, is that   10:24

11   the debtor would simply keep the $1,000?

12       A.   Yes, if the Court does not allow the payment,

13   yes.

14       Q.   So if the debtor had sold the art, it would only

15   get net $500; is that correct?  But if Ace New York had     10:24

16   sold the art, but it wasn't Court approved, the debtor

17   would get $1,000 assuming it recovers the money from Ace

18   New York?

19           MR. WERTH:  Objection.  Misstates prior

20   testimony.                                            10:24

21           THE WITNESS:  I said in both instances the Court

22   has to approve the payment of the expense art.  So if the

23   Court approves the payment of $500, then the net would be

24   $500 in both situations if the Court approved it.

25       BY MR. DAVIDOFF:                                  10:25
```

Page 39

USAO_00020048

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 28

```
 1        Q.   So if I understand your testimony, then, that     10:25
 2    the economic result to the debtor of the damages is a
 3    function of whether or not the Court approves Ace
 4    New York's payment of those expenses of that $500; is that
 5    correct?                                                   10:25
 6        A.   No.  It's whether the Court approves the
 7    debtor's payment of the $500.
 8        Q.   All right.  We have to go back so I make sure
 9    we're on the same page.
10        If -- Are you familiar, Ms. Ziegler, with the legal    10:25
11    concept that if transactions are in the ordinary course of
12    business, that they don't require Court approval, are you
13    familiar with that generally?
14        A.   Yes.
15        Q.   Is it your testimony, again going back to this    10:26
16    $1,000 example, that if the debtor sold their piece of art
17    in the ordinary course of business, that it's your
18    understanding that it would need Court approval to pay the
19    $500 to the artist?
20            MR. WERTH:  Objection.  Calls for legal            10:26
21    conclusion.
22      BY MR. DAVIDOFF:
23        Q.   I'm not asking for -- Just to clarify, I'm not
24    asking you for a legal opinion.  I'm asking you for your
25    understanding so that you can formulate an answer to my    10:26
```

Page 40

USAO_00020049
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 29

```
 1      question.                                          10:26

 2           A.   My understanding is that all payments for

 3      artist's expenses are disclosed to the Court.  If Ace

 4      New York is selling the art and paying expense, the Court

 5      doesn't have the opportunity to review those expenses and   10:27

 6      opine that they are fine to be paid.

 7           Q.   My question was a little different.  I was

 8      focusing really on the sale by the debtor.

 9           And my question is: What is your understanding if the

10      debtor sold this piece of art for $1,000, is it your        10:27

11      understanding that the debtor would need Court approval to

12      pay the artist?

13           A.   Ultimately at the end of the day, my

14      understanding is the payments would still be made in the

15      normal course of business, but they'd be submitted to the   10:27

16      Court and reviewed; and if the Court did not agree with

17      something, the Court could say, "No, you can't pay -- You

18      shouldn't have paid that or you can't pay that."

19           Q.   Let me ask you, please, to turn to your report,

20      Exhibit A of your report, which is the summary of your      10:28

21      background.  Let me know when you have that, please.

22           A.   I have it.

23           Q.   Okay.  In the third paragraph you say that you

24      are -- you're a Court-appointed accounting neutral trustee

25      and executor.                                               10:29
```

Page 41

USAO_00020050

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 30

```
 1      owned by the debtor?                                    11:38

 2          A.   That's correct.

 3          Q.   Okay.  Let me ask you, please, to take a look at

 4      Mr. Engel's report and to please take a look at Exhibit L.

 5          A.   Is that his rebuttal report or his report?     11:38

 6          Q.   Excuse me?

 7          A.   Mr. Engel's rebuttal report or his report?

 8          Q.   His rebuttal report, yes.

 9               VERITEXT CONCIERGE:  For the record, that's

10      marked as Exhibit 5.                                    11:39

11               THE WITNESS:  You said Exhibit L as in Larry?

12        BY MR. DAVIDOFF:

13          Q.   That's correct.

14          A.   Oh, yes.  Okay.  I'm here.

15          Q.   If you wouldn't mind, you can close the screen  11:39

16      share, please.

17          All right.  And I'm going to ask you, please, to

18      focus on the middle of the page where the heading is,

19      "Direct Expenses Debtor Would have Incurred."

20          Do you see that heading?                            11:40

21          A.   Not considered by Ziegler?

22          Q.   Yes.

23          A.   Yes.

24          Q.   Okay.  So the first one it says, "Less Ace

25      New York payments to artist per general ledger schedule  11:40
```

Page 71

USAO_00020080

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 31

```
1      N-1," and if we go to the total column it has 3 million --   11:40

2           (Reporter clarification.)

3      Q.   3,259,588.

4           And my question here, Ms. Ziegler, is: Is it correct

5      to say that you did not address any payments made by Ace      11:41

6      New York to artists because any such payments were not

7      approved by the Court?

8      A.    That's true.  And then also some of the payments

9      that Mr. Engel has in here, he used a general ledger,

10     there are payments that didn't even clear the bank.           11:41

11     Q.    But that -- Whether or not they cleared the

12     bank, for the purposes of your report, they wouldn't be

13     relevant because they were not approved by the Court;

14     correct?

15     A.    Well, it will be relevant when we're in trial          11:41

16     because if he's presenting a number that he says was paid,

17     and it's not paid, I'm going to be responding to that.

18     Q.    Okay.  Fair enough.

19          So let's for the moment assume that every one of

20     these payments actually did clear the bank account, the      11:42

21     $3,259,588 of payments were made by Ace New York to

22     artists that the Plan Agent alleged had contracts with the

23     debtor.  Let's assume that for a fact.  Okay.

24          What impact, if any, do you believe that that has on

25     the debtor's claim against Ace New York?                     11:42
```

Page 72

USAO_00020081

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 32

```
 1                MR. WERTH:  Objection.  Asked and answered.      11:43

 2                THE WITNESS:  So if there -- First of all, if

 3      they weren't paid, if it's not something that was actually

 4      paid, I would not include that.  And then if it wasn't

 5      approved by the Court, and it was paid, I'd let the Court    11:43

 6      decide if that's something that they are willing to pay.

 7      I'm not making that decision.

 8        BY MR. DAVIDOFF:

 9        Q.   I'm not asking you about what the Court should

10      or shouldn't do.                                            11:43

11        What I'm asking you is: From an economic point of

12      view, in calculating your claim against Ace New York, what

13      impact, if any, does -- I'm going to ask you to make the

14      assumption that all $3,299,588 was paid to artists?

15        A.   I didn't include that, so there is no impact         11:43

16      because I didn't include it in my analysis.

17        Q.   From an economic point of view, shouldn't you

18      have included it in your analysis for a damage

19      calculation?

20                MR. WERTH:  Objection.  Asked and answered.      11:44

21                THE WITNESS:  Not if it wasn't approved by the

22      Court.

23        BY MR. DAVIDOFF:

24        Q.   Let's look at the payments in the middle of the

25      page to Andrea Nasher for Ellsworth Kelly.                  11:44
```

<div align="right">Page 73</div>

USAO_00020082
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 33

```
1           And as you can see, Mr. Engel references schedule    11:44

2      N-3.  If you can turn to schedule N-3, please.

3               MR. WERTH:  This is a 192-page document.  If

4      it's possible to identify which of the 192 pages, that

5      would be helpful, I believe.                         11:45

6               MR. DAVIDOFF:  Sure.  It's page 52.  I believe

7      it's actually a 108-page document, at least according to

8      the Bates stamp, but it's page 52 of 108.

9               THE WITNESS:  "N" as in Nancy?

10       BY MR. DAVIDOFF:                                    11:45

11         Q.   "N" as in Nancy.  N-3.  And again, page 52 of

12      108.

13         A.   N-3.  Okay.

14         Okay.  I'm there.

15         Q.   All right.  So looking at this document, this is  11:46

16      Mr. Engel's analysis of the Ellsworth Kelly sale, and let

17      me just go through it with you.

18         Do you agree that on or about October 5, 2015, that

19      there was a sale by Ace New York of this Ellsworth Kelly

20      piece of art for $4,800,000?                          11:46

21         A.   Yes.

22         Q.   Okay.  When you were doing your computation, did

23      you look at whether or not under the contract the artist

24      was owed any money on account of that sale?

25         A.   I believe so, yes.                           11:47
```

                                                Page 74

USAO_00020083

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 34

```
1              Q.   And do you remember what you found?          11:47

2              A.   I don't recall specifically; but vaguely, I

3    believe the artist was owed a significant amount of money.

4              Q.   Okay.  According to Mr. Engel, Andrea Nasher was

5    paid $3,840,000.                                            11:47

6              Did you look at that in connection with the

7    preparation of your report?

8              A.   I did look at all the bank statements; so if

9    it's in the bank statement, yes, I looked at it.

10             Q.   To your understanding, is Mr. Engel's         11:47

11   calculation or Mr. Engel's statement that $3,840,000 was

12   paid to Ms. Nasher, Andrea Nasher, in connection with the

13   Ellsworth Kelly sale a correct statement?

14             A.   I believe that that was paid out of Ace

15   New York, yes.                                              11:48

16             Q.   Did you not consider it relevant to take into

17   account the fact that that amount was paid to Ms. Nasher

18   in connection with the Ellsworth Kelly sale?

19             MR. WERTH:  Objection.  At this point, it's

20   becoming argumentative.                                     11:48

21             THE WITNESS:  I did look at it, but it was not

22   approved by the Court, so I did not include it.

23   BY MR. DAVIDOFF:

24             Q.   Is there a place in the report that I could find

25   where you disclosed that you did not identify any amounts  11:49
```

                                                        Page 75

USAO_00020084
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 35

```
 1        that had been paid to artists?                    11:49

 2            A.   I don't understand your question.

 3            Q.   I'm asking: You have indicated that you did not

 4        take into account, for the purposes of your calculations,

 5        any amounts that were paid by Ace New York to the artist    11:49

 6        because it wasn't approved by the Court; correct?

 7            A.   Yes.

 8            Q.   Okay.  And I'm asking you whether there is any

 9        statement in your report that identifies that you have

10        excluded any amounts paid to artists.                11:49

11            A.   Well, it's implicit in my work that I did, and

12        Engel comments on it, so it was known that I didn't

13        include it based on my report.  I don't know that there is

14        a statement exactly of what you're asking, but it's

15        implicit in my report.                              11:50

16            Q.   How -- How -- When you say it's implicit, where

17        would one draw that information from if it's not in your

18        report?

19                 MR. WERTH:  I'm objecting to this.  You are

20        asking about words in a document which may or may not    11:50

21        exist.  To the extent they exist, you can point the

22        witness to those documents.  To the extent they do not

23        exist, your question is where in this document do those

24        words not occur, and that's not a proper question.

25                 MR. DAVIDOFF:  Mr. Werth, I only disagree.  I'm    11:50
```

Page 76

USAO_00020085

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

CEX 36

# EXHIBIT C

**Art & Architecture Books of the 21st Century**

**v.**

**Ace Gallery New York Corporation et al**

**September 1, 2021**

**Rebuttal Expert Report of Jason A. Engel,**
**CPA, CFE, CIRA, CVA, MAFF, ABV**

E N G E L  &  E N G E L ,  L L P
CERTIFIED PUBLIC ACCOUNTANTS

2029 Century Park East, Suite 1020, Los Angeles, CA  90067
Telephone (310) 277-2220  Facsimilie (310) 277-2212

CEX 38



2029 Century Park East, Suite 1020, Los Angeles, California 90067
Telephone (310) 277-2220  Facsimile (310) 277-2212

<div style="border: 1px solid">

### REBUTTAL EXPERT REPORT OF
### JASON A. ENGEL, CPA, CFE, CVA, CIRA, MAFF, ABV
### SEPTEMBER 1, 2021

### SAM LESLIE, PLAN AGENT FOR ART & ARCHITECTURE BOOKS OF THE 21ST CENTURY
### PLAINTIFF

### V.

### ACE GALLERY NEW YORK CORPORATION ET AL
### DEFENDANTS

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION
### CASE NO.: 2:13-BK-14135-RK

</div>

The purpose of this rebuttal report is to disclose to the parties and the United States Bankruptcy Court for the Central District of California, Los Angeles Division, the rebuttal expert opinions of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV in accordance with Rule 26 (a) (2) (B) of the Federal Rules of Civil Procedure.

I, Jason A. Engel, am a partner of Engel & Engel, LLP, Certified Public Accountants, 2029 Century Park East, Suite 1020, Los Angeles, California 90067 ("E&E").  On or about January 7, 2020, E&E was retained by Greenberg Glusker, LLP, counsel for 400 S. La Brea ("La Brea") to conduct a forensic investigation and tracing of transactions between Debtor Art & Architecture Books of the 21st Century ("the Debtor"); Ace Museum, a California non-profit corporation ("Ace Museum"); Ace Gallery New York, Corporation, a California Corporation ("Ace New York"); and La Brea in connection with the claims of Sam Leslie (the "Plan Agent"), of the Debtor, that certain lease payments made to La Brea constitute avoidable transfers.

CEX 39

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 2

On October 30, 2020, E&E issued the Expert Report of Jason A. Engel. Also, on October 30, 2020, Jennifer Ziegler ("Ziegler") issued her Expert Report ("Ziegler Expert Report") on behalf of the Plan Agent. This rebuttal report is to disclose E&E's rebuttal findings and opinions with respect to the Ziegler October 30, 2020.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 3

## Table of Contents

FORENSIC EXPERT QUALIFICATIONS ......................................................................................... 7

BANKRUPTCY EXPERT QUALIFICATIONS .................................................................................. 7

AUTHORED RESEARCH PUBLICATIONS ................................................................................... 8

RECORDS AND OTHER INFORMATION CONSIDERED ............................................................... 9

PRE-PETITION PERIOD ............................................................................................................ 9

I.    OVERALL ANALYSIS OF ZIEGLER'S PRE-PETITION FINDINGS AND OPINIONS ...................... 9

II.   DETAIL ANALYSIS OF ZIEGLER'S PRE-PETITION FINDINGS AND OPINIONS ...................... 11

A. ZIEGLER'S SOLVENCY ANALYSIS IS MATERIALLY DEFICIENT AND MISLEADING SINCE SHE DID NOT
CONDUCT A PROPER INVESTIGATION OF THE DEBTORS' SOLVENCY .................................. 11

1. THE APPROPRIATE STANDARDS ................................................................... 11

2. ZIEGLER DID NOT CONSIDER OR ADDRESS THE GOING CONCERN STATUS OF THE DEBTOR ....... 12

3. ZIEGLER SHOULD HAVE CONDUCTED A BALANCE SHEET TEST BASED ON THE FAIR VALUE OF THE
DEBTOR'S ASSETS ............................................................................... 13

4. ZIEGLER'S SOLVENCY ANALYSIS DID NOT CONSIDER OR ADDRESS THE FAIR VALUE OF THE
DEBTOR'S ASSETS ............................................................................... 14

5. ZIEGLER'S SOLVENCY ANALYSIS IS DEFICIENT SINCE SHE DID NOT CONSIDER OR ADDRESS THE
DEBTOR'S WORKING CAPITAL ................................................................. 14

6. ZIEGLER'S SOLVENCY ANALYSIS IS MATERIALLY DEFICIENT SINCE SHE DID NOT CONSIDER THE
DEBTOR'S INVESTMENT IN THE BEVERLY HILLS LEASE PURCHASE OPTION, WHICH HAD
SIGNIFICANT AND SUBSTANTIAL VALUE ....................................................... 15

7. ZIEGLER'S SOLVENCY ANALYSIS IS DEFICIENT SINCE SHE DID NOT CONSIDER THE DEBTOR'S
INVESTMENT IN THE MID-WILSHIRE LEASE PURCHASE OPTION ............................... 16

B. ZIEGLER'S SOLVENCY ANALYSIS IS MATERIALLY DEFICIENT AS IT IS SOLELY LIMITED TO FOUR
FINANCIAL RATIOS ................................................................................ 17

1. A RATIO ANALYSIS ON ITS OWN IS INSUFFICIENT AND IMPROPER TO EVALUATE A DEBTOR'S
ABILITY TO PAY ITS DEBTS AS THEY BECOME DUE .......................................... 18

A. ZIEGLER'S SOLVENCY ANALYSIS IS MATERIALLY DEFICIENT, SINCE SHE DID NOT CONDUCT AN
ANALYSIS AND IDENTIFICATION OF SPECIFIC VENDOR(S) OR LENDER(S) FOR WHICH THE
DEBTOR WAS UNABLE TO PAY AND MEET ITS OBLIGATION ................................. 19

B. ZIEGLER'S SOLVENCY ANALYSIS IS MATERIALLY DEFICIENT, SINCE SHE DID NOT CONDUCT AN
ANALYSIS OF THE NUMBER OF UNPAID DEBTS AS COMPARED TO THE NUMBER OF PAID DEBTS
AND RELATED MATERIALITY OF THE UNPAID DEBTS ......................................... 19

C. ZIEGLER'S SOLVENCY ANALYSIS IS DEFICIENT SINCE SHE DID NOT CONSIDER THE NATURE OF
THE DEBTOR'S BUSINESS ....................................................................... 19

C. ZIEGLER'S FINANCIAL RATIO ANALYSIS IS ERRONEOUS AND MISLEADING ......................... 21

1. ZIEGLER'S RATIO ANALYSIS DID NOT CONSIDER THE FAIR VALUATION OF THE DEBTOR'S ASSETS
.................................................................................................... 21

2. ZIEGLER'S RATIO ANALYSIS IS DEFICIENT SINCE ZIEGLER DID NOT COMPARE HER FINDINGS TO
THE INDUSTRY ................................................................................... 22

Expert Report of Jason A. Engel, CPA, CFE, CVA, CRFA, MAFF, ABV
September 1, 2021
Page 4

D. ZIEGLER'S PRE-PETITION FRAUDULENT TRANSFER ANALYSIS IS ERRONEOUS AND MISLEADING SINCE SHE DID NOT CONSIDER WHETHER THE DEBTOR RECEIVED REASONABLE EQUIVALENT VALUE 22

E. ZIEGLER'S SOLVENCY ANALYSIS IS ERRONEOUS AND MISLEADING SINCE SHE DID NOT PROPERLY CONSIDER FINANCIAL INFORMATION IN HER POSSESSION ................................................................. 23

F. HAD ZIEGLER CONDUCTED A PROPER SOLVENCY INVESTIGATION AND ANALYSIS, SHE WOULD HAVE FOUND THAT THE DEBTOR WAS SOLVENT AND ABLE TO PAY ITS DEBTS AS THEY BECAME DUE 24

III.    SUMMARY OF POST-PETITION REBUTTAL OPINIONS AND FINDINGS OF JASON A. ENGEL ............. 25

A. SUMMARY OF ZIEGLER'S POST PETITION OPINIONS ......................................................... 25

B. ZIEGLER'S DAMAGE ANALYSIS IS ERRONEOUS AND MISLEADING SINCE THE DEBTOR DID NOT SUFFER ANY ECONOMIC DAMAGES .................................................................................. 26

C. ZIEGLER FAILED TO CONSIDER THE BUSINESS RELATIONSHIP BETWEEN THE DEBTOR AND ACE MUSEUM ................................................................................................................ 31

D. ZIEGLER DID NOT PERFORM A PROPER TRACING OF ALLEGED FRAUDULENT FUNDS ..................... 32

E. ZIEGLER IMPROPERLY AND WITHOUT BASIS CONCLUDES THAT 100% OF ACE NEW YORK SALES BELONGED TO THE DEBTOR AND OPINES AS TO THE OWNERSHIP OF SUCH ASSETS ......................... 33

F. ZIEGLER MISCHARACTERIZED ACE NEW YORK'S RELATIONSHIP WITH THE DEBTOR ....................... 35

IV.    DETAIL ANALYSIS OF ZIEGLER'S POST-PETITION FINDINGS AND OPINIONS ..................................... 36

1. SUMMARY OF ZIEGLER'S POST PETITION OPINIONS ....................................................... 36

A. ZEIGLER'S FINDING #1: ZIEGLER INDEPENDENTLY DETERMINED THAT 100% OF ACE NEW YORK ART SALES TOTALING $14,359,941 WERE THE DEBTOR'S SALES. .................................................. 36

B. ZEIGLER'S FINDING #2: AS A RESULT OF ACE NEW YORK'S DIVERSION OF THE DEBTOR'S SALES, DEBTOR INCURRED ECONOMIC DAMAGES OF $12,809,091. .......................................................... 36

C. ZEIGLER'S FINDING #3: LA BREA RECEIVED $5,766,762 OF THE DEBTOR'S FUNDS FROM ACE NEW YORK. (SCHEDULE K) ...................................................................................................... 36

D. ZEIGLER'S FINDING #4: SINCE THE DEBTOR INCURRED DAMAGES OF $12,809,192 AND LA BREA RECEIVED $5,766,762 OF THE DEBTOR'S FUNDS, THE DEBTOR CAN RECOVER DAMAGES FROM LA BREA OF $5,766,762. (SEE SCHEDULE K). ........................................................................... 37

2. ZIEGLER'S POST-PETITION DAMAGE ANALYSIS IS ERRONEOUS AND MISLEADING SINCE THE DEBTOR DID NOT SUFFER ANY ECONOMIC DAMAGES ........................................................................ 37

3. ZIEGLER'S DAMAGE ANALYSIS IS ERRONEOUS AND MISLEADING AS SHE SYSTEMATICALLY DID NOT CONSIDER AND OMITTED ECONOMIC AND FINANCIAL BENEFITS THAT THE DEBTOR RECEIVED FROM ACE NEW YORK ............................................................................................................ 39

A. ZIEGLER OMITTED $7,459,057 OF DIRECT EXPENSES INCURRED BY ACE NEW YORK ................. 39

B. ZIEGLER OMITTED OTHER EXPENSES OF $374,381 PAID BY ACE NEW YORK AND ACE MUSEUM ................................................................................................................... 40

C. ZIEGLER IMPROPERLY INCLUDED AS DAMAGES $3,042,240 OF THE DIP LOAN AND OTHER BORROWINGS ................................................................................................... 41

I. ZIEGLER EXCLUDES $1,143,914 OF ACE NEW YORK PAYMENTS TO THE DEBTOR'S CREDITORS IN ACCORDANCE WITH THE COURT APPROVED DIP LOAN ....................................................... 41

D. ZIEGLER IMPROPERLY INCLUDED BORROWINGS FROM ERIC WILSON ....................................... 43

E. ZIEGLER'S DAMAGES CALCULATION DID NOT CONSIDER THAT ACE NEW YORK PROVIDED ECONOMIC BENEFIT TO THE DEBTOR AS A BROKER FOR THE DEBTOR ......................................... 46

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 5

F. ZIEGLER'S DAMAGE ANALYSIS DID NOT CONSIDER THAT THE DEBTOR BENEFITED FROM PRESERVING THE ACE MUSEUM LEASE PURCHASE OPTION ........................................................ 47

G. ZIEGLER DID NOT ADDRESS OTHER ECONOMIC SUPPORT PROVIDED BY ACE MUSEUM TO THE DEBTOR ........................................................................................................................................ 51

    1. ACE NEW YORK TRANSFERRED ALL OF ITS PROFITS TO THE DEBTOR ................................... 51

    2. ACE NEW YORK TRANSFERRED 100% OF DIP LOAN TO THE DEBTOR .................................... 51

    3. ACE NEW YORK TRANSFERRED $793,626 OF OTHER BORROWINGS TO THE DEBTOR ........... 52

    4. ACE NEW YORK PAID $7.8 MILLION OF EXPENSES RELATING TO ALLEGED SALES OF THE DEBTOR'S ART .............................................................................................................................. 52

H. ZIEGLER DID NOT PERFORM A PROPER TRACING OF ALLEGED FRAUDULENT FUNDS ............... 52

I. ZIEGLER IMPROPERLY AND WITHOUT BASIS CONCLUDES THAT 100% OF ACE NEW YORK SALES BELONGED TO THE DEBTOR AND OPINES AS TO THE OWNERSHIP OF SUCH ASSETS ................... 54

    1. ANALYSIS OF ZIEGLER'S OWNERSHIP OPINION ...................................................................... 54

    2. ZIEGLER'S FAILED TO CONDUCT AN ADEQUATE FORENSIC INVESTIGATION ......................... 55

    3. ZIEGLER IMPROPERLY MAKES A LEGAL CONCLUSION ............................................................ 55

    4. ACE NEW YORK'S LACK OF ASSETS AND CAPITAL IS NOT CONCLUSIVE .................................. 56

    5. LACK OF ACE NEW YORK'S ARTIST CONTRACTS OR CONSIGNMENT CONTRACTS ................. 56

    6. ZIEGLER'S TEST SAMPLE OF THREE TRANSACTIONS IS INADEQUATE .................................... 57

        A. ZIEGLER'S THREE TEST SAMPLES ARE TOO SMALL TO DRAW ANY CONCLUSIONS ......... 57

        B. ZIEGLER'S SAMPLE TEST IS IMPROPER FOR THE ANALYSIS OF DIVERSION OF THE DEBTOR'S SALES .............................................................................................................................. 57

        C. ZIEGLER'S ANALYSIS OF THE RESULTS OF HER TEST SAMPLES ARE ERRONEOUS ............ 58

            I. LAURIE LIPTON'S CONSIGNMENT CONTRACT ............................................................. 58

            II. LAURIE LIPTON CONSIGNMENT CONTRACT DURING THE FEBRUARY 13, 2015 ART SALE FOR INVOICE #1792 IN THE AMOUNT OF $35,970 ................................................. 59

            III.JULY 30, 2013 ART SALE FOR INVOICE #2022 FOR CHARLES FINES AND BERNAR VENET ART PIECES IN THE AMOUNT OF $172,000 ..................................................................... 59

                A. CONSIGNMENT CONTRACT WITH CHARLES FINE .................................................. 59

    7. ZIEGLER'S RELIANCE ON THE OCTOBER 19, 2017 DECLARATION OF TIMOTHY KINCAID ("DECLARATION OF KINCAID") ........................................................................................................ 60

        A. KINCAID'S FINDING THAT DIP LOAN PROCEEDS WERE NOT DEPOSITED INTO THE DEBTOR'S BANK ACCOUNT .......................................................................................................... 61

        B. ZIEGLER CONCLUDES THAT KINCAID'S FINDINGS ARE NOT RELIABLE SINCE IT DOES NOT INCLUDE NEW AND ADDITIONAL INFORMATION THAT ZIEGLER CONSIDERED ................... 61

         C. ZIEGLER CONCLUDES THAT SHE RELIED ON KINCAID'S ANALYSIS ................................... 62

        D. ZIEGLER SUGGESTS THAT SHE REVIEWED AND VERIFIED THE KINCAID ANALYSIS AND BACK UP DOCUMENTATION .......................................................................................................... 62

    8. OTHER FINDINGS THAT CONTRADICT ZIEGLER'S CONCLUSION THAT 100% OF ACE NEW YORK SALES WERE THE DEBTOR'S SALES ........................................................................................ 62

        A. ACE NEW YORK SALES WITHOUT ANY CONTRACTS APPROXIMATED $6.7 MILLION ....... 63

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 6

**I. ZIEGLER IMPROPERLY CONCLUDED THAT THE PROCEEDS OF $4.8 MILLION FOR THE SALE OF ELLSWORTH KELLY ARTWORK WERE THE DEBTOR'S SALES** ............................... 63

**II. ZIEGLER DID NOT CONSIDER OR ADDRESS THAT $75,960 OF ACE NEW YORK SALES THAT DID NOT HAVE ANY ARTIST CONTRACTS** ............................................................... 64

**III. ZIEGLER DID NOT CONSIDER OR ADDRESS THAT $680,061 OF ACE NEW YORK SALES DID NOT HAVE SIGNED CONTRACTS OR A SIGNED CONSIGNMENT AGREEMENT WITH THE DEBTOR** .................................................................................................................. 65

**IV. ZIEGLER DID NOT CONSIDER OR ADDRESS $409,208 OF ACE NEW YORK SALES FOR WHICH THE ARTIST WAS UNIDENTIFIED** ......................................................... 65

**V. ZIEGLER DID NOT CONSIDER OR ADDRESS $710,374 OF ACE NEW YORK SALES FOR WHICH SALES OF ART OCCURRED PRIOR TO A SIGNED CONTRACT** . 65

**B. ZIEGLER ERRONEOUSLY CONCLUDED THAT CONSIGNMENT CONTRACT SALES OF LAURIE LIPTON AND MARY CORSE (ARTISTS) RELATED TO THE DEBTOR** .......................... 66

**C. $10.7 MILLION OF SALES INVOICES WERE ON ACE NEW YORK LETTERHEAD** .................. 66

CEX 44

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 7

## FORENSIC EXPERT QUALIFICATIONS

I am a Certified Public Accountant and have been licensed as such in the State of California since 1982. In addition, I am a Certified Fraud Examiner (CFE), a Certified Insolvency and Restructuring Advisor (CIRA), a Certified Valuation Analyst (CVA), a Master Analyst in Financial Forensics (MAFF), and Accredited in Business Valuation (ABV). I have been engaged in public accounting since 1979 and my public accounting experience includes auditing, taxation, management consulting, SEC registration, and SEC reporting for public companies. I have approximately thirty-five years of forensic accounting experience, including a senior manager position with the Litigation Services practice at two of the "Big Four" (formerly Big Eight) accounting firms in the United States. I have testified as an expert witness in over 100 matters and have served as an expert witness in over 500 matters involving economic damages, business valuation, fraud, and bankruptcy. I am a member of the American Institute of Certified Public Accountants, California Society of Certified Public Accountants, National Association of Certified Fraud Examiners, Association of Insolvency and Restructuring Advisors, and National Association of Certified Valuation Analysts.

Attached hereto as **Exhibit 1** is a detailed summary of my professional qualifications and E&E's schedule of standard hourly rates. Also attached hereto as **Exhibit 2** is a listing of cases for which I have testified as an expert witness in the last five years either in trial, deposition, or both.

## BANKRUPTCY EXPERT QUALIFICATIONS

I am a Certified Insolvency Restructuring Advisor (CIRA) and was credentialed in 1996. I have served as the accountant for the Debtor, Creditors Committee, Trustee, creditors, and the Bankruptcy Court. I have testified in Bankruptcy Court, State Court, and Federal Court on a variety of bankruptcy issues including reasonable equivalent value, balance sheet solvency, inability to pay debts as they become due, undercapitalization, fraud, and tracing of fraudulent funds. My bankruptcy experience also includes preference analysis, liquidation analysis, analysis of adequate protection, preparation and analysis of reorganization plans, preparation and analysis of Interim Statements and Operating Reports, financial projections, business valuations, crisis management and fraud investigations of insiders and officers. I have authored four E&E research publications on the topics of reasonable equivalent value, solvency, inability to pay debts as they become due, and undercapitalization.

CEX 45

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 8

## **AUTHORED RESEARCH PUBLICATIONS**

I have authored 20 E&E research publications on a variety of forensic accounting topics.
The following is a listing of the publications I have authored:

1. Deposition Outline for Officers and Executives

2. Document Request for Accounting and Business Records

3. Fraudulent Transfers: The Element of Reasonably Equivalent Value

4. Fraudulent Transfers: The Element of Insolvency

5. Fraudulent Transfers: The Element of Unreasonably Small Capital

6. Fraudulent Transfers: The Element of Inability to Pay Debts as They Mature

7. Framework for the Calculation of Lost Profits Part I: Financial Principles as a
   Framework for the Calculation of Lost Profits

8. Framework for the Calculation of Lost Profits Part II: The Element of Certainty

9. Framework for the Calculation of Lost Profits Part III: Prospective Lost Profits

10. Framework for the Calculation of Lost Profits Part IV: Unestablished Businesses

11. Framework for the Calculation of Lost Profits Part V: Mitigation of Damages

12. Discounting Future Lost Profits

13. The Business Records Exception to the Hearsay Rule: The Admissibility of
    Financial Records in Federal and State Courts

14. Admissibility of Expert Testimony:  The Element of Reliability

15. Framework for the Calculation of Infringement Damages Part I: Trademark
    Infringement Damages Under the Lanham Act

16. Framework for the Calculation of Infringement Damages Part II: Patent
    Infringement Damages

17. Investigation and Discovery of Alter Ego Factors

18. Alter Ego: The Element of Undercapitalization

19. Framework for the Calculation of Employment Damages

20. Business Valuation Under California Corporate Code Section 2000.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 9

## Records and Other Information Considered

As the lead accountant for E&E and as an expert witness in this case, I and E&E professional staff, under my direction and supervision, have reviewed and analyzed various documents and records. Attached hereto as Exhibit 3 is a listing of various documents we reviewed and considered in connection with this report.

## Pre-Petition Period

This rebuttal report has been prepared in accordance and consistent with the court's May 5, 2021 Memorandum Decision on Motion to Amend ("Court's Decision"), which limited the pre-petition reach-back period applicable to the Plan Agent's avoidance claims to a four-year statute of limitations. Accordingly, the following reflects our rebuttal of Ziegler's Pre-Petition analysis and findings, as effectively modified by the Court's Decision, for the period February 19, 2009 through the Petition Date of February 19, 2013. (the "Pre-Petition Period")[1]

## I.    Overall Analysis of Ziegler's Pre-Petition Findings and Opinions

Ziegler's ultimate conclusion for the Pre-Petition Period is that payments of $1,321,619 were transferred from the Debtor to La Brea while the Debtor was insolvent (**See Schedule AA**).

Overall, I have found that Ziegler's conclusion as to the Debtor's solvency is erroneous and without basis, since she omitted the most basic and fundamental financial analyses that are an essential to a proper solvency analysis. Ziegler's solvency analysis did not include or consider the following:

---

[1] Ziegler's October 30, 2020 Expert Report covers the Pre-Petition Period of July 24, 2006 through Petition Date. Accordingly, we adjusted Ziegler's Pre-Petition analysis to exclude the Pre-Petition period July 24, 2006 through February 19, 2009 in accordance with the Court's Decision.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 10

- The going concern status of the Debtor

- A balance sheet solvency test

- The fair value of the Debtor's assets

- The Debtor's capital

- The Debtor's working capital

- Nature of the Debtor's business

- The Debtor's most significant asset (for which the estate realized a profit of $20 million)

We have also found that the solvency analysis that Ziegler did conduct is erroneous and not determinative of the Debtor's solvency. It is important to highlight that Ziegler's entire solvency analysis is limited to her investigation of four financial ratios, which Ziegler erroneously relied on to conclude that the Debtor was insolvent due to its inability to pay its debts as they became due.

Ziegler's methodology of solely employing four financial ratios as the only basis for determining the Debtor's solvency is materially deficient and erroneous. I have found that Ziegler did not conduct a proper analysis of the Debtor's ability to pay its debts as they became due, since she did not consider or analyze specific debts that the Debtor allegedly was unable to pay, the Debtor's working capital position or the Debtors capital and ability to borrow funds.

We have also found that the ratio analysis that Ziegler did conduct is erroneous, because it completely omits the fair value of the Debtor's assets (including the value of the lease purchase options) and their impact on the very financial statements from which Ziegler calculates her ratios.[2]

---

[2] It is important to note that the fair value of the Debtor's assets and the profits that the Debtor generated during the Pre-Petition Period were material and significant. Without such consideration of material assets, profits, and capital, Ziegler's ratio analysis is invalid and improper.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 11

Ziegler's analysis is materially flawed because it is devoid of any analysis or consideration of the Beverly Hills lease purchase option. In this regard, the Beverly Hills lease purchase option was appraised for $16,347,562 as of February 2013 and $14,517,743 as of February 2012. Ultimately, the Debtor exercised the lease purchase option in 2015 which generated approximately $20 million in profits to the Debtor.[3]

In my opinion, had Ziegler conducted a proper solvency analysis, she would have found that the Debtor was a going concern, solvent, had assets in excess of its liabilities, was able to pay its debts as they became due, had a positive working capital position, had sufficient capital, and received value from its payments in connection with the Ace Museum lease purchase option.

Ziegler's failure to acknowledge or incorporate such material assets and profits into her analysis renders her analysis invalid and not applicable for a solvency analysis.

## II.    Detail Analysis of Ziegler's Pre-Petition Findings and Opinions

### A.    Ziegler's Solvency Analysis is Materially Deficient and Misleading Since She Did Not Conduct a Proper Investigation of the Debtors' Solvency

Ziegler's solvency analysis is materially deficient since it is devoid of any substantive analysis, discussions, or consideration of the following:

1. The Appropriate Standards

---

[3] The $20 million of profits from the lease purchase option was material as to the Debtor's assets and liabilities. Based on the April 4, 2013 amended disclosure schedules of the Debtor, the reported assets of the Debtor approximated $12.1 million (without consideration of the Beverly Hills lease purchase option) and the reported liabilities approximated $22.3 million.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 12

The Bankruptcy Code defines insolvency, for a corporation, as a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation . . . .' 11 U.S.C. § 101(32).

In conducting a fair valuation of the Debtor's assets, it is critical to first analyze and evaluate if the Debtor was a going concern or on its "financial deathbed". If the Debtor was a going concern, then the assets would be valued at their fair market price as if they had been sold as a unit, in a prudent manner, and within a reasonable time. If the company was on its deathbed, then the assets may be valued on a liquidation basis.

2.  <u>Ziegler Did Not Consider or Address the Going Concern Status of the Debtor</u>

Ziegler did not address the going concern status of the Debtor. In this regard, we have identified the following as relevant to the analysis of the Debtor's status of a going concern:

i.  During the Pre-Petition Period, the Debtor continued to operate, generate revenues, and pay its expenses including employee salaries, commissions, and lease obligations.

ii.  During the Pre-Petition Period, the Debtor had a positive working capital, except for 2011 **(See Schedule H)**.

iii.  During the Pre-Petition Period, the Debtor's assets, including the value of its Beverly Hills lease purchase option, were substantially greater than its liabilities (Balance Sheet Test) **(See Schedule B)**.

iv.  During the Pre-Petition Period, the Debtor generated profits including the appreciation of its lease purchase option approximating $16.7 million **(See Schedule A-1)**.

CEX 50

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 13

The above financial performance clearly indicates that the Debtor was a going concern. Accordingly, if Ziegler had conducted a proper solvency analysis, she would have found that the Debtor was a going concern and valued each of the Debtor's assets based on fair market value (FMV).

3.  Ziegler Should Have Conducted a Balance Sheet Test Based on the Fair Value of the Debtor's Assets

We have found that Ziegler's solvency analysis was deficient since she did not conduct a balance sheet test of the Debtor. Had Ziegler conducted a balance sheet test she should have found that the Debtor had assets in excess of its liabilities. **Schedule A** is a summary of the fair value Balance Sheet of the Debtor for the fiscal years ended 5/31/2008 through 5/31/2013. We have prepared the fair valuation Balance Sheet reflecting fair value of the Beverly Hills lease purchase option and the fair value of consignment contracts reflecting the Debtor's solvency from 5/31/2008 through 5/31/2013[4].

| Year | Fair Value of Assets in Excess of Liabilities | Solvency Staus |
|---|---|---|
| 5/31/2008 | $  1,700,461 | Solvent |
| 5/31/2009 | 2,901,950 | Solvent |
| 5/31/2010 | 196,148 | Solvent |
| 5/31/2011 | 1,978,370 | Solvent |
| 5/31/2012 | 7,244,547 | Solvent |
| 5/31/2013 | 6,697,031 | Solvent |

---

[4] We did not evaluate the Debtor's goodwill since the Debtor was solvent without consideration of goodwill. In addition, we were unable to address the FMV of the Debtor's owned inventory since the Plan Agent did not appraise the Debtor's owned art inventory.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 14

4.  <u>Ziegler's Solvency Analysis Did Not Consider or Address the Fair Value of</u>
    <u>the Debtor's Assets</u>

Completely absent from Ziegler's solvency analysis is any consideration of
the fair value of the Debtor's assets. In my opinion, it is erroneous and
improper to conduct a solvency analysis without any consideration of the fair
value of the Debtor's assets.

With respect to the Debtor's assets, we have found that Ziegler did not
consider the fair value of the following assets:

- Owned art inventory
- Consignment inventory and related agreements
- Lease purchase options
- Goodwill

Had Ziegler conducted an investigation of the fair value of the Debtor's
assets, she would have found that the Debtor was solvent and had sufficient
assets and capital to meet its obligations **(See Schedule B)**.

5.  <u>Ziegler's Solvency Analysis is Deficient Since She Did Not Consider or</u>
    <u>Address the Debtor's Working Capital</u>

Ziegler's solvency analysis did not address or consider the Debtor's working
capital position. In conducting an investigation of the Debtor's solvency, it
is critical to analyze the Debtor's working capital position in order to
determine if the Debtor had the ability to pays its debts as they became due.
A working capital analysis is particularly relevant, since it addresses the
Debtor's current assets and whether such assets are sufficient to enable the
Debtor to meet its current obligations.

In the instant case, the Debtor's tax returns clearly demonstrate that, for all
fiscal years except May 2011, the Debtor had a positive working capital

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 15

position, whereby its current assets were greater than its current liabilities. **(See Schedule H)**.

| Year | Working Capital |
|------|-----------------|
| 5/31/2008 | $  2,162,164 |
| 5/31/2009 | 1,575,282 |
| 5/31/2010 | 362,573 |
| 5/31/2011 | (1,541,971) |
| 5/31/2012 | 1,045,014 |
| 5/31/2013 | 2,317,774 |

**Current assets in excess of current liabiliteis**

In this regard, the Debtor's records clearly reflect that the Debtor had sufficient working capital to meet its obligations which contradicts Ziegler's conclusion that her analysis of four financial ratios was conclusive as to the Debtor's inability to pay its debts as they became due.

6. Ziegler's Solvency Analysis is Materially Deficient Since She Did Not Consider the Debtor's Investment in the Beverly Hills Lease Purchase Option, Which Had Significant and Substantial Value

We have been provided with the appraised value of the Debtor's Beverly Hills lease option as follows:

Expert Report of Jason A. Engel, CPA, CFE, CVA, CITA, MAFF, ABV
September 1, 2021
Page 16

|  |  |
|---|---|
| Appraised Value as of February 2013 | $  16,347,562 |
| Appraised Value as of February 2012 | $  14,514,743 |

The appraisal of the FMV of the Debtor's Beverly Hills lease purchase option clearly supports that the Debtor had assets with substantial value that should be included as part of the Debtor's assets. Accordingly, a proper fair valuation of the Debtor's assets should include the Debtor's Beverly Hills lease purchase option.

The Debtor's accounting records did not include as assets, the Debtor's lease purchase options. In this regard, Ziegler's solvency analysis completely omitted any consideration of the value of the Beverly Hills lease purchase option, which was the Debtor's largest asset with values ranging from $14.5 million to $16.3 million. Ultimately, the Debtor realized $20 million when it sold the Beverly Hills lease purchase option in June 2015.

In my opinion, a proper solvency analysis must include the fair value of the Beverly Hills lease purchase option, since a creditor could look to collect its obligation from the sale of the Debtor's lease purchase option.

7.  <u>Ziegler's Solvency Analysis is Deficient Since She Did Not Consider the Debtor's Investment in The Mid-Wilshire Lease Purchase Option</u>

Also, Ms. Ziegler erroneously did not consider the value of the Mid-Wilshire lease purchase option which the Debtor ultimately realized a gain of approximately $3.1 million in 2012.

CEX 54

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 17

Ziegler's solvency analysis, despite noting the $3.1 million gain, went on to specifically exclude from her solvency ratio analysis the $3.1 million the Debtor realized in 2012 from the sale of its Mid-Wilshire lease purchase option. In this regard, Ziegler explains that she eliminated and excluded the $3.1 million "because it was not in the normal course of the Debtor's business".

In this regard, I have found that the Debtor's investment in lease purchase options was an integral part of the Debtor's business strategy. Douglas Chrismas/Ace Museum also negotiated a lease purchase option in connection with the Ace Museum lease at the La Brea Property and the Debtor's three leases, one at the Beverly Hills Property and two with the Mid-Wilshire Property. Thus, the strategy of the Debtor in its investments in lease purchase options is clearly part of the Debtor's business. Accordingly, such an analysis should have been included (and not excluded) in Ziegler's solvency analysis.

B. **Ziegler's Solvency Analysis is Materially Deficient As it is Solely Limited to Four Financial Ratios**

Ziegler's report concludes that the Debtor was insolvent since the Debtor was unable to pay its obligations when due. In reaching her conclusion that the Debtor was unable to pay its debts when due, Ziegler solely relied on the following four financial ratios of the Debtor **(See Ziegler's Expert Report Exhibits I-3 and I-4)**:

    i.    Debt-to-Equity Ratio

    ii.   Debt-to-Assets Ratio

    iii.  Interest Coverage Ratio

    iv.  Fixed Charges Coverage Ratio

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 18

1.  **A Ratio Analysis on Its Own is Insufficient and Improper to Evaluate a
    Debtor's Ability to Pay its Debts as They Become Due**

Based on Ziegler's limited analysis of only four ratios, Ms. Ziegler concludes
that the Debtor was insolvent. In my opinion a ratio analysis on its own is
insufficient and inadequate for determining a debtor's solvency. A proper
analysis of the Debtor's ability to meet its obligations as they come due should
include but is not limited the following:

i.    Identification of specific vendor(s) or lender(s) for which the Debtor
      was unable to pay and meet its obligation.

ii.   The number of unpaid debts each month, as compared to the number
      of paid debts, including the amount of the delinquency and the
      materiality of the delinquent payments, as compared to the Debtor's
      financial condition.

iii.  How long those debts remained unpaid, and whether special
      circumstances explain any failure to pay the debts.

iv.   Whether the Debtor's payment practices before the period of alleged
      nonpayment and the payment practices of the Debtor's
      trade/industry.

v.    The Debtor's working capital position and whether or not it had the
      capacity to meet its current obligations from current assets.

vi.   The fair value of the Debtor's assets and capital, and whether or not
      the Debtor had the capacity to borrow funds to meet its obligations.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 19

a. <u>Ziegler's Solvency Analysis is Materially Deficient, Since She Did Not Conduct an Analysis and Identification of Specific Vendor(s) or Lender(s) For Which the Debtor was Unable to Pay and Meet its Obligation</u>

Ziegler's solvency analysis and related analysis of the Debtor's inability to pay debts as they become due, did not address or consider specific instances where the Debtor was unable to meet its obligations. Overall, Ziegler's analysis is solely based on four ratios which she concluded was indicative of the Debtor's inability to pay its debts as they became due. Without specific examples of the Debtor's inability to pay its debts when they became due, Ziegler's analysis is speculative and improper.

b. <u>Ziegler's Solvency Analysis is Materially Deficient, Since She Did Not Conduct an Analysis of the Number of Unpaid Debts as Compared to the Number of Paid Debts and Related Materiality of the Unpaid Debts</u>

Ziegler's solvency analysis and related analysis of the Debtor's inability to pay debts as they become due, did not address or consider the monthly number of unpaid debts as compared to the monthly number of paid debts to determine whether the Debtor was unable to meet its obligations.

c. <u>Ziegler's Solvency Analysis is Deficient Since She Did Not Consider the Nature of the Debtor's Business</u>

In order to properly value the Debtor's assets, it is important to understand the nature of the Debtor's business. With respect to the Debtor, it is critical to acknowledge that the Debtor's investments in its lease purchase options were an integral part of the Debtor's operations.

CEX 57

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 20

In conducting its art gallery business operations, the Debtor negotiated three leases, one for its Beverly Hills location, and two for its Mid-Wilshire location. In all three instances, the Debtor negotiated a lease purchase option. In connection with its lease purchase options, the Debtor realized profits approximating $23 million.

|  | Profits Realized |
|---|---|
| Beverly Hills Option | $ 20,000,000 |
| Mid-Wilshire Option | 3,000,000 |
| Total | $ 23,000,000 |

The profits the Debtor earned from its lease purchase options were clearly material and significant. Also, the Debtor's profits realized from its lease purchase options were not just a by-product of its art gallery operations but were part of the Debtor's strategy in investing in real estate options. In other words, the Debtor's business necessarily consisted two components: art gallery operations and real estate investments (via lease purchase options).

The Debtor's investment in various lease purchase options was a very clever form of investing in real estate without having to acquire such real estate. Also, it is important to note that the Debtor used its cash flow from the art gallery operations to pay its lease obligations, thus preserving and maintaining its exercisable rights under the lease options and their FMV.

Overall, I have found that the Debtor's operations were highly focused on the significant value of its lease purchase options; as the underlying real estate increased in value, the corresponding lease purchase options also increased in value. Overall, the Debtor's operations were also motivated to

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 21

preserve its option rights which ultimately generated approximately $23 million in profits. Thus, any analysis of the Debtor's operations and assets must take into consideration the Debtor's investment in its lease purchase options.

**C.  Ziegler's Financial Ratio Analysis is Erroneous and Misleading**

   1.  Ziegler's Ratio Analysis Did Not Consider the Fair Valuation of the Debtor's Assets

Completely absent from Ziegler's solvency analysis is any consideration of the fair value of the Debtor's assets and a solvency Balance Sheet Test. In my opinion, it is erroneous and improper to evaluate a debtor's ability to pay its debts when they become due, by limiting the analysis to a few ratios. In particular, it is erroneous and improper to conduct a solvency analysis without any consideration of the fair value of the Debtor's assets when evaluating the Debtor's ability to pay debts as they become due.

The analysis of the Debtor's ability to pay debts when they become due must include an evaluation of the Debtor's ability to obtain financing or capital to meet its obligations. The analysis of the Debtor's ability to obtain financing or capital should, in turn, include and consider the FMV of its assets.

Based on our review and analysis of the Debtor's assets, we have found that the fair value of the Debtors assets are materially greater than their book value. Specifically, we have found that such assets include the following:

   i.    The Debtor's Lease Purchase Option of the Beverly Hills Property.
   ii.   The Debtor's Lease Purchase Option of the Mid-Wilshire Property
   iii.  Artist consignment contracts

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 22

Ziegler's ratio analysis is based on information she obtained from the Debtor's accounting records and tax returns. Since the Debtor's records (based on book value) do not reflect the fair value of the Debtor's assets, her analysis is erroneous and misleading to the extent that the fair value of the Debtor's assets are materially greater than their book values.

2.  <u>Ziegler's Ratio Analysis is Deficient Since Ziegler Did Not Compare Her Findings to the Industry</u>

I have found that Ms. Ziegler's financial ratio analysis did not consider or compare whether the Debtor's financial ratios exceeded or were below the industry ratios. In my opinion, without such a comparison Ziegler's ratio analysis is deficient and improper.

**D.  <u>Ziegler's Pre-Petition Fraudulent Transfer Analysis Is Erroneous and Misleading Since She Did Not Consider Whether the Debtor Received Reasonable Equivalent Value</u>**

Ziegler's pre-petition fraudulent transfer analysis includes alleged fraudulent transfers of approximately $1,321,619 in connection with the Debtor's lease payments to La Brea (La Brea lease) beginning February 19, 2009 through the Petition date **(See Ziegler's Expert Report Exhibit E)**. Although Ziegler did not conduct any analysis as to whether the Debtor received reasonably equivalent value, she does infer that such transfers were made with less than reasonably equivalent value. In my opinion, a fraudulent transfer analysis should include an investigation and analysis of the reasonable value the Debtor may have received in connection with the alleged transfers to La Brea.

Based on the economic relationship of the parties, I have found that the Debtor did receive a benefit of economic value from its payments to La Brea, as such payments were intended to preserve the La Brea lease purchase option. The La

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 23

Brea lease purchase option was clearly a financial strategy of the Debtor to generate Ace Museum profits, which the Debtor would have benefited from such profits.[5]

Alternatively, the Debtor may have received reasonable equivalent value as its payments to La Brea were recorded as a receivable from Ace Museum, and thus the Debtor received value from an antecedent debt.

### E. Ziegler's Solvency Analysis is Erroneous and Misleading Since She Did Not Properly Consider Financial Information in Her Possession

Overall, I have found that material deficiencies in Ziegler's solvency analysis suggests that Ziegler effectively concluded that the Debtor's solvency status is conclusive and does not require any financial inquiry. In this regard, I have found the following material financial information that was available to Ziegler and should have led Ziegler to question her assumption that the Debtor was insolvent during the Pre-Petition Period:

1. The Debtor realized approximately $20 million in profits when it exercised the Beverly Hills Purchase Option in June 2015. The Debtor's records reflect that as of Petition Date, the Debtor's assets approximated $10 million and the Debtor's liabilities approximated $20 million. The fact that the Debtor realized $20 million approximately two years after the Petition Date based on an option the Debtor owned as of the Petition Date, should have led Ziegler to consider the value of that option as of the Petition Date.

---

[5] The Debtor's financial benefit from the Ace Museum lease purchase option is confirmed in the June 8, 2015 email from Victor Sahn to David Shemano (Bates Stamp MBN – 1355), stating the following:

"…unless I am furnished with evidence that the June, 2015 rent on the La Brea Properties has been paid by this Thursday, June 11, 2015, I will recommend to my clients that they file an involuntary bankruptcy against Ace Museum in order **to preserve the very valuable purchase option on the La Brea properties**."

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 24

2. The Debtor continued to operate from February 19, 2009 through Petition Date.

3. The Debtor was able to meet its most significant and material obligation in connection with its lease payments, which preserved the Debtor's Beverly Hills Purchase Option, and ultimately enabled the Debtor to realize $20 million in profits from the exercise of the purchase option.

4. The Debtor's federal income tax returns reflect that the Debtor had a positive working capital position (current assets exceeded current liabilities) during the entire Pre-Petition period, except for 2011.

Overall, Ziegler did not address or consider material financial information that would have alerted Ms. Ziegler to question her conclusion that the Debtor was insolvent and unable to pay its debts when they became due. Had Ms. Ziegler properly evaluated such information, at a minimum it would have caused her to properly investigate the Debtor's solvency status.

**F.** **Had Ziegler Conducted a Proper Solvency Investigation and Analysis, She Would Have Found That the Debtor Was Solvent and Able to Pay its Debts as They Became Due**

With respect to the Debtor's solvency, we have found the following:

1. That the Debtor was a going concern from February 19, 2009 through Petition Date.

2. That the fair valuation of the Debtor's lease purchase options, owned inventory, consignment contracts, and goodwill had substantial value and reflects that the Debtor had sufficient capital (**See Schedule B**).

CEX 62

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 25

3.  The fair value of the Debtor's assets exceeded its liabilities for the fiscal year ended May 31, 2008 through May 31, 2013[6] **(See Schedule A)**.

4.  The Debtor had excess working capital since its current assets exceeded its current liabilities for all the years during the Pre-Petition Period except in 2011 **(See Schedule H)**.

5.  The Debtor's Lease Purchase Option of the Beverly Hills Property had substantial value approximating $16.3 million as of February 29, 2013.

## III.    Summary of Post-Petition Rebuttal Opinions and Findings of Jason A. Engel

The following are our rebuttal opinions to Ziegler's post-petition findings made in her October 30, 2020 Expert Report, which covers the period February 19, 2013 through April 6, 2016 (the "Post-Petition Period").

### A.    Summary of Ziegler's Post Petition Opinions

Ziegler opines that Ace New York "diverted" sales and loans approximating $17 million, which, based on her investigations, all "belonged to the Debtor". Ziegler then concludes that as a result of Ace New York's diversion of sales and loans belonging to the Debtor, the Debtor suffered economic damages of $12,809,192 ("$12.8 Million") **(See Schedule J)**. Ziegler further opines that La Brea is responsible for $5,766,762 ("$5.7 Million") of Debtor's damages attributable to the Post-Petition Period, since Ace New York transferred funds allegedly belonging to the Debtor to Ace Museum,

---

[6] Closest date to Petition Date (February 19, 2013) that is based on the Debtor's financial reporting on its May 31, 2013 Tax Return)

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 26

from which Ace Museum allegedly paid its lease obligations to La Brea. **(See Schedule K).**[7]

### B.  Ziegler's Damage Analysis is Erroneous and Misleading Since the Debtor Did Not Suffer Any Economic Damages

Ziegler states that she was asked to "[f]orm and express opinions regarding <u>net amounts</u>, if any, belonging to Debtor that went to the … defendants between February 19, 2013, the date Debtor's Chapter 11 case was filed ("Petition Date"), and April 6, 2016, the date Plan Agent took over Debtor's operations and records ("Plan Agent Start Date") [i.e. the Pre-Petition Period] …".  (Ziegler Report, page 1) (emphasis added).  She was also asked to "[q]uantify damages, if any, Debtor incurred …after Petition Date through Plan Agent Start Date ("Post-Petition") based on the transfer of funds to others." (Ziegler Report, page 2).

We have found that Ziegler's calculation of the "net amounts, if any, belonging to the Debtor," and her damage analysis and calculations are erroneous and misleading for the following principal reason: while she gave credit for certain amounts that were repaid back to the Debtor, she systematically did not consider and omitted economic benefits totaling $13,218,010 that the Debtor received from Ace New York, which we have found in total exceeded her economic damages of $12.8 Million, by approximately $400,000 **(See Schedule L)**. We have found that based on a proper economic damage analysis, the Debtor did not suffer any economic damages. Thus, consistent with Ziegler's methodology and theory of recovery, once all of the economic benefits that the Debtor received are taken into account, the Debtor would not have any claim against La Brea since the Debtor did not incur any damages.

Ziegler's economic damage analysis and damages calculation of $12.8 Million is materially flawed since it omits the most basic elements of an economic damage

---

[7] Although Ziegler does not address or consider the economic substance of such transfers, we have found that the transfers to La Brea were intended to preserve the La Brea lease purchase option, which we understand was perceived as having significant value.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 27

analysis. Specifically, Ziegler's damage analysis only considered the alleged harm to the Debtor due to the alleged diversion of the Debtor's sales and, but for credits for repayments to the Debtor, she completely ignored and omitted consideration of the economic benefit that Ace New York provided to the Debtor including payment of direct expenses (cost of goods sold) approximating $7.8 million, incurred by Ace New York for the same sales Ziegler calculated as damages (**See Schedule M**). By excluding expenses that the Debtor would have incurred, Ziegler's damage analysis is erroneous, invalid, and materially overstates the Debtor's damages by $7.8 million.

In my opinion, the Debtor received an economic benefit from Ace New York acting as a broker on the Debtor's behalf including the buying and selling of art. We have found that the economic benefit the Debtor received from Ace New York is at least equivalent to the operating expenses of $408,836 incurred by Ace New York on behalf of the Debtor (**See Schedule S**).[8]

It is important to note that our analysis is not intended as a legal assessment of the appropriateness of Ace New York's unauthorized role as a broker for the Debtor. We recognize that Ace New York's role as a broker for the Debtor may have been legally improper. However, the legal impropriety of such a role is immaterial to the economic analysis of that broker relationship and the clear economic benefits the Debtor received as a result therefrom. In the analysis of fraudulent transfers and economic damages, the issue of economic benefit that the Debtor received is appropriate and relevant for consideration.

Ziegler's damages calculation is also misleading and overstated as she concluded that loans of approximately $3.0 million intended for the Debtor that were not directly deposited to the Debtor's bank account, and thus constitutes the Debtor's economic damages. We have analyzed Ziegler's loan analysis and found that the Debtor did receive the benefit of such loans.

---

[8] Our analysis of the Debtor's benefit from Ace New York acting as a broker on behalf of the Debtor is based on Ziegler's assumption that 100% of Ace New York sales belong to the Debtor, and thus Ace New York's business operations were solely for the benefit of the Debtor.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 28

For example, Ziegler concludes that $1.1 million of the $1.5 million court-approved DIP loan was not received by the Debtor. However, based on our tracing, we found that the entire $1.5 million court approved DIP financing was paid by Ace New York to the Debtor's creditors in accordance and consistent with the court order **(See Schedule Q)**.

Ziegler also opines that Ace New York improperly diverted other borrowings not approved by the court ("Other Borrowings") approximating $988,000 allegedly belonging to the Debtor. Based on our tracing of the Other Borrowings deposited into Ace New York bank accounts, we have found that immediately after the funding of such Other Borrowings, Ace New York advanced approximately $794,000 to the Debtor **(See Schedule R)**.[9]

Ziegler also improperly included as damages, $916,822 of loans from Eric Wilson and his related entities ("Wilson Entities") advanced directly to Ace Museum (See Schedule J). Ziegler concludes that Ace Museum used such loans to pay its obligations, including its obligation to La Brea. Ziegler then opines that the $916,822 of Wilson Entities loans that were improperly diverted to Ace Museum, constitutes damages to the Debtor. Thus, Ziegler's opinion infers that the Debtor never received any benefit from the Wilson Entities loans and related payments to La Brea in connection with the preservation of the Ace Museum lease option.

We have found that Ziegler's inclusion of $916,822 as damages is erroneous and inconsistent with the estate's acceptance of Wilson Entities loans to Ace Museum.[10] The Wilson Entities proof of claim states that sums advanced to the Debtor's affiliates were used for preservation of the Debtor's estate, and thus confirming that the Debtor received the benefit from the preservation of Ace Museum's lease option.

---

[9] Although we were not able to directly trace approximately $195,256 ($988,882 - $793,626), (See Schedule R-1) of transfers from Ace New York to the Debtor, we did find that during the Ace New York-Debtor relationship, Ace New York transferred a total of $4,513,073 to the Debtor (See Schedule Y-2).
[10] Wilson's Chapter 11 Administrative claims and Section 3 of Claim No. 33

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 29

It is our understanding that Eric Wilson and his related entities thereafter entered into a settlement agreement with the Plan Agent whereby the Plan Agent agreed, among other things, to allow a portion of the $916,822 that the Wilson Entities advanced to Ace Museum as a claim against the Debtor.  The Plan Agent's motion for approval of the settlement agreement with the Wilson Entities described the multiple benefits that the Debtor received from the Wilson Entities loans. Accordingly, the Plan Agent's acceptance of a portion of the $916,822 Wilson Entities loans confirms that the Debtor did receive value and benefit from payments to La Brea in connection with the preservation of the Ace Museum lease option.

It is therefore entirely contradictory now for Ziegler to assert that the Debtor did not receive any economic benefit from these advances, and that they constitute economic damages. On the other hand, to the extent that Eric Wilson's proof of claim relating to the $916,822 was rejected by the Debtor, that amount does not constitute damages to the Debtor since the Debtor does not have to repay Eric Wilson for such loans.

Irrespective of Ziegler's obvious errors and omissions referenced above, in my opinion Ziegler's alleged unfunded loans do not constitute economic damages since such loans, even if paid to the Debtor, would have to be repaid by the Debtor. Accordingly, in principal unfunded loans do not constitute damages and Ziegler's damage analysis is overstated by approximately $3 million.

In addition, we have found that Ziegler did not consider or address the financial benefits the Debtor may have received from alleged transfers of the Debtor's funds to preserve the Ace Museum lease purchase option with La Brea.

Based on the potential value of the Ace Museum lease purchase option ($3 million) **(Schedule T)**, it made economic sense for the Debtor to contribute to Ace Museum's monthly lease payments in order to preserve the Debtor's ability to collect its accounts receivable of $4.3 million from Ace Museum. If the Debtor did not contribute to the preservation of the Ace Museum lease option and it expired, the Debtor's accounts receivable from Ace Museum of $4.3 million would be written off as uncollectable.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 30

Accordingly, we have found that the Debtor received an economic benefit by making the payments to preserve the lease option.

We have also found other information confirming that the Debtor did receive an economic benefit from alleged Debtor funds paid to preserve the Ace Museum lease purchase option. The Debtor's financial benefit from the Ace Museum lease purchase option is confirmed in the June 8, 2015 email from Victor Sahn to David Shemano (Bates Stamp MBN – 1355), stating the following:

> "…unless I am furnished with evidence that the June, 2015 rent on the La Brea Properties has been paid by this Thursday, June 11, 2015, I will recommend to my clients that they file an involuntary bankruptcy against Ace Museum in order to preserve the very valuable purchase option on the La Brea properties."

Furthermore, we have found that Eric Wilson, a creditor of the Debtor, advanced (loaned) funds to Ace Museum during the Post-Petition Period in order to preserve the Ace Museum lease purchase option. Accordingly, creditors of the Debtor perceived the Ace Museum lease purchase option as a benefit to the Debtor.

We have also found that to the extent that the Eric Wilson proof of claim accepted by the estate included a portion of the $916,822 he directly advanced to Ace Museum, also confirms that the Debtor received a benefit from the preservation of the Ace Museum lease purchase option.

Overall, we have found that for each individual payment of alleged Debtor's funds used to pay the Ace Museum lease option to La Brea, the Debtor received the full benefit of such payments. Accordingly, Ziegler's conclusion that the Debtor suffered economic damages of $5.7 Million for rent payments made to La Brea is erroneous since the Debtor received the benefit for the entire $5.7 Million paid to La Brea for the preservation of the Ace Museum lease purchase option.

CEX 68

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 31

We have, however, limited the financial benefit that the Debtor received to $3 million,
based on the value of the lease purchase option (**See Schedule T**).

**C.** **Ziegler Failed to Consider the Business Relationship Between the Debtor and**
**Ace Museum**

Ziegler's report is noticeably silent of any consideration or discussion with respect to
the business relationship between the Debtor and Ace Museum (sometimes, the "Two
Entities"). Although Ziegler's analysis includes a numerical accounting of the transfers
between the Two Entities, it is silent as to the economic substance behind such
transactions.

Based on our review of the historical and financial relationship between the Two
Entities, we have found that the Debtor and Ace Museum had a common financial
investment in real estate through their respective investments in lease purchase
options. The Debtor's investment in lease purchase options was significant and
included both the Beverly Hills and Mid-Wilshire leases. Ultimately, the Debtor
realized profits of approximately $23 million from both the Beverly Hills and Mid-
Wilshire properties, which was substantially greater than any profits it earned from its
art gallery operations. The significant amount of profits that the Debtor earned from its
lease purchase options was consistent with the strategies of the Two Entities to
advance funds to each other in order to preserve their respective lease purchase
options.

The Ace Museum lease purchase option was clearly perceived by the Two Entities to
have significant value. In this regard, we have found that the Debtor had an indirect
financial interest in the preservation of Ace Museum's lease purchase option. [11] This

---

[11] Historically, the Two Entities advanced to each other, loans for the principal purpose of preserving their
investment in lease purchase options. Shortly after its formation, Ace Museum received a considerable
contribution of approximately $3.7 million from the Herb Alpert Foundation. Thereafter, Ace Museum
advanced to the Debtor approximately $2.8 million during the period July 17, 2009 through May 18, 2010.
Beginning in June 2010 through Petition Date (February 2013), the Debtor repaid Ace Museum

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 32

financial interest is illustrated by the fact that as of Petition Date, Ace Museum was
indebted to the Debtor by approximately $4.3 million due to advances made to
preserve the Ace Museum lease purchase option.

**D.    Ziegler Did Not Perform a Proper Tracing of Alleged Fraudulent Funds**

We have found that Ziegler's analysis of alleged Debtor funds transferred from Ace
New York to Ace Museum, from which she alleges Ace Museum used to fund a large
portion of the $5.7 Million of rent payments to La Brea, is erroneous and deficient
since she did not perform a proper tracing (LIBR tracing) of funds from Ace New
York to Ace Museum. Accordingly, Ziegler's analysis of funds transferred from Ace
New York to Ace Museum is based on an improper assumption and speculation that
100% of Ace New York transfers to Ace Museum originated from Ace New York
sales belonging to the Debtor. Ziegler improperly assumes that Ace New York did not
have any of its own funds, including loan proceeds from third parties that could have,
and may have been part of Ace New York's transfers to Ace Museum. In my opinion,
without a proper LIBR tracing of Ace New York transfers to Ace Museum, it is
speculative to assume that 100% of Ace New York transfers to Ace Museum
originated from the Debtor and could not have originated from other sources.

In addition, Ziegler's analysis of alleged Debtor funds transferred from Ace Museum
to La Brea totaling $5.7 Million is also erroneous and misleading since she did not
perform a proper LIBR tracing of transfers from Ace Museum to La Brea.[12]
Accordingly, Ziegler's analysis of funds transferred from Ace Museum to La Brea
totaling $5.7 Million is based on an improper assumption and speculation that 100% of
Ace Museum transfers to La Brea originated from Ace New York funds and could not
have originated from any other Ace Museum sources of funds. Ace Museum, however
received considerable funds from sources other than Ace New York and had the ability
to direct its funds for its own purposes as it determined. In my opinion, without a

---

approximately $1.9 million. Accordingly, during the Pre-Petition Period, Ace Museum advanced to the
Debtor approximately $900,000.
[12] It should be noted that Ziegler did not perform any LIBR tracing, whatsoever.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 33

proper LIBR tracing of Ace Museum transfers to La Brea, it is speculative to assume
that the $5.7 Million came from no other source but Ace New York.

As reflected in our October 30, 2020 expert report, we did conduct a LIBR tracing of
Ace Museum funds transferred to La Brea. Based on our LIBR tracing, we have found
that a maximum of $3,640,201 paid to La Brea (and not $5.7 Million as Ziegler
opined) could have originated from alleged Debtor funds.[13]

Accordingly, regardless of Ziegler's analysis that the Debtor was damaged by $12.8
Million, or our findings that the Debtor did not suffer any damages, based on the LIBR
tracing, only a maximum of $3,640,201 of alleged Debtor funds could have been
transferred from Ace Museum to La Brea.[14]


### E.  Ziegler Improperly and Without Basis Concludes That 100% Of Ace New York Sales Belonged to the Debtor and Opines as to the Ownership of Such Assets

Ziegler's opinion that 100% of Ace New York sales belonged to the Debtor is the
foundation of her post-petition damages analysis. We have found that Ziegler's
conclusion that 100% of Ace New York sales "belonged to the Debtor" is improper
since the determination of ownership of Ace New York sales requires a legal analysis.
A financial analysis, alone, is not determinative of ownership. In this regard, it is
inconclusive that 100% of Ace New York sales belonged to the Debtor and
inconclusive that Ace New York did not and could not have generated some of its own

---

[13] It is important to note that our LIBR tracing of $3,640,201 assumes various improper assumptions
incorporated by Ziegler, which we analyzed and found to be erroneous and misleading. Ziegler's erroneous
assumptions include that 100% of Ace New York sales belonged to the Debtor. Accordingly, if the court
finds that Ziegler's assumptions are incorrect, then our LIBR tracing of $3,640,201 would be overstated. In
addition, Ziegler's analysis of Ace New York funds transferred to Ace Museum did not include a LIBR
tracing to determine how much of Ace New York transfers to Ace Museum, originated from the Debtor's
funds and how much originated from non-Debtor funds. Accordingly, to the extent that the court finds that
Ziegler overstated the Debtor's funds transferred from Ace New York to Ace Museum, would also result in
a reduction our $3,640,201 LIBR tracing.

[14] The total transfers to La Brea include $3,454,676 from Ace Museum and $185,525 of transfers from Ace
New York to La Brea, totaling $3,640,201.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 34

sales. Accordingly, if the court finds that certain sales of Ace New York did not belong to the Debtor, Zeigler's entire post-petition analysis would be void and erroneous.

We have also found that Ziegler's investigation and analysis as to the ownership of Ace New York sales is flawed since it is based on erroneous and misleading analyses and conclusions.

For example, Ziegler's test sample of three Ace New York sales transactions totaling $226,500 from all $14.5 million of Ace New York's sales **(See Schedule W-1),** is too small a sample to conclude that 100% of Ace New York sales belonged to the Debtor. In addition, we have found that Ziegler's analysis and findings relating to her three test samples were materially flawed and inconclusive as to ownership **(See Schedule W-2)**.

Furthermore, we have found that Ziegler's analysis did not consider other relevant financial information that may be necessary for a legal analysis as to the ownership of the Debtor's sales. In particular, we have found that approximately $6.7 million of Ace New York sales were sales of artist owned art where there was no artist contract with the Debtor **(See Schedule V)**. For example, we have found that Ace New York sales included sales where the name of the artist is unknown and there is no indication that the sale related to an artist who previously transacted with the Debtor (See Schedule V-3). Without a proper analysis of such sales it is speculative to assume that such sales belonged to the Debtor.

We have also found that certain Ace New York sales relating to consignment contracts with the Debtor, required monthly payments to the artist, and that Ace New York, not the Debtor, made such payments to the artists **(See Schedule W-4)**. We have also found that, of the $14.3 million of Ace New York sales approximately $10.7 million were sales with Ace New York letterhead **(See Schedule W-3)**. Accordingly, the issue of ownership is questionable and requires a legal analysis.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 35

### F.  Ziegler Mischaracterized Ace New York's Relationship with The Debtor

Ziegler acknowledges and specifically does not dispute the fact that Ace New York had a broker relationship with the Debtor intended to assist the Debtor in the sale and purchase of art since buyers and sellers may have been reluctant to transact with a DIP. Based on our financial investigation and analysis, we have confirmed that the Debtor's relationship with Ace New York was consistent with Ziegler's acknowledgement of this relationship.

On the other hand, we have found that Ziegler's opines that Ace New York had "diverted" sales "belonging to the Debtor". In my opinion, Ziegler's independent conclusion that Ace New York diverted sales belonging to the Debtor, is inconsistent with her acknowledgement that the Ace New York and Debtor relationship was fundamentally that of a broker relationship.[15] It is inconsistent to suggest that a broker diverted sales away from the Debtor when its business relationship is to transact on behalf of and for the benefit of the Debtor. For example, Ziegler omits the following:

a. Ace New York paid direct expenses relating to art purchases approximating $7.8 million (**See Schedule M**).

b. Ace New York advanced the Debtor approximately $4.5 million from profits it earned from the sale of art (**See Schedule Y-2**).

c. Ace New York did not profit from its financial dealings with the Debtor.

d. No evidence that Ace New York benefited from its relationship with the Debtor.

---

[15] As noted above, our criticism of Ziegler's improper characterization of the Ace New York and the Debtor's relationship is not intended to opine as to the propriety of Ace New York's relationship with the Debtor as we defer to the court. Our criticism of Ziegler's characterization is intended to properly and accurately describe the economic substance of the Ace New York and the Debtor's financial relationship.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 36

## IV.  Detail Analysis of Ziegler's Post-Petition Findings and Opinions

### 1.  Summary of Ziegler's Post Petition Opinions

A. <u>Zeigler's Finding #1</u>: Ziegler independently determined that 100% of Ace New York art sales totaling $14,359,941 were the Debtor's sales.

B. <u>Zeigler's Finding #2</u>: As a result of Ace New York's diversion of the Debtor's sales, Debtor incurred economic damages of $12,809,091.

**Ziegler's Damages Calculation (Schedule J)**

|  | Ace New York | Ace Museum | Total |
|---|---|---|---|
| Ace New York Post Petition Proceeds from Art Sales of Alleged Debtor's Art **(Per Ziegler Exhibit C)** | $ 14,359,941 |  | $ 14,359,941 |
| Less: Repayments to Debtor from Ace New York and Ace Museum **(Per Ziegler Exhibit C)** | (4,533,073) | (1,434,692) | (5,967,765) |
| Add: Transfers from Debtor to Ace Museum and Ace New York **(Per Ziegler)** | 20,000 | 322,180 | 342,180 |
| Net Alleged Diverted Debtor's Funds Transferred to Ace Museum and Ace New York |  |  | $ 8,734,356 |
| Net Alleged Proceeds from Debtor's Sales Deposited to Ace Museum **(Per Ziegler)** |  | 918,000 | 918,000 |
| Net Alleged Proceeds from Debtor's Sales Deposited to La Brea on behalf of Ace Museum **(Per Ziegler)** |  | 114,595 | 114,595 |
| Net Alleged Debtor's Loans Deposited to Ace New York and Ace Museum **(Per Ziegler Exhibit D)** | 2,125,419 [1] | 916,822 | 3,042,241 |
| Debtor's Alleged Net Diverted Funds Not Returned to Debtor Per Ziegler |  |  | $ 12,809,192 |

C. <u>Zeigler's Finding #3</u>: La Brea received $5,766,762 of the Debtor's funds from Ace New York. **(Schedule K)**

| | |
|---|---|
| Net Direct Payments from Ace New York to Ace Museum | $ 4,744,332 |
| Add: Direct Payments from Ace New York to La Brea | 185,525 |
| Net Payments from Ace New York to Ace Museum | $ 4,929,857 |
| Less: Net Payments from Ace Museum to Debtor | (1,112,512) |
| Total Net Damages to Debtor Due to Diversion of Sale Proceeds from Debtor's Artwork | $ 3,817,345 |
| Add: Alleged Customer Payments from Debtor's Sale of Artwork Directly Paid to Ace Museum | 918,000 |
| Add: Alleged Customer Payments from Debtor's Sale of Artwork Directly Paid to La Brea | 114,595 |
| Add: Debtor's Other Borrowings Deposited to Ace Museum | 916,822 |
| Total Post-Petition Damages Per Ziegler (Total Net Proceeds from Alleged Sales of Debtor's Art Diverted to/on behalf of Ace Museum) | $ 5,766,762 |

CEX 74

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 37

    D. <u>Ziegler's Finding #4</u>: Since the Debtor incurred damages of $12,809,192 and La Brea received $5,766,762 of the Debtor's funds, the Debtor can recover damages from La Brea of $5,766,762. **(See Schedule K)**.

**Flowchart of Ziegler's Post-Petition Damages Analysis**



2. **Ziegler's Post-Petition Damage Analysis is Erroneous and Misleading Since the Debtor Did Not Suffer Any Economic Damages**

Ziegler opined that the Debtor's post-petition damages were $12,809,192. In coming to the net number, Ziegler acknowledges that Ace New York and Ace Museum repaid the Debtor $5,625,585 ($4,513,073 + $1,112,512) **(See Schedule L)**. We have corrected Ziegler's damages calculation to include expenses of $7,833,438 that

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 38

were improperly omitted **(See Schedule L-1)**. We also adjusted Ziegler's damages analysis to exclude $1,995,736 for the court approved DIP Loan and Other Borrowings that were paid to the Debtor and on behalf of the Debtor. **(See Schedule L-1)**. In addition, we adjusted Ziegler's damages analysis for economic benefits of $408,836, that the Debtor received from Ace New York acting as a broker on its behalf. Furthermore, we adjusted Ziegler's damages analysis for the economic benefit of $3 million that the Debtor received from the preservation of the Ace Museum lease option. The following reflects that the Debtor did not suffer any economic damages, based on a Corrected Ziegler's Damage Calculation:

**Corrected Ziegler's Damage Calculation Assuming 100% of Ace New York Sales Were the Debtor's Sales (Schedule L-1)**

| | |
|---|---:|
| Ziegler's Opinion As to Post-Petition Damages **(Schedule J)** | $ 12,809,192 |
| Total Expenses Paid on Behalf of Debtor **(Not Considered by Ziegler) (Schedule M)** | (7,833,438) |
| DIP Advances Paid on Behalf of Debtor **(Not Considered by Ziegler) (Schedule Q-2)** | (1,078,914) |
| Other Borrowings Improperly included in Ziegler's Damage Analysis | (916,822) |
| Value of Ace New York Services as Intermediary Agent for the Benefit of the Debtor **(Schedule S)** | (408,836) |
| Debtor's investment value in connection with Ace Museum's lease purchase option **(Schedule T)** | (2,980,000) |
| Corrected Ziegler's Damage Calculation | $ (408,818) |

It is important to note that our Corrected Ziegler's Damage Calculation **(See Schedule L)** assumes Ziegler's principal finding and opinion that 100% of Ace New York sales were the Debtor's sales. However, as discussed herein, we have analyzed the basis of that finding, and have found that Ziegler's principal finding that 100% of Ace New York art sales totaling $14,359,941 were the Debtor's sales is erroneous and misleading since it is based on speculation and an improper legal conclusion.

Overall, our Corrected Ziegler's Damage Calculation reflects that the Debtor did not suffer any economic damages **(See Schedule L)**.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 39

### 3.  Ziegler's Damage Analysis is Erroneous and Misleading As She Systematically Did Not Consider and Omitted Economic and Financial Benefits that the Debtor received from Ace New York

#### A.  Ziegler Omitted $7,459,057 of Direct Expenses Incurred by Ace New York

We have found that Ziegler's damages calculation is improper and does not constitute a damages calculation. In particular, we have found that Ziegler's damages calculation does not correctly quantify the Debtor's lost profits or the Debtor's out-of-pocket losses. Ziegler acknowledges that Ace New York and Ace Museum repaid the Debtor $5,625,585 ($4,513,073 + $1,112,512) and deducts this from her damages calculation (**See Schedule L**). Ziegler, however, inexplicably omits from her calculation expenses incurred by Ace New York that would have been incurred by the Debtor. Accordingly, Ziegler's damages calculation is erroneous, misleading, and materially overstated.

Ziegler's damages calculation does not consider the following direct expenses (Cost of Goods Sold) that the Debtor would have incurred assuming there was no diversion of its sales as alleged:

**Direct Expenses Incurred by Ace New York in Connection with Alleged Sales of The Debtor's Art (Schedule N)**

| | |
|---|---|
| Artist Expenses Paid for Artwork Sold **(Schedule N-1)** | $ 3,259,588 |
| Ace Museum Payments to Artists **(Schedule N-2)** | 160,000 |
| Expenses Paid for Ellsworth Kelly Artwork Sold **(Schedule N-3)** | 4,000,000 |
| Exhibition Expenses for Artwork Sold **(Schedule N-4)** | 28,900 |
| Sales Taxes **(Schedule N-5)** | 10,570 |
| Total Direct Expenses Incurred (COGS) | $ 7,459,057 |

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 40

The above expenses were actual expenses incurred by Ace New York in connection with Ace New York's alleged diversion of the Debtor's sales. It is improper and erroneous to exclude from a damages calculation direct expenses that would have been incurred but for the alleged wrongdoing of Ace New York. Excluding such direct expenses from a damages calculation would result in an overpayment and windfall to the Debtor. As a forensic accounting expert for over 30 years with experience in over 500 damages calculations, it is my understanding that the principal goal of a damages calculation is to put the injured party in the same position, assuming there was no wrongdoing. Thus, Ziegler's damages calculation is not proper because it materially overstates the Debtor's damages and overcompensates the Debtor above and beyond its actual damages.

B. **Ziegler Omitted Other Expenses of $374,381 Paid by Ace New York and Ace Museum**

In addition, we have found that Ziegler's damages calculation improperly does not consider Ace New York payments relating to Debtor's rent expense with respect to the Debtor's leased properties located at (i) 5670 Wilshire Blvd., leased from landlord Trizec 5670 Wilshire LLC; and (ii) at 1269 S. Cochran Ave leased from Elorville and Margaret Nunley:

**Other Debtor Expenses Paid by Ace New York and Omitted from Ziegler's Damages Calculation (Schedule O-1)**

|       | Schedule O-2 | Schedule O-3 | |
|-------|---------------------------|---------------------------|---------------------------|
| Year  | Trizec Rent Payments | Nunley Rent Payments | Total Rent Payments |
| 2013  | $   40,813 | $   60,325 | $ 101,138 |
| 2014  | 41,314 | 112,619 | $ 153,933 |
| 2015  | 41,852 | 67,113 | $ 108,964 |
| 2016  | 10,347 | - | $  10,347 |
| Total | $   134,325 | $   240,056 | $ 374,381 |

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 41

### C.  Ziegler Improperly Included As Damages $3,042,240 of the DIP loan and Other Borrowings

Ziegler concludes that "$3,042,240 of DIP Loan Borrowing and additional Debtor borrowings (i.e. the Other Borrowings) were not deposited to the Debtor's bank accounts" (Page 20, Paragraph B), as follows:

**Ziegler's Damage Analysis and Findings Relating to the DIP Loan and Other Borrowings (Schedule P)**

|  | Court Approved DIP Loans | Other Borrowings | Total |
|---|---|---|---|
| DIP Loans and Other Borrowings Deposited to Ace New York | 1,574,980 | 1,039,882 | $ 2,614,862 |
| Other Borrowings Deposited to Ace Museum | - | 916,822 | $  916,822 |
| Total DIP Loans and Other Borrowings Per Ziegler | $   1,574,980 | $ 1,956,704 | $ 3,531,684 |
| Less: Loan Repayments from Ace New York | (438,444) | (51,000) | $  (489,444) |
| Net Alleged Diverted Borrowings Per Ziegler | $   1,136,536 | $ 1,905,704 | $ 3,042,240 |

The DIP Loan was a court approved loan, and the Other Borrowings were not approved by the court. However, Ziegler concludes that even though Other Borrowings were not court approved, they should have been deposited into the Debtor's bank accounts. In my opinion, it is erroneous and improper for Ziegler to opine as a financial matter that Other Borrowings not approved by the court belong to the Debtor as this requires a legal analysis.

### i.  Ziegler excludes $1,143,914 of Ace New York payments to the Debtor's creditors in accordance with the court approved DIP Loan

We have traced the funding of the $1,575,000 of the DIP Loan and found Ace New York payments of $1,582,357 for the benefit of the Debtor

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 42

occurred within days of the funding of the DIP loan. The court approval
of DIP Loan of $1,575,000 specified that the proceeds from the DIP Loan
were also for the purpose of curing the Debtor's lease obligations and
legal fees. Ziegler's damage analysis inexplicably and improperly
excludes $1,143,914 of such payments by Ace NY (**Schedule Q**).

**Tracing of Court Approved DIP Loan Proceeds of $1,575,000**



Accordingly, Ace New York payments to the Debtor's landlords were
consistent with the court approved use of the DIP Loan. Ziegler's
analysis and findings are erroneous and misleading since Ziegler does
not credit Ace New York for the net payments totaling $1,143,914 for
the Debtor's lease obligations and other transfers to the Debtor.

CEX 80

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 43

### Comparative Analysis of Court Approved DIP Loan

| | Per Ziegler | Per Engel | Difference |
|---|---|---|---|
| **Court Approved DIP Loans** | | | |
| 9/16/2013 Deposit to Ace NY | $ 1,124,980 | $ 1,124,980 | $ - |
| 9/16/2013 Deposit to Ace NY | 450,000 | 450,000 | - |
| Total Court Approved DIP Loans | $ 1,574,980 | $ 1,574,980 | $ - |
| | | | |
| **Repayment of Court Approved DIP Loans** | | | |
| 9/16/2013 Payment to Wilshire Landlord | 0 | (626,743) | (626,743) |
| 9/17/2013 Payment to BH Landlord | 0 | (452,171) | (452,171) |
| 9/17/2013 Re-Payment to Debtor (Counsel) | (421,186) | (421,186) | - |
| 9/17/2013 Re-Payment to Debtor (Ace Museum) | 0 | (65,000) | (65,000) |
| 11/15/2013 Re-Payment to Eric Wilson | (17,257) | (17,257) | - |
| Total Repayment of Court Approved DIP Loans | $ (438,444) | $ (1,582,357) | $ (1,143,914) |
| | | | |
| **Net Court Approved DIP Loans Not Returned to Debtor** | $ 1,136,536 | $ (7,377) | $ 1,143,914 |

### D. Ziegler Improperly Included Borrowings from Eric Wilson

Ziegler includes $1,905,704 of Other Borrowings from Eric Wilson and the Wilson Entities as part of her damages calculation (**See Schedule P**). Although such borrowings were not court approved, Ziegler concludes that such borrowings should have been deposited into the Debtor's bank accounts and are part of the Debtor's damages.

Ziegler's conclusion that such Other Borrowings belonged to the Debtor is questionable and inconclusive since such borrowings were not approved by the court. Ziegler concluded that Other Borrowings belonged to the Debtor based on the Declaration of Eric Wilson. We have reviewed Eric Wilson's Declaration and have noted that Eric Wilson directly transferred Other Borrowings to Ace New York and Ace Museum, for the benefit of the Debtor (See Claim No. 34: Proof of Claim of Eric Wilson's entity Telford Building, Ltd.).

Irrespective, Ziegler did not address that $793,626 of Other Borrowings deposited into Ace New York were in fact transferred to the Debtor within a

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 44

day or two of Ace New York's receipt of funds from Eric Wilson (**See Schedule R**). The following reflects our tracing of the Other Borrowings from Eric Wilson that were transferred to the Debtor:

**Other Borrowings of Ace New York Transferred to the Debtor and Omitted by Ziegler (Schedule R)**

| Date | Other Borrowings from Eric Wilson To Ace NY | Advances to Debtor (Omitted by Ziegler) | Advances (Considered by Ziegler) | Net |
|---|---|---|---|---|
| 3/7/2013 | $ 159,982 | $ (145,000) | | $ 14,982 |
| 5/21/2013 | | | (51,000) | $ (51,000) |
| 9/16/2013 | 199,980 | | | $ 199,980 |
| 9/18/2013 | | (10,325) | | $ (10,325) |
| 9/18/2013 | | (5,301) | | $ (5,301) |
| 2/19/2014 | 39,980 | | | $ 39,980 |
| 12/18/2014 | 319,980 | (318,000) | | $ 1,980 |
| 1/2/2015 | 219,980 | (215,000) | | $ 4,980 |
| 5/15/2015 | 99,980 | (100,000) | | $ (20) |
| Total | $ 1,039,882 | $ (793,626) | $ (51,000) | $ 195,256 |

**Tracing of Other Borrowings Transferred to the Debtor Excluded from Ziegler's Analysis**



Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 45

Ziegler also improperly included as damages, $916,822 of Wilson Entities loans that he advanced directly to Ace Museum (See Schedule J). Ziegler concludes that Ace Museum used such loans to pay its obligations, including its obligation to La Brea. Ziegler then opines that the $916,822 of Wilson Entities loans that were improperly diverted to Ace Museum, constitutes damages to the Debtor. Thus, Ziegler's opinion infers that the Debtor never received any benefit from the Wilson Entities loans and related payments to La Brea in connection with the preservation of the Ace Museum lease option.

We have found that Ziegler's inclusion of $916,822 as damages is erroneous and inconsistent with the Debtor's acceptance of Wilson Entities loans to Ace Museum.[16]  The Wilson Entities proof of claim states that sums advanced to the Debtor's affiliates were used for preservation of the Debtor's estate, and thus confirming that the Debtor received the benefit from the preservation of Ace Museum's lease option.

It is our understanding that Eric Wilson and his related entities thereafter entered into a settlement agreement with the Plan Agent whereby the Plan Agent agreed, among other things, to allow a portion of the $916,822 that the Wilson Entities advanced to Ace Museum, as a claim against the Debtor. The Plan Agent's motion for approval of the settlement agreement with the Wilson Entities described the multiple benefits that the Debtor received from the Wilson Entities loans. Accordingly, the Plan Agent's acceptance of a portion of the $916,822 Wilson Entities loans confirms that the Debtor did receive value and benefit from payments to La Brea in connection with the preservation of the Ace Museum lease option.

It is therefore entirely contradictory now for Ziegler to assert that the Debtor did not receive any economic benefit from these advances, and that they constitute economic damages. On the other hand, to the extent that Eric

---

[16] Wilson's Chapter 11 Administrative claims and Section 3 of Claim No. 33

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 46

Wilson's proof of claim relating to the $916,822 was rejected by the Debtor, that amount does not constitute damages to the Debtor since the Debtor does not have to repay Eric Wilson for such loans.

Irrespective of Ziegler's omissions of repayments to the Debtor, we have found that Ziegler improperly included Other Borrowings allegedly not transferred to the Debtor as the Debtor's damages, since if the loans had been funded to the Debtor, the Debtor would have been required to repay such loans.

E. **Ziegler's Damages Calculation Did Not Consider That Ace New York Provided Economic Benefit to the Debtor as a Broker for the Debtor**

Ziegler's damages calculation of $12,809,192 did not consider the economic benefit that the Debtor received from Ace New York's role as an agent for the alleged sales belonging to the Debtor.[17] Overall, we have found that the Debtor benefited from Ace New York since Ace New York, despite acting without court permission, did provide a critical and important economic service which enabled the sale of art for the benefit of the Debtor.

We have estimated that at a minimum the Debtor received an economic benefit based on Ace New York's Post-Petition operating expenses of approximately $408,836 (**See Schedule S**).

---

[17] It is important to note that our analysis is not intended as a legal assessment of the appropriateness of Ace New York's unauthorized role as a broker for the Debtor. We recognize that Ace New York's role as a broker for the Debtor may have been legally improper. However, the legal impropriety of such a role is immaterial to the economic analysis of that broker relationship and the clear economic benefits the Debtor received as a result therefrom. In the analysis of fraudulent transfers and economic damages, the issue of economic benefit that the Debtor received is appropriate and relevant for consideration.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 47

### F.  Ziegler's Damage Analysis Did Not Consider That the Debtor Benefited from Preserving the Ace Museum Lease Purchase Option

Ziegler's report is noticeably silent of any consideration or discussion with respect to the business relationship between the Debtor and Ace Museum (sometimes, the "Two Entities"). Although Ziegler's analysis includes a numerical accounting of the transfers between the Two Entities, it is silent as to the economic substance behind such transactions.

Based on our review of the historical and financial relationship between the Two Entities, we have found that the Debtor and Ace Museum had a common financial investment in real estate through their respective investments in lease purchase options. The Debtor's investment in lease purchase options was significant and included both the Beverly Hills and Mid-Wilshire leases. Ultimately, the Debtor realized profits of approximately $23 million from both the Beverly Hills and Mid-Wilshire properties, which was substantially greater than any profits it earned from its art gallery operations. The significant amount of profits that the Debtor earned from its lease purchase options was consistent with the strategies of the Two Entities to advance funds to each other in order to preserve their respective lease purchase options.

The Ace Museum lease purchase option was clearly perceived by the Two Entities to have significant value. In this regard, we have found that the Debtor had an indirect financial interest in the preservation of Ace Museum's lease purchase option.   This financial interest is illustrated by the fact that as of Petition Date, Ace Museum was indebted to the Debtor by approximately $4.3 million due to advances made to preserve the Ace Museum lease purchase option.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 48

Historical Transactions Between the Two Entities

Historically, the two entities advanced to each other, loans for the principal
purpose of preserving their investment in lease purchase options. Shortly
after its formation, Ace Museum received a considerable contribution of
approximately $3.7 million from the Herb Alpert Foundation. Thereafter,
Ace Museum advanced to the Debtor approximately $2.8 million during the
period July 17, 2009 through May 18, 2010. Beginning in June 2010 through
Petition Date (February 2013), the Debtor repaid Ace Museum
approximately $1.9 million. Accordingly, during the Pre-Petition Period,
Ace Museum advanced to the Debtor a net loan of approximately $900,000.

During the Post-Petition Period, Ace New York advanced approximately
$4.9 million to Ace Museum and Ace Museum advanced to the Debtor
approximately 1.1 million, or a net of $3.8 million **(See Schedule Y-6)**.

**Ace New York Net Post-Petition Advances to the Debtor**

| | |
|---|---|
| Net Transfers from Ace NY to Ace Museum | $ 4,919,057 |
| Net Transfers from Ace Museum to Debtor | $ (1,102,512) |
| Net Total | $ 3,816,545 |

Ace New York Advances to Ace Museum Were Economically Beneficial to
The Debtor

We have found that Ace New York's Post-Petition net advances to Ace
Museum approximating $3.8 million were mostly for the purpose of
preserving Ace Museum's lease purchase option. There were several reasons
for this:

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 49

The Debtor's interest in preserving Ace Museum's lease purchase option
related to its $4.3 million receivable from Ace Museum. In this regard, we
have found that, though Ace Museum generated its own revenue through
grants, parking leases and other sources, the financial condition of Ace
Museum was deficient in its ability to repay the full $4.3 million obligation
to the Debtor. Ace Museum's potential profits from its lease purchase option
would have been the primary source for the repayment of Ace Museum's
obligation to the Debtor.

The Debtor's financial benefit from the Ace Museum lease purchase option
is confirmed in the June 8, 2015 email from Victor Sahn to David Shemano
(Bates Stamp MBN – 1355), stating the following:

> "…unless I am furnished with evidence that the June, 2015
> rent on the La Brea Properties has been paid by this
> Thursday, June 11, 2015, I will recommend to my clients
> that they file an involuntary bankruptcy against Ace
> Museum in order to preserve the very valuable purchase
> option on the La Brea properties."

Furthermore, we have found that Eric Wilson, a creditor of the Debtor,
advanced (loaned) funds to Ace Museum during the Post-Petition Period in
order to preserve the Ace Museum lease purchase option. Accordingly,
creditors of the Debtor perceived the Ace Museum lease purchase option as
a benefit to the Debtor.

We have also found that to the extent that the Wilson Entities proof of
claim which included a portion of the $916,822 he directly advanced to
Ace Museum, was accepted by the estate and approved by the court, also
confirms that the Debtor received a benefit from the preservation of the
Ace Museum lease purchase option.

CEX 87

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 50

Based on a review of the declaration of Douglas Chrismas filed on July 8, 2021, we understand that he believed that having a museum would enhance the brand of the Debtor Ace Gallery and that once the option was exercised the Ace Museum premises would also become the home of Ace Gallery.

For all of the above reasons, we have found that the Debtor received an economic benefit for all of the payments that were used to preserve the lease option. For the purposes of quantifying this benefit we have however limited the benefit to the approximately $3 million which was the net value in Ace Museum's lease purchase option. Based on the June 29, 2015 purchase offer obtained by Victor Sahn on behalf of the Official Committee of Unsecured Creditors of approximately $35 million for the La Brea property, Ace Museum could have realized profits of $3 million from the Ace Museum purchase option. Accordingly, Ziegler's damage analysis erroneously omitted the economic benefit the Debtor received from preserving the lease option limited to the $3 million value of the Ace Museum lease option.

**Calculation of Benefit the Debtor Received from Preserving Ace Museum's Lease Option**

| | |
|---|---|
| June 29, 2015 Purchase Offer | $ 35,300,000 |
| Lease Option Exercise Price **(Note 1)** | 32,320,000 |
| Profit | $ 2,980,000 |

**Note: Based on the Fifth Amendment to the Lease between Ace Museum and 400 S. La Brea dated February 2015, the option price was $32,320,000.**

CEX 88

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 51

### G. Ziegler Did Not Address Other Economic Support Provided by Ace Museum to the Debtor

The following is a summary of material, economic, and financial evidence that is relevant and contradicts Ziegler's opinions and conclusions that Ace New York "diverted" the Debtor's sales:

---

**Other Evidence That Contradicts Ziegler's Conclusions and Opinions**

1. Ace New York Transferred All of Its Profits to the Debtor

2. Ace New York Transferred 100% of DIP Loans to the Debtor

3. Ace New York Transferred $793,626 of Other Borrowings to the Debtor

4. Ace New York Paid $7.8 Million of Expenses Relating to Alleged Sales of Debtor's Art

5. Ace New York Sales Benefited the Debtor Since Debtor's Customers and Artists May Have Been Reluctant to Transact With a DIP

---

#### 1. Ace New York Transferred All of Its Profits to the Debtor

In Ziegler's analysis, she acknowledges and does not dispute that Ace New York was "formed to broker art for the Debtor and process sales during the Debtor's bankruptcy because some buyers were reluctant to buy art from a company in bankruptcy" (Ziegler's Expert Report Page 10 Lines 4-6). Despite this acknowledgment, Ziegler did not disclose or consider that Ace New York transferred all of its profits to the Debtor and that Ace New York did not profit from its business activities as a broker or intermediary for the benefit of the Debtor.

#### 2. Ace New York Transferred 100% of DIP Loan to the Debtor

Ziegler's damage analysis improperly and erroneously includes approximately $1.1 million of the court approved DIP Loan deposited to Ace New York. However, Ziegler did not disclose or consider that Ace New York

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 52

paid the Debtor's lease and rental payments approximating $1.1 million in accordance with the court's order approving the DIP Loan from Eric Wilson **(Schedule Q)**.

3. <u>Ace New York Transferred $793,626 of Other Borrowings to the Debtor</u>

Ziegler's damage analysis improperly and erroneously includes approximately 793,626 of Other Borrowings deposited to Ace New York. Ziegler did not disclose or consider that the Debtor received approximately $793,626 of its Other Borrowings when Ace New York transferred such funds to the Debtor **(See Schedule R)**.

4. <u>Ace New York Paid $7.8 Million of Expenses Relating to Alleged Sales of the Debtor's Art</u>

Ziegler's gross damages approximating $12.8 million improperly excludes approximately $7.8 million of expenses that would have been incurred by the Debtor but for the alleged wrongful diversion of the Debtor's sales.

H. **<u>Ziegler Did Not Perform a Proper Tracing of Alleged Fraudulent Funds</u>**

We have found that Ziegler's analysis of alleged the Debtor's funds transferred to Ace Museum, from which she alleges Ace Museum used to fund the $5.7 Million of rent payments to La Brea, is erroneous and deficient since she did not perform a proper tracing (LIBR tracing) of funds from Ace New York to Ace Museum. Accordingly, Ziegler's analysis of funds transferred from Ace New York to Ace Museum is based on an improper assumption and speculation that 100% of Ace New York transfers to Ace Museum originated from Ace New York sales belonging to the Debtor. Ziegler improperly assumes that Ace New York did not have any of its own funds, including loan proceeds from third parties that could have, and may have been part of Ace New York's transfers to Ace Museum. In my opinion, without a proper LIBR tracing of Ace New York transfers to Ace Museum, it is speculative to assume that 100% of Ace New

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFFA, MAFF, ABV
September 1, 2021
Page 53

York transfers to Ace Museum originated from the Debtor and could not have originated from other sources.

In addition, Ziegler's analysis of alleged Debtor funds transferred from Ace Museum to La Brea totaling $5.7 Million is also erroneous and misleading since she did not perform a proper LIBR tracing of transfers from Ace Museum to La Brea.[18] Accordingly, Ziegler's analysis of funds transferred from Ace Museum to La Brea totaling $5.7 Million is based on an improper assumption and speculation that 100% of Ace Museum transfers to La Brea originated from Ace New York funds and could not have originated from any other Ace Museum sources of funds.

Ace Museum received considerable funds from sources other than Ace New York. After reviewing the books and records of Ace Museum, we have determined that Ace Museum during the Post-Petition Period, had funds from other sources in addition to funds that it received from Ace New York.  Other funds included funds from rents, loans, and charitable contributions.   See Schedule O to our report dated October 30, 2020.   As can also be observed from Schedule O, Ace Museum paid its regular operating expenses from these funds, including expenses for insurance, janitorial, telephone, utilities, and a host of other expenses. From this, we conclude that Ace Museum had the ability to direct its funds for its own purposes as it determined.

Based on a LIBR tracing of Ace Museum funds transferred to La Brea during the Post-Petition Period, as reflected in Schedule O to our report dated October 30, 2020, because Ace Museum generated such revenue from many other sources other than Ace New York, we have found that a maximum of $3,640,201 paid to La Brea (and not $5.7 Million as Ziegler opined) could have originated from alleged Debtor funds

---

[18] It should be noted that Ziegler did not perform any LIBR tracing, whatsoever.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 54

**I.** **Ziegler Improperly and Without Basis Concludes That 100% Of Ace New York Sales Belonged To The Debtor And Opines As to the Ownership of Such Assets**

1.  Analysis of Ziegler's Ownership Opinion

If one accepts Ziegler's acknowledgment that Ace New York was acting as a broker for the Debtor, then it is to some extent economically irrelevant whether the Ace New York sales did or did not belong to the Debtor. Regardless of the foregoing, Ziegler's conclusion that all Ace New York sales belonged to the Debtor is flawed as reflected below.

Ziegler's conclusion and assumption that $14,359,941 were all sales proceeds belonging to the Debtor ("Debtor's Money"), is incorporated in Ziegler's finding that all transfers from Ace New York to Ace Museum totaling $5,766,762 originated from Debtor's Money. Ziegler did not directly trace or identify as to whether or not the $5,766,762 of transfers from Ace New York to Ace Museum originated from Debtor's Money. Instead, Ziegler's finding that 100% of Ace New York sales belonged to the Debtor, allowed and enabled Ziegler to conclude that all transfers from Ace New York to Ace Museum were Debtor's Money.

If Ziegler's finding that 100% of all Ace New York sales proceeds totaling $14,359,941 originated from Debtor's Money is incorrect, then Ziegler's finding that all transfers of $5,766,762 from Ace New York to Ace Museum originated from Debtor's Money is also incorrect and overstated since Ace New York transfers to Ace Museum could have included funds that were not Debtor's Money.

CEX 92

Expert Report of Jason A. Engel, CPA, CFE, CVA, CRFA, MAFF, ABV
September 1, 2021
Page 55

2.  <u>Ziegler's Failed to Conduct an Adequate Forensic Investigation</u>

Overall, we have found that Ziegler concluded erroneously and without basis, that 100% of Ace New York sales approximating $14,359,941 (Ziegler Report, Exhibit C) were art sales belonging to the Debtor.

Ziegler did not conduct a complete and proper forensic investigation of Ace New York sales and improperly concluded without basis that all Ace New York sales belonged to the Debtor. Ziegler's report identifies and explains the following as the basis of her findings that 100% of Ace New York sales were sales belonging to the Debtor:

**Summary of the Basis for Ziegler's Finding #1 (Schedule L)**

| Basis of Ziegler's Finding #1 | E&E Analysis |
|---|---|
| 1.  Ziegler's Finding of Ace NY Lack of Assets | 1.  Ace NY art sales were sales of artist owned artwork and not owned by Debtor or Ace NY. Thus, Ace NY lack of assets is not indicative of a fraud. |
| 2.  Ziegler's Finding of Ace NY lack of artist contracts | 2.  Not all sales were contractual sales and thus, not all sales required contracts |
| 3.  Ziegler's sample test of 3 Ace NY sales totaling $226,500 | 3.  a. Sample test is too small (1.58% of total sales) |
|  | b. Improper to conclude fraud for all Ace NY sales based on a test sample |
|  | c. Approximately 50% of sample tests were non-fraudulent or not related to Debtor |
| 4.  Ziegler's reliance on Kincaid's declaration and related schedules | 4.  a. No disclosure of what specific analysis, documents, Ziegler relied on |
|  | b. Ziegler's Expert Report is vague at least, and most misleading |
| 5.  Ziegler's finding that $3,639,633 of Ace NY sales proceeds were without Debtor letterhead | 5.  Ziegler did not analyze or consider her finding in connection with Ace NY reimbursements to the Debtor of $4,533,073 |
| 6.  Ziegler's finding that $10,720,308 of Ace NY sales proceeds were with Ace New York letterhead | 6.  Ziegler did not investigate or explain her analysis and finding that all sales with Ace New York letterhead were Debtor's sales |

3.  <u>Ziegler Improperly Makes a Legal Conclusion</u>

Ziegler's conclusion that Ace New York sales were in fact the Debtor's sales is not a proper finding for a financial expert since a determination of ownership requires a legal analysis and conclusion.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 56

4.   Ace New York's Lack of Assets and Capital is Not Conclusive

Ziegler concluded that the lack of Ace New York assets is evidence that Ace New York sales must have been the Debtor's sales. Substantially all of Ace New York sales of $14,359,941 originated from consignment sales and other sales of artist owned artworks and did not originate from purchased inventory[19]. Accordingly, in my opinion Ace New York art sales did not require any investment in artwork as Ace New York sales were sales on behalf of artists for which Ace New York was paid a commission (or profit). In my opinion it is quite conceivable for a sales organization to operate with minimal assets or capital.

5.   Lack of Ace New York's Artist Contracts or Consignment Contracts

Ziegler concluded that 100% of Ace New York sales of $14,359,941 belonged to the Debtor because Ziegler was "unable to locate any contracts between Ace NY and any of the artist[s]…" (Page 17). In this regard, Ziegler neglected to disclose or consider that not all artwork sold by Ace New York included any contracts with either the Debtor or Ace New York. We have identified approximately $6.7 million of Ace New York sales without any contracts with the Debtor, Ace New York, or any other entity (**See Schedule V**). Accordingly, Ziegler's finding that the lack of a contract with Ace New York in of itself is evidence that 100% of Ace New York art sales totaling $14,359,941 belonged to the Debtor is speculative and requires a legal analysis.

---

[19] Kincaid's Declaration Paragraph 10

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFEA, MAFF, ABV
September 1, 2021
Page 57

6.  Ziegler's Test Sample of Three Transactions is Inadequate

To substantiate her conclusion that 100% of Ace New York art sales totaling
$14,359,941 related to the Debtor, Ziegler selected the following three test
samples of Ace New York art sales totaling $226,500 **(See Schedule W-2)**:

| Artist(s) | Invoice # | Sale Date | Sale Amount | |
|---|---|---|---|---|
| 1. Charles Fine and Bernar Venet | 2022 | 07/30/2013 | $ 172,000 | |
| 2. Laurie Lipton | 2050 | 06/19/2014 | 18,530 | |
| 3. Laurie Lipton | 1792 | 02/13/2015 | 35,970 | |
| Total Selected Examples of Fraudulent Art Sales in Ziegler's Expert Report | | | $ 226,500 | 1.58% |
| Total Fraudulent Art Sales Alleged by Ziegler | | | $ 14,359,941 | 100% |

a.  Ziegler's Three Test Samples are Too Small to Draw Any Conclusions

Overall, Ziegler's test sample of $226,500 only represents a small
fraction of 1.6% of the total Ace New York sales of $14,359,941. In my
opinion, Ziegler's test sample, even if accurate as to its finding (that the
sales belonged to the Debtor), is insufficient to conclude that all Ace New
York sales belonged to the Debtor.

b.  Ziegler's Sample Test is Improper for The Analysis of Diversion of the
Debtor's Sales

It is improper to conclude diversion of corporate assets based on a test
sample. In my opinion, all of the $14,359,951 should have been
investigated and analyzed to determine the specific financial evidence
and reason why such sales constitute the Debtor's sales. Accordingly,
Ziegler's conclusion that 100% of Ace New York art sales totaling
$14,359,951 were from diverted sales of the Debtor's artwork, is
erroneous, misleading, and without basis.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 58

    c.   <u>Ziegler's Analysis of the Results of Her Test Samples Are Erroneous</u>

We have found that Ziegler's three test samples did not confirm that Ace New York art sales were in fact sales belonging to the Debtor. In this regard, we have found that Ziegler's conclusions relating to her three test samples are misleading and without basis (See below).

**Ziegler's Three Test Samples That Substantiate Ziegler's Finding That 100% of Ace New York Art Sales Totaling $14,359,951 were from Diverted Sales of the Debtor are Inconclusive**

| Artist(s) | Invoice # | Sale Date | Related to Debtor Per Ziegler | Related to Debtor Per E&E |
|---|---|---|---|---|
| 1. Charles Fine and Bernar Venet | 2022 | 07/30/2013 | $ 172,000 | Inconclusive |
| 2. Laurie Lipton | 2050 | 06/19/2014 | 18,530 | Inconclusive |
| 3. Laurie Lipton | 1792 | 02/13/2015 | 35,970 | Inconclusive |
| Total Ziegler's Selected Samples of Fraudulent Art Sales | | | $ 226,500 | Inconclusive |

The following is a detail analysis of Ziegler's three test samples totaling $226,500 which are the basis of Ziegler's opinion that 100% of Ace New York art sales totaling $14,359,951 were diverted sales belonging to the Debtor:

    i.   **Laurie Lipton's Consignment Contract**

We have found that the artist consignment contract with Laurie Lipton required monthly payments to Laurie Lipton in order for the consignment contract to be enforced. From Petition date through the sale date of June 19, 2014, Ace New York paid $36,000 of the monthly payments to Laurie Lipton (**See Schedule W-5**). The Debtor did not pay any monthly payments to Laurie Lipton between the Petition date and the date of the sale for invoice #2050 (**See Schedule W-5**).

In my opinion, it is inconclusive and speculative to assume that the sale of the Laurie Lipton art related to the Debtor since it was Ace New York that made monthly payments to the artist, and not the Debtor.

CEX 96

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 59

ii.   **Laurie Lipton Consignment Contract During the February 13, 2015
Art Sale for Invoice #1792 in the Amount of $35,970**

We have found that the Debtor's artist contract with Laurie Lipton
required monthly payments to Laurie Lipton. In this regard, we have
found that from Petition Date through the date of the sale on February
17, 2015, Ace New York paid $45,000 of the monthly payments paid to
Laurie Lipton and the Debtor paid $45,000 of the monthly payments to
Laurie Lipton. Accordingly, Ace New York and the Debtor each
contributed 50% of the monthly payments to Laurie Lipton as of the date
of the sale.

Based on this in my opinion, it is speculative and inconclusive to say that
the Ace New York sale of Laurie Lipton art was a sale of the Debtor.

iii.   **July 30, 2013 Art Sale for invoice #2022 for Charles Fines and
Bernar Venet Art pieces in the Amount of $172,000**

Ace New York art sale proceeds for invoice #2022 reflects a sale in the
amount of $172,000 for two art pieces. We have found that the Charles
Fine art piece was sold for $72,000 and the Bernar Venet art piece was
sold for $100,000. However, Ziegler's analysis relating to the Charles
Fine transaction included both art pieces for $172,000 when it should
have only included the Charles Fine art piece for $72,000. Thus, we have
found her analysis to be inaccurate and overstated.

a.   Consignment Contract with Charles Fine

Invoice #2022 for the sale of Charles Fine art and Bernar Venet art is an
invoice with an Ace New York letterhead. Since the Charles Fine
consignment agreement produced is unsigned, absent a legal analysis it

CEX 97

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 60

is inconclusive and speculative to assume that the Ace New York sale relating to the Charles Fine art piece was a sale of the Debtor.

7. <u>Ziegler's Reliance on the October 19, 2017 Declaration of Timothy Kincaid ("Declaration of Kincaid")</u>

Overall, we have found Ziegler's reliance on the Declaration of Kincaid is vague at best and misleading at most. Ziegler's Expert Report identifies specific tasks that she was required to perform, including the following:

"evaluate and verify the conclusions presented in the October 19, 2017, declaration of Timothy Kincaid…" (Page 1, Paragraph A of Ziegler Expert Report).

However, Ziegler's "Summary of Opinions", lists seven opinions of which none of her opinions addresses her assignment to evaluate and verify the Declaration of Kincaid.

However, Ziegler's report does refer to the Declaration of Kincaid (Ziegler's Expert Report Page 14) and identifies the following specific findings in the Declaration of Kincaid that Ziegler relied on to form her opinion that 100% of Ace New York sales were the Debtor's sales:

| Summary of Kincaid's Findings Relied On By Ziegler |
| --- |
| a.  Kincaid's Finding That The Debtor's Monthly Operating Reports Filed With The Court Did Not Properly Reflect All Of Debtor's Sales And That Such Sales Were Not Deposited To Ace New York Bank Accounts |
| b.  Kincaid's Finding That Sales Proceeds And DIP Loan Proceeds Were Not Deposited Into Debtor's Bank Account |
| c.  Ziegler Concludes That Kincaid's Findings Are Not Reliable Since It Does Not Include New And Additional Information That Ziegler Considered |
| d.  Ziegler Concludes That She Relied On Kincaid's Analysis |
| e.  Ziegler Suggests That She Reviewed And Verified The Kincaid Analysis And Back Up Documentation |

CEX 98

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFRA, MAFF, ABV
September 1, 2021
Page 61

 

a.   <u>Kincaid's Finding That DIP Loan Proceeds Were Not Deposited Into the Debtor's Bank Account</u>

Kincaid found that DIP loan proceeds "were not deposited into the Debtor's bank account". In this regard, Ziegler relied Kincaid's finding and also conducted an independent investigation to confirm Kincaid's finding. Ziegler then concluded that the Debtor did not receive approximately $1.1 million in accordance with the court approved DIP Loan.

As to the DIP Loan proceeds, Kincaid's and Ziegler's findings are misleading and ignore important facts. As addressed above, we have traced and verified that Ace New York paid the Debtor's expenses in accordance with the court approved DIP Loan (**Schedule Q**).

 

b.   <u>Ziegler Concludes That Kincaid's Findings Are Not Reliable Since It Does Not Include New and Additional Information That Ziegler Considered</u>

Ziegler explains that since the filing of Kincaid's Declaration,

"more information became available which resulted in a better understanding of certain transactions. My analysis includes this new information and resulted in modifications to Kincaid's analysis" (Ziegler's Expert Report Page 14, Last Paragraph).

Thus, Ziegler suggests that Kincaid's Declaration is not reliable since it does not include new and updated information[20].

---

[20] It is important to note that Ziegler did not identify or specify which analysis and finding of Kincaid was verified and what was not verified. Also, Ziegler did not identify specifically which part of Kincaid's analysis required updating.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 62

    c.   <u>Ziegler Concludes That She Relied on Kincaid's Analysis</u>

Ziegler then completely dismissed her previous finding that the Kincaid analysis is outdated and unreliable, and indicates that she relied on the Kincaid declaration in forming her opinions that Ace New York, Ace Museum, and La Brea, received the Debtor's funds from the sale of alleged Debtor art sales.

In my opinion, Ziegler should have disclosed specifically what part(s) of the Kincaid analysis she verified and what part(s) she relied on.

    d.   <u>Ziegler Suggests That She Reviewed and Verified the Kincaid Analysis And Back Up Documentation</u>

Ziegler also suggests that she reviewed and verified the Kincaid analysis and backup documentation to support her opinion that $15,392,536 of the Debtor's funds were diverted to Ace New York, Ace Museum, and La Brea (Ziegler's Expert Report, Page 15 middle paragraph) In this regard, it appears that Ziegler did not need to rely on Kincaid's analysis since she conducted her own investigation.

In addition, Ziegler does not identify specifically identify what she verified or what specific documents she reviewed in connection with her investigation of Kincaid's Declaration and analysis.

8.   <u>Other Findings That Contradict Ziegler's Conclusion that 100% of Ace New York Sales Were the Debtor's Sales</u>

The following is a summary of other findings that contradict Ziegler's conclusion that 100% of Ace New York sales were the Debtor's sales.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 63

+-----------------------------------------------------------------------+
| **Summary of Other Findings That Contradict Ziegler's Principal Assumption** |
| |
| 1.  Ace New York Sales Without Any Contracts Approximated $6.7 million |
| |
| 2.  Ziegler Erroneously Concluded That Consignment Contract Sales of Laurie Lipton and Mary Corse (Artists) Were Debtor's Sales |
| |
| 3.  $10.7 Million of Sales Invoices were on Ace New York Letterhead |
| |
| 4.  Ziegler Did Not Consider That But For Ace New York Acting As a Intermediary Broker, Debtor's Customers and Artists Would Have Been Reluctant to Transact With a DIP |
+-----------------------------------------------------------------------+

    a.  <u>Ace New York Sales Without Any Contracts Approximated $6.7 million</u>

We have found that Ace New York art sales approximating $6.7 million **(See Schedule V)** included in Ziegler's analysis, had no contracts with the Debtor or Ace New York. Accordingly, Ziegler's finding is at minimum questionable and inconclusive as to whether or not sales without any consignment contracts belonged to the Debtor.

**Ace New York Sales Without Artist Contracts**

| | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|
| Ace NY Sales with No Artist Contracts **(Schedule V-1)** | $   44,160 | $       - | $   19,800 | $   12,000 | $   75,960 |
| Ace NY Sales With Unsigned Artist Contracts **(Schedule V-2)** | 428,548 | 129,393 | 122,120 | - | $  680,061 |
| Ace NY Sales with Unknown Artists **(Schedule V-3)** | 248,980 | 92,100 | 68,128 | - | $  409,208 |
| Ace NY Sales Before Effective Artist Contracts **(Schedule V-4)** | - | 688,574 | 21,800 | - | $  710,374 |
| Ellsworth Kelly Sale With No Artist Contract **(Schedule V-4)** | | | 4,800,000 | | $4,800,000 |
| Total | $   721,688 | $   910,067 | $5,031,848 | $   12,000 | $6,675,603 |

The following is a detail analysis of Ace New York sales without contracts, which Ziegler improperly concluded were the Debtor's sales:

    i.  <u>Ziegler Improperly Concluded that the Proceeds of $4.8 million for the Sale of Ellsworth Kelly Artwork were the Debtor's Sales</u>

Ziegler concluded that the sale proceeds of $4.8 million for Ellsworth Kelly art related to the Debtor, irrespective of the fact that there was no

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 64

contract between Ellsworth Kelly and the Debtor. In this regard, Ziegler does not address or explain, why and how the Ellsworth Kelly sale related to the Debtor.

We have found that $4,000,000 of the $4,800,000 sales proceeds from the Ellsworth Kelly was paid to Andrea Nasher as commission – a fact that Ziegler ignores in her Expert Report.  The net sales proceeds of $800,000 ($4,800,000 - $4,000,000) were split between the Debtor and Ace New York. The Debtor received $630,000 from Ace New York and Ace New York retained $170,000 **(See Schedule N-3)**. The following is a summary of the Ellsworth Kelly art sale proceeds and related transactions:

| Date | Kelly Ellsworth Sale Proceeds | Commision Paid to Andrea Nasher | Transfers to Debtor | Total Net Proceeds |
|------|---------|---------|---------|---------|
| 10/5/2015 | $    4,800,000 | | | $ 4,800,000 |
| 10/5/2015 | | $    (3,840,000) | | $ (3,840,000) |
| 10/5/2015 | | | $ (250,000) | $  (250,000) |
| 10/6/2015 | | (160,000) | | $  (160,000) |
| 10/6/2015 | | | (160,000) | $  (160,000) |
| 10/8/2015 | | | (30,000) | $   (30,000) |
| 10/9/2015 | | | (190,000) | $  (190,000) |
| Total | $    4,800,000 | $    (4,000,000) | $ (630,000) | $   170,000 |

ii. <u>Ziegler Did Not Consider or Address that $75,960 of Ace New York Sales That Did Not Have Any Artist Contracts</u>

We have found that Ziegler's analysis of the Debtor's art sales deposited into Ace New York did not consider or address sales totaling $75,960 for which there was no artist contract or consignment contract **(See Schedule V-1)**. In this regard, we have found that Ziegler's finding that such sales were the Debtor's sales and not Ace New York art sales, is questionable, inconclusive, and without basis.

Expert Report of Jason A. Engel, CPA, CFE, CVA, CFCA, MAFF, ABV
September 1, 2021
Page 65

   iii.  **Ziegler Did Not Consider or Address That $680,061 of Ace New York Sales Did Not Have Signed Contracts or A Signed Consignment Agreement with the Debtor**

We have found that Ziegler's analysis of the Debtor's art sales deposited into Ace New York did not consider or address sales totaling $680,061 for which the contract or consignment agreement were unsigned **(See Schedule V-2)**. In this regard, we have found that Ziegler's finding that such sales were the Debtor's sales and not Ace New York art sales, is questionable and not conclusive.

   iv.  **Ziegler Did Not Consider or Address $409,208 of Ace New York Sales for Which the Artist Was Unidentified**

We have found that Ziegler's analysis of the Debtor's art sales deposited into Ace New York did not consider or address sales totaling $409,208 for which the artist was not identified **(See Schedule V-3)**. In this regard, we have found that since the artist is unidentifiable, it is speculative to assume that the transaction related to a consignment contract with the Debtor. Accordingly, Ziegler's finding that such sales were the Debtor's sales and not Ace New York art sales, is questionable and without basis.

   v.  **Ziegler Did Not Consider or Address $710,374 of Ace New York Sales for Which Sales of Art Occurred Prior to a Signed Contract with the Debtor**

We have found that Ziegler's analysis of the Debtor's art sales deposited into Ace New York did not consider or address sales totaling $710,374 for which sales of art occurred prior to a signed contract with the Debtor **(See Schedule V-4)**. In this regard, we have found that such sales occurred without a contract. Accordingly, Ziegler's finding that such

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 66

sales were the Debtor's sales and not Ace New York art sales, is questionable and inconclusive.

b.  Ziegler Erroneously Concluded That Consignment Contract Sales of Laurie Lipton and Mary Corse (Artists) Related to the Debtor

Both Laurie Lipton and Mary Corse consignment contracts with the Debtor required monthly payments to the artists as a condition for the consignment. We have found that Ace New York made various required payments to Laurie Lipton and Mary Corse and the Debtor made no payments. Accordingly, we have found that it is inconclusive as to whether approximately $1,035,595 of Ace New York sales of Laurie Lipton and Mary Corse artwork related to the Debtor, since Ace New York made 100% of the contractual required monthly payments to the artists (**See Schedule W-4**).

**Ace New York Sales and Ace New York Monthly Payments to Artists**

| Artist | Period | Monthly Payments | | Art Sales |
|---|---|---|---|---|
| | | Ace NY | Debtor | |
| Mary Corse | 2/19/2013 - 5/31/2014 | $ 170,000 | $0 | $ 969,205 |
| Laurie Lipton | 2/19/2013 - 6/30/2014 | 42,000 | 0 | 66,390 |
| Total | | $ 212,000 | $0 | $ 1,035,595 |

c.  $10.7 Million of Sales Invoices were on Ace New York Letterhead

Ziegler's analysis of Ace New York sales is outlined on both Page 16 and Exhibit C of her Expert Report. Particularly, Page 16 reflects that of the total Ace New York sales of $14,359,951, $10,720,308 were sales with Ace New York letterhead (**See Schedule W-3**). Significant is that Ziegler did not identify the documents and analysis that form the basis of her conclusion that

Expert Report of Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV
September 1, 2021
Page 67

100% of the sales with Ace New York letterhead were in fact sales of the Debtor.

Ziegler's analysis of Ace New York sales reflects that $3,639,633 of Ace New York sales did not have Ace New York letterhead (**See Schedule W-4**).

Ace New York transferred and repaid $4,533,073 to the Debtor, which is $893,440 more than the sales with non-Ace New York letterhead (Ziegler Expert Report Exhibit AE). More significant is that $10.7 million of Ace New York sales were transacted with Ace New York sales invoices and Ace New York letterhead. Based on the $10.7 million of Ace New York sales invoices with Ace New York letterhead, it is inconclusive and questionable for Ziegler to have concluded that all such sales were in fact sales of the Debtor's artwork.

Our findings and opinions are subject to change should new information become available.

Respectfully submitted on
September 1, 2021

*Jason A. Engel*
_____
Jason A. Engel, CPA, CFE, CVA, CIRA, MAFF, ABV

CEX 105

# EXHIBIT D

CEX 106

| | |
|---|---|
| **From:** | Sahn, Victor A. |
| **Sent:** | Mon, 22 Jun 2015 21:08:17 +0000 |
| **To:** | Shemano, David B. |
| **Cc:** | Beth R. Young (bry@lnbyb.com);'Kurt Ramlo' (KR@lnbyb.com);Krikor J. |

Meshefejian;Weg, Howard J.;Lev, Daniel A.;Hami, Asa S.;anahmias@mbnlawyers.com
**Subject:**        RE: Ace Museum Lease Payment

Thanks very much.

---

**From:** Shemano, David B. [mailto:DShemano@RobinsKaplan.com]
**Sent:** Monday, June 22, 2015 2:06 PM
**To:** Sahn, Victor A.
**Cc:** Beth R. Young (bry@lnbyb.com); 'Kurt Ramlo' (KR@lnbyb.com); Krikor J. Meshefejian; Weg, Howard
J.; Lev, Daniel A.; Hami, Asa S.; anahmias@mbnlawyers.com
**Subject:** RE: Ace Museum Lease Payment

Victor – I just confirmed with Douglas that the rent was paid today.

**David B. Shemano**
**ROBINS ◢ KAPLAN** LLP

Robins Kaplan LLP | 2049 Century Park East | Suite 3400 | Los Angeles, CA  90067
p 310 229 5894 | f  310 229 5800 | DShemano@RobinsKaplan.com| RobinsKaplan.com

---

**From:** Sahn, Victor A. [mailto:vsahn@sulmeyerlaw.com]
**Sent:** Monday, June 22, 2015 1:58 PM
**To:** Shemano, David B.
**Cc:** Beth R. Young (bry@lnbyb.com); 'Kurt Ramlo' (KR@lnbyb.com); Krikor J. Meshefejian; Weg, Howard
J.; Lev, Daniel A.; Hami, Asa S.; anahmias@mbnlawyers.com
**Subject:** Ace Museum Lease Payment

David,

We have the involuntary bankruptcy petition ready to file against Ace Museum.  Can you please confirm
that the payment to the La Brea landlord has been made today.  Today is the last day to make the
payment based upon the extension given by the Landlord.

I need to hear back from you on this by 4 p.m.

Thanks.

Victor.

CEX 107

---

Victor Sahn



333 South Hope Street, Thirty-Fifth Floor, Los Angeles, CA 90071
Voice: 213.617.5211  Fax: 213.629.4520

E-Mail: vsahn@sulmeyerlaw.com
URL: www.sulmeyerlaw.com

*********************************************************************
This e-mail message is for the sole use of the intended recipient(s) and may contain confidential
or legally privileged information. Any unauthorized review, use, disclosure or distribution
is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail,
delete this message from your computer and destroy all copies of the original message.
*********************************************************************

---

Information contained in this e-mail transmission may be privileged, confidential and covered by
the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error
by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax
advice contained in this communication (including any attachments) is not intended to be used,
and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal
Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related
matter.

Thank you in advance for your cooperation.

Robins Kaplan LLP
http://www.robinskaplan.com

---

| | |
|---|---|
| **From:** | Shemano, David B. |
| **Sent:** | Fri, 26 Jun 2015 23:08:30 +0000 |
| **To:** | Douglas Chrismas |
| **Subject:** | Email exchange with Victor |

**From:** Sahn, Victor A. [mailto:vsahn@sulmeyerlaw.com]
**Sent:** Wednesday, June 24, 2015 4:54 PM
**To:** Shemano, David B.
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.;
anahmias@mbnlawyers.com; Weg, Howard J.; Howard Grobstein (Hgrobstein@gtfas.com); Steven
Roopenian; Joshua Teeple; Beth R. Young
**Subject:** RE: Art & Architecture Books of the 21st Century

David,

I like to think I expressly myself clearly. But perhaps in the "…irrelevant accusations…" and the
"…sanctimony…" of my prior correspondence, I have not communicated clearly in this case.

Last week, we had a meeting at Court and discussed negotiation of a Plan where your client stated-(1) a
payment plan based upon art gallery operations, and (2) a modification of the existing order appointing
the Responsible Person to permit your client until December 1, 2015 to monetize the La Brea asset and
pay the claim owed to the bankruptcy estate.

I told you that we could not respond with regard to the payment plan option without information. I told
you I would be writing you a letter respecting the La Brea asset. I wrote that letter on June 16 and on
pages 3 and 4, I told you what the conditions were for an extension of the Responsible Person Order until
December 1.

You responded by calling me and pointing to paragraph 9 of the Stipulation which you believe relieves
Ace Museum of the obligation to pay the bankruptcy estate on its claim against the Museum. You then
wrote a letter to me which stated, in pertinent part,

"Ace Museum: As previously discussed, Douglas is committed to
monetizing the La Brea property to help satisfy claims against the Debtor. The
restrictive terms outlined in your letter are not acceptable, especially in view of the
fact that, as we discussed, Ace Museum's obligation to the Debtor was satisfied as
a result of the Beverly Hills sale and, therefore, the Committee no longer has any
right to enforce rights and remedies against Ace Museum. Accordingly, the La
Brea property should be excluded from the plan and the Committee should rely
on the plan prepayment terms to incentivize Douglas to monetize the property
and use the proceeds to pay down the Debtor's obligations. However, if the
Committee decides to prioritize the monetization of the La Brea property and
wants restrictive language in the plan, we are willing to discuss such terms in the

CEX 109

context of good faith negotiations concerning other plan terms." (emphasis added)

In response to this portion of your letter, I want to be clear in my response even though I already have been. **That portion of your letter is a non-starter to negotiations. If this is going to be your client's position (that is, your client Douglas Chrismas as the principal and controlling person of Ace Museum not as the principal and controlling person of the Debtor), I am very concerned we are not going to have a negotiated resolution.** (emphasis added)

Forgive me for putting the language directly above in larger, bold type, but I wanted to be sure that I was communicating clearly and not engaging in "…sanctimony…" or "…irrelevant accusations…"  I want to be sure that there is no ambiguity in your mind with regard to what I am saying.

I shall continue as I have been, to negotiate in good faith with the Debtor (that is, Douglas Chrismas in his position as principal of the Debtor) through its counsel with whom I enjoy a respectful, cordial, and professional relationship.  I shall continue to exchange information with her and hope that her client, Douglas Chrismas as the principal of the Debtor, will supply us with information that we have requested and access that we need.  Given his conduct to date, we will wait and see what he does going forward.

But I also want to be clear with you that if Ace Museum acting through its principal and controlling person Douglas Chrismas, intends to attempt to take the Ace Museum asset off the table, I am fearful that our discussions are not going to lead to a global agreement.

Accordingly, the decision on what to do about this conundrum lies with Douglas Chrismas, this time in his capacity as the principal of Ace Museum.

Please let me know what Douglas as the Debtor says to Douglas as representative of Ace Museum and feel free to report back to me on the result of this conversations at your earliest opportunity.

If anything in this email has moved you to view it as either "…sanctimonious…" or "…irrelevant accusations…", I apologize in advance.

Last, it is disappointing that you refuse to acknowledge conversations as I asked you to do, because my questions about those conversations to you were rhetorical.  What I told you was said was exactly what was said.  This probably leads to a necessity to have all further communications with you take place in writing so that your "memory" will not be called upon going forward.

Best regards,

Victor.

_____

Victor Sahn

**Sulmeyer**Kupetz

A PROFESSIONAL CORPORATION

333 South Hope Street, Thirty-Fifth Floor, Los Angeles, CA 90071
Voice: 213.617.5211  Fax: 213.629.4520

CEX 110

E-Mail: vsahn@sulmeyerlaw.com
URL: www.sulmeyerlaw.com

**From:** Shemano, David B. [mailto:DShemano@RobinsKaplan.com]
**Sent:** Wednesday, June 24, 2015 4:10 PM
**To:** Sahn, Victor A.; Beth R. Young
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.;
anahmias@mbnlawyers.com; Weg, Howard J.; Howard Grobstein (Hgrobstein@gtfas.com); Steven
Roopenian; Joshua Teeple
**Subject:** RE: Art & Architecture Books of the 21st Century

Victor –

I have no idea why you have interest in making irrelevant accusations instead of doing what we proposed
in our letter – negotiate plan terms in good faith.  Regarding due diligence, I don't know how many more
times I have to say it – we agree you are entitled to due diligence and I see you and Beth are working
productively together.

If you have a transcription memorializing word for word the language below, I would like to see it.  Your
description is not my recollection.  With respect to point one, my recollection is that Douglas told  you, as
you were told before, that no third party would be willing to put up new money for rent if the property
was going to be promptly sold.  Douglas was stating a fact, not making a threat.  With respect to point
two, my recollection is that I told you that if the Committee did not agree to a reasonable stay of sale and
marketing efforts by Simon, Ace Museum would seek a modification of the Stipulation (and responsible
officer order) based upon the sale of the Beverly Hills property and extension of the option.

I also recall telling you that Douglas is highly motivated to monetize the La Brea property for the benefit
of creditors and you should give him the space to do it.  Sometimes the carrot is preferable to the stick.

**David B. Shemano**
**ROBINS KAPLAN** LLP

Robins Kaplan LLP | 2049 Century Park East | Suite 3400 | Los Angeles, CA  90067
p 310 229 5894 | f  310 229 5800 | DShemano@RobinsKaplan.com| RobinsKaplan.com

**From:** Sahn, Victor A. [mailto:vsahn@sulmeyerlaw.com]
**Sent:** Wednesday, June 24, 2015 2:15 PM
**To:** Shemano, David B.; Beth R. Young
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.;
anahmias@mbnlawyers.com; Weg, Howard J.; Howard Grobstein (Hgrobstein@gtfas.com); Steven
Roopenian; Joshua Teeple
**Subject:** RE: Art & Architecture Books of the 21st Century

David-  Thanks for your note.  I never tire of a lawyer's delusional ability to view themselves and their client in a positive manner.  Your email below is proof of that fact.

I will not be saving you the "sanctimony", but I will be representing my client.  We have not backed out of anything.  We stand ready to negotiate with your client.  Your client, thus far, has prevented us from discovering information that we need.  It remains to be seen whether that will continue to be the case.  Now your client has attempted to pull the Ace Museum asset off the table.  When your client does these things, in addition to the legion of other acts committed during and before this bankruptcy case was filed which are either grossly negligent or fraudulent, it is difficult to get the Committee to stay in line with regard to a negotiated resolution that avoids further litigation and asks us to "trust" him with regard to a payment plan that he already admits is not justified or supported by the operations of the Debtor to date.  With that in mind, I will ask you two simple questions, which your email below does not address:

1.  Did your client state to me on a witnessed phone call of which you were a part that he was not making the June, 2015 rent payment on the La Brea Properties and was willing to risk termination of the underlying lease and purchase option (which is the only source that Ace Museum has to pay its indebtedness to the Debtor) until and unless the Committee backed off its position regarding the Responsible Officer.

2.  Did you tell me on a witnessed phone call that if the Committee did not back off this position regarding the Responsible Officer and agree to new terms and conditions regarding the marketing and sale of the La Brea properties and payment of the Ace Museum obligation that Mr. Chrismas would do everything within his power to undermine the efforts of the Responsible Officer to sell the La Brea Property.

Answer 'yes' or 'no' to each.  These are important questions.

Your client has an egregious conflict with the Debtor.  It is readily apparent and has been pointed out to him repeatedly.  Perhaps he is fortunate to have you to defend him from these facts, but that will not change them.

You would do far better to tell your client to be cooperative with the Committee so a negotiated process has a chance of succeeding rather than attempting to shift attention away from his actions to some other matter that only serves to deflect and obfuscate.

And last for now, you should tell your client to stop telling artists to call Eric Wilson so that Mr. Wilson could bring David Kupetz's mother-in-law's efforts to take over your client's business to my attention.  It only brings further embarrassment to Mr. Chrismas and undermines him even further with the Committee.  In further regard to that accusation, we will be filing our Rule 2004 motion by the end of this week.

In regard to the questions posed which your client needs to answer, I will look forward to hearing from you.

Victor.

_____
Victor Sahn

CEX 112

**Sulmeyer**Kupetz

A PROFESSIONAL CORPORATION

333 South Hope Street, Thirty-Fifth Floor, Los Angeles, CA 90071
Voice: 213.617.5211  Fax: 213.629.4520
E-Mail: vsahn@sulmeyerlaw.com
URL:  www.sulmeyerlaw.com

---

**From:** Shemano, David B. [mailto:DShemano@RobinsKaplan.com]
**Sent:** Wednesday, June 24, 2015 1:13 PM
**To:** Sahn, Victor A.; Beth R. Young
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.;
anahmias@mbnlawyers.com; Weg, Howard J.; Howard Grobstein (Hgrobstein@gtfas.com); Steven
Roopenian; Joshua Teeple
**Subject:** RE: Art & Architecture Books of the 21st Century

Victor – the Committee is certainly entitled to take any position that it wants and, as reflected in my letter
to you, Ace Museum will negotiate in good faith.  However, let me make our position very clear.  The
Stipulation negotiated in February was intended to, and did, incentivize Douglas to sell the Beverly Hills
property for $40 million.  That number was presumably selected by the Committee as a goal that the
Committee likely thought could never be reached, but the fact is Douglas came through to the undisputed
benefit of the Committee.  If the Committee is going to try and pocket Douglas's achievement and then
back out of its part of the bargain, so be it and Ace Museum will respond, but save me the sanctimony.

In the meantime, please confirm that, in accordance with the Stipulation, you will be promptly dismissing
the Ace Museum adversary proceeding and requesting that Judge Kwan vacate the responsible officer
order.

**David B. Shemano**

**ROBINS**／**KAPLAN** LLP

Robins Kaplan LLP | 2049 Century Park East | Suite 3400 | Los Angeles, CA  90067
p 310 229 5894 | f  310 229 5800 | DShemano@RobinsKaplan.com| RobinsKaplan.com

---

**From:** Sahn, Victor A. [mailto:vsahn@sulmeyerlaw.com]
**Sent:** Wednesday, June 24, 2015 12:45 PM
**To:** Beth R. Young
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.;
anahmias@mbnlawyers.com; Weg, Howard J.; Howard Grobstein (Hgrobstein@gtfas.com); Steven
Roopenian; Joshua Teeple; Shemano, David B.
**Subject:** RE: Art & Architecture Books of the 21st Century

Beth,

CEX 113

Thanks for your note.  I shall be writing to you very shortly with respect to the documents that we have from the AERC litigation which shall be transmitted to Howard Grobstein's firm today.

I appreciate the reinstatement of the original payment proposal, however, while you state that Ace Museum is not the Debtor's problem, I must make two points.  It is the Debtor's problem because the Debtor's principal should be opposed to any position taken by any party which seeks to deprive the Bankruptcy Estate of a valuable asset.  Unfortunately, the person on behalf of the entity taking a position adverse to the Bankruptcy Estate regarding its entitlement to receive $3.5 Million owed to it by its affiliate, is identical to the person who should not permit such a position to be taken or advanced.  Mr. Chrismas as the person acting on behalf of Ace Museum has been personally adverse to and in conflict with the Bankruptcy Estate on the Ace Museum receivable since the inception of this Bankruptcy Case.  He told me on a witnessed phone call that he was not making the June, 2015 rent payment on the La Brea Properties and was willing to risk termination of the underlying lease and purchase option (which is the only source that Ace Museum has to pay its indebtedness to the Debtor) until and unless the Committee backed off its position regarding the Responsible Officer.  His lawyer told me on a witnessed phone call that if the Committee did not back off this position regarding the Responsible Officer and agree to new terms and conditions regarding the marketing and sale of the La Brea properties and payment of the Ace Museum obligation that Mr. Chrismas would do everything within his power to undermine the efforts of the Responsible Officer to sell the La Brea Property.

Now, we have Ace Museum telling us that the underlying obligation is no longer owed.  I don't know what the Committee's response will be to this position.  I presume its response will either be to continue to attempt a negotiation with the Debtor, Ace Museum and Mr. Chrismas or it will be to indicate that all negotiations should cease in consideration of this position and the Committee go forward with its own Plan of Reorganization.

The second point relates to the first in that we have no response from Ace Museum regarding my letter on that subject of last week which followed our meeting in Court where issues regarding Ace Museum were discussed.  The response that we received was paragraph 9 of the Stipulation reached in the underlying litigation means that the Ace Museum receivable is no longer an asset of the Debtor's bankruptcy estate and there was no reason, therefore, to discuss our proposal in that regard.

While Ace Museum is free to take any position that it wishes, and David Shemano may attempt to sugar coat this position with words that sound like they are ameliorative but actually are not, I want to point out that the pursuit of negotiations toward a consensual plan are being undermined by Ace Museum's recent actions.

The Debtor, Mr. Chrismas and the Debtor's counsel should be very concerned about these latest events as it attempts to reach a consensual resolution with the Committee on a Plan of Reorganization.

Thanks.  Again, you will receive the list of documents which we have taken from the AERC litigation exhibits shortly.

Victor.

_____

Victor Sahn

**Sulmeyer**Kupetz

A  PROFESSIONAL  CORPORATION

CEX 114

333 South Hope Street, Thirty-Fifth Floor, Los Angeles, CA 90071
Voice: 213.617.5211  Fax: 213.629.4520
E-Mail: vsahn@sulmeyerlaw.com
URL:  www.sulmeyerlaw.com

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Wednesday, June 24, 2015 12:12 PM
**To:** Sahn, Victor A.; Shemano, David B.
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.;
anahmias@mbnlawyers.com; Weg, Howard J.
**Subject:** RE: Art & Architecture Books of the 21st Century

Victor:

I wanted to follow up with you on your email below.  I have confirmed with the Debtor that it will proceed with the original post-petition payment proposal of $1MM in year one; $1.25MM in year two; and $1.5MM in years three, four and five, with the added contributions as previously stated (payment of the AERC amounts if the appeal to the 9th Circuit is reversed, minus any funds needed for taxes as a consequence of that refund; and monetization of the new purchase option on the Beverly Hills Property).

Hopefully, this confirmation can put our dialogue back on track, although I will leave it to you and David to discuss the Museum situation.

Also, I wanted to let you know that the Debtor is in the process of getting me copies of the insurance policies you requested as well as the tax returns for 2013 and 2014.  Let me know what other documents, if any, you need from the list based upon a review of what you already have.

CEX 115

Thanks so much.

Beth

**BETH ANN R. YOUNG,** Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

10250 Constellation Blvd.  ❙  Suite 1700  ❙  Los Angeles, CA  90067
Phone  310 229 1234  ❙  Direct  310 229 3352  ❙  Fax  310 229 1244
bry@lnbyb.com  ❙  **www.lnbyb.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌐 Please consider the environment before printing this email

---

**From:** Sahn, Victor A. [mailto:vsahn@sulmeyerlaw.com]
**Sent:** Monday, June 22, 2015 6:05 PM
**To:** Shemano, David B.; Beth R. Young
**Cc:** Krikor J. Meshefejian; Kurt Ramlo; Lev, Daniel A.; Richardson, David J.; Hami, Asa S.; anahmias@mbnlawyers.com; Weg, Howard J.
**Subject:** RE: Art & Architecture Books of the 21st Century

Thanks for your letter.  What it does not address is the need for due diligence information.  You indicate that Beth Young and I are addressing this, but where you state at the end of your letter that you "…look forward to hearing from us…," you fail to account for our requirement that due diligence be satisfied before we will address or discuss any proposal respecting repayment of the claims of creditors over time.  Accordingly, in response to your proposal, you will not be "…hearing from us…" until our information requirements are fully satisfied.

With that said, there are at least two things I can tell you-

First, we will not negotiate any incentive to reduce the payments to creditors-therefore, the "Incentivized Prepayment" will not be acceptable.  Creditors shall receive 100% of their allowed unsecured claims, plus interest and attorneys' fees as these are provided for in the value of the Debtor's assets per the testimony of your client, and interest and attorneys' fees are permitted under applicable law.  Solvency has been demonstrated as solvent as your client has testified to it, under oath, on numerous occasions.  All three Committee members have incurred significant attorneys' fees in this bankruptcy case, and we intend to request their full repayment.

Second, you have already backed off of your earlier proposal to pay increased yearly payments after year 1 from what was proposed in court late last week and to which I confirmed and responded to in my letter.  Forgive me, but I always understood the process to entail an initial proposal from the Debtor (in this case) followed by a counter-proposal from the Creditors.  Your client has taken the unique approach of making an offer respecting a repayment plan and then revising that repayment plan to a lesser proposal before we have had an opportunity to respond.  What shall I look forward to from him next week?

CEX 116

Of course, nothing stated herein is meant as a complete statement of our rights and all such rights are expressly reserved.

Thanks again.

Victor.

_____

Victor Sahn

**Sulmeyer**Kupetz
A PROFESSIONAL CORPORATION

333 South Hope Street, Thirty-Fifth Floor, Los Angeles, CA 90071
Voice: 213.617.5211  Fax: 213.629.4520
E-Mail: vsahn@sulmeyerlaw.com
URL:  www.sulmeyerlaw.com

---

**From:** Shemano, David B. [mailto:DShemano@RobinsKaplan.com]
**Sent:** Monday, June 22, 2015 5:45 PM
**To:** Sahn, Victor A.; Beth R. Young (bry@lnbyb.com)
**Cc:** Krikor J. Meshefejian; 'Kurt Ramlo' (KR@lnbyb.com); Lev, Daniel A.; Richardson, David J.; Hami, Asa S.; anahmias@mbnlawyers.com; Weg, Howard J.
**Subject:** RE: Art & Architecture Books of the 21st Century

Victor – following up on our conversation this afternoon, please see the attached letter responding to you letter.

**David B. Shemano**
**ROBINS**╱**KAPLAN** LLP

Robins Kaplan LLP | 2049 Century Park East | Suite 3400 | Los Angeles, CA  90067
p 310 229 5894 | f  310 229 5800 | DShemano@RobinsKaplan.com| RobinsKaplan.com

---

**From:** Sahn, Victor A. [mailto:vsahn@sulmeyerlaw.com]
**Sent:** Wednesday, June 17, 2015 4:45 PM
**To:** Beth R. Young (bry@lnbyb.com); Shemano, David B.
**Cc:** Krikor J. Meshefejian; 'Kurt Ramlo' (KR@lnbyb.com); Lev, Daniel A.; Richardson, David J.; Hami, Asa S.; anahmias@mbnlawyers.com; Weg, Howard J.
**Subject:** Art & Architecture Books of the 21st Century

Beth and David,

Letter of this date regarding proposal made earlier this week in connection with a consensual Plan of Reorganization.

CEX 117

Thanks.

Victor.

_____
Victor Sahn

**Sulmeyer**Kupetz
A   P R O F E S S I O N A L   C O R P O R A T I O N

333 South Hope Street, Thirty-Fifth Floor, Los Angeles, CA 90071
Voice: 213.617.5211  Fax: 213.629.4520

E-Mail: vsahn@sulmeyerlaw.com
URL:  www.sulmeyerlaw.com

*********************************************************************
This e-mail message is for the sole use of the intended recipient(s) and may contain confidential
or legally privileged information. Any unauthorized review, use, disclosure or distribution
is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail,
delete this message from your computer and destroy all copies of the original message.
*********************************************************************

_____

Information contained in this e-mail transmission may be privileged, confidential and covered by
the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error
by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax
advice contained in this communication (including any attachments) is not intended to be used,
and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal
Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related
matter.

Thank you in advance for your cooperation.

Robins Kaplan LLP
http://www.robinskaplan.com
_____

# **Sulmeyer**Kupetz

A  P R O F E S S I O N A L  C O R P O R A T I O N
ATTORNEYS AT LAW SINCE 1952

August 19, 2015

E-MAIL vsahn@sulmeyerlaw.com
DIRECT DIAL 213.617.5211

**Settlement Discussions-Privileged Under FRE 408 and**
**Evidence Code 1152**

**Via E-Mail and U.S. Mail**

Howard Weg, Esq.                    Beth A. Young, Esq.
David B. Shemano, Esq.              Kurt Ramlo, Esq.
Robins Kaplan LLP                   Levene Neale Bender Yoo & Brill
2049 Century Park East             10250 Constellation Boulevard
Suite 3400                          Los Angeles, California 90067
Los Angeles, California 90067
E-Mail: dshemano@robinskaplan.com

Re:    Art & Architecture Books of the 21st Century ("Debtor")

Dear Howard, Beth, Kurt & David:

In advance of our meeting tomorrow, I write to provide you with some thoughts
respecting an outline for a consensual Plan of Reorganization.

### **Down-Payment On Plan Confirmation**

Currently, the Debtor is holding approximately $5.4 Million in the Trust Account
at Levene Neale. On the Plan's Effective Date, the entirety of these proceeds, less priority tax
claims and administrative claims shall be paid to unsecured creditors through Mr. Grobstein.

### **Ace Musuem Indebtedness and Real Property**

(1)  The Responsible Officer Order will remain in place and will be modified as set
forth below.



(2)  Ace Museum will have until December 1, 2015 to pay creditors $3.5 Million.
Additionally, if Ace Museum provides a loan to the Debtor of up to $5 Million, it
will have the opportunity to retain the La Brea Properties. These additional proceeds
shall be utilized to pay creditor claims under the confirmed Plan. On a pari pasu
basis, the disputed liens of Westminster Finance and Ben Jewelry shall be
transferred to the first proceeds received by the bankruptcy estate from Ace Museum
until their allowed claims are paid in full.

---

333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR, LOS ANGELES, CA 90071-1406 • TELEPHONE 213.626.2311 • FACSIMILE 213.629.4520
2424 SE BRISTOL ST, SUITE 300, NEWPORT BEACH, CA 92660 • TELEPHONE 949.721.7300 • FACSIMILE 213.629.4520

VAS\2453680.1 8/19/2015 (3:22 PM)

CEX 120



David B. Shemano, Esq
August 19, 2015
Page 2

(3) If Ace Museum does not pay creditors $3.5 Million by December 1, 2015 plus such additional sums up to $5 Million as can be obtained from the sale of the La Brea Properties or otherwise, the Responsible Officer will have all of the necessary powers pursuant to the existing order and any additional provisions to that Order which the Committee reasonably requests to sell the entire property for the highest price obtainable after a reasonable marketing period that will be dictated by whatever time remains on the purchase option for the properties owned by Ace Museum

(4) Douglas Chrismas will obtain an extension of the purchase option from the landlord on terms which are acceptable to the Committee. This is a condition to confirmation of the Plan.

### Return of Artwork to Eric Wilson

The artwork that constitutes the property of Eric Wilson will be returned to him under the confirmed Plan. The disputed security interest of both Westminster Finance and Ben Jewelry will be transferred to alternative collateral which is described above with respect to Ace Museum sales proceeds. These are ideas I have had about the situation, and have been transmitted without consulting with Mr. Wilson or his counsel. They may have other suggestions, however, the situation involving Mr. Wilson and the Debtor is of great concern to me respecting our ability to limit unsecured claims in this bankruptcy case and not see them dramatically increased due to actions taken by either Westminster Finance and/or Ben Jewelry or potential claims for conversion by Mr. Wilson.

### Payment Proposal From Company Operations

The Committee payment proposal is as follows.

(1) payments previously communicated which start one year after Plan confirmation and annually thereafter are unacceptable,

(2) payments should commence on the first day of the first month after Plan Confirmation and continue monthly thereafter,

(3) Based upon a payment of $1.5 Million in the first year, monthly payments of principal only shall be $125,000 per month. These payments shall be made to the Committee's Plan Agent, 

(4) Payments in the second year would be $166,667 per month and would remain in that amount for each year thereafter,

David B. Shemano, Esq.
August 19, 2015
Page 3

(5) There shall be interest paid on the claim balances due from Plan Confirmation until all payments due under the Plan are made at the rate of 7% per annum,

(6) Mr. Chrismas has talked about getting involved in brokering artwork sales, independent, we presume, of gallery operations and revenues. There is no evidence that he has relationships with anyone with regard to his "brokerage" proposal. The brokerage proposal is either something he has never done or something he has not done for a long time. This is inherently not feasible. There are no projections supplied with the proposal, nothing showing what artwork will be sold from existing inventory or when, and nothing showing who the clients shall be in connection with these "brokerage" revenues that Mr. Chrismas plans to obtain,

(7) There needs to be a definitive inventory created of the artwork owned by the Debtor through the efforts of Howard Grobstein and his team. The blocking of the taking of this inventory by Mr. Grobstein must be stopped and he must be permitted to take it in the best way that he can, based upon professional advice that he receives

(8)  Treatment of Unsecured Creditor Claims: Interest will accrue on the unsecured claims from the petition date to the confirmation date based upon application of existing law.  Committee members who have incurred attorneys' fees and costs will have those fees and costs added on to their allowed claims as of the confirmation hearing date.

(9) Security Interest of Bankruptcy Estate: The security interests of the Debtor to the Creditors will be in all assets, real and personal, and will contain complete language typically given to lenders holding "blanket" security interests. Additionally, remedies upon default shall be typical of secured credit facilities and shall be in addition to remedies that are provided under the Bankruptcy Code with respect to default of substantially consummated Chapter 11 Plans.  Finally, there will be certain governance provisions which we will request going forward until unsecured creditor claims are paid.

CEX 122

David B. Shemano, Esq.
August 19, 2015
Page 4

(10)  Plan Agent: Howard Grobstein shall be the Plan Agent and shall receive and
distribute funds to unsecured creditors under the Plan.  The payment agreement for
Mr. Grobstein's services shall be paid by the Debtor; additionally Mr. Grobstein's
actual out-of-pocket costs and attorneys' fees up to $75,000 annually shall be paid
by the Debtor.  If Mr. Grobstein must incur attorneys' fees or accounting expenses
in excess of $75,000 annually, he shall give notice to the Debtor of this fact and of
the reason for incurring such additional fees and costs. If the Debtor objects, the
parties will agree upon an abbreviated dispute resolution procedure whose
determinations shall be final and non-appealable.

(11)  Daily Gallery Operations: Until creditor claims are paid in full, the Debtor's
operations shall be supervised and controlled by Mr. Grobstein.  He shall have sole
authority over all financial matters related to gallery operations.  He will likely
work with Mr. Chrismas and his staff with regard to these operations until creditor
claims are paid in full, however, that will be a matter of his discretion.

## Mary Corse Art Sales and Sales of Other Popular Artists

The Debtor has been paying Mary Corse $60,000 per month for a number of
months.  What is this for?  We require an answer to this question as a prerequisite to agreeing to
consensual Plan treatment in this bankruptcy case.  In connection with the Mary Corse show
discussed previously discussed:

(1)  The Debtor must conduct the show at an earlier time than what was previously
discussed.  Waiting until January, 2016 is simply too long.

(2)  Howard Grobstein's team must be directly involved in the sale and in the receipt
and deposit of proceeds

(3)  Howard Grobstein's team must be directly involved in the invoicing of artwork
sales that take place at the Mary Corse show.  These last two requirements are
consistent with the authority that Mr. Grobstein shall receive which is detailed
above.

(4)  We must ascertain, before we can reach an agreement with the Debtor, what
Mary Corse works are consigned and which are owned, and what the value is of the
artwork that is owned and what the value is of the Debtor's interest in the consigned
works.  We will wish to establish pricing parameters in connection with the sale of
this artwork

David B. Shemano, Esq.
August 19, 2015
Page 5

    (5)  Before any artwork of Mary Corse is sold, the Parties will ascertain how the
proceeds of sale will be divided and identify the items or categories of expense that
must be quantified and paid from the sales proceeds.

### Sale of Other Valuable Artwork

    The Committee will work with the Debtor, prior to Plan Confirmation, to identify
artwork that is valuable and readily saleable.  Once this artwork is identified, the Parties will
agree upon a process to price this art and sell it as quickly as possible while at the same time
maximizing its value.  The Committee believes that there is other artwork besides the Mary
Corse art that can be sold for the benefit of more expeditiously paying creditors' claims.

### Information Requested From Debtor

    The Committee has, on numerous occasions, communicated its information
requests to the Debtor respecting the artwork and its books and records.  I think that Howard
Weg and I have had productive discussions over the past few weeks on these issues and
hopefully that will continue.  However, the fulfillment of the Committee's requirements for
information shall continue to be a condition to a consensual Plan of Reorganization.

    We look forward to discussing the contents of this correspondence with you
tomorrow.  I will canvass the Committee members to confirm their agreement with the foregoing
proposal.



VAS\ 2453680.1 8/19/2015 (3:19 PM)

CEX 124

David B. Shemano, Esq.
August 19, 2015
Page 6

Very truly yours,

**Sulmeyer**Kupetz
A Professional Corporation

Victor A. Sahn

VAS:vas

cc:    Daniel Lev, Esq.
       Asa Hami, Esq.
       David Richardson, Esq.
       Alan Nahmias, Esq.
       Committee Members
       Mr. Howard Grobstein
       Mr. Joshua Teeple
       Mr. Steven Roopenian

VAS\ 2453680.1 8/19/2015 (3:19 PM)

CEX 125

# EXHIBIT E

114

| | | |
|---|---|---|
| | 1 | used business name that a corporation will go by. |
| | 2 | Q    With whom? |
| | 3 | A    California -- I'm sorry, this particular document is filed |
| | 4 | with the Los Angeles County Recorder's Office. |
| 03:53PM | 5 | Q    On what date, sir? |
| | 6 | A    December 19th, 2005. |
| | 7 | Q    Turning to page 2 -- 3, then. |
| | 8 | What was the third name that Art and Architecture |
| | 9 | went by according to this document? |
| 03:53PM | 10 | A    Ace Gallery Los Angeles. |
| | 11 | Q    And based on your knowledge, did Ace Gallery Los Angeles |
| | 12 | use an even shorter name? |
| | 13 | A    Yes.  Ace Gallery, from my own experience, was used more |
| | 14 | often than Ace Gallery Los Angeles. |
| 03:53PM | 15 | Q    Where was Ace Gallery located? |
| | 16 | A    Its primary location was a gallery space on Wilshire |
| | 17 | Boulevard.  It's listed here 5514 Wilshire Boulevard in Los |
| | 18 | Angeles. |
| | 19 | Q    What part of town is that, sir? |
| 03:54PM | 20 | A    Mid City.  It's close to locations like La Brea Tar Pits |
| | 21 | or the LA County Museum of Art. |
| | 22 | Q    Did it have a second location? |
| | 23 | A    It did.  It had a location in Beverly Hills, also on |
| | 24 | Wilshire Boulevard. |
| 03:54PM | 25 | Q    Did Ace Gallery own or rent its locations? |

**UNITED STATES DISTRICT COURT**

115

```
         1    A     It rented them.

         2    Q     What business did Ace Gallery do?

         3    A     It ran an art gallery, sold art.  It primarily focused on

         4    usually living artists, current 20th century artists.  It would

03:54PM  5    -- it sold a mix of art that it owned and art that artists

         6    would consign to it.

         7    Q     Prior to April 2016, who ran Ace Gallery on a daily basis?

         8    A     Douglas Chrismas.

         9    Q     So you've mentioned you practiced bankruptcy law.  Are you

03:55PM  10   familiar with the bankruptcy law in general?

         11   A     Yes, I am.

         12   Q     Is it a part of federal law?

         13   A     It is.  The bankruptcy code is part of federal law.

         14   Q     Are you familiar with a thing called the United States

03:55PM  15   Code?

         16   A     Yes, I am.

         17   Q     What is that?

         18   A     It's the -- a compendium of U.S. laws, essentially.

         19   Q     A collection?

03:55PM  20   A     A collection, yes.

         21   Q     How is the United States Code organized?

         22   A     By chapters.

         23   Q     And what chapter is the bankruptcy portion of the United

         24   States Code?

03:55PM  25   A     It's -- perhaps titles is a better, more accurate phrase
```

**UNITED STATES DISTRICT COURT**

120

| | |
|---|---|
| 1 | terms -- what his understanding of how those terms are defined |
| 2 | under the bankruptcy law. |
| 3 | MS. MAKAREWICZ:  Thank you. |
| 4 | THE COURT:  Just those three, though? |
| 04:00PM 5 | MS. MAKAREWICZ:  I can't promise.  My memory.  Thank |
| 6 | you. |
| 7 | THE COURT:  All right. |
| 8 | (Sidebar ends.) |
| 9 | BY MS. MAKAREWICZ: |
| 04:01PM 10 | Q    Mr. Richardson, what is a debtor? |
| 11 | A    A debtor is the -- whether it's a corporation or an |
| 12 | individual, the entity that files bankruptcy in order to seek |
| 13 | the protection of what the bankruptcy code offers.  Typically, |
| 14 | they are there to try to restructure their debts, reorganize |
| 04:01PM 15 | their debts.  Just obtain the protections they can get from |
| 16 | bankruptcy. |
| 17 | Q    In the column labeled Type of Debtor, what type of debtor |
| 18 | was chosen? |
| 19 | A    Corporation. |
| 04:01PM 20 | Q    All right.  Directing your attention to the column on the |
| 21 | right labeled Chapter of Bankruptcy Code, what chapter of the |
| 22 | bankruptcy code under which this petition was filed, what is |
| 23 | chosen? |
| 24 | A    Chapter 11. |
| 04:01PM 25 | Q    Are there different types of bankruptcy? |

**UNITED STATES DISTRICT COURT**

121

|   |   |   |
|---|---|---|
| | 1 | A     There are.  And each of those chapters that are listed |
| | 2 | there are the different kinds. |
| | 3 | Q     What is a Chapter 11? |
| | 4 | A     A Chapter 11 is a -- for a corporation, it's a bankruptcy |
| 04:02PM | 5 | case where the company can try to reorganize the business, |
| | 6 | continue in business by coming up with a plan of reorganization |
| | 7 | that will allow them to move forward by paying, usually a |
| | 8 | percentage of what they owe to their creditors. |
| | 9 |       Where an individual can file a Chapter 11, it's a little |
| 04:02PM | 10 | bit different because an individual doesn't reorganize in the |
| | 11 | way that a corporation does, but they file Chapter 11, they |
| | 12 | maintain more control over their assets and how the case |
| | 13 | proceeds. |
| | 14 | Q     In a Chapter 11, what is the debtor allowed to do? |
| 04:02PM | 15 |       MS. MAITIA:  Objection.  702, foundation. |
| | 16 |       THE COURT:  You can answer.  Go ahead. |
| | 17 |       THE WITNESS:  Generally, a debtor in Chapter 11 can |
| | 18 | continue to operate the business that they have operated prior |
| | 19 | to filing bankruptcy in what we call the ordinary course. |
| 04:03PM | 20 |       So, for example, if Target were to file bankruptcy, it |
| | 21 | could immediately continue to stock the shelves with paper |
| | 22 | towels, sell paper towels to customers.  It couldn't shut down |
| | 23 | one of its stores, run a going out of business sale or start |
| | 24 | selling cars in the parking lot. |
| 04:03PM | 25 |       Anything like that, that is not just a very ordinary, |

**UNITED STATES DISTRICT COURT**

122

| | | |
|---|---|---|
| | 1 | ongoing transaction, it would need to bring before the Court to |
| | 2 | obtain approval. |
| | 3 | Q    What is the debtor in a Chapter 11 not allowed to do? |
| | 4 | MS. MAITIA:  Objection.  Foundation.  Vague. |
| 04:03PM | 5 | THE COURT:  I'm going to sustain the objection.  It |
| | 6 | also calls for opinion testimony. |
| | 7 | This is not designated as an expert in bankruptcy |
| | 8 | law, correct. |
| | 9 | MS. MAKAREWICZ:  Yes, sir. |
| 04:03PM | 10 | THE COURT:  Yeah.  Objection is sustained. |
| | 11 | BY MS. MAKAREWICZ: |
| | 12 | Q    Are you familiar with what is called a debtor in |
| | 13 | possession? |
| | 14 | A    Yes, I am. |
| 04:04PM | 15 | Q    What does that mean? |
| | 16 | A    It's the term that applies to a debtor who maintains |
| | 17 | control of their business.  So when you file bankruptcy, when a |
| | 18 | corporation files bankruptcy, it begins as a debtor in |
| | 19 | possession.  It's still in control of the business. |
| 04:04PM | 20 | Sometimes a trustee will get appointed, and if the |
| | 21 | trustee steps in and takes control of the business, it is no |
| | 22 | longer a debtor in possession.  They are simply a debtor |
| | 23 | operated by a trustee. |
| | 24 | Q    Was Ace Gallery a debtor in possession? |
| 04:04PM | 25 | A    Yes, it was. |

**UNITED STATES DISTRICT COURT**

123

```
  1    Q     Does a debtor in possession have to be appointed or named?

  2    A     No.  It's automatic.  When a debtor files bankruptcy, it

  3    begins as debtor in possession.

  4    Q     In 2013 through 2016, who was running the

04:04PM  5    debtor-in-possession Ace Gallery?

  6               MS. MAITIA:  Objection.  Foundation.

  7               THE COURT:  You can answer.

  8               THE WITNESS:  Douglas Chrismas.

  9    BY MS. MAKAREWICZ:

04:04PM 10    Q     Did that designation of being a debtor in possession

 11    change how the defendant could run the company now that it was

 12    in bankruptcy court?

 13               MS. MAITIA:  Objection.  Foundation.  702.

 14               THE COURT:  Objection is sustained.

04:05PM 15    BY MS. MAKAREWICZ:

 16    Q     What responsibilities did the defendant have to the Court

 17    by running as a debtor in possession?

 18               MS. MAITIA:  Same objection.

 19               THE COURT:  Objection is sustained.

04:05PM 20    BY MS. MAKAREWICZ:

 21    Q     Could the defendant make any decisions independently while

 22    in bankruptcy from 2013 to 2016?

 23               MS. MAITIA:  Same objection, Your Honor.

 24               THE COURT:  Objection is sustained.

04:05PM 25    BY MS. MAKAREWICZ:
```

**UNITED STATES DISTRICT COURT**

CEX 132

144

|  | | |
|---|---|---|
| | 1 | there something else, counsel, that you were pointing to? |
| | 2 | BY MS. MAKAREWICZ: |
| | 3 | Q    Who is typed as the name of the person completing the form |
| | 4 | on this document? |
| 04:35PM | 5 | A    The typed name is Douglas Chrismas.  I just took that to |
| | 6 | be an electronic signature. |
| | 7 | Q    What is the position? |
| | 8 | A    President. |
| | 9 | Q    Mr. Chrismas was also the chief financial officer? |
| 04:35PM | 10 | A    Yes.  He is listed above as chief financial officer. |
| | 11 | Q    And the chief executive officer? |
| | 12 | A    That's correct. |
| | 13 | Q    Also the agent for service of process, right? |
| | 14 | A    Yes. |
| 04:36PM | 15 | Q    Okay.  Let's go back to Ace Museum.  Did Ace Museum own or |
| | 16 | rent its location? |
| | 17 | A    It rented its location. |
| | 18 | Q    And what was the name of its landlord? |
| | 19 | A    400 South La Brea, LLC. |
| 04:36PM | 20 | Q    In February of 2013 through March in early of 2016, are |
| | 21 | you aware that the defendant embezzled money from the debtor |
| | 22 | Ace Gallery to Ace Museum? |
| | 23 | A    Yes. |
| | 24 | MS. MAITIA:  Excuse me.  Objection, Your Honor. |
| 04:36PM | 25 | Foundation.  402.  403.  Move to strike the question and |

**UNITED STATES DISTRICT COURT**

CEX 133

145

```
 1    answer.
 2              THE COURT:  Objection is sustained.  The jury will
 3    disregard the question and the answer.
 4              MS. MAITIA:  And it was leading, also, Your Honor.
 5    Thank you.
 6    BY MS. MAKAREWICZ:
 7    Q    Are you aware that defendant sent money that belonged to
 8    Ace Gallery's bankruptcy estate to Ace Museum directly?
 9              MS. MAITIA:  Objection, Your Honor.  This is
10    leading.  Calls for a legal conclusion.  402.  403.
11              THE COURT:  Objection overruled.  You can answer.
12              THE WITNESS:  Yes, I am.
13    BY MS. MAKAREWICZ:
14    Q    How do you know that?
15    A    As part of my job, I undertook an investigation that was
16    basically my full-time job for about a year and a half to two
17    years, looking into all of the transactions that the debtor
18    undertook, searching through bank records, e-mails, invoices,
19    everything I could find to create a very long, comprehensive
20    timeline of all of these transactions to show how sale proceeds
21    that should have come into the estate's bank accounts would
22    instead have gone elsewhere in order to pay Ace Museum's rent.
23    Q    You said it was your full-time job?
24    A    As a full-time lawyer, this was by far the largest case on
25    my desk.  I didn't have any other large cases at the time.
```

04:36PM (line 5)
04:36PM (line 10)
04:37PM (line 15)
04:37PM (line 20)
04:37PM (line 25)

**UNITED STATES DISTRICT COURT**

146

```
 1   Q     And, again, what documents did you look at?

 2   A     I would look at all bank records, corporate records of the

 3   various entities, Ace Museum and the debtor e-mails, invoices.

 4   So, for example, these would be e-mails with purchasers of an

 5   artwork.

 6              Well, to give you a simple example, if the debtor

 7   sold an artwork, there would be documents that deal with the

 8   history of the artwork.  Who owned it, how it came into the

 9   debtor's possession, either as an owned artwork or consigned

10   artwork.  It would be e-mails with the buyer, sometimes

11   confirming a price if it wasn't done in person; e-mails that

12   would send the invoice and the wire instructions, unless the

13   purchaser was paying by check.  And then bank records that

14   would show what would happen to the money, where it would go.

15              And so, I piece all of these things together.  In

16   some cases, they were documents I would find on the debtor's

17   computers.  If we couldn't find them in files, I searched --

18   spent many days searching through the debtor's computers for

19   files, hidden files, deleted files, everything I could find.

20   Q     Was it organized?

21   A     Somewhat.  Organized, I guess, is a subjective term.

22   Q     How did you find the records?

23   A     So, some records had been produced to us during the

24   bankruptcy case as part of litigation.  We asked that certain

25   categories of documents be given to us, so those were the first
```

The times 04:38PM (lines 5, 10, 15), 04:39PM (lines 20, 25) appear in the left margin.

**UNITED STATES DISTRICT COURT**

147

```
 1   documents we could go through.  Examples would be some of the
 2   bank statements and invoices.
 3         And then when I went to the location, they are in the
 4   accounting office, the accountant's office inside the gallery,
 5   there were computers, there were filing cabinets, and it was
 6   just a process of going through files of paperwork and the
 7   computers and the hard drives to find everything we could.
 8   Q     So, in your investigation and your review of all of those
 9   records, did I find that the defendant diverted money to
10   another business?
11               MS. MAITIA:  Objection, Your Honor.  Leading.  702.
12   Calls for a legal conclusion.
13               THE COURT:  Objection overruled.  You can answer.
14               THE WITNESS:  Yes, I did.
15   BY MS. MAKAREWICZ:
16   Q     What did you find?
17   A     So, Mr. Chrismas set up another company right at the time
18   that he filed bankruptcy for Ace Gallery.  It was by the name
19   Ace Gallery New York.
20         And he had a different bank account set up for that and
21   it was outside of the bankruptcy court's jurisdiction.
22         And frequently -- in fact, more often than not, when
23   someone would buy an artwork from the debtor, Mr. Chrismas or
24   someone under his direction would e-mail them an invoice and
25   banking instructions that would be for the Ace Gallery New York
```

04:39PM (line 5)
04:39PM (line 10)
04:40PM (line 15)
04:40PM (line 20)
04:40PM (line 25)

**UNITED STATES DISTRICT COURT**

CEX 136

148

1    bank account so that the funds would be transferred into the

2    Ace Gallery New York account.

3    Q    Let's look at Exhibit 24, please.

4         THE COURT:  Counsel, just whenever you are at a good

04:40PM  5    breaking point, we will stop for the day.

6         MS. MAKAREWICZ:  Here is fine.

7         THE COURT:  Okay.  Great.  We will knock off a

8    little bit earlier today.  We will let you get a little bit of

9    a jump on the traffic.

04:41PM  10        We will start tomorrow morning right at

11   9 o'clock.  I'm going to have the lawyers here earlier and we

12   will try to eliminate some of those back and forth, some of

13   those sidebar objections.  Sorry about that.

14        Have a good night.  Don't talk about the case.

04:41PM  15   We will see you in the morning.  Thank you.

16        THE COURTROOM DEPUTY:  All rise.

17        THE COURT:  Have a seat.  I just want to give the

18   parties a little bit of rhyme or reason in the rulings on these

19   objections because they're -- how I'm trying to parse them out

04:42PM  20   is that I don't want this witness to give opinion -- to give

21   legal opinions because I think that is improper.

22        But to the extent this witness has personal

23   experience from working in this bankruptcy, looking at the

24   bankruptcy, making determinations in bankruptcy, what he did

04:42PM  25   with respect to this bankruptcy proceeding, he can answer.

**UNITED STATES DISTRICT COURT**

21

```
 1   to Mr. Richardson who is going to start on the stand today.
 2   First, directly related to Ms. Kellen, the Government intended
 3   to call Ms. Kellen to introduce certain e-mails and invoices of
 4   Ace Gallery as part of its 404(b) evidence.  I'm concerned that
 5   now the Government is going to rely on Mr. Richardson to
 6   testify about those documents because he saw them as part of
 7   his investigation when he was the lawyer litigating against
 8   Mr. Chrismas.
 9            And so I don't want to -- the Government hasn't done
10   that yet.  I just wanted to raise it with the Court that, if
11   they do intend to do that, the defense would object.
12   Mr. Richardson may have done his job as a lawyer litigating
13   against Mr. Chrismas, but he does not have personal knowledge
14   about the underlying documents.  So that's the first issue.
15            Two more quick ones related to Mr. Richardson.  The
16   Government produced on Monday Government Exhibits 75 through
17   80.  And based on the interview memos from their prep with
18   Mr. Richardson, it looks like they are going to elicit
19   testimony about these exhibits.
20            These exhibits were not produced before the
21   discovery cutoff according to the Court's trial order.  So we
22   would ask that, if the Government does intend to elicit
23   testimony and/or introduce these exhibits, that they not be
24   allowed to do that.
25            And then finally, long -- within the appropriate
```

**UNITED STATES DISTRICT COURT**

22

1    discovery cutoff, the Government did produce and put on their

2    exhibit list declarations from three people who were witnesses

3    in the underlying bankruptcy case.  And Mr. Richardson

4    presumably prepared declarations for them in the civil case.

5            And the Government, according to its discovery, has

6    asked Mr. Richardson questions about these three individuals,

7    teeing up an idea that Mr. Chrismas, you know, lied about

8    something.  He lied about the fact that these individuals were

9    on the board of trustees for the Museum.

10           And we've noted our objections on the exhibit list.

11   And if the Government is intending to elicit testimony from

12   Mr. Richardson about what these third parties who are not here

13   and who have not been subpoenaed said to create a contradiction

14   or some sort of multi-level hearsay party opponent admission,

15   we'd like to know about it so that we can object and have that

16   excluded because that raises in addition to evidentiary issues

17   Sixth Amendment issues about the confrontation clause.

18           THE COURT:  Okay.  So these are all -- you are just

19   giving me a background as to what objections might come up?

20           MS. MAITIA:  Yes.  And if the Government is going to

21   go down any of these three roads, we would like to deal with it

22   outside the presence of the jury.

23           THE COURT:  Okay.  That is -- I'm a little reluctant

24   to make advance rulings until I know what the Government is

25   intending to put in.  But, you know, certainly nothing will be

**UNITED STATES DISTRICT COURT**

39

```
 1    he's not in court.

 2              Counsel, please proceed.

 3              (Exhibit No. 48 received into evidence.)

 4              MS. MAKAREWICZ:   Publishing page 1.

 5    BY MS. MAKAREWICZ:

 6         Q      What is the last statement before the salutation?

 7         A      It states, "As per you request, please find

 8    attached information on Ace Museum's board members."

 9         Q      What date -- I'm sorry.  I asked.

10              Now, you've stated yesterday you've worked on

11    this matter.  Did other attorneys in your firm work on the

12    bankruptcy as part of the creditors committee?

13         A      Yes, in different capacities.  I was the primary

14    attorney in charge of this investigation.  Others had roles

15    like being primarily in charge of drafting a plan of

16    reorganization.  We worked as a team.

17         Q      How many attorneys?

18         A      Over the time I was there, I think -- I would say

19    maybe five, four or five attorneys had different roles in the

20    case.

21         Q      Do you know of a gentleman named Bruce Karatz?

22         A      Yes, I am familiar with that name.

23         Q      How do you know that?

24         A      He's one of the people who is listed as

25    purportedly being on Ace Museum's board of trustees.
```

**UNITED STATES DISTRICT COURT**

40

```
 1              MS. MAITIA:  Objection, Your Honor.  Hearsay, lacks
 2    foundation, 402, 403, Sixth Amendment.
 3              THE COURT:  Objection is overruled.
 4    BY MS. MAKAREWICZ:
 5         Q      Was Bruce Karatz on the board of Ace Museum?
 6              MS. MAITIA:  Objection, Your Honor.  Hearsay, lacks
 7    foundation.
 8              THE COURT:  I think you can ask whether he knows if
 9    Bruce Karatz was on the board of Ace Museum.
10    BY MS. MAKAREWICZ:
11         Q      Do you?
12         A      I do.  And he was not.
13              MS. MAITIA:  Objection, Your Honor.  Called for
14    hearsay, was hearsay, move to strike.
15              THE COURT:  Objection is overruled.
16    BY MS. MAKAREWICZ:
17         Q      Do you know of a person named Frederick Nicholas?
18         A      Yes, I do.
19         Q      Who is it he?
20         A      He's also someone who is claimed to be a member
21    of the Ace Museum board of trustees.
22         Q      Was he based upon your personal knowledge?
23         A      He was not.
24              MS. MAITIA:  Objection, Your Honor.  Pardon.
25    Objection, Your Honor.  Lacks foundation, calls for hearsay,
```

**UNITED STATES DISTRICT COURT**

CEX 141

41

```
 1    402, 403, Sixth Amendment.

 2              THE COURT:  Objection overruled.

 3    BY MS. MAKAREWICZ:

 4         Q       Do you know of a person named Matt Toledo?

 5         A       Yes.

 6         Q       Who is he?

 7         A       He's also listed as an individual being on the

 8    Ace Museum board of directors.

 9         Q       Based upon your personal knowledge, was

10    Matt Toledo on the board of trustees of Ace Museum?

11              MS. MAITIA:  Objection, Your Honor.  Calls for

12    hearsay, lacks foundation, 402, 403, Sixth Amendment.

13              THE COURT:  Objection overruled.

14              THE WITNESS:  He was not.

15    BY MS. MAKAREWICZ:

16         Q    I believe you stated something about your

17    investigation yesterday to the Court and to the jury.  Can you

18    as attorney for the creditors tell us, tell the jury what you

19    did in the investigation of Ace Gallery debtor in possession?

20              MS. MAITIA:  Objection, Your Honor.  Calls for

21    hearsay.

22              THE COURT:  Objection overruled.

23              THE WITNESS:  So my primary task was to try to

24    determine whether -- excuse me -- whether there were funds

25    that -- moneys that should have come into the debtor's accounts
```

**UNITED STATES DISTRICT COURT**

43

```
1        Q        How long did that take you?

2        A        Well, I think as I said yesterday, I worked on

3   this case close to full-time for about two years.  And it was

4   about that long before I felt that we had the case ready to

5   begin taking depositions like Mr. Chrismas's deposition.  So it

6   was about two years of work.

7        Q        How was that -- how were your documents

8   organized?

9        A        Primarily on my computer.  I try to be paperless

10  to the extent I can.  So when there's a paper file like an

11  invoice, I make sure we scan it, put it into the computer.  And

12  I keep various file folders of different time periods of

13  transactions, different types of transactions, and documented

14  on a timeline.

15       Q        Now, based upon this investigation and all of the

16  documents that you've described having been reviewed, in

17  February 2013 through the beginning of April 2016, based upon

18  your knowledge as an attorney for the creditor, are you aware

19  that the defendant diverted money from the debtor Ace Gallery

20  to Ace Museum?

21            MS. MAITIA:  Objection, Your Honor.  702, lacks

22  foundation, calls for a legal conclusion.

23            THE COURT:  Objection is overruled.

24            THE WITNESS:  The conclusion I came to is that over

25  $14 million of sale proceeds; that is, the money that
```

**UNITED STATES DISTRICT COURT**

44

```
 1   purchasers owed to the debtor for purchasing artwork was not
 2   deposited in the debtor's account but was instead deposited
 3   into a bank account of a company that we briefly discussed
 4   yesterday called Ace Gallery New York which was not a debtor in
 5   bankruptcy.
 6   BY MS. MAKAREWICZ:
 7        Q       We'll get to Ace New York in a moment.  But you
 8   mentioned $14 million being diverted to that company?
 9        A       Yes.
10        Q       Did the money, that $14 million, stay in that
11   account based upon your personal knowledge and review of the
12   documents?
13        A       No, it did not.
14        Q       Where did it go?
15        A       It would typically move very quickly.  Over
16   $5 million of it was transferred down into the Ace Museum bank
17   account, usually in the amount that was required for Ace Museum
18   to pay its rent that month.  And often the very same day Ace
19   Museum would pay its rent to 400 South La Brea.
20        Q       Did -- are you aware, based upon your personal
21   knowledge and review of the documents that you've described,
22   where defendant diverted money from Ace Gallery directly to
23   Ace Museum?
24        MS. MAITIA:  Objection, Your Honor.  Lacks
25   foundation, calls for hearsay, calls for a legal conclusion.
```

**UNITED STATES DISTRICT COURT**

45

```
 1              THE COURT:  Objection is overruled.
 2              THE WITNESS:  Yes, there were also a series of
 3    transactions which amounted to over a million dollars of money
 4    that was either transferred directly from the debtor's bank
 5    account to the Ace Museum bank account or someone who owed
 6    money to the debtor was told to pay it into the Ace Museum bank
 7    account.
 8    BY MS. MAKAREWICZ:
 9         Q      Let's turn to Exhibit 24 in your binders.  Let me
10    know when you are ready.
11         A      Yes, I'm there.
12         Q      Do you recognize this document?
13         A      Yes, I do.
14         Q      What is it?
15         A      It's the Articles of Incorporation to establish
16    Ace Gallery New York in California.
17         Q      When was it -- is it filed with someone?
18         A      Yes.  It's filed with the California Secretary of
19    State.
20         Q      What date?
21         A      February 14, 2013.
22              MS. MAKAREWICZ:  Government moves 24 into evidence.
23              THE COURT:  Any objection?
24              MS. MAITIA:  Lacks foundation, calls for hearsay,
25    402, 403, 404(b).
```

**UNITED STATES DISTRICT COURT**

62

```
 1   represented the committee of unsecured creditors, we had a

 2   right to ask the debtor and third parties, like Ace Gallery

 3   New York, to give us documents.  And requests were made for

 4   relevant documents about transactions.

 5            And in response to that, we received a large number

 6   of invoices, but it wasn't complete.  So I found other invoices

 7   on the debtor's computers and in the debtor's files once we had

 8   access to that.

 9   BY MS. MAKAREWICZ:

10       Q       You personally?

11       A       I personally.  I spent several days in that

12   location logged on to the computers going through the files,

13   yes.

14       Q       What is being -- oh, have you -- are you familiar

15   with artists that were represented by Ace Gallery?

16       A       Yes, I am, based on the contracts that I

17   reviewed.

18       Q       Was De Wain Valentine an artist represented or

19   had art within -- on -- in Ace Gallery?

20       A       Yes.  De Wain Valentine had a consignment

21   contract with the debtor, and there were also some artworks

22   that were owned outright by the debtor.

23       Q       What about Gisela Colon?

24       A       Yes.  She also had a consignment arrangement with

25   the debtor.  My recollection is the contract, we may not have
```

**UNITED STATES DISTRICT COURT**

CEX 146

63

```
 1    found a signed copy of that contract, but there were many

 2    documents and e-mails evidencing the agreement.

 3           Q       And Helen Pashgian?

 4           A       Yes.  She also had a consignment agreement with

 5    the debtor.

 6           Q       Looking at this document, what is being sold?

 7           A       So this is a sale of three artworks, one by each

 8    of those artists, purportedly a sale by Ace Gallery New York

 9    rather than by the debtor.

10           So when I found this invoice -- invoices are

11    typically the first step in the investigation.  And so when I

12    found this, I would want to go -- I went back to the files to

13    confirm would these be subject to the consignment contracts or

14    could I find these particular artworks listed on the debtor's

15    inventory of owned artworks because there was overlap

16    sometimes.

17           Off the top of my head, I don't recall if each of

18    these artworks were consignment artworks or owned artworks.  It

19    didn't really make a difference.  It was the debtor's property

20    to sell.  The debtor had the contract right to sell those

21    artworks on consignment, or the debtor had the ownership if it

22    owned the art outright.  Either way, sale proceeds from the

23    sales of these artworks are owed to the debtor and should be

24    paid to the debtor.

25           Q       And as a debtor in possession, defendant had
```

**UNITED STATES DISTRICT COURT**

78

```
 1   full payment would be late.
 2            MS. MAITIA:  Objection, Your Honor.  Move to strike.
 3   Nonresponsive, lacks foundation.
 4            THE COURT:  Motion granted.  The jury will ignore
 5   the last testimony.
 6            MS. MAKAREWICZ:  Just a moment, Your Honor.
 7   BY MS. MAKAREWICZ:
 8       Q     In this transaction, the Balson sale, based on
 9   your review of the documents, the invoice, the bank records,
10   how much money was diverted from debtor Ace Gallery to
11   Ace New York -- excuse me, to Ace Museum and then to the
12   landlord of Ace Museum?
13       A     About $258,000 was diverted from the debtor to
14   Ace Gallery New York.  On this particular day, not the entire
15   amount went to the landlord.  But the vast majority of it went
16   to the landlord on this particular day.
17       Q     Now, you mentioned yesterday the ordinary course
18   of business.  We talked about Target and towels, paper towels.
19   What was Ace Gallery's ordinary course of business?
20            MS. MAITIA:  Objection, Your Honor.  702.
21            THE COURT:  You can ask him what his understanding
22   is.
23   BY MS. MAKAREWICZ:
24       Q     Can you tell us what your understanding of
25   Ace Gallery's ordinary business?
```

**UNITED STATES DISTRICT COURT**

79

```
 1        A      Sure.  In the course of representing creditors in

 2   the case, I would be looking to Ace Gallery to only be carrying

 3   out what we would consider to be ordinary course transactions.

 4   And I would consider that to be the sale of artworks in the

 5   name of Ace Gallery Los Angeles with the funds coming into the

 6   estate to pay the debtor's expenses and to hopefully earn

 7   profits that will fund the plan of reorganization and pay

 8   creditors as much as the debtor can pay.

 9        Q      Now, based upon your understanding, was it the

10   ordinary course of the debtor Ace Gallery's business to divert

11   or give money to Ace New York?

12        A      No, not at all.

13             MS. MAITIA:  Objection, Your Honor.  Lacks

14   foundation, 403, 702.

15             THE COURT:  He can answer.  He can answer.  He

16   answered what his understanding was.

17   BY MS. MAKAREWICZ:

18        Q      Based on your understanding, was it the ordinary

19   course of Ace Gallery debtor in possession's business to give

20   money to Ace Museum?

21        A      No.  And just to be clear, what I mean by

22   ordinary course there is what the debtor -- what I believe the

23   debtor is supposed to do under bankruptcy law.  The fact that

24   the debtor frequently did it and diverted money doesn't turn it

25   into ordinary course.  It just means it was frequent.
```

**UNITED STATES DISTRICT COURT**

CEX 149

92

1        Q        And the paragraph underneath, what is explained

2    by Mr. Chrismas to Mr. Balson here?

3        A        He explains it's very important that the wire be

4    set up this morning so that the funds are received by the

5    afternoon and can be wired to the Ace Museum account the same

6    day.

7        Q        Now, looking at the attachments at the top of the

8    page, is an attachment attached?

9        A        Yes, it is.

10       Q        Turning your -- what is the name of the PDF or

11   Adobe document?

12       A        Ace Gallery New York - wire instructions.

13       Q        Let's turn to page 7 -- 8, please.

14                Based upon your review of this e-mail when you

15   reviewed the documents in possession of debtor Ace Gallery, was

16   this attachment attached to the exhibit?

17       A        Yes, it was.

18       Q        And to where does the -- where does Mr. Chrismas

19   tell Mr. Balson to send the money?

20       A        To the account of Ace Gallery New York.

21       Q        Based upon your understanding as a lawyer for the

22   creditor, where should the money, the $220,258, have been

23   deposited?

24                MS. MAITIA:  Objection, Your Honor.  702.

25                THE COURT:  Objection sustained.

**UNITED STATES DISTRICT COURT**

CEX 150

93

```
 1   BY MS. MAKAREWICZ:
 2        Q      Was the money deposited into the debtor in
 3   possession's account on or around March 19th, 2015?
 4        A      No, it was not.
 5        Q      The art was part of the -- Ace Gallery's
 6   bankruptcy; correct?
 7        A      Correct.
 8        Q      And money exchanged for the art as a creditor --
 9   as a lawyer for the creditor, you expected that money to be
10   deposited into the debtor in possession account?
11              MS. MAITIA:  Objection, Your Honor.  Calls for
12   expert testimony.
13              THE COURT:  Objection sustained.
14   BY MS. MAKAREWICZ:
15        Q      Did the money go into the debtor in possession's
16   account?
17        A      It did not.
18        Q      Because we traced that and the exhibits we saw
19   before; correct?
20        A      Yes, we did.
21        Q      It went to Ace New York and then to Ace Museum
22   and then to Ace's landlord; true?
23        A      Correct.
24        Q      On the same day?
25        A      On the same day.
```

**UNITED STATES DISTRICT COURT**

98

1      Q      What is it?

2      A      It is another of the invoices bearing the name of

3   the debtor, Ace Gallery Los Angeles.

4      Q      What is the date?

5      A      March 30, 2016.

6      Q      What does the letterhead state?

7      A      It states that it is Ace Gallery Los Angeles, the

8   debtor, at its Wilshire Boulevard address.

9      Q      What is being recorded on this document?

10     A      It reports a sale of two artworks by Tara Donavan

11  and Jonathan Monk to an individual named Michael Straus.

12             MS. MAKAREWICZ:  Let's put this to the side and

13  Exhibit 46, please.  In evidence.

14  BY MS. MAKAREWICZ:

15     Q      Have you seen Exhibit 46, page 1 before, sir?

16     A      Yes, I have.

17     Q      What is it?

18     A      This is an example of a consignment sheet which

19  was part of the debtor's records for keeping track of artworks

20  that it held on consignment as part of the contracts, the

21  consignment agreements we looked at earlier.

22     Q      Calling your attention to the piece noted at

23  part 6, what is being described there?

24     A      That describes an artwork by the name Colony

25  dated 2002, pencils, and gives the dimensions.

UNITED STATES DISTRICT COURT

CEX 152

99

```
 1        Q        And who made this art?

 2        A        It's a Tara Donovan artwork.

 3        Q        Does this document, Exhibit 46, match the art

 4   being sold at Exhibit 5?

 5        A        Yes, it does.

 6        Q        How much did Mr. Chrismas sell that piece for?

 7        A        $80,000.

 8             MS. MAKAREWICZ:  We can take down Colony and go

 9   to --

10   BY MS. MAKAREWICZ:

11        Q        Have you seen page 2 before?

12        A        Yes, I have.

13        Q        What is this?

14        A        It's another of the consignment sheets showing

15   that the artwork that is listed on this invoice is the

16   Jonathan Monk artwork.

17             And just to clarify, as with the other, it shows

18   that it's come into the estate as a consignment sale on behalf

19   of the owner of the artwork, in this case Pentti Kouri.

20        Q        What is being described in part 1?  What is the

21   name of the art?

22        A        The Moment Before You Realize You Are Not Lost

23   dated 2005.

24        Q        Is this the same art that is being described at

25   Exhibit 5?
```

**UNITED STATES DISTRICT COURT**

100

```
 1      A      That is my understanding.

 2      Q      Being sold to Mr. Straus?

 3      A      Yes.

 4      Q      How much did Mr. Chrismas sell this for?

 5      A      For $20,000.

 6      Q      Were both these pieces of art part of the

 7   bankruptcy estate on March 30, 2016, based upon your personal

 8   knowledge and review of all of the records of Ace Gallery

 9   debtor in possession?

10      A      Yes, they were.

11             MS. MAKAREWICZ:  Let's return to Exhibit 5.  Take

12   down the right.

13   BY MS. MAKAREWICZ:

14      Q      How much was the total sale price for both

15   pieces?

16      A      $100,000.

17      Q      Who signs the document?

18      A      Signed by Douglas Chrismas, director and chief

19   curator of the debtor.

20      Q      On what date?

21      A      March 30th, 2016.

22      Q      Turning to page 2, what is being communicated in

23   this part of the document?

24      A      So this is the wire instructions that were sent

25   not to Mr. Straus to inform him where he should send the money
```

**UNITED STATES DISTRICT COURT**

CEX 154

101

1    that he's paying for these two artworks.  In this case it's to

2    the Ace Museum bank directly.

3         Q       Last four digits?

4         A       6347.

5         Q       Did Mr. Straus pay that money on or around

6    March 30th, 2016, the $100,000?

7         A       From my review of the bank records, it shows that

8    he did.

9         Q       And where did he send it?

10        A       To Ace Museum.

11        Q       On whose letterhead is this document?

12        A       Ace Museum.

13        Q       Based upon your knowledge, who was entitled to

14   the $100,000 from this sale?

15        A       The debtor.

16        Q       Why?

17        A       Because the artworks were property of the estate.

18            MS. MAKAREWICZ:  Exhibit 3.  In evidence.

19   BY MS. MAKAREWICZ:

20        Q       Have you seen this document before?

21        A       Yes, I have.

22        Q       Do you recognize it?

23        A       Yes.  It is an account statement -- monthly

24   account statement for the Ace Museum bank account, in this case

25   for March 2016.

**UNITED STATES DISTRICT COURT**

106

```
 1        Q       Are you familiar with a person named Mary Corse?

 2        A       Yes, I am.

 3                MS. MAKAREWICZ:  Let's look at Exhibit 7.  In

 4   evidence.

 5   BY MS. MAKAREWICZ:

 6        Q       What is this document, sir?

 7        A       This is the consignment agreement or artist

 8   contract between the debtor Ace Gallery and the artist

 9   Mary Corse.

10        Q       Drawing your attention to the first paragraph,

11   first page -- first paragraph, first sentence.

12        A       Paragraph No. 1?

13        Q       Yes, sir.

14        A       "Ace Gallery and/or its subsidiaries will have

15   exclusive international representation of the artist's work.

16   Any and all future exhibitions for the artist" -- I'm sorry.

17   There was a period there, wasn't there?

18        Q       That's fine.  We can stop there.

19                Going back to Exhibit 6, drawing your attention

20   to the art by Mary Corse, did Mr. Chrismas sell a Mary Corse

21   untitled 1987 art -- piece of art to the purchasers for

22   $150,000?

23        A       Yes.  That is what this invoice shows.

24        Q       Was this Mary Corse part of the bankruptcy estate

25   on March 30, 2016, based upon your personal knowledge, all of
```

**UNITED STATES DISTRICT COURT**

107

```
 1    the records, all of the bank statements, on behalf of -- as a

 2    lawyer for the creditors committee?

 3        A      Yes.  I don't recall if it was owned outright or

 4    if was held under consignment.  But the debtor had either way

 5    the exclusive right to be selling this art.

 6             MS. MAITIA:  Your Honor, I just want to interpose a

 7    belated objection for lacks foundation.  And if you could ask

 8    the witness to just give me a moment to object before he

 9    answers.

10             THE WITNESS:  I'm sorry.

11             THE COURT:  Yeah, I don't think we've got a problem

12    from the witness.

13             But if you can, just be conscious of the fact that

14    an objection may be coming.

15             Objection overruled.  Go ahead, Counsel.

16    BY MS. MAKAREWICZ:

17        Q      Let's look at the second transaction on this

18    page.  What is being recorded in this portion?

19        A      This is the sale of a Sylvie Fleury painting

20    called Life Can Get Heavy; Mascara Shouldn't dated 1999.

21             MS. MAKAREWICZ:  Let's go to 46 again, page 3.

22    BY MS. MAKAREWICZ:

23        Q      Have you seen this document?

24        A      Yes, I have.

25        Q      What is it?
```

**UNITED STATES DISTRICT COURT**

CEX 157

108

```
 1         A       It's another of the debtor's consignment sheets
 2   showing artwork that it held in its warehouse on -- under
 3   consignment agreements with artists.
 4         Q       And the art Life Can Get Heavy; Mascara
 5   Shouldn't, 1999, was that part of the bankruptcy estate on or
 6   around March 30, 2016, based upon your knowledge of the matter?
 7         A       Yes, it was.
 8         Q       And contrasting that with Exhibit 6, that was the
 9   piece that was sold also on March 30, 2016; true?
10         A       That's correct.
11              MS. MAKAREWICZ:  Can we go back to 6, please?  We
12   can take this down.
13   BY MS. MAKAREWICZ:
14         Q       How much did Mr. Chrismas sell this for?
15         A       That particular piece sold for $50,000.
16         Q       Was the $50,000 deposited into the debtor in
17   possession's bank account ending 8402 from the sale?
18         A       My recollection is that it was not.
19         Q       Turning the page, have you seen this part of the
20   document?
21         A       Yes, I have.
22         Q       I want to draw your attention to the first
23   paragraph.  What is Mr. Chrismas telling the customer to do?
24         A       He's telling them to send the payment by
25   overnight FedEx to the debtor's address, the second floor of
```

**UNITED STATES DISTRICT COURT**

112

1       Q       What is this Exhibit 12?

2       A       This is a bank statement for 400 South La Brea

3   LLC for its account at Cathay Bank for the period of

4   March 2016.

5               MS. MAKAREWICZ:  Can we look at Exhibit 12, page 2?

6   BY MS. MAKAREWICZ:

7       Q       Can we draw your attention to the credit section

8   of this page.  Can you describe what occurred on 3/30/2016?

9       A       Yes.  It shows a receipt of the $150,000 wired

10  into the landlord's account from Ace Museum.

11      Q       Based upon your understanding, the $150,000

12  transferred into this account was property of the estate?

13      A       That is my understanding.

14              MS. MAKAREWICZ:  Now let's go to 13.

15  BY MS. MAKAREWICZ:

16      Q       Looking at the debits -- oh, what is this again,

17  sir?

18      A       This is the account statement for the landlord's

19  bank account at Cathay Bank now for the month of April, 2016.

20      Q       I want to turn your attention to page 2.  What

21  is -- what occurred in the credits section on April 1st, 2016?

22      A       So it shows the original deposit of $114,595.32.

23  The -- it appears to be the check we looked at earlier.

24      Q       From the sale of the Mary Corse?

25      A       Correct.

**UNITED STATES DISTRICT COURT**

CEX 159

113

```
 1     Q      That was property of the estate?

 2     A      Correct.

 3     Q      This $114,595.32, that was property of the

 4  estate?

 5     A      That is my understanding, yes.

 6     Q      Did Mr. Chrismas get permission from the

 7  bankruptcy court to do either -- any of these three

 8  transactions?

 9     A      No, he did not.

10     Q      Did he get permission from the bankruptcy court

11  to deposit the money either into Ace Museum or directly to

12  Cathay Bank for the payment of rent of Ace Museum?

13     A      No, he did not.

14     Q      Did the plan agent start his job on April 6,

15  2016?

16     A      Yes, he did.

17     Q      Soon after, did he inform the defendant and his

18  attorney about the transfers that we've just discussed?

19     A      Yes.

20            MS. MAITIA:  Objection.  Hearsay.

21            THE COURT:  Objection sustained.  Counsel, do you

22  have a response to the hearsay objection?

23            MS. MAKAREWICZ:  I can -- I can withdraw it.

24            THE COURT:  Okay.

25            MS. MAKAREWICZ:  I would like to turn to Exhibit 17.
```

**UNITED STATES DISTRICT COURT**

CEX 160

114

```
 1   BY MS. MAKAREWICZ:

 2        Q      Have you seen this document before?

 3        A      Yes, I have.

 4        Q      What is this?

 5        A      This is a letter from David Shemano from the law

 6   firm of Robbins Kaplan to Carolyn Dye who was an attorney for

 7   the plan agent.

 8        Q      Who did Mr. Shemano represent on or around

 9   April 25, 2016?

10        A      He represented Mr. Chrismas, Jennifer Kellen, and

11   Ace Museum.

12        Q      Personally?

13        A      Yes.

14        Q      Not as debtor in possession?

15        A      No.

16        Q      Paragraph 1, first sentence.  Can you describe

17   what occurs here?  Or read it, please.

18        A      Yes.  It states under transfers to Ace Museum,

19   "Sam is correct that on or about March 30th, 2016, Douglas

20   caused Ace Gallery to transfer approximately $264,000 to

21   Ace Museum."

22        Q      This is in reference to the $264,595.32; true?

23        A      Yes, it is.

24        Q      Last sentence of this paragraph?

25        A      It states, "Douglas recognizes that the loaned
```

**UNITED STATES DISTRICT COURT**

115

```
 1    funds must be promptly repaid.  Ace Museum will repay the
 2    $264,000 plus 5 percent interest no later than May 20th, 2016."
 3        Q        Did Mr. Chrismas obtain permission from the
 4    bankruptcy court to loan Ace Museum $264,595.32?
 5        A        No, he did not.
 6        Q        Was it part of the ordinary course of business,
 7    based upon your personal review, for Ace Gallery to loan money
 8    to Ace Museum?
 9            MS. MAITIA:  Objection, Your Honor.  Lacks
10    foundation, calls for expert testimony.
11            THE COURT:  You can answer with respect to what your
12    understanding was.
13            THE WITNESS:  My understanding was no, it was not
14    and would have required bankruptcy court approval.
15    BY MS. MAKAREWICZ:
16        Q        The ordinary course of Ace Gallery's business was
17    selling art?
18        A        Yes.
19        Q        Not loaning money?
20        A        No.
21            MS. MAITIA:  Objection, Your Honor.  Leading.
22            THE COURT:  Objection overruled.
23            MS. MAKAREWICZ:  Let's turn to page 2, paragraph 5.
24    BY MS. MAKAREWICZ:
25        Q        What is being described in this paragraph?
```

**UNITED STATES DISTRICT COURT**

CEX 162

92

```
 1        Q        And you've never been an art curator?
 2        A        I have not.
 3        Q        And you've never sold a piece of fine art?
 4        A        Well, I guess that would depend how people would
 5   characterize wildlife photography that I sold from a small
 6   gallery of my own that I used to have.  I would like to think
 7   it's fine art.  But since my sales weren't high enough, I
 8   closed it down.  So perhaps --
 9        Q        What was the most you ever sold one of your
10   pictures for?
11        A        I think about $1,200.
12        Q        Not bad.
13                 I asked you a moment ago -- or I said a moment
14   ago that your job was to sue Mr. Chrismas, and you said "among
15   others."
16        A        Well, among other defendants and among other jobs
17   that I had, yes.
18        Q        Okay.  But with respect to the Ace Gallery
19   bankruptcy-related cases, you weren't just suing Mr. Chrismas.
20   You were suing other people and other entities?
21        A        Yes.
22        Q        So you sued or were in litigation against Ace
23   Museum specifically?
24        A        Yes.
25        Q        Ace New York specifically?
```

**UNITED STATES DISTRICT COURT**

CEX 163

6

```
 1   A     Yes, I do.

 2   Q     And on the next page at the very top in parens it says the

 3   debtor's right under that contract to acquire the Beverly Hills

 4   property are referenced herein as the option.

 5         Do you see that?

 6   A     Yes, I do.

 7   Q     Okay.  And then at page 4, Paragraph 3, under the title:

 8   Claims amendment and additional consideration.

 9         It says, in exchange for an assignment of the option to

10   Wilson, Wilson and plan agent agree to the amendment of will

11   since allowed claims and post-confirmation debt and additional

12   consideration as follows:

13         Do you see that?

14   A     Yes, I do.

15   Q     Carolyn Dye was the point person on this with Mr. Leslie?

16   A     That's my recollection, yes.

17   Q     Going back to Government Exhibit 16, the order confirming

18   the Creditors' Committees Plan of Reorganization, the one you

19   helped draft.

20         Do you recall that?

21   A     Yes.

22   Q     I believe we talked about this yesterday, the order

23   confirming the plan contemplated there was about $5 million set

24   aside in trust for AERC?

25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

7

```
 1   Q    And that $5 million came from the proceeds of the Beverly
 2   Hills purchase option that was exercised?
 3   A    Correct.
 4   Q    And Sam Leslie settled with AERC in 2017?
 5   A    Yes.
 6   Q    And as part of that settlement the $5 million held in
 7   trust was split between AERC and Sam Leslie?
 8   A    I have a vague recollection of that.
 9   Q    But half went to AERC and about half went to Sam Leslie,
10   correct?
11   A    That's my vague recollection, yes.
12   Q    And Carolyn Dye was the point person on receiving Sam
13   Leslie's half of that two and a half million dollars?
14   A    That would make sense, yes.
15   Q    And Sam Leslie as plan agent, he could pay himself as plan
16   agent under the plan without further order from the Court?
17   A    Yes, that's typical.
18   Q    And he also, under the terms of the plan, he was paid a
19   percentage of any disbursements he made out to creditors?
20   A    Yes, that's how trustees get paid.
21   Q    Under the plan creditors includes any professionals that
22   Mr. Leslie hires?
23   A    Yes.
24   Q    Like your law firm?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

CEX 165

8

1    Q      Now, going to page 16 of the order you helped draft.  I'm

2    trying to make it bigger.

3           At the very top of Paragraph 7 it says:  Until a plan

4    termination event -- a plan termination event, if any, takes

5    place, as that term is defined in Paragraph 24 below, the plan

6    agent shall, among other things, be vested with the sole and

7    exclusive authority subject to the AERC plan term sheet to --

8    then I'm going to narrow down my next part so it's easier to

9    read.

10          Starting at C, market, sell, encumber, and otherwise

11   negotiate and consummate a transaction to sell or monetize the

12   estate's interest, if any, in the La Brea lease, the La Brea

13   property purchase option, and the La Brea property.

14          Do you see that?

15   A      Yes, I do.

16   Q      When it says "La Brea," do you understand that to mean Ace

17   Museum?

18   A      Yes.  Sorry, La Brea property, yes, I guess that is what

19   would be referred to, I haven't seen the defined terms.

20   Q      When you were working on this case, if somebody says La

21   Brea, I think --

22   A      Typically I would say 400, but yeah, La Brea.

23   Q      Now, turning to I'm going to ask you to switch to exhibit

24   finders, Government Exhibit 58.

25   A      Yes, I'm there.

**UNITED STATES DISTRICT COURT**

CEX 166

9

| | | |
|---|---|---|
| 1 | Q | Do you recognize this document? |
| 2 | A | Yes, I do. |
| 3 | Q | What is it? |
| 4 | A | This is a stipulation to provide the creditors committee |

5  withstanding, which is the right to pursue lawsuits, and in

6  this case, against Ace Museum.

7  Q     And your firm, Sulmeyer, on behalf of the creditors

8  committee filed this document in Bankruptcy Court in November

9  of 2014?

10 A     Yes.

11 Q     Victor Sahn's name is on the filing?

12 A     Yes, it is.

13        MS. MAITIA:  Defense moves to admit Government's

14 Exhibit 58.

15        MS. MAKAREWICZ:  No objection.

16        THE COURT:  58 is in evidence.

17          (Exhibit 58 received into evidence.)

18        MS. MAITIA:  I'm going to guide you on the screen

19 now, on the second page, Paragraph C, it says:  Prior to the

20 petition date, Ace Museum became indebted to the debtor in the

21 approximate sum of at least 4.48 million on account of a loan

22 made by the debtor to AERC.

23      Do you see that?

24        THE WITNESS:  Yes, I do.

25 BY MS. MAITIA:

**UNITED STATES DISTRICT COURT**

10

1  Q    Then the next Paragraph D, starts on March 5th, 2013, the

2  debtor filed Schedule B of his bankruptcy schedules identifying

3  the loan obligation as one of its assets and an asset of this

4  bankruptcy estate.

5       Do you see that?

6  A    Yes, I do.

7  Q    Now, if you could switch back to Defense Exhibit 217.

8  A    Yes, I'm there.

9  Q    Do you recognize this document?

10 A    Yes, I do.

11 Q    What is it?

12 A    It's a stipulation that authorizes the committee to amend

13 their complaint and seek appointment of a responsible officer

14 to take over Ace Museum.

15 Q    And it's the complaint against the museum, so the

16 creditors committees lawsuit filed against the museum?

17 A    It's my recollection.  It's a long time since I have look

18 at this, but I'm looking at it now.

19 Q    Go to the next page.  The first paragraph.

20      It identifies the creditors committee as the plaintiff,

21 and Ace Museum as the defendant.

22      Does that refresh your recollection that Ace Museum is

23 the defendant?

24 A    That much I certainly remember.  Other terms I'm scanning

25 through.

**UNITED STATES DISTRICT COURT**

CEX 168

11

1  Q    And your name is on this pleading as being responsible for

2  filing this document?

3  A    Yes.  I wouldn't have done the first draft but I probably

4  finalized it and filed it.

5  Q    The defense moves to admit Defense Exhibit 217.

6             THE COURT:  Any objection?

7             MS. MAKAREWICZ:  The objection is based upon that

8  the entire document, only select portions are in, so the

9  government would request the entire document be moved into

10 evidence and not the selected portions on rule of completeness.

11            THE COURT:  Any objection to that, counsel?

12            MS. MAITIA:  I believe the government needs to make

13 a showing of why any remaining portions of the document makes

14 this incomplete, and they haven't done that.

15            MS. MAKAREWICZ:  Well, I can see that the document

16 is 65 pages long, and the defense exhibit is numbered only up

17 to 17.

18            THE COURT:  Is the document 62 pages?

19            MS. MAKAREWICZ:  I'm drawing your attention to

20 page 17, I know 17, which appears to be the clearest.

21     It talks about Document 223-2 pages 62 out of 62 at the

22 top, so that's what I'm basing it on.

23            THE COURT:  So 62 pages?

24            MS. MAKAREWICZ:  I would request all 62 be placed in

25 evidence.

**UNITED STATES DISTRICT COURT**

CEX 169

12

```
 1                THE COURT:  I think that is fair, counsel.

 2                MS. MAITIA:  I have a response to that, Your Honor.

 3                THE COURT:  Okay.

 4                MS. MAITIA:  The document has three different ECF

 5    headers, it was originally filed on February 17th, 2015, and

 6    then it was refiled later in different litigation in 2017.

 7                I would like to at least inquire if the stipulation is

 8    complete according to Mr. Richardson.

 9                THE COURT:  Go ahead.

10    BY MS. MAITIA:

11    Q    Mr. Richardson, does Defense Exhibit 217, a stipulation

12    that you looked at and filed for your client, appear to be a

13    complete document, a complete reflection of the stipulation you

14    filed with the two accompanying exhibits, 6 and 7?

15    A    It doesn't appear, at least, my copy does not appear to

16    include 6 unless --

17    Q    I apologize, I took out 6 in order to have less paper.

18    A    Also, it says:  Attached here to Exhibit 5, it appears it

19    would be Exhibit 1, 2, 3, 4, so there is 6 of 7 exhibits

20    missing.

21                MS. MAKAREWICZ:  The government has no objection.

22    It wants the entirety of the government --

23                THE COURT:  The Court agrees if counsel wants to

24    come back with a complete copy of this, it sounds like we have

25    an agreement to put it in evidence.
```

**UNITED STATES DISTRICT COURT**

13

```
 1            MS. MAKAREWICZ:  The government is fine with counsel
 2   proceeding in her line of questioning regarding these certain
 3   pages, it's just that when the exhibits go to the jury it just
 4   wants the entirety of the documents.  It's fine with
 5   proceeding.
 6            MS. MAITIA:  May I move to admit the exhibit subject
 7   to the defense providing a full copy?
 8            THE COURT:  Yes.
 9            (Exhibit 5 received into evidence.)
10   BY MS. MAITIA:
11   Q    I'm going to hopefully direct your attention to page 6,
12   which I will pull up on the screen.  And according to page 6 of
13   the stipulation you prepared, it identifies an attached
14   Exhibit 6 and 7 with Exhibit 7 being a promissory note.
15        Do you see that?
16   A    Yes, I do.
17   Q    And then right under that, it says:  The foregoing
18   documents in the agreement of the debtor defendant and Douglas
19   Chrismas, the foregoing documents in the agreement of the
20   debtor, defendant and Douglas Chrismas, to the terms and
21   conditions is art of the stipulation and these exhibits shall
22   all be approved by the Court as a condition of the stipulation.
23        Do you see that?
24   A    I do.
25   Q    Now, this is the first page of Exhibit 7.
```

**UNITED STATES DISTRICT COURT**

14

1          The exhibit number page and at the top of Exhibit 7, so

2     the stipulation, it's entitled as a secured promissory note.

3          Do you see that?

4     A     Yes, I do.

5     Q     Do you recognize this secured promissory note?

6     A     Yes, I have seen it before.

7     Q     Okay.  And it's a promissory note where the museum is

8     confirming that it owes the gallery $3.3 million pursuant to an

9     earlier loan?

10    A     It says that, it turned out to be incorrect, but it says

11    that.

12    Q     Okay.  But the museum owes the gallery, the debtor a

13    couple of million dollars?

14    A     Far more than couple of.

15    Q     Several million?

16    A     Yes.

17    Q     A lot of money?

18    A     Yes.

19    Q     Okay.  And at the very top of this first paragraph it says

20    that the museum owes the money to Art and Architecture Books of

21    the 21st Century.

22          Is that the former name for Ace Gallery?

23    A     Yes, it is.

24    Q     Then it says, in care at Victor Sahn, Sulmeyer.

25    A     Yes.

**UNITED STATES DISTRICT COURT**

15

1  Q    Counsel for the official committee of unsecured creditors?

2  A    Correct.

3  Q    Down at the bottom of this page, there is a paragraph.

4  Paragraph 3, it says security and this paragraph is securing

5  the promissory note to the gallery which is in care of the

6  creditors committee and Victor Sahn as their lawyer?

7  A    Yes.

8  Q    This note is secured by all of the makers' right, title

9  and interest in that certain real property in Los Angeles

10 commonly known as 400 South La Brea.

11       Do you see that?

12 A    Yes, I do.

13 Q    Including, but not limited, to any of the makers' present

14 and future leases of and leasehold interests in the La Brea

15 property and any and all options to purchase the La Brea

16 property, together with the rents issues and profits thereof as

17 evidence of certain leasehold treatment of trusts leasehold

18 interest.

19       Do you see that?

20 A    Some of what you said went beyond the bottom of the page,

21 so I'm scanning to see where else it is.

22 Q    I blew up the paragraph on the screen.

23 A    I just took a look at the top of page 2, to see if the

24 rest of it that you read out, yes, it is there.

25 Q    Can you please turn to Defense Exhibit 226?

**UNITED STATES DISTRICT COURT**

16

```
 1   A     I'm there.
 2   Q     Okay.  Do you recognize this as an e-mail that Victor Sahn
 3   sent to David Shemano and a copy to you, among other people?
 4   A     I don't recall it, but my name is on here.  I must have
 5   received it.
 6   Q     And this e-mail is dated June 11th, 2015?
 7   A     Yes.
 8   Q     So this is after the stipulation that we just looked at
 9   where there was the secured promissory note in favor of the
10   creditors, secured by the museum property?
11   A     Yes.
12   Q     And David Shemano is the bankruptcy lawyer for the museum?
13   A     Yes, he is or was.
14   Q     Victor Sahn is telling him:  We shall proceed to protect
15   the bankruptcy estate's interests in the lease until such time
16   as the landlord acknowledges in writing that the due date is
17   extended to June 22.
18             MS. MAKAREWICZ:  Objection, hearsay.
19             THE COURT:  Any response to the hearsay objection?
20             MS. MAITIA:  This is effect on the listener with
21   David Shemano representing the museum.
22             THE COURT:  Effect on which listener?
23             MS. MAITIA:  David Shemano as representative for the
24   museum.
25             THE COURT:  Okay.  That objection is sustained.
```

**UNITED STATES DISTRICT COURT**

17

```
1   BY MS. MAITIA:

2   Q     Do you recall after the stipulation was filed with the

3   Court that we looked at in the last exhibit in February

4   of 2015, that your firm made efforts to ensure that the museum

5   rent was paid?

6   A     I don't recall any efforts, no.

7   Q     Did you consider the museum and a lease on the purchase

8   option to be something the creditors now had an interest in

9   given the promissory note we just looked at?

10  A     It created an interest, yes.  Unfortunately, misleading

11  one at the time, but yes, it created an interest.

12  Q     It created an interest with the secured promissory note

13  when the creditors committee received it in 2015?

14  A     Yes.

15  Q     In the time period summer of 2015, before the plan is

16  approved in 2016, the parties were -- the parties, meaning the

17  creditors committee and the museum and the debtor and

18  Mr. Chrismas personally were in negotiation to see if they

19  could come to agreement on a plan?

20  A     Yes.

21  Q     The parties were exchanging proposals?

22  A     Yes, they were.

23  Q     And do you recall Victor Sahn proposing to the Ron Bender

24  firm and David Shemano that as part of the creditors committee

25  plan the museum landlord 400 South La Brea, would be required
```

**UNITED STATES DISTRICT COURT**

18

1    to accept rent payments from Ace Gallery to preserve the lease

2    and purchase option?

3    A     I don't recall that.  But if that had gone forward and the

4    Court had approved it, then it could have happened.

5    Q     It doesn't seem outside the realm of possibility of

6    something Victor Sahn would suggest, given the negotiations you

7    were part of?

8                    MS. MAKAREWICZ:  Speculation.

9                    THE COURT:  Objection sustained.

10   BY MS. MAITIA:

11   Q     Please turn to Defense Exhibit 227.

12   A     Yes, I'm there.

13   Q     Okay.  And do you recognize this as letterhead of your

14   firm at the time, Sulmeyer?

15   A     Yes, it is.

16   Q     And do you recognize this as a letter that Victor Sahn,

17   you know, was identified as the author of?

18   A     It certainly shows it suggests on its face it is.  I don't

19   ever recall seeing this.

20   Q     Okay.  Can you please turn to the last page of this

21   letter?

22   A     Yes, I'm there.

23   Q     Okay, and Paragraph 8.  I'd like you to read that and let

24   me know when you are done?

25                    MS. MAKAREWICZ:  Objection, hearsay, it's not in

**UNITED STATES DISTRICT COURT**

CEX 176

25

1            MS. MAKAREWICZ:  Objection, hearsay.  Foundation,

2    speculation.

3            THE COURT:  Sustained, on speculation.

4    BY MS. MAITIA:

5    Q    Even if it's not possible legally to file involuntary

6    bankruptcy against a 503 nonprofit, it doesn't prevent anyone

7    from threatening to do so?

8            MS. MAKAREWICZ:  Same objections.

9            THE COURT:  Objection sustained.

10   BY MS. MAITIA:

11   Q    Have you been to the museum?

12   A    I have been around it.  I have never been able to go in

13   since it didn't actually operate with business hours.

14        And calling it the museum, it was never a museum, it was

15   just called the museum.

16   Q    I mean, was there ever a time -- I will call it the museum

17   property if that makes you more comfortable, was there ever a

18   time where you tried to get access to it during business hours

19   and you weren't permitted to?

20   A    No.  I walked around it, it was just closed.  There was no

21   sign of any activity there.

22        I just wanted to see it for myself, that was all.

23   Q    When did you do that?

24   A    It was early in the case, early in my investigation.  I

25   drove by it quite frequently, and I was just curious.

UNITED STATES DISTRICT COURT

33

```
 1   each other.
 2          Do you want to ask him your next question?
 3   BY MS. MAITIA:
 4   Q    You never attended an exhibition for an artist at the
 5   museum location, correct?
 6   A    No, I did not.
 7   Q    In your work, you only looked at invoices and contracts
 8   and consignment sheets, you didn't interview artists, correct?
 9   A    My recollection is interviewing artists, but I would have
10   to go back to notes.
11          I know I reached out to many, I don't recall how many
12   returned calls.
13   Q    Did you interview Matt Hope?
14   A    I don't recall interviewing Matt Hope.
15   Q    Did you interview Andrew Holmes?
16   A    I don't recall, because I don't believe he was someone who
17   was owed money or had sales carried out by the debtor during
18   the bankruptcy case.
19   Q    Did you interview Sylvie Fleury?
20   A    I don't believe so.
21   Q    Do you know who that is?
22   A    Yes.
23   Q    What about Tara Donovan?
24   A    I would have to look at my notes.
25   Q    What about Jonathan Monk?
```

**UNITED STATES DISTRICT COURT**

34

```
 1   A      I don't believe so.

 2   Q      Do you have any of their phone numbers saved in your cell

 3   phone?

 4   A      Not in my cell phone, but they may very well be in my

 5   notes.

 6          I have got so many files, I couldn't begin to count

 7   them.

 8   Q      On direct, you testified about the $14 million figure?

 9   A      Yes.

10   Q      That is all of the money you added up that went into the

11   Ace New York account?

12   A      Yes.

13   Q      And you didn't subtract or offset any money from that

14   $14 million if the Ace New York account sent money back to the

15   gallery?

16   A      I thought that was a net figure.  I would have to go back

17   to my charts and look.

18   Q      So you don't remember if that is what it includes?

19   A      I don't remember if it's net or not.

20          It also depends how the money was sent back, because

21   over a million dollars was sent down to the Ace Museum account

22   and then paid to the debtors account and claimed to be a loan

23   repayment.  Whether it was -- so it depends how you are talking

24   about a repayment to the debtor.

25   Q      You hired a forensic accountant expert to do a lot of this
```

**UNITED STATES DISTRICT COURT**

35

1   analysis?

2   A    She did her own analysis and came essentially to the same

3   conclusion, yes.

4   Q    Her conclusion was that the total amount of money that

5   went into Ace New York was $14 million?

6   A    Yes.

7   Q    And she did not do any offsets, if the money went directly

8   back to the gallery from Ace New York?

9   A    I don't recall if she did or did not.  Her report came out

10  after I left.

11  Q    Victor Sahn was still involved at that time?

12  A    Yes.

13  Q    And she also -- if money from the Ace New York account

14  went to pay an expense or a bill on behalf of the gallery, she

15  didn't subtract from that either.

16          MS. MAKAREWICZ:  Objection.  He testified he doesn't

17  recall.

18          THE COURT:  Objection sustained.

19  BY MS. MAITIA:

20  Q    When you did your calculation, if money went into Ace New

21  York and then, for example, Ace Gallery got $100 bill for

22  Internet, and the $100 was taken out of Ace New York to pay the

23  gallery's bill, you didn't subtract $100 from the 14 million?

24  A    I don't recall if I did or did not.  I would have to go

25  back and look.

**UNITED STATES DISTRICT COURT**

36

```
 1        Quite frankly, from the perspective of -- was it a

 2   diversion of the funds in the estate and put in the wrong

 3   account, it was still part of the 14 million as far as we were

 4   concerned.

 5   Q    Because you wanted to have the highest number possible?

 6   A    No.  We wanted to be accurate.

 7             MS. MAITIA:  Your Honor, I have two new defense

 8   exhibits and copies for everyone.

 9        May I distribute them and seek to admit them?

10             THE COURT:  Sure.

11             MS. MAITIA:  Thank you.

12   BY MS. MAITIA:

13   Q    Mr. Richardson, please look at Defense Exhibit 346 in the

14   folder.

15   A    Yes, I have it.

16   Q    There are three pages, correct?

17   A    Yes, there are.

18   Q    And the first page, do you recognize this as the Miracle

19   Mile location of Ace Gallery?

20   A    Yes.  This is -- it looks like it was taken about the time

21   of the bankruptcy case.

22   Q    Okay, because you have been there before?

23   A    I have been there before, and now it's completely vacant

24   and for lease.

25   Q    Do you know how long it's been vacant?
```

**UNITED STATES DISTRICT COURT**

48

```
 1   Century, correct?

 2   A     Right.

 3   Q     It goes on to state that the -- it's going to happen, this

 4   loan is going to occur, right?

 5   A     Yes.

 6   Q     And there was no interest on this loan, right?

 7   A     No.

 8   Q     And it could be paid back at any time as funds became

 9   available on Ace Museum's account, right?

10   A     Correct.

11   Q     Now, the document lists the directors who voted, correct?

12   A     Yes, it does.

13   Q     And Scott Schaefer and Frederick Nicholas are alleged to

14   have been voting on this document, right?

15   A     They are.

16   Q     And we discussed yesterday that they weren't on the board

17   of directors, true?

18              MS. MAITIA:  Pardon me, objection.  Calls for

19   hearsay.  Confrontation clause.  Leading questions.

20              THE COURT:  Counsel, can you ask that in a

21   non-leading way?

22              MS. MAKAREWICZ:  Who, on this document, are the

23   directors that voted on this loan?

24              THE WITNESS:  Well, from my own discussions with, at

25   least two of them --
```

**UNITED STATES DISTRICT COURT**

CEX 182

49

```
 1              MS. MAITIA:  Pardon me.
 2    BY MS. MAKAREWICZ:
 3    Q     Just answer who is on it?
 4          Who is listed as being voting?
 5    A     On the listed, Andrea Nasher, Scott Schaefer, and
 6    Frederick Nicholas.
 7    Q     Scott Schaefer wasn't a board of director member?
 8              MS. MAITIA:  Objection, lacks foundation.  Calls for
 9    hearsay, confrontation clause.
10              THE COURT:  He can answer whether he has an
11    understanding of whether Scott Schaefer was a board member.
12              MS. MAITIA:  Your Honor, may I be heard at sidebar
13    please?
14              THE COURT:  No.  Go ahead.
15              THE WITNESS:  I interviewed Mr. Schaefer and
16    obtained a declaration from him confirming under penalty of
17    perjury that he was not a member of the board of directors of
18    Ace Museum.
19    BY MS. MAKAREWICZ:
20    Q     Same for Fred Nicolas, right?
21              MS. MAITIA:  Objection, Your Honor.  Move to strike,
22    hearsay.  Confrontation clause.
23              THE COURT:  Let me bring the lawyers to sidebar.
24                   (Sidebar begins.)
25              THE COURT:  I didn't realize the witness was going
```

**UNITED STATES DISTRICT COURT**

52

```
 1          The jury is not to consider them.  Any reference to

 2   statements made out of court that are sworn are not evidence in

 3   the case and not something you are to consider.

 4          You should ignore that part of the answer.  Please

 5   proceed.

 6   BY MS. MAKAREWICZ:

 7   Q     Based on your personal knowledge, was Scott Schaefer or

 8   Fred Nicholas on the board of directors?

 9          MS. MAITIA:  Objection, lacks foundation.  Calls for

10   hearsay.  Confrontation clause.

11          THE COURT:  Maybe you can ask the witness, does he

12   know whether he was on the board of directors?

13          MS. MAKAREWICZ:  Do you know?

14          THE WITNESS:  Yes, I do know.

15          MS. MAKAREWICZ:  Were they?

16          MS. MAITIA:  Objection.

17          THE COURT:  Overruled.  You can answer.

18          THE WITNESS:  No, they were not.

19   BY MS. MAKAREWICZ:

20   Q     Did you depose Andrea Nasher?

21   A     I did not, no.

22   Q     The defense counsel -- we have been talking about this

23   loan.

24          Did the creditors committee try to collect on this loan?

25   A     We were looking for opportunities.  It was one of the
```

**UNITED STATES DISTRICT COURT**

71

```
 1                MR. WILLIAMS:  Yes, Your Honor.

 2                MS. WILLIAMS:  Thank you.  I just wanted to know I

 3    believe Crawford versus Washington states that testimonial, at

 4    least, includes statements under oath in court in affidavits

 5    and in depositions.  It's not exclusive to criminal cases.

 6                MR. WILLIAMS:  Davis and Crawford are parallel cases

 7    that dealt with similar issues that work together.  We can

 8    happily brief this after the trial.

 9                THE COURT:  Let's get the jury back in.  How much

10    further do we have on Mr. Richardson?

11                MS. MAKAREWICZ:  Twenty minutes, maybe less, Your

12    Honor.

13                THE COURT:  You said 20 minutes?

14                MS. MAKAREWICZ:  Yeah, he needs to go.

15                MR. WILLIAMS:  We have one more witness who has been

16    waiting all day we were hoping to slide in.

17           She will be very similar to the final witness yesterday,

18    who was 45 minutes.

19                THE COURT:  Great.

20           Yes, Mr. Richardson, thank you very much.

21                THE COURTROOM DEPUTY:  All rise.

22            (Jury enters the courtroom at 3:05 p.m.)

23                THE COURT:  Please have a seat.  Okay.  While the

24    jury was gone we were discussing a legal issue.

25                Mr. Richardson testified about who was or wasn't on the
```

**UNITED STATES DISTRICT COURT**

72

```
 1   board for Ace Museum.
 2        That testimony was, at least, based in part on
 3   statements made out of court that we would consider hearsay
 4   statements, and those statements shouldn't -- those statements
 5   don't come into evidence in this case.
 6        So Mr. Richardson's testimony being based on that
 7   shouldn't come in either.  So the Court is going to strike the
 8   testimony Mr. Richardson has given so far relating to who was
 9   or wasn't on the board of Ace Museum.
10        Now, the government may ask additional questions around
11   the same topic, but we will just -- I will caution everyone
12   that we only want to know about something in his personal
13   knowledge not something that was made -- not something he heard
14   from a statement made out of court, so ignore that.
15             MS. MAKAREWICZ:  Let's look at Exhibit 59, please.
16   BY MS. MAKAREWICZ:
17   Q    Do you see that exhibit in front of you, sir?
18   A    I do.
19   Q    Do you recognize it?
20   A    I do, although, it's been a long time since I have looked
21   at it.
22   Q    What is the name of this document?
23   A    It's the debtor's third-amended plan of reorganization
24   dated January 12, 2016?
25   Q    This is the debtor's plan?
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT F

U.S. v. Vogel, 37 F.3d 1497 (1994)

37 F.3d 1497
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals, Fourth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Daniel A. VOGEL, Jr., Defendant–Appellant.

No. 93–5275.
|
Argued July 14, 1994.
|
Decided Oct. 12, 1994.

Appeal from the United States District Court for the
District of South Carolina, at Charleston. David C.
Norton, District Judge. (CR–91–440–2)

**Attorneys and Law Firms**

ARGUED: Roger William Smith, Tharrington, Smith &
Margrove, Raleigh, NC, for appellant.

David S. Kris, U.S. Dept. of Justice, Washington, DC, for
appellee.

ON BRIEF: E. Hardy Lewis, Tharrington, Smith &
Hargrove, Raleigh, NC, for appellant.

J. Preston Strom, Jr., U.S. Atty., Alfred W. Bethea, Asst.
U.S. Atty., U.S. Dept. of Justice, Washington, DC, for
appellee.

**Synopsis**
D.S.C.

AFFIRMED.

**Procedural Posture(s):** On Appeal.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit
Judge, and PHILLIPS, Senior Circuit Judge.

OPINION

MURNAGHAN, Circuit Judge:

**\*1** On October 3, 1991, a federal grand jury sitting in the
District of South Carolina returned a twelve-count
indictment charging Daniel A. Vogel and several others
with conspiracy and several substantive offenses
stemming from a scheme to burn down Vogel's beach
house and collect the fire insurance proceeds. Vogel was
convicted by a jury on all but two of the counts in the
indictment. The district court sentenced him to 120
months' imprisonment, three years of supervised release,
and $1,659,144.60 in restitution to his insurance
company. Vogel has appealed his conviction and his
sentence on the following grounds:

1) that the government improperly vouched for the
credibility and truthfulness of its primary witness,
Charles Terry Norman;

2) that the introduction of Vogel's co-defendants'
convictions invited the jury to find Vogel guilty by
association;

3) that the district court committed plain error by
admitting "expert" testimony concerning Vogel's
bankruptcy proceedings;

4) that the evidence did not establish a sufficient nexus
with interstate commerce to satisfy the jurisdictional
requirement of the federal arson statute, 18 U.S.C.§
844(i);

5) that the language of the verdict form submitted to the
jury required Vogel to prove his innocence beyond a
reasonable doubt;

6) that Vogel's convictions on Counts 9 and 11 merged
with his convictions on Counts 10 and 12;

7) that Vogel was improperly sentenced under the
Sentencing Guidelines; and

8) that the district court erred in imposing restitution on
Vogel.

Finding Vogel's several grounds for appeal unpersuasive,
we affirm the district court's decision.

CEX 188

*BACKGROUND*

Daniel Vogel, a business man from Charlotte, North Carolina, hired Larry Moore, Philip McLamb and Charles Terry Norman to burn down his own beachfront house located at 6202 North Ocean Boulevard in Myrtle Beach, South Carolina.[1] During his trial, the government offered the theory that Vogel wanted his house destroyed because he had filed for bankruptcy under Chapter 11 and needed the insurance proceeds to pay his creditors. Vogel's Chapter 11 reorganization plan, developed in bankruptcy proceedings during 1987, required him to make large payments to creditors which Vogel allegedly could not have afforded without the insurance proceeds.

In the summer of 1987, Vogel contacted Moore, a former tenant, and asked him to arrange the arson of Vogel's beach house. In business with McLamb and Norman, Moore recruited the two men to help him commit the arson in exchange for $100,000, ten percent of the anticipated proceeds. On August 15, 1987 Vogel met with Moore and Norman for about 45 minutes to discuss the arson and to take the two men on a tour of his beach house in South Carolina. Norman testified that he and Moore told Vogel they would burn the house to the ground using gasoline and C4 explosives. Norman also testified that Vogel said he wanted to make sure no one got hurt and that Moore assured him they knew what they were doing.

*2 In the Fall, Vogel contacted Moore and told him to go ahead with the arson. It took three different attempts on three consecutive days for the defendants to accomplish their goal, November 20, 21, and 22, 1987. The first attempt involved Moore, McLamb, and Norman. Alison Harbour was also present in South Carolina when they attempted the arson. Although Moore arranged the initial attempt, he did not accompany Norman and McLamb to the house. Notified upon his return to North Carolina that the attempt had not been successful, Norman said he would return to try again but that he did not want to go back with McLamb. That night, Norman, Blake Tilley, and Gregory (nicknamed Murdock) went back to South Carolina, and Tilley and Gregory attempted the arson. After the three returned home, Norman was notified once again that the attempt had not been successful. At that point, Gregory said he would take care of it himself. He returned to South Carolina and effectively destroyed the beach house on November 23, 1987.

After the house was destroyed, Vogel submitted claims to Aetna Casualty & Surety Co., which the insurance company proceeded to pay in installments. Aetna paid him over $1.6 million under the terms of his policy.

On October 3, 1991, a federal grand jury returned a twelve count indictment against Vogel and others charging them with conspiracy and several substantive offenses stemming from the scheme to burn down Vogel's house and collect the insurance proceeds. Vogel was convicted of conspiracy (Count 1) in violation of 18 U.S.C. § 371; five counts of mail fraud and aiding and abetting that crime (Counts 2–6) in violation of 18 U.S.C. §§ 1341 and 2; two counts of arson and aiding and abetting that crime (Counts 9 and 11) in violation of 18 U.S.C. § 844(i) and 2; and two counts of using fire to commit a felony and aiding and abetting that crime (Counts 10 and 12) in violation of 18 U.S.C. § 844(h)(1) and 2. He was acquitted on one count of arson (Count 7) and one count of using fire to commit a felony (Count 8).

The district court used the 1987 edition of the Sentencing Guidelines to calculate Vogel's sentence. Under § 3D1.2(b), the Presentence Report (PSR) grouped the conspiracy and mail fraud counts (Counts 1–6) together with the two fire and explosives counts stemming from the arson attempt on November 21, 1987 (Counts 9–10). The base offense level for that group of counts was 6 under § 2K1.4, which was then increased by *18* levels pursuant to § 2K1.4(b)(1) because Vogel was found to have knowingly created a substantial risk of death or serious bodily injury. The court increased Vogel's sentence by another 4 levels under § 3B1.1 because the court found Vogel to be an organizer or leader of the criminal activity. His adjusted offense level for that group of offenses was *28.*

The PSR treated the fire and explosives charges stemming from the successful arson on November 22, 1987 (Counts 11 and 12) as a separate group of offenses. Using the same calculations, the report suggested an adjusted offense level of *28.* Because Vogel had two groups of offenses with an adjusted level of *28, his* total offense level was increased by 2 levels under § 3D1.3 and § 3D1.4, bringing his total offense level to *30.* Under the applicable criminal history category of I, the sentencing range was 97–121 months. The court accepted the presentencing report with only a few minor changes in the representations of the facts, entertained and overruled Vogel's objections to that report during the sentencing hearing, and sentenced Vogel to 120 months' imprisonment to be followed by three years' supervised release.

*3 The PSR contained a detailed description of Vogel's financial condition. The report also indicated that he owed

Aetna Casualty $1,659,144.60, and the court ordered him to pay restitution in that amount in installments of $553,048.00 over three years.

**Vogel's** appeal is based on alleged errors in both the trial and the sentencing process.

*Standard of Review*

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Hassan El,* 5 F.3d 726, 731 (4th Cir.1993). When an appellant has failed to object during the proceedings below, we review for plain error. Federal Rule of Civil Procedure 52(b); *United States v. Jarvis,* 7 F.3d 404, 410 (4th Cir.1993), *cert. denied,* 114 S.Ct. 1200 (1994). Pursuant to 18 U.S.C. § 3742(e), we grant due deference to the district court's determinations under the Sentencing Guidelines. If the issue involves a factual determination, we apply the clearly erroneous standard of review. See, *Anderson v. Bessemer City,* 470 U.S. 564, 573–76 (1985); *United States v. Daughtrey,* 874 F.2d 213, 217–18 (4th Cir.1989).

*Improper Vouching*

Charles Terry Norman and three of **Vogel's** convicted codefendants testified at **Vogel's** trial pursuant to plea agreements. As a result of Norman's cooperation with the government and a plea agreement pertaining to a prior unrelated offense, Norman was not indicted for the arson of **Vogel's** home. Norman provided the government with details about the arson and testified against **Vogel's** codefendants. Prior to the trial, the prosecutor asked the court if he could discuss Norman's plea agreement and the co-defendant's convictions during the presentation of his case-in-chief. Knowing that **Vogel** would undoubtedly raise those issues on cross, the prosecutor explained that he intended to address them on direct. **Vogel** informed the court that he did not object to that procedure.

On direct, the prosecutor asked Norman, the government's first witness, about the terms of his plea agreement. Norman testified that if he cooperated fully and testified truthfully the government would move the court for a downward departure from his Guidelines sentence for a prior offense and keep him in the Federal Witness Protection Program (FWPP). The plea agreement was admitted without objection. Also during the government's case-in-chief, three co-defendants (Moore, McLamb and Harbour) testified regarding their roles in the arson. They also testified that they had been convicted of the arson.

The appellant has contended that the government improperly vouched for the credibility of its primary witness, Norman, by eliciting details regarding the truthfulness provision of Norman's plea agreement on direct examination. The appellant has also suggested that the district court committed plain error by allowing evidence and permitting argument by the government tending to show that Norman had performed the agreement satisfactorily and had reaped its rewards.[2]

**\*4 Vogel** did not object to the district court's evidentiary rulings regarding the allegedly improper vouching of which he now complains. His failure to object below limits this court to review for plain error. *United States v. Jarvis,* 7 F.3d 404, 410 (4th Cir.1993), *cert. denied,* 114 S.Ct. 1200 (1994); FRCP 52(b). "Plain error is an exception to the general rule that entitlement to appellate review is dependent upon a party's lodging a contemporaneous objection in the tribunal of first instance." *Jarvis,* 7 F.3d at 410. The authority to correct plain errors under rule 52(b) "is to be applied 'sparingly' and saves only 'particularly egregious errors' in those circumstances 'in which a miscarriage of justice would otherwise result.' " *Id.* (citation omitted).

Improper vouching occurs when "the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." *United States v. Lewis,* 10 F.3d 1086, 1089 (4th Cir.1993). A prosecutor may not offer or elicit "explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony." *Id.* A prosecutor's solicitation of assertions of trustworthiness from government witnesses may also be impermissible vouching. *Id.* Vouching is prohibited because it "invite[s] the jury to rely on the government's assessment that the witness is testifying truthfully." *United States v. Roberts,* 618 F.2d 530, 536 (9th Cir.1980). There is no evidence in the record that the prosecutor offered personal assurances on behalf of Norman's truthfulness.

In *United States v. Henderson,* 717 F.2d 135, 138 (4th Cir.1983), *cert. denied,* 465 U.S. 1009 (1984), we concluded that the district court did not abuse its discretion in permitting the government to elicit details of a witness's plea agreement during the course of direct examination.[3] Here, the prosecutor asked permission of the court and of **Vogel's** counsel before proceeding with

CEX 190

such questioning. Strategically, it may be to the government's advantage to elicit details potentially harmful to its witness' credibility on direct before those details are extracted on cross. The government must be careful not to indulge in rehabilitative efforts, however, before its witness is attacked.

It did not constitute error for the government to elicit details regarding the benefits Norman received for cooperating with the government. "[A]bsent an 'overt statement of personal belief and [any] insinuation that the prosecutor knew better than the jury what the truth was' ... there is nothing improper in bringing to the jury's attention the fact that the government has an agreement with one of its witnesses that requires a witness to testify truthfully." *United States v. Machi,* 811 F.2d 991, 1003 (7th Cir.1987). At the time of **Vogel's** trial, for example, Norman was participating in the witness protection program. To remain in that program, Norman understood that he was required to testify truthfully. Placing all of the evidence before the jury allows the jury members an opportunity to weigh the evidence and determine the credibility of the witnesses. *Id.* at 1004.

**\*5** BATF Agent David Lazar testified regarding his investigation of the arson. He spoke with both Norman and **Vogel** during the course of that investigation. His investigation corroborated Norman's testi mony, but, as the government has argued, it did not improperly bolster or vouch for that witness's credibility. Under *Lewis,* the government has the "right to explain its procedures and the relationship between the Government and its witnesses." *Lewis,* 10 F.3d at 1089.

The court did not abuse its discretion in permitting the challenged testimony.

### Co-Defendants' Convictions

The appellant has argued that the court committed plain error by admitting evidence that **Vogel's** co-defendants were convicted of the same charges in an earlier jury trial based on Norman's testimony. He has contended that admission of the evidence violated both Federal Rule of Evidence 608(b) and **Vogel's** Sixth Amendment right to a trial by jury.

Under Federal Rule of Evidence 608(b), "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence." In *United States v. Taylor,*

900 F.2d 779, 781–82 (4th Cir.1990), the government introduced evidence that its star witness had given "reliable" testimony that had led to convictions in other, unrelated cases, and it argued that the jury should believe its star witness because other juries had done so in the past. In *Taylor,* we held that introducing convictions obtained in other cases in which a testifying witness had testified in an effort to bolster or rehabilitate that witness's credibility violates Rule 608(b).

The government did not engage in such conduct in the instant case, however. The prosecutor did not tell the jury that it should convict **Vogel** on the strength of Norman's testimony merely because other juries had convicted Moore, McLamb and Gregory after Norman testified against them. The prosecutor elicited testimony regarding the co-defendants' convictions during their own testimony to soften the impeachment anticipated on cross.

The court gave the jury a limiting instruction, emphasizing that the jury was not to consider the co-defendants' convictions as evidence of **Vogel's** guilt. Because jurors are presumed to follow their instructions, *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), we should assume that they did so absent any evidence to the contrary. **Vogel** has not presented any evidence that would tend to prove that the jury found **Vogel** guilty based on the testimony from other individuals who had been found guilty.

**Vogel** has also asserted that the admission of the co-defendants' convictions violated his Sixth Amendment rights because knowledge of these convictions invited the jury to find him guilty by association. In *United States v. Blevins,* 960 F.2d 1252, 1260–61 n. 3 (4th Cir.1992), we rejected a challenge to the admission of *testifying* codefendants' guilty pleas finding that the appellants had the opportunity to cross-examine them and that

**\*6** the government was justified in eliciting testimony as to their pleas in anticipation of impeachment of the witnesses on that basis. If there was any error, however, it was rendered harmless by the district court's instruction to the jury at the end of the trial that they were not to consider the guilty pleas of the testifying co-defendants as substantive evidence against [the accused].

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

CEX 191

*Id.* Accord, *United States v. Griffin,* 778 F.2d 707, 711 n. 5 (11th Cir.1985) (where a co-defendant takes the witness stand, evidence of a guilty plea may be introduced to help the jury in assessing the credibility of that co-defendant). The fact that these co-defendants did not plead guilty, but rather, were convicted, does not change the *Blevins* analysis. Both pleas and convictions result in convictions. *Griffin,* 778 F.2d at 711 ("[t]here is no appreciable difference between informing a jury that a cohort has pleaded guilty and informing it that a cohort has been adjudicated guilty").[4] Again, the court in the instant case instructed the jury that the convictions were not to be considered as evidence of **Vogel's** guilt, but only as an indication of the codefendants' credibility.[5]

*Testimony on the Bankruptcy Proceedings*

**Vogel** has contended that the court committed plain error by admitting expert testimony on questions of bankruptcy law, the legal significance of court orders, and other events in his pending bankruptcy proceeding. **Vogel** has asserted that the admission of such evidence affected his substantial right to have his guilt determined in a trial in which the judge states the law and the jury determines whether the defendant committed the requisite acts with the requisite states of mind. Because the defense counsel did not object at the trial, we may review only for plain error. *United States v. Gastiaburo,* 16 F.3d 582, 587 (4th Cir.1994), *petition for cert. filed,* April 29, 1994 (No. 93–8903).

The insurance proceeds forwarded to **Vogel** as a result of the fire, which he used to pay off his creditors, inured to his personal benefit, albeit indirectly. **Vogel** had filed for bankruptcy under Chapter 11, and he was under an obligation to comply with his reorganization plan by making payments to creditors. It was the government's theory of the case that **Vogel** had his house burned down in order to acquire the proceeds and pay off his creditors. To establish the validity of the proposed motive, the government had to present evidence to the jury showing why it would benefit **Vogel** to pay off his creditors in compliance with the Chapter 11 reorganization plan. Assuming a group of average citizens who may not have been involved in bankruptcy proceedings prior to their service on the jury, the government had to provide testimony that would elucidate the bankruptcy process, the difference between Chapter 11 and Chapter 7, and the ways in which **Vogel** would benefit by paying his creditors. See, Note, *Expert Legal Testimony,* 97 Harv. L.Rev. 797 (1984) (arguing that expert legal testimony, like other expert testimony, should be admissible when

helpful under Rule 702).

**\*7 Vogel** has argued that a witness may not give an opinion or conclusion on a question of law and that Rule 704(a), which allows opinions on ultimate issues, "was not intended to allow experts to offer opinions embodying legal conclusions." The "expert" testimony on the bankruptcy proceedings offered by the government's witnesses did not constitute opinions as to legal conclusions relevant to **Vogel's** criminal charges.[6] *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 368 (4th Cir.1986) and *United States v. Zipkin,* 729 F.2d 384, 387 (6th Cir.1984) are not to the contrary. *Adalman* proscribed an expert witness's testimony regarding the meaning and applicability of the securities law to the transactions at issue before the court. The testimony at issue in *Adalman* constituted the expert's opinion on the governing law. In *Zipkin,* the Sixth Circuit held improper and prejudicial the testimony provided by a bankruptcy judge as to a question of bankruptcy law in a case concerning the allegedly fraudulent appropriation of funds from a bankrupt estate by the receiver of that estate.

**Vogel** has claimed that the court's admission of "expert" testimony on bankruptcy law during his criminal trial, despite the lack of objection thereto, constituted plain error because it deprived him of the right to have his guilt determined at a trial in which the judge stated the law. In no event would the judge in the instant case have instructed the jury on bankruptcy law. Had the court done so, the jury would have been utterly confused because the charges against **Vogel** were criminal charges of arson. As such, the admission of testimony on bankruptcy law and **Vogel's** bankruptcy proceedings did not constitute legal conclusions designed to usurp the function of the trial court in a manner contemplated in *Adalman.*[7] The bankruptcy issues were not relevant to ultimate conclusions of law, but rather were evidentiary matters relevant to the factual framework underlying the government's theory of the case. Had the jury been unable to understand the bankruptcy procedures and technicalities, the jury would have been unable to understand the tenor of the government's argument. Any testimony that assists the trier of fact is permissible as expert testimony. Federal Rule of Evidence 702.

**Vogel** also has argued that, in a trial for charges arising out of burning a building, it was plain error for the court to admit a government auditor's opinion that the defendant had a motive to cause the fire. **Vogel** has characterized motive as a psychological concept akin to intent and states that the auditor's testimony on that topic constituted an ultimate legal conclusion. The government has argued that the auditor's testimony went to the state of

**Vogel's** finances, not to the state of his mind.

Diana Galloway, an auditor employed by the BATF, had a B.A. in accounting and math, had been an auditor for 27 years, and had performed reviews of financial records in relation to arson investigations for the previous eight years "to determine whether there [was] ... a financial motive to commit the arson and collect the insurance proceeds." She was not formally admitted as an expert, but she testified as an expert in the form of an opinion. She reviewed **Vogel's** finances and concluded that he did have a financial motive to collect the insurance proceeds because, at the time of the fire, he was behind in his payments under the Chapter 11 plan.

**\*8** All of the testimony admitted regarding the bankruptcy proceedings was appropriate. Rule 702 provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine the fact in issue." The Rule" is broadly interpreted, and helpfulness to the trier of fact is its 'touchstone.' " *Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir.1993). As the government has argued, the testimony at issue here was admissible because it was helpful to the jury: "Expert testimony on bankruptcy law was essential for the jury to intelligently evaluate **Vogel's** financial situation and his motive to commit the arson-for-profit charged in the indictment." The district court's admission of all of the foregoing testimony regarding **Vogel's** bankruptcy proceedings was not clearly erroneous and did not constitute plain error.

*Interstate Commerce Issues*
The defendant has argued that, in a trial for charges of burning a building used in interstate commerce in violation of 18 U.S.C. § 844(i), it was error for the court to conclude as a matter of law that the building, a private residence, was used in interstate commerce. Because it raises a legal issue, we review the district court's decision *de novo.*

The federal arson statute applies to the arson of "any building" that is "used in interstate or foreign commerce"; it is not limited to commercial buildings. **Vogel** has suggested that the legislative history reflects no intent whatsoever that § 844(i) wholly subsume state arson law by covering purely private homes. Moore, McLamb and Gregory made such an argument during the course of their appeal, and we rejected it, relying on *United States v. Ramey,* 24 F.3d 602, 606–07 (4th Cir.1994). *United States v. Moore,* 25 F.3d 1042 (4th Cir.1994) (Table) (text in 1994 WL 251174, Ca. No. 93–5273 (4th Cir. June 10,

1994)). In *Ramey,* we held that connection of a house to an interstate power grid constitutes a sufficient use in an activity that affects commerce to satisfy the arson statute. **Vogel** testified at trial that his beach house was connected to interstate gas and telephone lines, had been renovated using materials that had travelled in interstate commerce, was insured by an out-of-state insurance company, and was an asset under the control of the United States Bankruptcy Court.

**Vogel** has recommended that we adopt a bright line rule according to which privately owned homes used solely as private residences, would not fall within the scope of the statute. That is in conflict with *Ramey.*

Even assuming that we will not adopt the proposed bright line rule, appellant has argued that the court erred by deciding the issue as a matter of law and presenting its conclusion to the jury, thereby removing from the prosecution the burden of proving that element of the crimes charged. Although the issue is a jurisdictional one, and therefore presents a question of law for the court, **Vogel** has argued that the underlying facts should have been submitted to the jury. Because the jury was not allowed to consider one of the essential elements charged in Counts Nine and Eleven, **Vogel** has contended that the jury's verdict is incomplete and should be reversed. Actually, the court based its conclusion that the jurisdictional prerequisite had been met on the "stipulated facts" of the case. Because of the stipulation, there were no evidentiary factual determinations to be made by the jury regarding the jurisdictional question. The court did not commit plain error by concluding that the beach house constituted a building in interstate commerce for the purposes of the federal arson statute.

*The Verdict Form*
**\*9** The appellant has argued that the verdict form constituted plain error. The verdict form submitted to the jury read as follows:

WE, THE JURY, FIND AS FOLLOWS:

We, the jury, find unanimously, and beyond a reasonable doubt, that defendant **Daniel** A. **Vogel** is

NOT GUILTY

GUILTY

of the charges alleged against him in Count I of the

Indictment.

Not guilty/Guilty blanks for each of the eleven other counts followed and the form included a signature line for the foreperson. **Vogel** has argued that the form required the jury to find him *not guilty beyond a reasonable doubt* in order to find him not guilty. Appellant has urged that the way the form was worded deprived him of the benefit of the proposition that a reasonable doubt as to a defendant's guilt can arise from an insufficiency of the evidence.

The defendant did not object to the wording of the verdict form, but the record indicates that the form went directly from the judge to the jury without being submitted to counsel for examination. **Vogel** has maintained that an instructional error that misdescribes the burden of proof "vitiates all the jury's findings." Appellant has suggested that the guilty verdicts contained on that form should be reversed because they constitute a deprivation of the defendant's due process right. **Vogel's** legal argument regarding the vitiation of the jury's findings need not be addressed because the underlying interpretation of the verdict form on which that argument is based is not persuasive.

**Vogel's** point that the jury instructions were both incorrect and carelessly worded is well-taken. The instructions at issue should not have been used. Whether such an error amounts to a miscarriage of justice is, however, another matter. **Vogel's** argument is, essentially, a semantic one. On the verdict form, the jury found **Vogel** guilty of the counts charged "beyond a reasonable doubt." **Vogel** has argued that the jury *may* have found **Vogel** guilty only because it could *not* find him "not guilty beyond a reasonable doubt." Such an interpretation of the jury's decision does not follow logically from **Vogel's** semantic construction of the verdict form. According to **Vogel's** interpretation of the verdict form, the jury had to find that **Vogel** was either (1) GUILTY beyond a reasonable doubt, or (2) NOT GUILTY beyond a reasonable doubt. In other words, it is conceivable, based on the wording of the verdict form, that the jury could have been incapable of making either finding. Therefore, the jury's inability to find **Vogel** NOT GUILTY beyond a reasonable doubt does not have as its corollary an inevitable finding of guilt. Rather, the way the verdict form is worded, *any* finding made by the jury was required to be beyond a reasonable doubt. In the case of Counts 1–6 and 9–12, the jury found **Vogel** guilty beyond a reasonable doubt as it indicated on the verdict form. The semantic argument put forth by **Vogel**, therefore, is internally inconsistent and, in the end, unpersuasive. The jury clearly found **Vogel** guilty beyond a reasonable doubt under any construction of the verdict form.

*Merging of Counts*
**\*10 Vogel** has argued that his convictions for arson in violation of 18 U.S.C. § 844(i), Counts 9 and 11, merged with his convictions for using fire to commit a felony in violation of 18 U.S.C. § 844(h), Counts 10 and 12. By calculating the guidelines and entering its judgment on Counts 10 and 12, **Vogel** alleges that the court subjected him to being twice punished for the same conduct in violation of the Double Jeopardy clause of the Fifth Amendment. **Vogel** did not challenge the Counts by motions to dismiss, so review is limited to review for plain error. *United States v. Jarvis,* 7 F.3d 404 (4th Cir.1993), *cert. denied,* 114 S.Ct. 1200 (1994).

The indictment did not identify the federal felony underlying Counts 10 and 12. The jury instructions, however, specifically identified mail fraud as the predicate felony **Vogel** was alleged to have committed using fire. The jury's verdict simply said that **Vogel** was guilty of the charges alleged in Counts 10 and 12. Despite the explicit jury instructions, **Vogel** has contended that the guilty verdicts on Counts 10 and 12 *may,* in fact, have been based on the same elements as the guilty verdicts on the parallel Counts 9 and 11 because the indictment's allegation of the Count 10 and 12 offenses did not identify the federal felony in the course of which fire was used. In other words, the jury *may* have concluded that, on two occasions, he used fire to damage a building used in interstate commerce. Such a verdict would violate the double jeopardy clause because that clause prohibits multiple punishments for the same offense.

**Vogel's** highly speculative argument must fail for two reasons. First, a jury is presumed to follow its instructions, and the court clearly instructed the jury that the predicate felony for Counts 10 and 12 was mail fraud. *Richardson v. Marsh,* 481 U.S. 200, 211 (1987). The silence of the indictment does not negate the effect of the instructions. **Vogel** has presented no evidence to suggest that the jury failed to follow its instructions in this case. Second, Congress may prescribe multiple punishments for the same conduct. Under *Blockburger v. United States,* 284 U.S. 299, 304 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  7

test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

As Vogel has conceded, the offenses described by § 844(i) and § 844(h)(1) do not share identical elements and are not the same offense under the *Blockburger* test. "In general, double jeopardy bars a succeeding prosecution if the proof actually used to establish the first offense would suffice to convict the defendant of the second offense." *Jarvis,* 7 F.3d at 410.

The government would appear to agree that, if arson were used as the underlying offense for counts 10 and 12, the convictions on Counts 9 and 11 as well as 10 and 12 would constitute double punishment for the same conduct: committing arson and using fire to commit arson. The government has steadfastly maintained, however, and the jury instructions indicate, that mail fraud constituted the underlying offense for Counts 10 and 12, and Vogel has not presented any evidence that would persuade us to the contrary. The convictions on Counts 9 and 11, 10 and 12 are, therefore, affirmed, as are the sentences that were calculated on the basis of those convictions.

*Sentencing Guideline Errors*
**\*11** Vogel has raised three specific errors which he believes the district court committed in the sentencing process. These errors involve the following subjects: the district court's decision not to group the arson counts, the knowing creation of a substantial risk of death or bodily injury, and Vogel's aggravating role in the offense. The district court did not err in applying the Sentencing Guidelines, and we affirm Vogel's sentence.

*Grouping*
The Guidelines provide that, when a defendant is convicted of multiple counts, all "counts involving substantially the same harm shall be grouped together into a single Group" for sentencing purposes. U.S.S.G. § 3D1.2. Under the same-harm rule, "counts involve substantially the same harm" when they "involve the

same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b). Vogel has argued that the district court erred by failing to group the counts of arson, and, consequently, the court should not have given him a two level increase. Gregory, one of the defendants convicted for his participation in the arson at issue in this case, made a similar argument on his appeal.

As did Gregory, Vogel has argued that there was only one victim of his crime—Aetna Casualty and Surety Co. As did Gregory, Vogel has also argued that the unsuccessful and successful arson attempts constituted one common scheme or plan: to defraud Aetna by destroying the residence and collecting the proceeds. In *Moore,* an unpublished opinion, we held that the district court's decision not to group Stephen Gregory's counts of arson was not clearly erroneous since two separate risks of harm were involved. Vogel, like Gregory, was involved in criminal activity constituting multiple, separate risks of harm, not one of composite harm.

As the government has noted in the instant case, two discrete, unsuccessful arson attempts were followed by a successful arson. The second attempt involved a difference in time and different actors than the first. The district court found that there were three break-ins and two attempted arsons and that the arson itself constituted multiple risks of harm rather than one composite harm. The first involved 10 to 20 gallons of gasoline and C4 explosives; the second involved 10 gallons of gasoline and flares; and the third, successful arson was accomplished by undetermined means. As in *Moore,* we find that the district court's determination that the offenses should not be grouped was not clearly erroneous.

*Serious Risk of Death or Injury*
The court sentenced the defendant under the arson guideline § 2K1.4(b)(1). Section 2K1.4(b)(1) reads as follows:

(b) Specific Offense Characteristics
  If more than one applies, use the greatest: (1) if the defendant knowingly created a substantial risk of death or serious bodily injury, increase by 18 levels.[8] Vogel has claimed that it was error for the court to

increase his offense level by 18 levels based on the conclusion that he "knowingly created a risk of serious injury" when there was no evidence that he had knowledge of the risk, and the court failed to make any findings as to his knowledge of the risk. **Vogel** has argued that § 2K1.4(b)(3) should apply: "If the offense involved destruction or attempted destruction of a residence increase by 12 levels." We will not disturb the district court's factual finding that **Vogel** knowingly created a substantial risk to others unless that court's finding is clearly erroneous. *United States v. Markum, 4 F.3d 891, 896–97 (10th Cir.1993)* (affirming 18–level enhancement under § 2K1.4(b)(1) where a fire was set with gasoline during business hours and the ferocity of fire and risk of explosion put firefighters in severe jeopardy).

**\*12** **Vogel** has suggested that § 2K1.4(b)(1) may be applied only when the court reaches the following two conclusions: 1) that a substantial risk of death and serious bodily injury was created; and 2) that the risk was *knowingly* created by the defendant. **Vogel** has argued that the evidence and findings were insufficient to establish the second factor: that he knowingly created the risk. Norman testified that he and Moore told **Vogel** at the beach house that they planned to use C4 explosives to detonate gasoline. Although he was made aware that C4 explosives would be used to accomplish the destruction of the house, **Vogel** has asserted that no evidence tends to show that he knew that C4 explosives would create a substantial risk of death and serious bodily injury. At the worst, **Vogel** claims he should receive a 14 level increase under the reckless endangerment provision,§ 2K1.4(b)(2).[9]

The government has argued that "the facts of this case as far as risk or danger speak[ ] for [themselves,]" and there is no need to reiterate all of the evidence in the record that supports that assertion. **Vogel** engineered an arson in a residential area accomplished with C4 explosives and gasoline. As we noted in *Moore,* **Vogel's** neighbors and the firefighters who responded to the fire were all placed at substantial personal risk as a result of the rapid burning of the gasoline soaked home. The district court's finding that **Vogel** knowingly created a substantial risk of death or serious bodily injury by having his house burned down using C4 explosives and gasoline was not clearly erroneous. That conclusion mirrors the determination to the same effect in *Moore.*

**Aggravating Role**
The court increased **Vogel's** offense level by four levels

(from 24 to 28) pursuant to § 3B1.1(a) for the aggravating role he played in the offense. Section 3B1.1(a) reads as follows: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by four levels." To determine whether this section applies to a particular defendant a court should consider the following relevant factors set forth in Application Note 4: the exercise of decision-making authority; the nature of participation in the commission of the offense; the recruitment of accomplices; the claimed right to a larger share of the fruits of the crime; the degree of participation in planning or organizing the offense; the nature and scope of the illegal activity; and the degree of control or authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. § 3B1.1, Comment., Applic. Note 4.

**Vogel** has suggested that the arson and the conspiracy to commit that crime were not extensive within the meaning of the guideline. He has also argued that, at the most, he knew of and/or procured the participation of only Moore and Norman and that he did not plan, organize, or recruit others in furtherance of the scheme to burn his house.

**\*13** Five or more people were, however, involved in the criminal scheme (including **Vogel**, Moore, McLamb, Norman, Harbour, and Gregory), and **Vogel** concedes that much. **Vogel** organized the plan to burn down his beach front home regardless of the fact that he did not personally solicit the services of each of those participants. The evidence adduced at trial showed that **Vogel**: conceived of and controlled the plan to burn his house down; hired Moore and Norman to carry it out; helped them prepare by meeting with them in South Carolina to show them the house; dictated the timing of the offense; was entitled to 90% of the profit; and defrauded his insurance company out of over one and a half million dollars. **Vogel** obtained the services of Moore and Norman by offering to pay them. Because the insurance policy was in **Vogel's** name, he had control over the payment for services rendered.

The court did not err in concluding that **Vogel** was a leader or organizer of the criminal activity under § 3B1.1(a), and, therefore, we affirm.

**Restitution**
Finally, **Vogel** has asserted that it was error for the court to order restitution without explicitly considering his

CEX 196

ability to pay in violation of the mandatory methodology set forth in *United States v. Bruchey,* 810 F.2d 456, 459 (4th Cir.1987) and reiterated and applied in *United States v. Plumley,* 993 F.2d 1140, 1142–43 (4th Cir.), *cert. denied,* 510 U.S. 903, 114 S.Ct. 279 (1993). **Vogel** has argued that the court made no realistic findings regarding **Vogel's** ability to pay and no effort to key his ability to pay to the restitution ordered. **Vogel** did not object to the restitution order in the proceedings below, and thus, we review the decision for plain error. Despite his failure to object, appellant argues that the case should be remanded for resentencing.

"In order to assure effective appellate review of restitution orders, this circuit requires sentencing courts to make specific, explicit findings of fact on each of the factors set forth in§ 3664(a)" of the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3663–64 (West 1985 & Supp.1993). *United States v. Molen,* 9 F.3d 1084, 1086 (4th Cir.1993) (citing *Bruchey* and *Plumley* ). "Further, these findings of fact must key a defendant's financial resources, financial needs, and earning ability to the type and amount of restitution." *Molen,* 9 F.3d at 1086 (citing *Bruchey* ). To justify restitution, the court must conclude that the defendant can feasibly comply with the order without undue hardship to himself or to his dependents. *Id.*

*Molen* is particularly important to the disposition of the instant case because in that case we wrote that the district court could meet the foregoing requirements by "adopting a presentence report that recites adequate recommended findings." *Id.* As we noted in *Molen,* such an approach allows the court to determine the resolution and treatment of the factors by the district court and to conduct an effective review of the restitution order.[10] *Id.* at 1086–87.

**\*14** As *Molen* makes clear, then, it is not inappropriate or, inadequate *per se,* to adopt the findings contained in the presentence report. In the instant case, the presentence report carefully detailed **Vogel's** financial condition and ability to pay in paragraphs 115 through 124. That report indicated assets of $13,159,300 (including two apartment complexes, a life insurance policy, two cars, mortgages held as mortgagee, and personal property) and liabilities of $8,140,158 (including those assets and liabilities

shared by his wife), leaving **Vogel** with a Net Worth of $5,019,142. His total monthly income was reported as $8,000 and his total necessary monthly expenses as $6,082 including minimum installment payments due to protection under Chapter 11 (**Vogel** filed for Chapter 11 protection in Miami, Florida on August 5, 1992). The report also indicated with respect to his family's needs and potential hardship, that **Vogel's** parents are deceased and his children are adults.

At the beginning of the hearing, the court asked **Vogel** which paragraphs of the sentencing report he objected to, and **Vogel** responded "15, 16, 17, 19, 31, 36, 102, 70 and 76." None of those paragraphs fell under the "Financial Condition: Ability to Pay" section of the report. The court said, "But the remainder of the paragraphs in the pre-sentence report you have no objection to and I'm going to adopt those for purposes of sentencing; is that all right?" Counsel responded, "That's correct, Your Honor." The court did not make additional findings regarding **Vogel's** ability to pay. The court ordered **Vogel** to pay the total amount of restitution over a period of three years while he was on supervised release after he was released from prison. **Vogel** was 58 years old at the time of trial and was sentenced to ten years in prison. **Vogel** did not object to the court's findings or to the imposition of restitution, which, given his assets and net worth, would seem to be feasible.

*CONCLUSION*

For the foregoing reasons, we affirm the district court's conviction of **Vogel** and reject each of **Vogel's** claims of error.

*AFFIRMED.*

**All Citations**

37 F.3d 1497 (Table), 1994 WL 556994

---

**Footnotes**

[1]  **Vogel's** co-defendants—Larry Moore, Stephen Gregory, Philip McLamb, and Alison Harbour—were tried separately and were convicted. Moore, McLamb, and Gregory appealed their convictions and, in a decision issued June 10, 1994, we affirmed the convictions of all three defendants. *United States v. Moore,* 25 F.3d 1042 (4th Cir.1994) (Table) (text in 1994 WL 251174, Ca. No. 93–5273, slip op. at p. 8 (4th Cir. June 10, 1994)). The issues raised by **Vogel**

which were also raised and disposed of during his co-defendants' appeal are noted accordingly.

[2] Vogel has claimed that the government vouched for Norman in the following ways: 1) introducing evidence that Norman was testifying pursuant to a plea agreement and that he had been placed in a witness protection program under the terms of that agreement; 2) arguing that the agreement gave Norman an incentive to tell the truth; 3) demonstrating that his pre-trial statements to the Bureau of Alcohol, Tobacco, and Firearms (BATF) were confirmed by independent investigation; and 4) eliciting from co-defendants the fact that they were convicted in a prior trial at which Norman testified for the government.

[3] In that case, there was no evidence that the government derived any improper advantage from the witness's testimony concerning his promise to be truthful. The prosecutor's questions did not imply that he had special knowledge of the witness's veracity, and the promise was not disproportionately emphasized or repeated. *Id.*

[4] In *Griffin,* the court held that informing the jury that an *absent* codefendant had been adjudicated guilty constituted an abuse of discretion. *Id.* at 711. Likewise, informing a jury of an absent co-defendant's guilty plea would be inappropriate.

[5] "Ladies and Gentlemen of the jury, as you just heard, and you will hear evidence that some witnesses have been convicted of the crimes which arose out of the same events for which the defendant is on trial here. You must not consider those convictions as any evidence as to this defendant's guilt. You may consider those witnesses' convictions only for the purposes of determining how much, if at all, to rely on their testimony and for the purpose of showing their acknowledgement of the participation of the offenses for which they were convicted."

[6] The government has suggested, in any event, that Philip Wall, a court-appointed examiner in Vogel's bankruptcy case, and William Yaeger and Robert Price, two bankruptcy attorneys who served as counsel to some of Vogel's creditors, did not testify as experts. They merely recounted certain factual events that occurred during Vogel's bankruptcy proceedings.

George Cauthen, an expert in the field of bankruptcy law, did testify as an expert after reviewing Vogel's bankruptcy file. He testified that the Chapter 11 reorganization plan required a balloon payment to one of the creditors and that, in his opinion, Vogel did not have the resources to make that payment. If he was unable to make the payment, his Chapter 11 proceeding would have failed and would have been converted into an involuntary Chapter 7 proceeding in which all of Vogel's assets would have been immediately liquidated to pay off the creditors.

[7] In that case, a suit alleging violations of the securities laws and breach of contract, while it may have been permissible for a legal expert to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the Securities and Exchange Commission, the expert was *not* permitted to give an opinion as to the legal standards he believed to govern the parties' conduct or his expert opinion on the governing law. *Adalman,* 807 F.2d at 367–68.

U.S. v. Vogel, 37 F.3d 1497 (1994)

[8]   The next two paragraphs of § 2K1.4(b) read as follows:

(2) If the defendant recklessly endangered the safety of another, increase by 14 levels.

(3) If the offense involved destruction or attempted destruction of a residence, increase by 12 levels.

Section 2K1.4(b)(1) was deleted and replaced as of November 1, 1990. See Appendix C, Note 330. The analogous provision, § 2K1.4(a)(1), now reads:

(a) Base Offense Level (Apply the Greatest):

(1) 24, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling.

[9]   In *Moore,* defendant Gregory, ==Vogel's== co-conspirator, argued that he did not knowingly create a substantial risk of death or serious bodily harm. In that case, we emphasized that "[i]t is the creation of risk, not the actual consequences of the defendant's action, that triggers the enhancement under § 2K1.4(b)(1)." *United States v. Moore,* Ca. No. 93–5273, slip op. (4th Cir. June 10, 1994).

[10]  In *Molen,* the district court adopted the findings in the presentence report, but we found those findings incomplete and inadequate to satisfy the clear mandate of *Bruchey* that explicit factual findings be made. In *Molen,* the presentence report did not contain findings as to the individuals' or families' financial needs and potential hardship, nor did it offer findings that would key the amount of restitution to the Molens' ability to pay. In addition, one of the defendant's future earning capacity was not discussed.

We vacated the restitution order and remanded to the district court for explicit findings.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

CEX 199